

SEALED

1  Wilmer J. Harris (150407)
   wharris@sdshhlaw.com
2  Isabel M. Daniels (270887)
   idaniels@sdshhlaw.com
3  SCHONBRUN DESIMONE SEPLOW
4  HARRIS & HOFFMAN LLP
   715 Fremont Avenue, Suite A
5  South Pasadena, CA 91030
6  Telephone: 626/441-4129
   Fax:  626/283-5770
7

**FILED**

MAR 1 9 2015

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY
DEPUTY CLERK

8  Attorney for Plaintiffs
9  UNITED STATES OF AMERICA *ex rel.*
   Nicolle O'Neill, and Relator Nicolle O'Neill
10

11          UNITED STATES DISTRICT COURT

12          EASTERN DISTRICT OF CALIFORNIA

13  UNITED STATES and the STATE OF )     Case No.    1: 1 5 **CV** - 0 0 4 3 3 ˉ ‐ GS∧
14  CALIFORNIA *ex rel.* NICOLE      )
    O'NEILL. NICOLE O'NEILL          )    **[FILED UNDER SEAL]**
15                                   )
16               Plaintiffs/Relator  )        1. VIOLATION OF FEDERAL
                                     )           FALSE CLAIMS ACT 31 U.S.C.
17          vs.                      )           § 3729 (a) (1);
                                     )
18  SOMNIA, INC., PRIMARY            )
19  ANESTHESIA SERVICES,             )        2. VIOLATION OF FEDERAL
    MCKESSON CORPORATION,            )           FALSE CLAIMS ACT 31 U.S.C.
20  ROBERT GOLDSTEIN, M.D., ROY      )           § 3729 (a) (2);
    WINSTON, M.D., BYRON             )
21  MENDENHALL, M.D., QUINN GEE,     )        3. VIOLATION OF CALIFORNIA
22  M.D., AND MARGARET VASSILEV,     )           FALSE CLAIMS ACT CAL.
    M.D, and DOES 1 through 10, inclusive )      GOVT. CODE §§ 12651 *et seq.*;
23                                   )
24               Defendants.         )        4. RETALIATION FALSE CLAIMS
25  ─────────────────────────────── )           ACT;
                                     )
26                                            5. RETALIATION CAL. FALSE
27                                               CLAIMS ACT;
28
                                              6. VIOLATION OF HEALTH AND
                                                 SAFETY CODE SECTION

─────────────────────────────────────────────
                    COMPLAINT

1278.5;

7. WHISTLEBLOWER
RETALITION - LABOR CODE §
1102.5 *et seq.*;

8. WRONGFUL TERMINATION IN
VIOLATION OF PUBLIC
POLICY;

9. INTENTIONAL INFLICTION OF
EMOTIONAL DISTRESSW

10. NEGLIGENT INFLICTION OF
EMOTIONAL DISTRESS

**DEMAND FOR JURY TRIAL**

COMPLAINT

1    Plaintiff/Relator Nicole O'Neill ("Ms. O'Neill," "Plaintiff," or "Relator") for

2  her complaint against Defendants Primary Anesthesia Services ("PAS"), Somnia, Inc.

3  ("Somnia"), McKesson Corporation ("McKesson"), Robert Goldstein, M.D., Roy

4  Winston, M.D.,  Byron Mendenhall, M.D., Quinn Gee, M.D., and Margaret Vassilev,

5  M.D., allege as follows:

6                              **JURISDICTION AND VENUE**

7    1.    This Court has subject matter jurisdiction of this action pursuant to 28

8  U.S.C. §1331 and 31 U.S.C. §3732 under the Federal False Claims Act.

9    2.    This Court has personal jurisdiction over each defendant because each

10  transacts business in the state of California.

11    3.    Venue of this action is proper in this this judicial district by virtue of 28

12  U.S.C. Section 1391 because, among other things, the acts complained of occurred in

13  this judicial district and because each defendant transacts business in California.

14    4.    Pursuant to 28 U.S.C. 1367, this Court has supplemental jurisdiction

15  over the subject matter of the claim brought pursuant to the California False Claims

16  Act on the ground that the claim is so related to the claims within this Court's original

17  jurisdiction that they form the same case or controversy under Article III of the

18  United States Constitution.

19                                      **PARTIES**

20    5.    Plaintiff/Relator Nicolle O'Neill is a citizen of the United States of

21  America and of the State of California who resides in Tulare County, State of

22  California.  Plaintiff O'Neill is a Certified Registered Nurse Anesthetist (hereinafter

23  "CRNA"), duly licensed by California state Board of Registered Nursing to provide

24  CRNA medical services to patients.

25    6.    Sarasate Nursing Anesthesia, P.C. ("Sarasate") is a closely-held

26  California Corporation authorized to do business in the State of California.  Plaintiff

27  O'Neill is the President, Director, and principal shareholder in Sarasate.  Sarasate was

28  formed by Plaintiff O'Neill and the contracting party with PAS/Somnia.

1     7.    Relator is informed and believes and on that basis alleges that Defendant

2  PAS is a corporation incorporated in the State of California and which does business

3  in the Eastern District of California.  In doing the acts herein alleged, its employees,

4  subcontractors, and agents of PAS acted within the course and scope of their

5  employment and agency with PAS.  Defendant PAS is a "person" within the meaning

6  of 31 U.S.C. §3729(a) and the legal authority interpreting that provision.

7     8.    Relator is informed and believes and on that basis alleges that Defendant

8  Somnia, Inc. is a corporation incorporated in the State of New York and which does

9  business in the Eastern District of California through its control of PAS.  In doing the

10  acts herein alleged, its employees, subcontractors, and agents of Somnia acted within

11  the course and scope of their employment and agency with Somnia.  Defendant

12  Somnia is a "person" within the meaning of 31 U.S.C. §3729(a) and the legal

13  authority interpreting that provision.

14     9.    Relator is informed and believes and on that basis alleges that

15  Defendants PAS and Somnia, although separately incorporated, have an interrelation

16  of operations, common management, centralized control of labor relations, uniform

17  management and employment practices and policies, and common ownership and

18  financial control, creating an integrated enterprise.  Plaintiffs further allege that all

19  Defendants may be comprised of multiple organizational entities, however there is

20  but one enterprise and this enterprise has acted in concert to commit the wrongs

21  herein alleged.

22     10.    Relator is informed and believes and on that basis alleges that McKesson

23  is a Fortune 500 company that serves the health care industry, including with respect

24  to medical billing as alleged in this complaint.  Defendant McKesson is a "person"

25  within the meaning of 31 U.S.C. §3729(a) and the legal authority interpreting that

26  provision.

27     11.    Plaintiff/Relator O'Neill is informed and believes, and thereon alleges

28  that Defendant Robert Goldstein, M.D., is a natural person residing in the State of

1  New York.  Plaintiff/Relator O'Neill is informed and believes, and thereon alleges
2  that Defendant Goldstein was at all relevant times the Vice President and Chief
3  Medical Officer of PAS/Somnia.  Defendant Goldstein is a "person" within the
4  meaning of 31 U.S.C. §3729(a) and the legal authority interpreting that provision.

5         12.     Plaintiff/Relator O'Neill is informed and believes, and thereon alleges
6  that Defendants Roy Winston, M.D., Byron Mendenhall, M.D., Quinn Gee, M.D. and
7  Margaret Vassilev, MD.  Are natural persons residing in the State of California and
8  who work in Visalia, California.  These defendants are "persons" within the meaning
9  of 31 U.S.C. §3729(a) and the legal authority interpreting that provision.

10        13.     In doing the acts herein alleged, each defendant, its employees,
11  subcontractors, and agents was acting within the course and scope of their
12  employment and agency with each other defendant.

13        14.     The Somnia website states that it "manages anesthesia services for
14  hospitals, ambulatory surgery centers and office based surgical practices in 14 states,
15  and has 325 anesthesiologists and certified registered nurse anesthetists in its clinical
16  network."  The operations in California include, but may not be limited to the
17  following: Desert Regional Medical Center in Palm Springs, California, Kaweah
18  Delta Medical Center operated by the Kaweah Delta Healthcare District (hereinafter
19  "Kaweah") in Visalia, California, St. Joseph's Medical Center in Stockton,
20  California, Kern Medical Center in Bakersfield, California and San Joaquin General
21  Hospital in French Camp, California.  Outside of California, Defendant Somnia
22  provides anesthesia services in other states, including but not limited to the following:
23  Providence Regional Medical Center in Everett, Washington, Memorial Medical
24  Center in Las Cruces, New Mexico, San Juan Regional Medical Center in
25  Farmington, New Mexico, Memorial Healthcare in Owosso, Michigan, St. Barnabas
26  Hospital in the Bronx, New York, Lehigh Valley Hospital in Hazleton, Pennsylvania,
27  Kentucky Surgery Center in Lexington, Kentucky, Fayette Regional Health System in
28  Connersville, Indiana, Mercy Hospital in Grayling, Michigan, and University

1  Medical Center of El Paso, Texas.  Plaintiff is informed and believes, and thereon

2  alleges, that Somnia's fraudulent billing procedures extended beyond Kaweah

3    15.    On or about March 22, 2012, Plaintiff O'Neill, by and through Sarasate,

4  entered into a contract with PAS/Somnia to provide anesthesia services to patients of

5  Kaweah as Chief CRNA.  Ms. O'Neill was forced to enter into a putative independent

6  contractor relationship with PAS/Somnia.  However, in the alternative, Ms. O'Neill

7  was clearly subject to substantial control by PAS/Somnia in the execution of her

8  duties as Chief CRNA and later as Staff CRNA.  Because of the control PAS/Somnia

9  retained over the particulars of Ms. O'Neill's work, Ms. O'Neill was actually an

10  employee of defendants PAS/Somnia.

11    16.    Relator is informed and believes and on that basis alleges that the true

12  names and capacities, whether corporate, associate, individual or otherwise of

13  defendants, DOES 1 through 10, inclusive, are unknown to Plaintiff, who therefore

14  sues said Defendants by such fictitious names.  Plaintiffs are informed and believe

15  and thereon allege that DOES 1 through 5 are individuals who submitted, or caused

16  to be submitted, false statements or records resulting in payment from either the state

17  or federal government.  Plaintiffs are informed and believe and thereon allege that

18  DOES 6 through 10 are entities responsible for the wrongful conduct herein alleged.

19  Each of the defendants designated herein as DOE is negligently or otherwise legally

20  responsible in some manner for the events and happenings herein referred, including

21  violations of the False Claims Act, 31 U.S.C. §3729, *et seq.,* and California False

22  Claims Act, Cal. Govt. Code §§12650, *et seq.,* and caused injuries and damages

23  proximately thereby to Plaintiff, to the United States Government and to the State of

24  California, as herein alleged.

25    17.    Ms. O'Neill is an "original source," as defined by law, of the

26  information set forth herein.

27    18.    Ms. O'Neill is informed and believes and on that basis alleges that the

28  allegations in this complaint have not been publicly disclosed.

19.     Relator has complied with the California and Federal False Claims Act by providing the information upon which the allegations of this complaint are based on both to the Attorney General of the United States of America and of the State of California, and the United States Attorney for the Eastern District of California. Relator's disclosure statement is supported by material evidence known to relator at his filings establishing the existence of Defendants' false claims. Because the statement includes attorney-client communications and work product of relator's attorneys, and is submitted to the Attorneys General and to the United States Attorney for the Eastern District of California in their capacity as potential co-counsel in the litigation, the relator understands the disclosure statement to be privileged and confidential.

20.     Relator is informed and believes and on that basis alleges that all of the acts complained of herein either (i) occurred within the last six years or (ii) within the last ten years and that the United States government neither knew nor should have known of the violation of the False Claims Act within the last three years.

21.     The United States is herein named a Plaintiff pursuant to the False Claims Act, 31 U.S.C. §3729, *et seq.*, as funds of the United States have been directly or indirectly disbursed and awarded to Defendants, as a result of the knowingly false statements, false claims and/or false records alleged in this Complaint made by or caused to be made by Defendants.

22.     The state of California is herein named a Plaintiff pursuant to the California False Claims Act, Cal. Govt. Code §§12650, *et seq.*, as funds of the state of California have been directly or indirectly disbursed and awarded to Defendants, as a result of the knowingly false statements and false claims alleged in this Complaint made by or caused to be made by Defendants. Relator is informed and believes and on that basis alleges that California funds were misappropriated as a result of defendants' illegal scheme. First, relator is informed and believes that California contributes state money to the Medicaid program, funds which were

1  wrongfully tapped to pay defendants' false claims.  Moreover, relator is informed and
2  believes that defendants' false claims caused money to be paid to defendants out of
3  California's Medi-Cal program.

4  ## INTRODUCTION

5      23.     This is an action to recover damages and civil penalties on behalf of the
6  United States and the state of California, brought by Plaintiff as *qui tam* relator
7  pursuant to the False Claims Act, 31 U.S.C. §§3729 *et seq*. (the "FCA" or the "Act")
8  and the California False Claims Act, Cal. Govt. Code §§ 12650 *et seq*.

9  ## APPLICABLE REGULATIONS

10     24.     42 CFR 415.110 sets out the conditions for payment of anesthesia
11  services claims:

12  **§415.10 Conditions for payment for Medically Directed anesthesia**
13  **services:**

14  (a) General payment rule. Medicare pays for the physician's medical direction
15  of anesthesia services for one service or two through four concurrent anesthesia
16  services furnished after December 31, 1998, only if each of the services meets
17  the condition in § 415.102(a) and the following additional conditions:

18      (1) For each patient, the physician—

19          (i) Performs a pre-anesthetic examination and evaluation;

20          (ii) Prescribes the anesthesia plan;

21          (iii) Personally participates in the most demanding aspects of the

22          anesthesia plan including, if applicable, induction and emergence;

23          (iv) Ensures that any procedures in the anesthesia plan that he or

24          she does not perform are performed by a qualified individual as

25          defined in operating instructions;

26          (v) Monitors the course of anesthesia administration at frequent

27          intervals;

28          (vi) Remains physically present and available for immediate

1    diagnosis and treatment of emergencies; and

2    (vii) Provides indicated post-anesthesia care.

3    (2) The physician directs no more than four anesthesia services

4    concurrently and does not perform any other services while he or she is

5    directing the single or concurrent services so that one or more of the

6    conditions in paragraph (a)(1) of this section are not violated.

7    (3) If the physician personally performs the anesthesia service, the

8    payment rules in § 414.46(c) of this chapter apply (Physician personally

9    performs the anesthesia procedure).

10    (b) Medical documentation. The physician alone inclusively documents in the

11    patient's medical record that the conditions set forth in paragraph (a)(1) of this

12    section have been satisfied, specifically documenting that he or she performed

13    the pre-anesthetic exam and evaluation, provided the indicated post-anesthesia

14    care, and was present during the most demanding procedures, including

15    induction and emergence where applicable.

16    25.    A Medicare claim processed by defendants as *medically directed* would

17    pay PAS/Somnia 50% of the allowable charges per case (up to four) under the

18    anesthesiologist's ("MDA") name, and 50% under the name of the CRNA. In other

19    words, a *medically directed* claim would allow PAS/Somnia to receive payment for

20    all base units under that procedure.

21    26.    If there are more than 4 concurrent cases, or if all of the seven TEFRA

22    requirements for *medical direction* are not followed and documented, then, as long as

23    the MDA had any involvement in the case, the claim is required to be processed as

24    *medical supervision. Medical supervision* allows reimbursement for the MDA service

25    at only 3 units (plus one unit if the MDA was present for induction). It also allows

26    50% reimbursement for the CRNA. This results in a reimbursement significantly less

27    than for a *medically directed* claim. In addition, if defendants billed for *medical*

28    *supervision*, not only would the reimbursement per case be significantly less than for

1 || other types of service, but because District's bylaws required a 4:1 ratio, even a
2 || *medically supervised* case would have to comply with that ratio. That is, even under
3 || *medical supervision*, PAS/Somnia could not bill for more than four concurrent cases
4 || for any one MDA.

5 |||   27.   The modifiers that indicate the types of services are as follows:

6 |||        Personally Performed:   MDA only   = AA

7 |||        Medically Directed:     MDA        = QK

8 |||                                MDA        = QY

9 |||             (MDA *medically directing* only one CRNA)

10 |||                               CRNA       = QX

11 |||       Medically Supervised:   MDA        = AD

12 |||                               CRNA       = QX

13 |||       CRNA Independent        CRNA only = QZ

14 |||   28.   Due to the bylaws of District prohibiting unsupervised CRNA service,
15 || billing a QZ modifier was not allowed at Kaweah Hospital. Yet, PAS/Somnia and
16 || later McKesson expressly violated applicable regulations by routinely billing under
17 || the QZ modifier when the conditions for payment as *medical direction* were not met.
18 || The "AD" modifier was never used because the reimbursement was less than for
19 || either "QK" or "QZ." This was the case even where it would have accurately
20 || reflected the service.

21 |||   29.   Though California is an "opt-out" state allowing CRNAs to work
22 || independently, the bylaws of District emphatically prohibited that and mandated that
23 || CRNAs be supervised. In keeping with the Kaweah Hospital bylaws, Section 2.1 (g)
24 || of their contract with PAS/Somnia mandated that, *under no circumstances shall the*
25 || *ratio of supervised CRNAs to Physicians providing Services under this Agreement*
26 || *exceed 4:1.*

27 |||   30.   Medicare requires careful documentation of anesthesia service including
28 || documenting all providers involved in the service. Therefore it is improper to drop

1    the MDA from the claim in favor of a QZ modifier because the conditions for
2    *medical direction* were not met. (482.52 et seq.; *MCM* chapter 12 section 50 *et seq.*)

3       31.    According to the *Medicare Claims Processing Manual*, (*MCM*) which
4    codifies the rules set forth by CMS, MDAs may be reimbursed by Medicare for
5    services *personally performed, medically supervised,* or *medically directed*. When an
6    MDA is personally performing an anesthetic, he should not be documenting
7    participation in an anesthetic in any other operating room. Medicare reimburses
8    *personally performed* services by an MD A at 100% of the allowable amount.
9    *Medical Direction,* which includes payment for the services of qualified non-
10   physician anesthetists and the MDA, combines to result in 100% reimbursement for
11   the procedure. *Medical Supervision*, which is a lower level of MDA involvement
12   than *medical direction,* allows MDA reimbursement by Medicare for only 3 to 4 units
13   on any procedure. This results in less than 100% of the otherwise allowable payment.
14   However, *medical supervision* is the proper documentation where an MDA fails to
15   comply with all seven requirements of *medical direction* and/or where the MDA was
16   involved in more than 4 concurrent cases. (*MCM* chapt.12 section 50.C) However, as
17   set forth above, both District's bylaws and its contract with PAS/Somnia did not
18   (under any circumstances) allow an MDA to be involved in more than 4 concurrent
19   cases.

20      32.    Chapter 12 Section 140 et seq. of the *MCM* defines qualified non-
21   physician anesthetists as CRNAs and anesthesia assistants, ("AAs") and outlines the
22   criteria and modifier codes pertaining to them.

23      33.    As noted above under conditions for payment (§415.10),
24   Anesthesiologists who comply with the requirements set forth in TEFRA (the *Tax
25   Equity and Fiscal Responsibility Act of 1982*, Pub.L. 97-248) may be reimbursed by
26   Medicare for *medical direction* (e.g. of CRNAs) if they have no more than 4
27   concurrent cases (i.e. 4:1 ratio) and the physician documents in the patient's medical
28   record that all requirements were met. [(*Social Security Act*, § 1833(e)] :

    i)    Perform a pre-anesthesia examination and evaluation;

    ii)   Prescribe the anesthesia plan;

    iii)  Personally participate in the most demanding procedures of the anesthesia plan, including induction and emergence, if applicable;

    iv)  Ensure that any procedures in the anesthesia plan that he or she does not perform are performed by a qualified anesthetist;

    v)   Monitor the course of anesthesia administration at intervals;

    vi)  Remain physically present and available for immediate diagnosis and treatment of emergencies; and

    vii)  Provide indicated post-anesthesia care.  (see also *MCM*, Chap 12 §50.C)

34.    If the physician leaves the immediate area of the operating suite for other than short durations or devotes extensive time to an emergency case or is otherwise not available to respond to the immediate needs of the surgical patients, the physician's services to the surgical patients are supervisory in nature, and should be billed as *medical supervision.* Carriers may not make payment [for *medically directed* service] under the fee schedule.  (§50.C)

35.    Defendants violated the False Claims Act by knowingly submitting fraudulent claims for *medical direction*:

    a) when MDAs were involved in more than 4 concurrent cases;

    b) when MDAs were documented as personally performing a concurrent case;

    c) when CRNAs were independently performing a case;

    d) when they knew the MDA had not complied with nor documented the seven TEFRA requirements;

36.    Defendants violated the False Claims Act when they submitted claims for *personally performed* service when they knew the MDA was not present throughout the case, as required.

1      37.    Defendants PAS/Somnia and McKesson violated the False Claims Act

2 when they submitted claims that they knew failed to comply with *medical direction*,

3 as non-medically directed service (QZ) with 100% reimbursement, rather than

4 properly submit them as *medically supervised.* In other words, to maximize

5 reimbursement, defendants PAS/Somnia and McKesson would drop the MDA's

6 modifier entirely rather than process the claim as *medical supervision* (AD modifier).

7 This practice not only failed to include the MDA's actual level of involvement, but it

8 resulted in overpayment.

9      38.    Defendants violated the False Claims Act when they intentionally failed

10 to comply with the documentation requirements that are a condition of payment from

11 Medicare.

12      39.    Defendants PAS/Somnia and McKesson also violated the False Claims

13 Act when they knowingly failed to return overpayments.

14      **CONTRACT BETWEEN PAS/SOMNIA AND KAWEAH**

15      40.    PAS/Somnia contracted with Kaweah Delta Health Care District

16 ("District") who operates Kaweah, a general acute care hospital known as Delta

17 Medical Center ("the Hospital") in Visalia, California to exclusively provide

18 professional services for their Anesthesia Department ("the Department"). The

19 Hospital is a certified Medicare/Medicaid supplier having met *conditions of*

20 *participation* set forth by the *Centers for Medicare and Medicaid* (CMS) the body

21 that administers the Medicare program.

22      41.    The contract between the District and PAS/Somnia was executed in July,

23 2011 and went into effect December 13, 2011.

24      42.    Consistent with the TEFRA requirements set forth above, the contract

25 required PAS/Somnia to do its own documentation in the electronic medical record

26 ("EMR") which was to be in compliance with state and federal regulations (Section

27 2.22) and Section 7.1 required PAS/Somnia to bill its patients and third party payers

28 (including Medicare) directly. "District shall have no interest in or responsibility with

1  respect thereto . . ."

2  **EMPLOYMENT OF O'NEILL**

3  43.   PAS/Somnia hired providers (MDAs and CRNAs) as *locum tenens* or
4  independent contractor S corps. Providers were salaried and PAS/Somnia billed (later
5  hiring McKesson to do their billing) and was reimbursed under providers' names
6  directly from Medicare.

7  44.   The fee schedule for anesthesia service is based on allowable base and
8  time units multiplied by an anesthesia conversion factor specific to that locality.
9  (§50.A)

10  45.   Nicolle O'Neill was employed by PAS/Somnia, to provide services as a
11  CRNA and Chief CRNA.

12  46.   Nicolle O'Neill  first began as a *locum tenens* starting on or about
13  December 13, 2011. She received a letter of understanding on or about January 31,
14  2012 while the contract for Chief CRNA was being negotiated.  She was told that her
15  only option was to work as an employee, with no benefits, or to form an S
16  corporation.  After a prolonged negotiation, a contract was finally signed on March
17  22, 2012 between Sarasate and District d/b/a Kaweah Delta Medical Center
18  ("Hospital").

19  47.   Ms. O'Neill's duties are outlined in Schedule 2 of the contract. In
20  relevant part, as Chief CRNA, Ms. O'Neill was in charge of  developing a weekly
21  schedule for CRNAs in consultation with PAS/Somnia personnel; managing and
22  leading staff CRNAs assigned to specific ORs; coordinating OR activity and OR
23  nurse management to create efficient patient flow; managing room turnover and prep
24  toward high quality anesthesia services. In addition, Ms. O'Neill  was to keep and
25  maintain the medical charts as well as all data required to allow defendant
26  PAS/Somnia to properly bill for services provided. (Schedule 2.6). As Chief CRNA,
27  Ms. O'Neill  was charged with executing all documentation necessary for
28  PAS/Somnia to be a participating provider in any third-party reimbursement

1  programs PAS/Somnia requested. (Schedule 2.14).

2  **NICOLLE O'NEILL'S COMPLAINTS ABOUT THE *QUI TAM***
3  **VIOLATIONS**

4        48.    It was not long after Ms. O'Neill began that she noticed inadequate
5  staffing was systemic. Also very evident to Ms. O'Neill was that operations were
6  incredibly wrong and that public and patient safety were routinely being
7  compromised. There was a history of chronic understaffing that endangered the
8  public and patient safety of anesthesiology patients at Kaweah.

9        49.    Ms. O'Neill  also found there was a blatant pattern of disregard for
10  proper and adequate documentation in the medical records. MDAs not only failed to
11  document the charts, but when they did, it was often inaccurate, listing a case as
12  *medically directed* when they had not complied with the TEFRA requirements; listing
13  *medically directed* when they were engaged in more than four concurrent cases or not
14  "immediately available" and they should have documented *medically supervised;* and
15  listing concurrent cases as *personally performed*. Often, CRNAs performed the
16  procedure without knowing which MDA was in-house.

17        50.    It was common for cases to be listed as *medically directed* when the
18  MDA had left the building to do other cases, run errands, play golf or go home.

19        51.    In addition, in the Obstetrical (OB) Department at night, only a CRNA
20  was "in-house." The MDA was on-call. Often, the CRNA had to perform procedures
21  and could not wait for an MDA to arrive. However, the cases were always
22  documented as *medically directed*.

23        52.    After only three months at the Hospital, on March 21, 2012, Ms. O'Neill
24  wrote to Kimberly Carriere, Project Manager at Somnia regarding the charting and
25  billing issue in the OB department, stating that only the CRNA should be listed as
26  doing the case. She responded the following day, that the Hospital by-laws did not
27  allow for independent practice by CRNAs. However, on or about April 2012, Ms.
28  O'Neill was able to institute a rule change in the OB department that allowed CRNAs

1   to perform non-medically directed anesthesia service pertaining to cesarean sections
2   and postpartum tubal ligations.  This change did not affect the inaccurate charting of
3   *medical direction* that still persisted in the main OR.

4        53.   Ms. O'Neill later learned that cases done in the middle of the night in the
5   OB department were considered emergencies. For that reason, the Hospital also
6   allowed CRNAs to document those cases as independently performed. However,
7   many CRNAs still charted that an MDA was *medically directing* them though no
8   MDA was in-house.

9        54.   On June 15, 2012, Dr. Roy Winston, then Chief of Anesthesia, left the
10  hospital in the afternoon when Ms. O'Neill had charted him as *medically directing*
11  her. Ms. O'Neill  learned he was gone when the patient had to be admitted to the ICU
12  unexpectedly post-op. Ms. O'Neill  discovered he was on his way to LAX. He told
13  Ms. O'Neill to do whatever she thought was best. Ms. O'Neill had to get Dr. Wilson,
14  a trauma surgeon, to get the physician approval required to admit the patient to the
15  ICU.

16       55.   On March 1, 2013, Dr. Winston was supposed to be *medically directing*
17  Ms. O'Neill on a difficult all day case with a medically unstable patient. He stopped
18  into the OR at about 10:30AM and asked how things were going and stated he had to
19  attend a meeting. Later Ms. O'Neill texted him several times with calls from the
20  secretary and questions from staff, as she was trying to manage the anesthesia on this
21  case.  At about 3:30PM, Dr. Byron Mendenhall stopped into the OR and informed her
22  that Dr. Winston was not responding because he was playing golf with Kaweah Chief
23  Operating Officer Tom Raynor and VP of Nursing Linda Pruett. He had left the
24  premises without notifying Ms. O'Neill. Ms. O'Neill  complained to Karen Bennett,
25  the practice administrator for Somnia. Ms. O'Neill  then sent a letter to Dr. Winston
26  resigning as Chief CRNA.  After further conversation, it was decided that Dr.
27  Winston would not forward Ms. O'Neill's resignation to Somnia.

28       56.   On March 19, 2013, Dr. Mendenhall was listed as *medically directing*

1  Ms. O'Neill but left the OR without letting her know. Her second patient complained
2  of shortness of breath in the recovery room. When Ms. O'Neill tried to contact Dr.
3  Mendenhall she was told he was no longer in-house and left to attend "an event." Ms.
4  O'Neill is informed and believes and on that basis allege that "attending an event"
5  was code for playing golf. Ms. O'Neill subsequently looked up PA's chart and
6  discovered that nine days after the case, Dr. Winston had logged onto the chart and
7  signed it as if to show that he had been *medically directing* Ms. O'Neill.

8      57.    On or about March 21, 2013 after the incident with Dr. Mendenhall, Ms.
9  O'Neill again argued with Dr. Winston and resigned as Chief CRNA, effective
10  immediately. Ms. O'Neill  followed up with a call to Margaret See, VP for Facility
11  Operations at Somnia, apprising her of her resignation and informing her that some of
12  the anesthesiologists were playing golf and not notifying CRNAs of their
13  whereabouts. The following day, Dr. Winston sent a letter to the anesthesia
14  department that Ms. O'Neill had resigned as Chief CRNA, and her salary
15  immediately reflected the change.

16      58.    On April 21, 2013, Ms. O'Neill emailed Brent Sommers, CRNA liaison
17  to Somnia regarding the reasons for her resignation as Chief CRNA. His response
18  states that Somnia had concerns over the supervision issue and it had been discussed
19  among Robert Goldstein, MD, Executive Vice President, Somnia, and other Somnia
20  executives before Ms. O'Neill brought it up.

21      59.    On or about May, 2013, Dr. Victoria Gerken, Medical Director of the
22  OR told Ms. O'Neill that she was aware that MDAs were doing their own cases while
23  at the same time supervising other rooms which was against the Somnia contract as
24  well as a violation of the bylaws of the Hospital. It follows that this was also a
25  violation of documentation and billing requirements of *CMS*.

26      60.    In mid-2013 an Incident Report was generated stating that Dr. Winston
27  left the OR while personally providing anesthesia to a patient. According to the
28  Registered Nurse on the case, Dawn, his absence was discovered upon completion of

1  the surgery when the drapes were lowered and no MDA was present.

2      61.    On or about August 5, 2013, an amended contract between PAS/Somnia
3  and SNA, reflecting Ms. O'Neill's resignation as Chief CRNA, was drawn and
4  became effective.

5      62.    On October 18, 2013 there were four concurrent cases plus cases listed
6  in the OB department that Dr. Winston charted as *medically directing*. In addition,
7  one of the cases was charted as *personally performed*. He could not be *personally*
8  *performing* a case and *medically directing* at the same time.

9      63.    On October 25, 2013, there were two concurrent cases.  Both were listed
10  as *medically directed* though one was charted as *personally performed*.  An
11  anesthesiologist who is personally performing a procedure is not immediately
12  available to medical direct other rooms.  TEFRA guidelines were not met.

13      64.    One of the problems contributing to the absent/false documentation was
14  the fact that PAS/Somnia ignored repeated requests for more staff. MDAs could be
15  scheduled to concurrently work shifts in the Main or Cardiac OR and simultaneously
16  be on emergency call. Often these cases would be in separate buildings. For instance,
17  on December 1, 13, and 15, 2013, Dr. Bart Lee was assigned to work Cardiac call at
18  the same time he was scheduled for Call 2. On December 14 and 22, 2013, he was
19  scheduled for first call in the Main OR as well as Cardiac. In addition, the Saturday,
20  8-hour shift was understaffed. Ms. O'Neill was told that PAS/Somnia would never
21  pay to cover these shifts.

22      65.    Dr. Adam Dorin replaced Dr. Winston as Chief of Anesthesiology on or
23  about January 1, 2014. Immediately he tried to alleviate the staffing problem. In an
24  email dated January 2, 2014, he outlined his plan. This plan was rejected by Robert
25  Goldstein.

26      66.    On or about March 3, 2014, PAS/Somnia engaged McKesson, an
27  international corporation providing services to the healthcare industry, to handle their
28  billing and to "fix" the problems that were becoming too obvious and overwhelming

1  to manage.

2  **MCKESSON PERPERTUATES THE FRAUDULENT BILLING PRACTICES**

3       67.    In a letter from Dr. Dorin dated March 3, 2014, to Margaret See, Vice

4  President, Facility Operations/Somnia Anesthesia, and Mattie Cantu, Dorin

5  mentioned the overlapping Cardiac and Main OR call and talked about the "near-

6  miss" the day before when Dr. Bart Lee covered 2 calls and was needed in both

7  places when an "emergency heart came through while Bart was doing emergency

8  cases in the Main operating room."  Dr. Dorin also mentioned a similar situation

9  occurred the previous Friday.

10      68.    On April 10, 2014 11:04 AM, Karen Berkey, a McKesson employee,

11  emailed Mattie Cantu, to whom she was referred as a contact at Somnia. She stated

12  she was running into issues where there was a doctor *personally performing* "when

13  he/she should be *medically directing* which causes errors, or where they are *medically*

14  *directing* 5 rooms at once." She asked Mattie for help in resolving the issue as "we

15  cannot post any charges for the entire date of service until these errors get resolved."

16  Mattie Cantu then emailed Dr. Dorin for guidance. He responded that Somnia

17  decided, in accordance with CA and Federal Law that CRNAs can be operating

18  independently. He added that there may be further nuances and "Billing at a CMS-

19  type 4:1 'direction' ratio appears to be immaterial to the changes afoot, but I defer to

20  Somnia's leadership." Karen forwarded the email to Lisa A. Zigarovich, CPC,

21  CANPC, McKesson

22      69.    On April 11, 2014, Lisa Zigarovich emailed Dr. Dorin, copying Matti

23  Cantu, and Margaret See. She corroborated that Dorin was correct, "CRNAs may

24  work independently in the state of California." She directed them to "Please disregard

25  Karen's email below, we are able to process the below mentioned cases as *non-*

26  *medically directed* CRNA. . . . " McKesson's practice thus is in clear violation of

27  applicable regulations.

28      70.    Dr. Dorin likely precipitated his own demise with PAS/Somnia by

having the audacity to put defendants' fraudulent practices in writing. In an email sent to Dr. Goldstein, Dr. Dorin presented a scathing indictment of defendants' unlawful conduct. "With endo and short-staffed days, a facilitating doc would have more than 4 rooms under his purview; how is it that you can act to the hospital as if you have a 'traditional' 1:4 ratio, have your docs' names on a board with more than 4 rooms, and not expect the nurses and surgeons and administrators to notice? . . . . I asked over a month ago if the 'contract' and 'med-staff issues' were covered and you said 'yes.' The charting/board/perception all fit together in a real setting of medical care. You cannot formulate a plan and expect others not to notice something is different if the staffing is different. So here we are. There is no way to finesse a change of this sort without violating the nature, spirit and perception of the Contract and Med Staff Bylaws at Kaweah." Dr. Dorin also urged that for a smooth operation, "I believe Somnia needs a nonclinical physician who is not beholden to policy makers in the NY office . . . "

71.    On April 23, 2014, Robert Goldstein admonished Dr. Dorin for discussing these things online, stating "I will not engage in an email back and forth." He states he is available by phone.

72.    On May 13, 2014, Dr. Robert Goldstein unexpectedly flew in from New York to meet with all the CRNAs. Ms. O'Neill explained that charts were not documented appropriately, and that CRNAs do not know who is supervising them at various points during the day since they don't know who is in house. Two other PAS/Somnia executives, Margaret See and Fitz George, arrived at the Hospital shortly thereafter to also meet with staff.

73.    On June 13, 2014, Ms. O'Neill received a letter of termination from PAS/Somnia terminating her pursuant to §6.2 of our contract—termination without cause. This required a 90-day notice per the SNA contract with PAS/Somnia.

74.    On or about June 22, 2014, the OB/GYN doctors, fueled by Ms. O'Neill's inexplicable termination, wrote a letter to Dr. Paskert and others about the

1  "unacceptable" short staffed anesthesia service in the OB Department.

2      75.    On or about June 27, 2014, Dr. Dorin was terminated "with cause" after

3  responding to the OB department's complaints and admitting that that there was not

4  enough staff and that he had complained to Somnia but that they did not respond to

5  his requests to hire more people.

6      76.    On July 31, 2014, Dr. Mendenhall was listed as *medically directing* Ms.

7  O'Neill performing a pericardial debridement while he was actually performing his

8  own anesthetic (i.e. *personally performing*) at the same time in another cardiac room.

9      77.    On or about Monday, July 28, 2014, Ms. O'Neill performed an

10  anesthesia service for Dr. Ian Duncan, an orthopedic surgeon. He asked Ms. O'Neill

11  who the supervising MDA was for the procedure and explained that the Hospital had

12  suddenly changed the surgeons' documentation requirements. Surgeons could now

13  only chart that an MDA had performed the anesthesia procedure. He stated "This

14  makes no sense since it is a CRNA who is in the room." This change came on the

15  heels of Ms. O'Neill's recent report to the Hospital of billing fraud. Ms. O'Neill

16  believes the purpose of this new requirement was an attempt to ensure the MDAs'

17  presence as mandated by the Hospital bylaws. Whatever Kaweah's purpose, it shows

18  that false documentation was so blatant that even an orthopedic surgeon was calling it

19  into question. The result was the creation of a false surgical record and a continuation

20  of fraudulent billing.

21      78.    Ms. O'Neill worked until August 1, 2014 when she was suddenly

22  removed from the operating room. During the remainder of her employment,

23  violations of the applicable regulations continued to be rampant.

24      79.    Ms. O'Neill obtained a copy of some of the schedules after her

25  termination: On August 13 and 14, 2014, Dr. Mendenhall supposedly *medically*

26  *directed* cases on the second floor of the Acequia building at the same time he was

27  required to be "immediately available" to the CRNA on the first floor of the Mineral

28  King building.

80.     The following are ongoing abuses Ms. O'Neill witnessed and/or learned about, while employed at the Hospital, which reflect a systemic pattern that was known to defendants:

a) Dr. Mendenhall was the main anesthesiologist for cardiac. He and another MDA did all of the cardiac surgeries. Dr. Mendenhall continued to bill for personally performed anesthesia services though he would leave the OR, the building, or even the hospital grounds (per Cindy Conley, prior Nurse Manager) while the patient was on bypass. CRNAs did not do cardiac bypass anesthesia at the Hospital. Therefore when Dr. Mendenhall left, there was no anesthesia provider in the room. It is unacceptable to leave a patient alone while they are under anesthesia. These cases could only be charted as personally performed (i.e. AA). Moreover, the AA designation also requires the MDA to be present for the entire procedure. Therefore all of these cases were fraudulently billed "AA" paying 100% of the allowable charge;

b) MDAs did not perform the pre-anesthesia exam and post anesthesia evaluation requirement of *medical direction* when a CRNA was involved in the patient's care;

c) If an anesthesiologist did sign the pre-op form it was often after the patient was already under anesthesia when they came in the room to give the CRNA a break;

d) Even after McKesson was engaged to "fix" the billing and charting problems, McKesson would bill as *medical direction*. However, MDAs would not sign the electronic medical record and there was no documentation of TEFRA guidelines being met.

e) Dr. Mendenhall, Dr. Quinn Gee, Dr. Margaret Vassilev and Dr. Roy Winston would consistently depart for the day at approximately 3pm. They failed to document the chart to indicate who would now be *medically*

*directing* that OR. CRNAs were often unaware of which MDAs remained in
house and who to call for an emergency.

f) On or about November 2, 2013, Cindy Conley, prior Nurse Manager,
confided to Ms. O'Neill that the Hospital representatives warned she would
lose her job if she reported that Dr. Mendenhall didn't remain in the OR
during cardiac bypass.  She also told Ms. O'Neill sometimes she had seen
him off hospital grounds during cardiac surgery. Dr. Mendenhall would
frequently order lunch from Checkers and pick up his meal while his patient
was on bypass.

g) Split cases where there would be a hand-off between MDAs due to a shift
change or other reason, were not documented. MDAs never documented
their departure time and the replacement MDA would never put his/her
name on the chart. Medical charts consistently indicate the name of only
one MDA even where there was a shift change and a split case;

h) MDAs would improperly give breaks to a CRNA while listed as *medically
directing* three other rooms. An MDA cannot be *medically directing* a
CRNA if the CRNA is not present. In such a case, the MDA would be
*personally performing* which would also not be allowed while *medically
directing* other rooms. The proper way to give a break required another
CRNA to step in;

i) Dr. Kimura (now deceased) did all spinal fusions with surgeon Dr. Madsen.
They were charted as *personally performed*  though the CRNA would start
all the lines, give him breaks, help intubate, and do pre-ops on the patient;

j) Dr. Vassilev deliberately made the time and date on her post-op forms
illegible, making it impossible to read the time documenting post-op
visits—required for *medical direction*. In reality, she never saw patients
after an epidural was placed or after a cesarean section was performed;

k) Benton Duckett, Director of Surgical Services told Ms. O'Neill that often

when he called Dr. Winston he would not respond and was never around despite the fact that he was being documented as *medically directing* OR cases;

l) Nellie Navaie, CRNA, and other CRNAs would improperly document all unscheduled anesthesia procedures as emergencies, which are reimbursed at a higher rate. An emergency only exists when a delay in treatment would lead to a significant threat to life or body part.

m) CRNAs performing ultrasound-based peripheral nerve blocks did not capture an image with the ultrasound or make the image a part of the permanent record until 2014. In order to bill for ultrasound, Medicare requires the image to be captured and stored in the patient's chart. Ms. O'Neill had told Somnia about this problem while she was Chief CRNA. This practice continued until McKesson took over;

n) CRNAs would monitor epidurals while concurrently performing multiple caesarean sections, a practice which was not allowed: since they were performing independently they were required to be present at all times and they could properly only bill for one service at a time. In addition, though they were performing independently, it was typically documented as *medically directed.*

o) CRNA, Heather Lee kept a record of how often she would call an MDA, charted as *medically directing* and therefore supposedly immediately available, who wouldn't arrive in a reasonable amount of time.

p) Dr. Gee Quinn would consistently leave the hospital during his shift. One day while Dr. Quinn was first call to the OR, he left to start a shift at another hospital where he worked, leaving the CRNA alone to do a remaining case independently—violating the Hospital bylaws. Cindy Conley, Nurse Manager of the OR at the time brought this to everyone's attention. Ms. O'Neill texted Dr. Winston about the event and he responded,

1    "Very concerning." The CRNA in this situation still had to chart *medically*

2    *directed* or the case could not be closed.

3    81.    After her termination, Ms. O'Neill did some research regarding

4  McKesson. On October 1, 2014, Ms. O'Neill made a call to McKesson posing as an

5  anesthesiologist exploring their billing options for EMR on behalf of a hospital in

6  Alabama (Ms. O'Neill had an Alabama area code on her cell phone). Ms. O'Neill

7  first spoke with a Marvin Jones who answered their main line. He put Ms. O'Neill in

8  touch with Jerald Hendrix who she contacted on his cell phone.  Ms. O'Neill stated

9  she had used all the major EMRs and noticed that McKesson's program didn't seem

10  to have a way anesthesiologists could indicate their involvement in a case and her

11  hospital was concerned about compliance. Mr. Hendrix only spoke broadly about

12  different programs. However, he put Ms. O'Neill in touch with a Mr. Lane Dowling

13  who he said could answer all of her questions.

14    82.    Later that day, Mr. Hendricks put Ms. O'Neill on a conference call with

15  Mr. Dowling. Hendricks remained on the line.  Since Mr. Dowling stated he only

16  knew about billing, Ms. O'Neill asked him how the coding worked with *medical*

17  *direction* and *medical supervision*. He stated that McKesson handles everything: OR

18  log charges and capturing data from the anesthesia record and submitting to payer. He

19  said that a standard case might go for 11 units, but if there were 5 concurrent cases it

20  would no longer be *medical direction*. Rather Medicare would consider it *medical*

21  *supervision* and the allowable units would drop to 3 [plus one if MDA is present for

22  induction]. As an illustration of how much money was lost on a *medical supervision*

23  *claim*, he stated that depending on the geographic location, you might have a $75 per

24  unit case drop from about an $800 reimbursement to about $200. He also gave the

25  example of spinal fusions which allowed 20 units dropping to only 3 units for

26  *medical supervision*. He explained that when the ratio went over 1:4 [CRNAs to

27  MDAs], McKesson would not list a modifier for the anesthesiologist, which would

28  properly have been AD/QX for *medical supervision*. Rather they would use the

1  CRNA modifier "QZ" which indicates there was no MDA directing or supervising,
2  and reimburses at 100%.  When Ms. O'Neill questioned him about this, he stated that
3  McKesson would drop the modifier for the MDA, send it out unmodified, and
4  indicate that it was autonomous. Since he believed Ms. O'Neill was inquiring for an
5  Alabama hospital—a state that had not opted out and required CRNAs be supervised,
6  she asked him how McKesson could do that. Ms. O'Neill also pointed out that many
7  hospitals in opt-out states still have bylaws that require supervision. He said, "Bylaws
8  don't mean anything to billers. Too much money is lost to bill it as *medical*
9  *supervision."* He stated that McKesson's goal was to maximize reimbursement, "we
10 bill everything at 100%." He then admitted, "Yes, it is a bit of a sticky subject. We
11 think the OIG is tapped up to start investigating it."

12     83.     Mr. Dowling's remarks lead Ms. O'Neill to conclude that McKesson has
13 a nationwide practice of defaulting to the QZ modifier (resulting in a higher
14 reimbursement rate to both McKesson and its clients) when the conditions for
15 *medical direction* were not met.  Instead of billing for independent CRNA practice,
16 McKesson should have defaulted to the lower rate of reimbursement available for
17 *medical supervision.*

18     84.     Ms. O'Neill was terminated under §6.2 of her contract with
19 PAS/Somnia, (i.e. "without cause") at a time when the Hospital was dangerously
20 short staffed. The reason was because of her complaints about the systemic fraudulent
21 documentation and billing.

22     85.     Defendants chose profits over public and patient safety, violated the
23 implied covenants of good faith and fair dealing in their contracts with Plaintiffs,
24 retaliated against Plaintiffs for making numerous complaints about the severe
25 shortage of staff and personnel by Defendants at Kaweah, and terminated Plaintiffs in
26 bad faith, attempting to cover up the severe shortcomings of Defendants' operations
27 at Kaweah.

28     86.     The acts of Defendants were despicable, oppressive, and were conducted

1  with malice and with a conscious disregard of Plaintiffs' rights, so as to justify the
2  imposition of punitive damages in an amount to be shown according to proof at trial.

3  ## FIRST CAUSE OF ACTION
4  ### VIOLATION OF FEDERAL FALSE CLAIMS ACT
5  ### 31 U.S.C. §3729(a)(1)
6  ### (BY RELATOR O'NEILL AGAINST ALL DEFENDANTS)

7      87.    Paragraphs 1 through 86 are incorporated herein.

8      88.    Defendant knowingly presented, or caused to be presented, false or
9  fraudulent claims for payment or approval to officers or employees of the United
10  States Government.

11      89.    Moreover, defendants knowingly retained, or caused to be retained,
12  overpayments received from the United States Government as a result of the conduct
13  alleged herein.

14      90.    As a result of these false or fraudulent claims, the United States
15  Government suffered damages.

16  ## SECOND CAUSE OF ACTION
17  ### VIOLATION OF FEDERAL FALSE CLAIMS ACT
18  ### 31 U.S.C. §3729(a)(2)
19  ### (BY RELATOR O'NEILL AGAINST ALL DEFENDANTS)

20      91.    Paragraphs 1 through 90 are incorporated herein.

21      92.    Defendant knowingly made, used, or caused to be made or used, false
22  records and statements to obtain the United States Government's payment of false or
23  fraudulent claims.

24      93.    The false records and statements included, but may not be limited to, the
25  representations made in Defendant's billings to the United States Government and its
26  agents, through explicit and implicit certifications of compliance with federal
27  regulations, statutes, and program instructions in order to get paid by the United
28  States government.

1    94.    As a result of these false records or statements, the United States

2  Government suffered damages.

3                    **THIRD CAUSE OF ACTION**

4       **VIOLATION OF CALIFORNIA FALSE CLAIMS ACT**

5             **CAL. GOVT. CODE §§ 12651 *et seq.***

6      **(BY RELATOR O'NEILL AGAINST ALL DEFENDANTS)**

7    95.    Paragraphs 1 through 94 are incorporated herein.

8    96.    Defendants knowingly presented, or caused to be presented, false or

9  fraudulent claims to the California State Government for payment or approval.

10    97.    Defendants also knowingly retained overpayments from the State of

11  California based upon its campaign of unlawful billing for anesthesia services.

12    98.    By virtue of the acts described above, Defendants knowingly made,

13  used, or caused to be made or used, false records and statements, and omitted

14  material facts, to induce the California State Government to approve and pay such

15  false and fraudulent claims.

16    99.    The California State Government, unaware of the falsity of the records,

17  statements and claims made, used, presented or caused to be made, used or presented

18  by Defendants, paid and continues to pay the claims that would not be paid but for

19  the acts and/or conduct of Defendants, as alleged herein.

20    100.  By reason of Defendants' acts, the State of California has been damaged,

21  and continues to be damaged, in a substantial amount to be determined at trial.

22                  **FOURTH CAUSE OF ACTION**

23       **RETALIATION FEDERAL FALSE CLAIMS ACT**

24    **(BY PLAINTIFF AGAINST PAS/SOMNIA AND DOES 6-10**

25    101.  Paragraphs 1 through 100 are incorporated herein.

26    102.  As a direct and proximate result of this unlawful retaliation resulting in

27  the termination of relator's employment, Nicolle O'Neill has suffered substantial

28  general and special damages, including lost wages, medical expenses, earnings

1   capacity, emotional distress and special damages associated with his efforts to obtain
2   alternate employment, in an amount to be proven at trial.

3   103.   As a direct and proximate result of this unlawful retaliation, Plaintiff
4   O'Neill seeks the imposition of punitive damages because Defendants and their
5   managers, officers, and/or directors committed the acts alleged herein maliciously,
6   fraudulently, and oppressively, with the wrongful intention of injuring Ms. O'Neill
7   and acted with an improper and evil motive amounting to malice or oppression, and
8   in conscious disregard of Ms. O'Neill's rights. Moreover, Defendants and their
9   managers, officers, and/or directors authorized or ratified the wrongful conduct of
10  their employees and/or are personally guilty of oppression, fraud, or malice. As such,
11  Ms. O'Neill is entitled to recover punitive damages from Defendants in an amount
12  according to proof.

13  104.   Ms. O'Neill also seeks to recover her attorneys' fees, costs of suit and
14  any other relief deemed appropriate by the Court.

15  ### FIFTH CAUSE OF ACTION
16  ### RETALIATION CALIFORNIA FALSE CLAIMS ACT
17  ### (BY PLAINTIFF  AGAINST PAS/SOMNIA AND DOES 6-10)

18  105.   Paragraphs 1 through 105 are incorporated herein

19  106.   At all times herein mentioned, Government Code §§ 12653(a) was in
20  full force and effect and was binding upon Defendants, and each of them.
21  Government Code §12653(a) provides:

22  107.   (a) Any employee, contractor, or agent shall be entitled to all relief
23  necessary to make that employee, contractor, or agent whole, if that employee,
24  contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in
25  any other manner discriminated against in the terms and conditions of his or her
26  employment because of lawful acts done by the employee, contractor, agent, or
27  associated others in furtherance of an action under this section or other efforts to stop
28  one or more violations of this article.

1  108.  As a direct and proximate result of the unlawful practices described

2  herein, Plaintiff has suffered damage and injury as herein alleged.

3  109.  Pursuant to Government Code §12653(b) Plaintiff is entitled to all relief

4  necessary to make the employee whole, including reinstatement with the same

5  seniority status that the employee would have had but for the termination, two times

6  the amount of back pay, interest on the back pay, compensation for any special

7  damage sustained as a result of the termination.

8  110.  As a direct and proximate result of this unlawful retaliation, Plaintiff

9  O'Neill seeks the imposition of punitive damages because Defendants and their

10  managers, officers, and/or directors committed the acts alleged herein maliciously,

11  fraudulently, and oppressively, with the wrongful intention of injuring Ms. O'Neill

12  and acted with an improper and evil motive amounting to malice or oppression, and

13  in conscious disregard of Ms. O'Neill's rights. Moreover, Defendants and their

14  managers, officers, and/or directors authorized or ratified the wrongful conduct of

15  their employees and/or are personally guilty of oppression, fraud, or malice. As such,

16  Ms. O'Neill is entitled to recover punitive damages from Defendants in an amount

17  according to proof.

18  111.  Ms. O'Neill also seeks to recover her attorneys' fees, costs of suit and

19  any other relief deemed appropriate by the Court.

20  ### SIXTH CAUSE OF ACTION

21  ### HEALTH AND SAFETY CODE

22  ### SECTION 1278.5

23  ### (BY PLAINTIFF O'NEILL AGAINST DEFENDANTS PAS/SOMNIA AND

24  ### DOES 6-10)

25  112.  Paragraphs 1 through 111 are incorporated herein.

26  113.  By virtue of the conduct alleged herein, defendants violated Health &

27  Safety Code Section 1278.5 which provides:

28  a.  No health facility shall discriminate or retaliate, in any manner,

1  against any patient, employee, member of the medical staff, or any

2  other health care worker of the health facility because that person

3  has done either of the following:

4      i.  Presented a grievance, complaint, or report to the facility, to

5        an entity or agency responsible for accrediting or evaluating

6        the facility, or the medical staff of the facility, or to any

7        other governmental entity.

8      ii.  Has initiated, participated, or cooperated in an investigation

9        or administrative proceeding related to, the quality of care,

10        services, or conditions at the facility that is carried out by an

11        entity or agency responsible for accrediting or evaluating

12        the facility or its medical staff, or governmental entity.

13      114.  As a result of defendants' violation of this section, Nicolle O'Neill is

14  entitled to a $25,000 civil penalty, lost wages and work benefits, noneconomic

15  damages, including substantial emotional distress, costs of suit and reasonable

16  attorney's fees pursuant to Health & Safety Code Section 1278.5(g) and/or Code of

17  Civil Procedure Section 1021.5.

18      115.  As a direct and proximate result of this unlawful retaliation, Plaintiff

19  O'Neill seeks the imposition of punitive damages because Defendants and their

20  managers, officers, and/or directors committed the acts alleged herein maliciously,

21  fraudulently, and oppressively, with the wrongful intention of injuring Ms. O'Neill

22  and acted with an improper and evil motive amounting to malice or oppression, and

23  in conscious disregard of Ms. O'Neill's rights.  Moreover, Defendants and their

24  managers, officers, and/or directors authorized or ratified the wrongful conduct of

25  their employees and/or are personally guilty of oppression, fraud, or malice. As such,

26  Ms. O'Neill is entitled to recover punitive damages from Defendants in an amount

27  according to proof.

28

## SEVENTH CAUSE OF ACTION

### WHISTLEBLOWER RETALIATION- LABOR CODE § 1102.5 *et. seq.*

### (BY PLAINTIFF O'NEILL AGAINST PAS/SOMNIA AND DOES 6-10

116.   Paragraphs 1 through 115 are incorporated herein.

117.   At all times herein mentioned, Labor Code § 1102.5(a) was in full force and effect and was binding upon Defendants, and each of them.  Labor Code § 1102.5(a) provides: "An employer may not make, adopt, or enforce any rule, regulation, or policy preventing an employee from disclosing information to a government or law enforcement agency, where the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation or noncompliance with a state or federal rule or regulation."

118.   At all times herein mentioned, Labor Code § 1102.5(b) was in full force and effect and was binding upon Defendants, and each of them.  Labor Code § 1105(b) provides: "An employer may not retaliate against an employee for disclosing information to a government or law enforcement agency, where the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation or noncompliance with a state or federal rule or regulation."

119.   At all times herein mentioned, Labor Code §1102.5(c) was in full force and effect and was binding upon Defendants, and each of them.  Labor Code §1102.5(c) provides: "An employer may not retaliate against an employee for refusing to participate in an activity that would result in a violation of state or federal statute, or a violation or noncompliance with a state or federal rule or regulation."

120.   As set forth fully herein, Defendants retaliated against Plaintiff as a result of her refusal to participate in defendants' fraudulent schemes and/or for disclosing information to Kaweah Delta Medical Center, a government entity, about defendants' fraudulent schemes.

121.   As set forth herein, Defendants retaliated against Plaintiff for protesting

1  about waste, fraud, and abuse.

2      122.   As a direct and proximate result of the unlawful employment practices

3  described herein, Plaintiff has suffered damage and injury as herein alleged.

4      123.   As a direct and proximate result of this unlawful retaliation, Plaintiff

5  O'Neill seeks the imposition of punitive damages because Defendants and their

6  managers, officers, and/or directors committed the acts alleged herein maliciously,

7  fraudulently, and oppressively, with the wrongful intention of injuring Ms. O'Neill

8  and acted with an improper and evil motive amounting to malice or oppression, and

9  in conscious disregard of Ms. O'Neill's rights. Moreover, Defendants and their

10  managers, officers, and/or directors authorized or ratified the wrongful conduct of

11  their employees and/or are personally guilty of oppression, fraud, or malice. As such,

12  Ms. O'Neill is entitled to recover punitive damages from Defendants in an amount

13  according to proof.

14      124.   Moreover, Ms. O'Neill is entitled to costs of suit and reasonable

15  attorney's fees pursuant to Code of Civil Procedure Section 1021.5.

16              **EIGHTH CAUSE OF ACTION**

17              **WRONGFUL TERMINATION IN**

18              **VIOLATION OF PUBLIC POLICY**

19  **(BY PLAINTIFF O'NEILL AGAINST(AGAINST PAS/SOMNIA AND DOES 6**

20                  **THROUGH 10)**

21      125.   Paragraphs 1 through 124 are incorporated herein.

22      126.   At all times during her employment with Defendants, Ms. O'Neill

23  performed her duties in an exemplary fashion.

24      127.   Ms. O'Neill is informed and believes and thereon alleges that

25  Defendants' termination of Ms. O'Neill from employment, as alleged herein, was

26  based on the fact that Ms. O'Neill had refused to participate in illegal conduct,

27  complained of and/or reported illegal conduct by Defendants  that violated the both

28  the United States and California False Claims Acts, as well as Health & Safety Code

1 | Section 1278.5, Labor Code Section 1102.5, among others.

2 |     128.   By reason of the aforementioned conduct and circumstances,

3 | Defendants violated the fundamental public policies of the United States and the State

4 | of California.

5 |     129.  As a direct, foreseeable, and legal result of Defendants' acts and

6 | omissions, Ms. O'Neill has incurred and continues to incur expenses and substantial

7 | losses in earnings and job benefits, and has suffered and continues to suffer

8 | humiliation, embarrassment, mental and emotional distress, and discomfort, all to her

9 | damage, the precise amount of which will be proven at trial.

10 |     130.  Ms. O'Neill is informed and believes and thereon alleges that

11 | Defendants and their managers, officers, and/or directors committed the acts alleged

12 | herein maliciously, fraudulently, and oppressively, with the wrongful intention of

13 | injuring Ms. O'Neill and acted with an improper and evil motive amounting to malice

14 | or oppression, and in conscious disregard of Ms. O'Neill's rights.  Moreover,

15 | Defendants and their managers, officers, and/or directors authorized or ratified the

16 | wrongful conduct of their employees and/or are personally guilty of oppression,

17 | fraud, or malice. As such, Ms. O'Neill is entitled to recover punitive damages from

18 | Defendants in an amount according to proof.

19 |     131.  Moreover, Ms. O'Neill is entitled to costs of suit and reasonable

20 | attorney's fees pursuant to Code of Civil Procedure Section 1021.5.

21 | **NINTH CAUSE OF ACTION**

22 | **INTENTIONAL INFLICTION EMOTIONAL DISTRESS**

23 | **(BY PLAINTIFF O'NEILL AGAINST PAS/SOMNIA AND DOES 6 -10)**

24 |     132.  Paragraphs 1 through 131 are incorporated herein.

25 |     133.  Defendants engaged in outrageous conduct towards Plaintiff with the

26 | intention to cause, or reckless disregard for probability of causing, Plaintiff to suffer

27 | severe emotional distress, and with wanton and reckless disregard for injurious result

28 | to Plaintiff.

1     134.   By the aforesaid acts and omissions of Defendants, and each of them,

2 Plaintiff has been directly and legally caused to suffer actual damages including, but

3 not limited to, loss of earning and future earning capacity, costs of suit, and other

4 pecuniary loss not presently ascertained.

5     135.   As a further direct and legal result of the acts and conduct of Defendants,

6 and each of them, as aforesaid, Plaintiff has been caused to and did suffer and

7 continues to suffer severe emotional and mental distress, anguish, humiliation,

8 embarrassment, fright, pain, discomfort, and anxiety. The exact nature and extent of

9 said injuries is presently unknown to Plaintiff, who will seek leave of Court to assert

10 the same when they are ascertained.

11     136.   By aforesaid acts and omissions of Defendants, and each of them,

12 Plaintiff has been directly and legally caused to suffer actual damages including, but

13 not limited to, loss of earnings and future earning capacity, and other pecuniary loss

14 not presently ascertained.

15     137.   Plaintiff is informed and believes and thereon alleges that Defendants

16 and their managers, officers, and/or directors, including, without limitation,

17 committed the acts alleged herein maliciously, fraudulently, and oppressively, with

18 the wrongful intention of injuring Plaintiff and acted with an improper and evil

19 motive amounting to malice or oppression, and in conscious disregard of Plaintiff's

20 rights. Moreover, Defendants and their managers, officers, and/or directors

21 authorized or ratified the wrongful conduct of their employees and/or are personally

22 guilty of oppression, fraud, or malice. As such, Plaintiff is entitled to recover punitive

23 damages from Defendants in an amount according to proof.

24               **TENTH CAUSE OF ACTION**

25         **NEGLIGENT INFLICTION EMOTIONAL DISTRESS**

26   **(BY PLAINTIFF O'NEILL AGAINST PAS/SOMNIA AND DOES 6 -10)**

27     138.   Paragraphs 1 through 86 are incorporated herein.

28     139.   As an employee of Defendants, Plaintiff was owed a duty of due care by,

1   Defendants, and each of them, to ensure that Plaintiff was not exposed to foreseeable

2   harms.

3      140.   Defendants, and each of them, knew, or should have known, that

4   Plaintiff was being, or would be, subjected to the conduct as alleged herein, and

5   knew, or should have known, that subjecting Plaintiff to such conduct and/or failing

6   to exercise due care to any other employee, officer, agent or supervisor from

7   engaging in such conduct, could and would cause Plaintiff to suffer severe emotional

8   distress.  Defendants, and each of them, breached their duty of due care by engaging

9   in such conduct, by failing to take any and all reasonable steps to half such conduct

10   and/or prevent such conduct from occurring, and by failing to take appropriate

11   corrective action following such conduct.

12      141.   By the aforesaid acts and omissions of Defendants, and each of them,

13   Plaintiff has been directly and legally caused to suffer actual damages including, but

14   not limited to, loss of earning and future earning capacity, interest, costs of suit, and

15   other pecuniary loss not presently ascertained.

16      142.   As a further direct and legal result of the acts and conduct of Defendants,

17   and each of them, as aforesaid, Plaintiff has been caused to and did suffer and

18   continues to suffer severe emotional and mental distress, anguish, humiliation,

19   embarrassment, fright, pain, discomfort, and anxiety. The exact nature and extent of

20   said injuries is presently unknown to Plaintiff, who will seek leave of Court to assert

21   the same when they are ascertained.

22                       **PRAYER**

23      WHEREFORE, Plaintiff prays for the following relief:

24      1.   A permanent injunction requiring Defendants to cease and desist from

25   violating the federal False Claims Act and the California False Claims Act,

26      2.   Judgment against Defendants in an amount equal to three times the

27   amount of damages the United States has sustained as a result of the Defendants'

28   unlawful conduct;

1       3.    Judgment against Defendants in an amount equal to three times the

2 amount of damages the state of California has sustained as a result of the Defendants'

3 unlawful conduct;

4       4.    Civil monetary penalties for each false and fraudulent claim submitted to

5 the United States and the State of California by Defendants;

6       5.    An award to Relator pursuant to 31 U.S.C. §3730(d);

7       6.    An award to Relator pursuant to Cal. Govt. Code §12652;

8       7.    An award of reasonable attorneys' fees, costs, and expenses pursuant to

9 31 U.S.C. §3730(d), Cal. Govt. Code §12652;

10       8.    A $25,000 civil penalty pursuant to Health & Safety Code Section

11 1278.5;

12       9.    A $10,000 civil penalty pursuant to Labor Code Section 1102.5;

13       10.    Such other relief as the Court deems just and equitable.

14 DATED: March 19, 2015      SCHONBRUN DESIMONE SEPLOW

15                        HARRIS & HOFFMAN LLP

16

17                        By: _Wilmer J. Harris_

18

19                          Wilmer J. Harris

20                          Isabel M. Daniels

                           Attorneys for Relator/Plaintiff,

21                          Nicole O'Neill

22

23

24

25

26

27

28

COMPLAINT

1

## **JURY DEMAND**

2      Plaintiffs hereby demand a jury trial on all issues triable to a jury.

3

4   DATED:  March 19, 2015        SCHONBRUN DESIMONE SEPLOW
                                   HARRIS & HOFFMAN LLP
5

6                                By: _Wilmer J. Harris_____
7

8                                    Wilmer J. Harris
9                                    Isabel M. Daniels
                                     Attorneys for Relator/Plaintiff,
10                                   Nicole O'Neill

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28