Wilmer J. Harris (150407)
wharris@sshhlaw.com
Isabel M. Daniels (270887)
idaniels@sshhlaw.com
SCHONBRUN SEPLOW
HARRIS & HOFFMAN LLP
715 Fremont Avenue, Suite A
South Pasadena, CA 91030
Tel.: 626-441-4129
Fax:  626-283-5770

Michael D. Seplow, SBN 150183
mseplow@sshhlaw.com
SCHONBRUN SEPLOW
HARRIS & HOFFMAN LLP
11543 W. Olympic Blvd.
Los Angeles, CA  90064
Tel.: 310-396-0731
Fax: 310-399-7040

        Attorney for Relator
UNITED STATES OF AMERICA *ex rel.*
Nicolle O'Neill, and Relator Nicolle O'Neill

## UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES and the STATE OF CALIFORNIA *ex rel.* NICOLLE O'NEILL, NICOLLE O'NEILL<br><br>        Plaintiffs/Relator<br><br>        vs.<br><br>SOMNIA, INC., PRIMARY ANESTHESIA SERVICES, PST SERVICES LLC , ROBERT GOLDSTEIN, M.D., ROY WINSTON, M.D., BYRON MENDENHALL, M.D., QUINN GEE, M.D., AND MARGARET VASSILEV, M.D, and DOES 1 through 10, inclusive | Case No.  1:15-cv-00433-DAD-EPG<br><br>**FIRST AMENDED COMPLAINT**<br><br>1. VIOLATION OF FEDERAL FALSE CLAIMS ACT 31 U.S.C. § 3729 (a) (1);<br><br>2. VIOLATION OF FEDERAL FALSE CLAIMS ACT 31 U.S.C. § 3729 (a) (2);<br><br>3. VIOLATION OF CALIFORNIA FALSE CLAIMS ACT CAL. GOVT. CODE §§ 12651 *et seq.*; |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Defendants.   )
_____   )
                                   )

4. RETALIATION FALSE CLAIMS ACT;

5. RETALIATION CAL. FALSE CLAIMS ACT;

6. VIOLATION OF HEALTH AND SAFETY CODE SECTION 1278.5;

7. WHISTLEBLOWER RETALIATION - LABOR CODE § 1102.5 *et seq.*;

8. WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY;

9. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

10. NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

**<u>DEMAND FOR JURY TRIAL</u>**

---

FIRST AMENDED COMPLAINT

Plaintiff/Relator Nicolle O'Neill ("Ms. O'Neill," "Plaintiff," or "Relator") for her complaint against Defendants Primary Anesthesia Services ("PAS"), Somnia, Inc. ("Somnia"), PST Services LLC ("PST Services"), Robert Goldstein, M.D., Roy Winston, M.D., Byron Mendenhall, M.D., Quinn Gee, M.D., and Margaret Vassilev, M.D., alleges as follows:

## INTRODUCTION

1.     This action is based on Defendants' practice of overbilling the Government for anesthesia services. In particular, Defendants knowingly and systematically submitted false claims for payment to the Centers for Medicare and Medicaid Services ("CMS") stating that medical doctors were medically directing anesthesia services when, in reality, such services were actually being performed by Certified Registered Nurse Anesthetists ("CRNAs"), with little or no oversight by medical doctors, thereby resulting in overpayments by the Government. When Plaintiff O'Neill, a Certified Registered Nurse Anesthetist ("CRNA"), complained about these fraudulent practices by her employer, she was terminated from her position in retaliation for her complaints.

2.     Plaintiff O'Neill seeks to recover damages and civil penalties on behalf of the United States and the state of California, as *qui tam* relator pursuant to the False Claims Act, 31 U.S.C. §§3729 *et seq*. (the "FCA" or the "Act") and the California False Claims Act, Cal. Govt. Code §§ 12650 *et seq*.

## JURISDICTION AND VENUE

3.     This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. §1331 and 31 U.S.C. §3732 under the Federal False Claims Act.

4.     This Court has personal jurisdiction over each Defendant because each transacts business in the state of California.

5.     Venue of this action is proper in this this judicial district by virtue of 28 U.S.C. Section 1391 because, among other things, the acts complained of occurred in this judicial district and because each Defendant transacts business in California.

6.     Pursuant to 28 U.S.C. 1367, this Court has supplemental jurisdiction over the subject matter of the claim brought pursuant to the California False Claims Act on the ground that the claim is so related to the claims within this Court's original jurisdiction that they form the same case or controversy under Article III of the United States Constitution.

## PARTIES

7.     Plaintiff/Relator Nicolle O'Neill is a citizen of the United States of America and of the State of California who resides in Tulare County, State of California.  Plaintiff O'Neill is a CRNA duly licensed by California state Board of Registered Nursing to provide CRNA medical services to patients.

8.     Sarasate Nursing Anesthesia, P.C. ("Sarasate") is a closely-held California Corporation authorized to do business in the State of California.  Plaintiff O'Neill is the President, Director, and principal shareholder in Sarasate.  Sarasate was formed by Plaintiff O'Neill and the contracting party with PAS/Somnia.

9.     Defendant PAS is a corporation incorporated in the State of California and which does business in the Eastern District of California.  In doing the acts herein alleged, its employees, subcontractors, and agents of PAS acted within the course and scope of their employment and agency with PAS.  Defendant PAS is a "person" within the meaning of 31 U.S.C. §3729(a) and the legal authority interpreting that provision.

10.     Defendant Somnia, Inc. is a corporation incorporated in the State of New York and which does business in the Eastern District of California through its control of PAS.  In doing the acts herein alleged, its employees, subcontractors, and agents of Somnia acted within the course and scope of their employment and agency with Somnia.  Defendant Somnia is a "person" within the meaning of 31 U.S.C. §3729(a) and the legal authority interpreting that provision.

11.     Relator is informed and believes and on that basis alleges that Defendants PAS and Somnia, although separately incorporated, have an interrelation

of operations, common management, centralized control of labor relations, uniform management and employment practices and policies, and common ownership and financial control, creating an integrated enterprise.  Relator further alleges that all Defendants may be comprised of multiple organizational entities, however there is but one enterprise and this enterprise has acted in concert to commit the wrongs herein alleged.

12.    PST Services LLC is a company that serves the health care industry, including with respect to medical billing as alleged in this complaint.  Defendant PST Services LLC is a "person" within the meaning of 31 U.S.C. §3729(a) and the legal authority interpreting that provision.[1]

13.    Plaintiff/Relator O'Neill is informed and believes, and thereon alleges that Defendant Robert Goldstein, M.D., is a natural person residing in the State of New York.  Plaintiff/Relator O'Neill is informed and believes, and thereon alleges that Defendant Goldstein was at all relevant times the Vice President and Chief Medical Officer of PAS/Somnia.  Defendant Goldstein is a "person" within the meaning of 31 U.S.C. §3729(a) and the legal authority interpreting that provision.

---

[1] The original Complaint named McKesson Corporation as a Defendant. Based on representations from McKesson Corporation's counsel, the business entity that is actually described in the original Complaint was a subsidiary of McKesson Corporation which had previously been transferred to Change Healthcare, Inc., and is now known as PST Services LLC.  Specifically, on March 1, 2017, the majority of businesses in McKesson Technology Solutions and substantially all of Change Healthcare, Inc. came together to form the new entity -  Change Healthcare LLC ("Change").  Among the businesses transitioned to Change was McKesson Business Performance Services ("BPS").  BPS is now a part of the Technology Enabled Services ("TES") business unit with its business being conducted by the subsidiaries PST Services, LLC, a Georgia limited liability company (fka PST Services, Inc.), and MED3000 Group, Inc., a Delaware corporation, and its subsidiaries. Accordingly, Defendant PST Services LLC is legally responsible for the actions of its predecessors, including McKesson Corporation and its subsidiaries and related entities.

14.     Plaintiff/Relator O'Neill is informed and believes, and thereon alleges that Defendants Roy Winston, M.D., Byron Mendenhall, M.D., Quinn Gee, M.D. and Margaret Vassilev, MD. are natural persons residing in the State of California and who work in Visalia, California.  These defendants are "persons" within the meaning of 31 U.S.C. §3729(a) and the legal authority interpreting that provision.

15.     In doing the acts herein alleged, each Defendant, its employees, subcontractors, and agents was acting within the course and scope of their employment and agency with each other Defendant.

16.     The Somnia website states that it "manages anesthesia services for hospitals, ambulatory surgery centers and office based surgical practices in 14 states, and has 325 anesthesiologists and certified registered nurse anesthetists in its clinical network."  The operations in California include, but may not be limited to the following: Desert Regional Medical Center in Palm Springs, California, Kaweah Delta Medical Center operated by the Kaweah Delta Healthcare District (hereinafter "Kaweah") in Visalia, California, St. Joseph's Medical Center in Stockton, California, Kern Medical Center in Bakersfield, California, Rideout Hospital in Yuba City, California, and San Joaquin General Hospital in French Camp, California. Outside of California, Defendant Somnia provides anesthesia services in other states, including but not limited to the following: Providence Regional Medical Center in Everett, Washington, Memorial Medical Center in Las Cruces, New Mexico, San Juan Regional Medical Center in Farmington, New Mexico, Memorial Healthcare in Owosso, Michigan, St. Barnabas Hospital in the Bronx, New York, Lehigh Valley Hospital in Hazleton, Pennsylvania, Kentucky Surgery Center in Lexington, Kentucky, Fayette Regional Health System in Connersville, Indiana, Mercy Hospital in Grayling, Michigan, Missouri Delta Medical Center in Sikeston, Missouri, Munson Healthcare Grayling Hospital in Michigan, and University Medical Center of El Paso, Texas.  Plaintiff alleges that Somnia's fraudulent billing procedures extended beyond Kaweah, where she was employed by Defendants PAS/Somnia.

17.     Kaweah has a patient population that is approximately 72% government-supported, with Kaweah receiving approximately 37% of its payments for medical services from Medicare, 31% from Medicaid, and 4% from the County of Tulare.

18.     On or about March 22, 2012, Plaintiff O'Neill, by and through Sarasate, entered into a contract with PAS/Somnia to provide anesthesia services to patients of Kaweah as Chief CRNA.  Ms. O'Neill was forced to enter into a putative independent contractor relationship with PAS/Somnia.  However, in the alternative, Ms. O'Neill was clearly subject to substantial control by PAS/Somnia in the execution of her duties as Chief CRNA and later as Staff CRNA.  In particular, PAS/Somnia controlled the hours and days that Ms. O'Neill worked and was responsible for the billing for her services. She was assigned an operating room and cases by PAS/Somnia and medical doctors told her what type of anesthesia services should be administered. Because of the control PAS/Somnia retained over the particulars of Ms. O'Neill's work, Ms. O'Neill was actually an employee of Defendants PAS/Somnia.

19.     PAS/Somnia contracted with Kaweah Delta Health Care District ("District") who operates Kaweah, a general acute care hospital known as Delta Medical Center ("the Hospital") in Visalia, California to exclusively provide professional services for their Anesthesia Department ("the Department"). The Hospital is a certified Medicare/Medicaid supplier having met *conditions of participation* set forth by the *Centers for Medicare and Medicaid* (CMS) the body that administers the Medicare program.

20.     The contract between the District and PAS/Somnia was executed in July 2011 and went into effect December 13, 2011.

21.     Consistent with the TEFRA requirements set forth herein, the contract required PAS/Somnia to do its own documentation in the electronic medical record ("EMR") which was to be in compliance with state and federal regulations (Section 2.22) and Section 7.1 required PAS/Somnia to bill its patients and third-party payers (including Medicare) directly. "District shall have no interest in or responsibility with

1  respect thereto . . ."

2      22.    PAS/Somnia hired providers (MDAs and CRNAs) as *locum tenens* or

3  independent contractor S corps. Providers were salaried and PAS/Somnia billed (later

4  hiring PST Services and/or its predecessors) to do their billing) and was reimbursed

5  under providers' names directly from Medicare.

6      23.    Relator is informed and believes and on that basis alleges that the true

7  names and capacities, whether corporate, associate, individual or otherwise of

8  defendants, DOES 1 through 10, inclusive, are unknown to Plaintiff, who therefore

9  sues said Defendants by such fictitious names.  Plaintiff is informed and believes and

10 thereon allege that DOES 1 through 5 are individuals who submitted, or caused to be

11 submitted, false statements or records resulting in payment from either the state or

12 federal government.  Plaintiff is informed and believes and thereon alleges that

13 DOES 6 through 10 are entities responsible for the wrongful conduct herein alleged.

14 Each of the defendants designated herein as DOE is negligently or otherwise legally

15 responsible in some manner for the events and happenings herein referred, including

16 violations of the False Claims Act, 31 U.S.C. §3729, *et seq.,* and California False

17 Claims Act, Cal. Govt. Code §§12650, *et seq.*, and caused injuries and damages

18 proximately thereby to Plaintiff, to the United States Government and to the State of

19 California, as herein alleged.

20     24.    Ms. O'Neill is an "original source," as defined by law, of the

21 information set forth herein.

22     25.    Ms. O'Neill is informed and believes and on that basis alleges that the

23 allegations in this complaint have not been publicly disclosed.

24     26.    Relator has complied with the California and Federal False Claims Act

25 by providing the information upon which the allegations of this complaint are based

26 on both to the Attorney General of the United States of America and of the State of

27 California, and the United States Attorney for the Eastern District of California.

28 Relator's disclosure statement is supported by material evidence known to relator as

FIRST AMENDED COMPLAINT

6

her filings establishing the existence of Defendants' false claims.  Because the statement includes attorney-client communications and work product of relator's attorneys, and is submitted to the Attorneys General and to the United States Attorney for the Eastern District of California in their capacity as potential co-counsel in the litigation, the relator understands the disclosure statement to be privileged and confidential.

27.   Relator is informed and believes and on that basis alleges that all of the acts complained of herein either (i) occurred within the last six years or (ii) within the last ten years and that the United States government neither knew nor should have known of the violation of the False Claims Act within the last three years.

28.   The United States is herein named a Plaintiff pursuant to the False Claims Act, 31 U.S.C. §3729, *et seq.*, as funds of the United States have been directly or indirectly disbursed and awarded to Defendants, as a result of the knowingly false statements, false claims and/or false records alleged in this Complaint made by or caused to be made by Defendants.

29.   The state of California is herein named a Plaintiff pursuant to the California False Claims Act, Cal. Govt. Code §§12650, *et seq.*, as funds of the state of California have been directly or indirectly disbursed and awarded to Defendants, as a result of the knowingly false statements and false claims alleged in this Complaint made by or caused to be made by Defendants.  California funds were misappropriated as a result of Defendants' illegal scheme.  First, California contributes state money to the Medicaid program, funds which were wrongfully tapped to pay Defendants' false claims.  Moreover, Defendants' false claims caused money to be paid to Defendants out of California's Medi-Cal program.

## APPLICABLE REGULATIONS REGARDING BILLING FOR ANESTHESIA SERVICES

30.   There are four basic ways in which anesthesia services are provided and billed, based on the level of involvement by a Medical Doctor of Anesthesiology

("MDA"): (1) Personally Performed, (2) Medical Direction, (3) Medical Supervision and (4) CRNA Independent.

31. Anesthesia services are "Personally Performed" when a medical doctor (MDA) is performing all of the anesthesia services by him or herself.

32. Anesthesia services are performed under "Medical Direction" when an MDA is directly involved in providing the anesthesia services, but with the assistance of another qualified individual such as a CRNA.

33. More specifically, anesthesia services are "medically directed" when a physician meets certain conditions or performs certain tasks, such as monitoring the administration of anesthesia at certain intervals and remaining available to diagnose and treat emergencies. 42 C.F.R. §414.46(d)(i); 42 C.F.R. § 415.110 (describing activities physician must perform under 42 C.F.R. § 414.46(d)(i) for "medically directed" services); *see also* Medicare Claims Processing Manual, Ch.12, § 50(C) (explaining when "medical direction" occurs). Notably, a physician may medically direct up to four concurrent procedures. 42 C.F.R. § 415.110(a)(2); *see also* Medicare Claims Processing Manual, Ch.12, § 50(J) (defining "Concurrent Medically Directed Anesthesia Procedures" and providing examples of concurrent procedures).

34. Anesthesia services are performed under "Medical Supervision" when the MDA is involved with more than four concurrent cases or does not fulfill the seven requirements to qualify for Medical Direction.

35. Anesthesia services are "CRNA Independent," where there is no MDA involved and the services are performed by a CRNA.

36. The modifiers that indicate the types of services are as follows:

| | | |
|---|---|---|
| Personally Performed: | MDA only | = AA |
| Medically Directed: | MDA | = QK |
| | MDA | = QY |
| (MDA *medically directing* only one CRNA) | | |
| | CRNA | = QX |

|  | Medically Supervised: | MDA | = AD |
|--|--|--|--|
|  |  | CRNA | = QX |
|  | CRNA Independent | CRNA only | = QZ |

37.    42 CFR § 415.110 sets out the conditions for payment of anesthesia services claims:

**§415.10 Conditions for payment for Medically Directed anesthesia services:**

(a) General payment rule. Medicare pays for the physician's medical direction of anesthesia services for one service or two through four concurrent anesthesia services furnished after December 31, 1998, only if each of the services meets the condition in § 415.102(a) and the following additional conditions:

    (1) For each patient, the physician—

        (i) Performs a pre-anesthetic examination and evaluation;

        (ii) Prescribes the anesthesia plan;

        (iii) Personally participates in the most demanding aspects of the anesthesia plan including, if applicable, induction and emergence;

        (iv) Ensures that any procedures in the anesthesia plan that he or she does not perform are performed by a qualified individual as defined in operating instructions;

        (v) Monitors the course of anesthesia administration at frequent intervals;

        (vi) Remains physically present and available for immediate diagnosis and treatment of emergencies; and

        (vii) Provides indicated post-anesthesia care.

    (2) The physician directs no more than four anesthesia services concurrently and does not perform any other services while he or she is directing the single or concurrent services so that one or more of the conditions in paragraph (a)(1) of this section are not violated.

(3) If the physician personally performs the anesthesia service, the payment rules in § 414.46(c) of this chapter apply (Physician personally performs the anesthesia procedure).

(b) Medical documentation. The physician alone inclusively documents in the patient's medical record that the conditions set forth in paragraph (a)(1) of this section have been satisfied, specifically documenting that he or she performed the pre-anesthetic exam and evaluation, provided the indicated post-anesthesia care, and was present during the most demanding procedures, including induction and emergence where applicable.

38.    As noted above under conditions for payment (§415.10), Anesthesiologists who comply with the requirements set forth in TEFRA (the *Tax Equity and Fiscal Responsibility Act of 1982*, Pub.L. 97-248) may be reimbursed by Medicare for *medical direction* (e.g. of CRNAs) if they have no more than 4 concurrent cases (i.e. 4:1 ratio) and the physician documents in the patient's medical record that all requirements were met. [(*Social Security Act*, § 1833(e)].

39.    The gravamen of this case is that Defendants were knowingly billing the Government at a higher rate for "medically directed" anesthesia services when they should have been billed under the "medical supervision" category.  As a result of Defendants' knowing overbilling of the anesthesia services, the Government overpaid for the anesthesia services.

40.    For instance, if a physician is involved in more than four concurrent procedures, he is no longer "medically directing" any of the procedures and must bill at the lower "medically supervised" rate for all of the services. 42 C.F.R. § 414.46(f). Similarly, a physician cannot "medically direct" a service if he is "perform[ing] any other services," because doing so would prohibit him from performing any of the activities necessary for him to qualify for "medically directing" other procedures. *See* 42 C.F.R. § 415.110(a)(2).

41.    By way of example, if an anesthesiologist leaves surgical patients in an

operating suite for an extended period of time or is not available to respond to emergencies in the operating suite, the anesthesiologist would not meet the criteria for "medically directing" a procedure. However, he could still meet the criteria for "medical supervision" and would bill at that lower rate for that type of service. *See* Medicare Claims Processing Manual, Ch. 12, § 50(C).

42.     Billing for "medical direction" rather than "medical supervision" results in higher payments by the payor (here, the Government). This is because the fee schedule for anesthesia service is based on allowable base and time units multiplied by an anesthesia conversion factor specific to that locality. (§50.A)

43.     Specifically, a Medicare claim processed by Defendants as *medically directed* would pay PAS/Somnia 50% of the allowable charges per case (up to four) under the MDA's name, and 50% under the name of the CRNA. In other words, a *medically directed* claim would allow PAS/Somnia to receive payment for all base units under that procedure.  If there are more than 4 concurrent cases, or if all of the seven TEFRA requirements for *medical direction* are not followed and documented, then, as long as the MDA had any involvement in the case, the claim is required to be processed as *medical supervision*. *Medical supervision* only allows reimbursement for the MDA service at only 3 units (plus one unit if the MDA was present for induction). It also allows 50% reimbursement for the CRNA. This results in a reimbursement significantly less than for a *medically directed* claim.

44.     Put another way, Medicare reimburses *personally performed* services by an MDA at 100% of the allowable amount. *Medical Direction,* which includes payment for the services of qualified non-physician anesthetists and the MDA, combines to result in 100% reimbursement for the procedure.  *Medical Supervision,* which is a lower level of MDA involvement than *medical direction,* allows MDA reimbursement by Medicare for only 3 to 4 units on any procedure. This results in less than 100% of the otherwise allowable payment. Nonetheless, *medical supervision* is the proper documentation where an MDA fails to comply with all

seven requirements of *medical direction* and/or where the MDA was involved in more than 4 concurrent cases. (*Medicare Claims Processing Manual*, chapt. 12 section 50.C) However, as set forth herein, the District's contract with PAS/Somnia did not (under any circumstances) allow an MDA to be involved in more than 4 concurrent cases.

45.     Furthermore, Chapter 12 Section 140 *et seq.* of the *Medicare Claims Processing Manual* (*MCM*) defines qualified non-physician anesthetists as CRNAs and anesthesia assistants, ("AAs") and outlines the criteria and modifier codes pertaining to them. If the physician leaves the immediate area of the operating suite for other than short durations or devotes extensive time to an emergency case or is otherwise not available to respond to the immediate needs of the surgical patients, the physician's services to the surgical patients are supervisory in nature, and should be billed as *Medical Supervision.* Carriers may not make payment [for *medically directed* service] under the fee schedule.  (§50.C).

46.     Defendants also falsely billed anesthesia services as CRNA Independent when they should not have been.

47.     Though California *generally* is an "opt-out" state allowing CRNAs to work independently, CRNAs must be directly supervised by an anesthesiologist if they are working in Level I, II and/or III Trauma Centers and the institution seeks to collect Medicare Part A reimbursement.  Kaweah Hospital is a Level III Trauma Center that collects Medicare Part A reimbursement.

48.     Thus, the bylaws of District prohibited independent CRNA practice and mandated the stricter requirement that CRNAs be supervised. In keeping with the Kaweah Hospital bylaws, Section 2.1 (g) of their contract with PAS/Somnia mandated that, *under no circumstances shall the ratio of supervised CRNAs to Physicians providing Services under this Agreement exceed 4:1.*

49.     Due to these District bylaws, billing a QZ modifier was not allowed at Kaweah Hospital.  Yet, PAS/Somnia and later McKesson/PST Services expressly

1   violated applicable regulations by routinely billing under the QZ modifier (for CRNA

2   Independent services) when the conditions for payment as *medical direction* were not

3   met. The "AD" modifier was never used because the reimbursement was less than for

4   either "QK" or "QZ." This was the case even where it would have accurately

5   reflected the service.

6       50.   Medicare requires careful documentation of anesthesia service including

7   documenting all providers involved in the service. Therefore, it is improper to drop

8   the MDA from the claim in favor of a QZ modifier because the conditions for

9   *medical direction* were not met. (482.52 et seq.; *MCM* chapter 12 section 50 *et seq.*)

10                  **DEFENDANTS' SUBMISSION OF FALSE CLAIMS FOR**

11                             **ANESTHESIA SERVICES**

12      51.   Defendants had a practice of improperly and knowingly coding – both in

13   medical charts and in billing to the Government – anesthesia services as Medical

14   Direction that should have been charted, coded, and billed as Medical Supervision.

15   Even after PST Services (or its predecessors) took over coding and billing practices at

16   Kaweah Hospital, anesthesia services that should have been coded and billed as

17   Medical Supervision were fraudulently billed as Medical Direction or CRNA

18   Independent. This resulted in false claims being submitted to the Government, via the

19   Medicaid and Medicare programs.  The Government paid higher levels of

20   reimbursement for Medical Direction and/or CRNA Independent anesthesia services

21   than it would have paid had the services been properly billed as Medical Supervision.

22      52.   Specifically, the EMR system implemented and used at Kaweah

23   Hospital for patient medical charts required, in order for the chart to be closed for

24   billing to the Government, that an MDA was listed as *medically directing* the

25   anesthesia services.  This was true regardless of the actual type of anesthesia services

26   being provided to the patient.

27      53.   Thus, the EMR for all patients receiving anesthesia services at Kaweah

28   Hospital reflected an MDA performing Medical Direction even if the requirements

1  for such a level of service were not met.

2       54.    Bills to the Government for anesthesia services are derived from the

3  patient EMR and/or medical charts.  Defendants use the information recorded on the

4  EMR and/or medical charts as the basis for billing the Federal and California

5  healthcare programs.

6       55.    Defendants' employees and/or agents who generated the bills to the

7  Government were not permitted to alter or amend the patient EMR and/or medical

8  charts.  Thus, when a patient's EMR and/or medical chart indicated that the

9  anesthesia services were performed with an MDA as Medical Direction, the

10  anesthesia services were then billed to the Government as Medical Direction.

11       56.    Moreover, in conformity with Defendants' practices, once an anesthesia

12  patient was brought to the post-operative care unit, the CRNA was required to print a

13  hard-copy version of the EMR for the chart.  That hard-copy version was placed in a

14  bin that was sent to Defendants to be coded and billed.

15       57.    Pursuant to Defendants' policy and practice of submitting medical bills

16  that are consistent with the information in the EMR/medical charts, Defendants

17  submitted false bills to the government for the incidents described herein.

18       58.    From about December 2011 through about October 2015, Defendants

19  caused false claims for anesthesia services to be submitted to the Government by

20  knowingly overbilling those services at the higher rate of "Medical Direction" when

21  the requirements for Medical Direction were not met.

22       59.     Defendants violated the False Claims Act by knowingly submitting

23  fraudulent claims for *Medical Direction*:

24       a)     when MDAs were involved in more than 4 concurrent cases;

25       b)     when MDAs were documented as personally performing a concurrent

26              case;

27       c)     when CRNAs were independently performing a case;

28       d)     when they knew the MDA had not complied with nor documented the

FIRST AMENDED COMPLAINT
14

seven TEFRA requirements.

60.     Defendants violated the False Claims Act when they submitted claims for *personally performed* service when they knew the MDA was not present throughout the case, as required.

61.     Defendants violated the False Claims Act when they intentionally failed to comply with the documentation requirements that are a condition of payment from Medicare.

62.     Defendants PAS/Somnia and PST Services (including its predecessors) violated the False Claims Act when they submitted claims that they knew failed to comply with *medical direction*, as non-medically directed service (QZ) with 100% reimbursement, rather than properly submit them as *medically supervised.* In other words, to maximize reimbursement, Defendants PAS/Somnia and PST Services (including its predecessors) would drop the MDA's modifier entirely rather than process the claim as *medical supervision* (AD modifier). This practice not only failed to include the MDA's actual level of involvement, but it resulted in overpayment.

63.     Defendants PAS/Somnia and PST Services (including its predecessors) also violated the False Claims Act when they knowingly failed to return overpayments.

**SPECIFIC EXAMPLES OF FALSE CLAIMS FOR ANESTHESIA SERVICES**

64.     After she started working as a CRNA at Kaweah Hospital, Ms. O'Neill observed that there was a blatant pattern of disregard for proper and adequate documentation in the medical records by the Somnia/PAS Defendants, which resulted in overbilling to the government given that approximately 72% of the patients were Government-insured.

65.     Defendants had a pattern and practice of not documenting TEFRA compliance in their medical records and of failing to have MDAs sign the charts. Moreover, the records were also misleading with respect to the level of the MDAs participation in the procedure.

66.     MDAs not only failed to document the charts, but when they did, it was often inaccurate, listing a case as *medically directed* when they had not complied with the TEFRA requirements; listing *medically directed* when they were engaged in more than four concurrent cases or not "immediately available" and they should have documented *medically supervised;* and listing concurrent cases as *personally performed.* Often, CRNAs performed the procedure without knowing which MDA was in-house.

67.     The following are examples of abuses Ms. O'Neill witnessed and/or learned about, while employed at the Hospital, which reflect a systemic pattern that was known to Defendants:

a) Dr. Mendenhall was the main anesthesiologist for cardiac. He and another MDA were responsible for anesthesia for the all the cardiac surgeries. Dr. Mendenhall continued to bill for personally performed anesthesia services though he would leave the OR, the building, or even the hospital grounds (per Cindy Conley, prior Nurse Manager) while the patient was on bypass. CRNAs did not do cardiac bypass anesthesia at the Hospital. Therefore when Dr. Mendenhall left, there was no anesthesia provider in the room. It is unacceptable to leave a patient alone while they are under anesthesia. These cases could only be charted as personally performed (i.e. AA). Moreover, the AA designation also requires the MDA to be present for the entire procedure. Therefore, all these cases were fraudulently billed "AA" paying 100% of the allowable charge;

b) MDAs did not perform the pre-anesthesia exam and post anesthesia evaluation requirement of *medical direction* when a CRNA was involved in the patient's care;

c) If an anesthesiologist did sign the pre-op form it was often after the patient was already under anesthesia when they came in the room to give the CRNA a break;

d)  Even after PST Services and its predecessors were engaged to "fix" the billing and charting problems, they would bill as *medical direction*. However, MDAs would not sign the electronic medical record and there was no documentation of TEFRA guidelines being met.

e)  Dr. Mendenhall, Dr. Quinn Gee, Dr. Margaret Vassilev and Dr. Roy Winston would consistently depart for the day at approximately 3 pm. They failed to document the chart to indicate who would now be *medically directing* that OR. CRNAs were often unaware of which MDAs remained in house and who to call for an emergency.

f)  On or about November 2, 2013, Cindy Conley, prior Nurse Manager, confided to Ms. O'Neill that the Hospital representatives warned she would lose her job if she reported that Dr. Mendenhall didn't remain in the OR during cardiac bypass.  She also told Ms. O'Neill sometimes she had seen him off hospital grounds during cardiac surgery. Dr. Mendenhall would frequently order lunch from Checkers and pick up his meal while his patient was on bypass.

g)  Split cases where there would be a hand-off between MDAs due to a shift change or other reason, were not documented. MDAs never documented their departure time and the replacement MDA would never put his/her name on the chart. Medical charts consistently indicate the name of only one MDA even where there was a shift change and a split case;

h)  MDAs would improperly give breaks to a CRNA while listed as *medically directing* three other rooms. An MDA cannot be *medically directing* a CRNA if the CRNA is not present. In such a case, the MDA would be *personally performing* which would also not be allowed while *medically directing* other rooms. The proper way to give a break required another CRNA to step in;

i)  Dr. Vassilev deliberately made the time and date on her post-op forms

illegible, making it impossible to read the time documenting post-op visits – required for *medical direction*. In reality, she never saw patients after an epidural was placed or after a cesarean section was performed;

j)  Benton Duckett, Director of Surgical Services, told Ms. O'Neill that often when he called Dr. Winston he would not respond and was never around despite the fact that he was being documented as *medically directing* OR cases;

k)  Some CRNAs would improperly document all unscheduled anesthesia procedures as emergencies, which are reimbursed at a higher rate. An emergency only exists when a delay in treatment would lead to a significant threat to life or body part.

l)  CRNAs performing ultrasound-based peripheral nerve blocks did not capture an image with the ultrasound or make the image a part of the permanent record until 2014. In order to bill for ultrasound, Medicare requires the image to be captured and stored in the patient's chart. Ms. O'Neill had told Somnia about this problem while she was Chief CRNA. This practice continued until PST Services and/or its predecessors) took over;

m) CRNAs would monitor epidurals while concurrently performing multiple caesarean sections, a practice which was not allowed: since they were performing independently they were required to be present at all times, and they could properly only bill for one service at a time. In addition, though they were performing independently, it was typically documented as *medically directed.*

n)  CRNA Heather Lee kept a record of how often she would call an MDA, charted as *medically directing* and therefore supposedly immediately available, who wouldn't arrive in a reasonable amount of time.

o)  Dr. Gee Quinn would consistently leave the hospital during his shift. One

day while Dr. Quinn was first call to the OR, he left to start a shift at another hospital where he worked, leaving the CRNA alone to do a remaining case independently – violating the Hospital bylaws. Cindy Conley, Nurse Manager of the OR at the time brought this to everyone's attention. Ms. O'Neill texted Dr. Winston about the event and he responded, "Very concerning." The CRNA in this situation still had to chart *medically directed* or the case could not be closed.

68.     It was common for cases to be listed as medically directed when the MDA had left the building to do other cases, run errands, play golf or go home.

69.     For example, on June 15, 2012, Dr. Roy Winston, then Chief of Anesthesia, left the hospital in the afternoon when Ms. O'Neill had charted him as *medically directing* her. Ms. O'Neill learned he was gone when the patient, who was insured via Medicare, had to be admitted to the ICU unexpectedly post-op. Ms. O'Neill discovered he was on his way to LAX. He told Ms. O'Neill to do whatever she thought was best. Ms. O'Neill had to get Dr. Wilson, a trauma surgeon, to get the physician approval required to admit the patient to the ICU. This Medicare patient's anesthesia services were coded in the EMR and billed to the Government as Medical Direction by Dr. Winston even though the requirements for that level were not met.

70.     Additional specific examples of Medicare patient's anesthesia services that were coded in the EMR and billed to the Government by Defendants as Medical Direction even though the requirements for that level were not met are as follows:

- December 16, 2011 – a Medicare patient received anesthesia services that were charted and billed to the Government as Medical Direction, when the requirements for Medical Direction were unmet.
- January 13, 2012 – a Medicare patient received anesthesia services that were charted and billed to the Government as Medical Direction, when the requirements for Medical Direction were unmet.
- August 1, 2014 – six Medicare patients underwent surgical procedures

FIRST AMENDED COMPLAINT

19

and received anesthesia services which were improperly documented and billed to the Government as Medical Direction, when the requirements for Medical Direction were unmet.

71.     In addition, in the Obstetrical (OB) Department at night, only a CRNA was "in-house." The MDA was on-call. Often, the CRNA had to perform procedures and could not wait for an MDA to arrive. However, the cases were always documented as *medically directed*.

72.     After only three months at the Hospital, on March 21, 2012, Ms. O'Neill wrote to Kimberly Carriere, Project Manager at Somnia, regarding the charting and billing issue in the OB department, stating that only the CRNA should be listed as doing the case. Ms. Carriere responded the following day, that the Hospital by-laws did not allow for independent practice by CRNAs and that these charts should be put aside and later signed by MDs as if to reflect their presence.

73.     Ms. O'Neill was informed that cases done in the middle of the night only in the OB department, were considered emergencies. For that reason, she was able to institute a change where the Hospital would allow CRNAs to document those cases as independently performed. However, many CRNAs still charted that an MDA was *medically directing* them though no MDA was in-house.

74.     On March 1, 2013, Dr. Winston was supposed to be *medically directing* Ms. O'Neill on a difficult all-day case with a medically unstable patient, who was insured via Medi-Cal. He stopped into the OR at about 10:30 a.m. and asked how things were going and stated he had to attend a meeting. Later Ms. O'Neill texted him several times with calls from the secretary and questions from staff, as she was trying to manage the anesthesia on this case.  At about 3:30 p.m., Dr. Byron Mendenhall stopped into the OR and informed her that Dr. Winston was not responding because he was playing golf with Kaweah Chief Operating Officer Tom Raynor and VP of Nursing Linda Pruett. He had left the premises without notifying Ms. O'Neill. This Medi-Cal patient's anesthesia services were coded in the EMR and billed to the

1    Government as Medical Direction by Dr. Winston even though the requirements for

2    that level were not met.

3         75.    Ms. O'Neill complained to Karen Bennett, the practice administrator for

4    Somnia, about this incident. Ms. O'Neill then sent a letter to Dr. Winston resigning as

5    Chief CRNA.  She agreed to a position as a Staff CRNA. After further conversation,

6    it was decided that Dr. Winston would not forward Ms. O'Neill's resignation to

7    Somnia.

8         76.    On March 19, 2013, Dr. Mendenhall was listed as *medically directing*

9    Ms. O'Neill but left the OR without letting her know. Her second patient complained

10   of shortness of breath in the recovery room. When Ms. O'Neill tried to contact Dr.

11   Mendenhall she was told he was no longer in-house and left to attend "an event." Ms.

12   O'Neill is informed and believes and on that basis alleges that "attending an event"

13   was code for playing golf.  Ms. O'Neill subsequently looked up PA's chart and

14   discovered that nine days after the case, Dr. Winston had logged onto the chart and

15   signed it as if to show that he had been *medically directing* Ms. O'Neill.

16        77.    On or about March 21, 2013 after the incident with Dr. Mendenhall, Ms.

17   O'Neill sent an email to Dr. Winston complaining of the poor precedent that had been

18   set at Kaweah.  "When a physician leaves the hospital the CRNA has to be notified

19   and the chart documented appropriately. . . This is fraud."

20        78.    On or about March 21, 2013 after the incident with Dr. Mendenhall, Ms.

21   O'Neill again argued with Dr. Winston and resigned as Chief CRNA, effective

22   immediately. Ms. O'Neill followed up with a call to Margaret See, VP for Facility

23   Operations at Somnia, apprising her of her resignation and informing her that some of

24   the anesthesiologists were playing golf, leaving the hospital in the middle of

25   anesthesia cases, and not notifying CRNAs of their whereabouts. The following day,

26   Dr. Winston sent a letter to the anesthesia department that Ms. O'Neill had resigned

27   as Chief CRNA, and her salary immediately reflected the change.

28        79.    On April 21, 2013, Ms. O'Neill sent an email describing the fraud to

Brent Sommers, CRNA liaison to Somnia.  She outlined the reasons for her resignation as Chief CRNA and described the fraud occurring at Kaweah.  He responded, indicating that Somnia had existing concerns about the issue of CRNA supervision and that it had been discussed between Robert Goldstein, MD, Executive Vice President, Somnia, and other Somnia executives before Ms. O'Neill brought it up. His response stated, "your email is spot on… don't regret having stated the truth."

80.    Ms. O'Neill also discussed the reasons for her resignation from her position as Chief CRNA with Benton Duckett, Chief of Surgical Services.  He told her that he has noticed that Dr. Winston is never around and believes that Dr. Winston leaves the hospital in the middle of the day.  Mr. Duckett told Ms. O'Neill that he was "new to the hospital and doesn't want to make waves."  He also acknowledged that the physicians took advantage of the staffing environment because "all the CRNAs are new and inexperienced with school loans to pay."

81.    On or about May 1, 2013, Ms. O'Neill communicated with Dr. Victoria Gerken, Medical Director of the Operating Room, about her concerns.  Dr. Gerken admitted to Ms. O'Neill that she knew that MDAs were both personally performing cases while at the same time supervising anesthesia services in other rooms.  Not only did this practice violate Kaweah's contract with Somnia and the bylaws of the Hospital, it violated CMS's rules for coding and processing claims for anesthesia services.  Specifically, if an MDA is personally performing an anesthetic, that MDA cannot document his or her participation in an anesthetic in any other operating room.

82.    In mid-2013, an Incident Report was generated stating that Dr. Winston left the OR while personally providing anesthesia to a patient. According to the Registered Nurse on the case, Dawn Haldeman, his absence was discovered upon completion of the surgery when the drapes were lowered and no MDA was present.

83.    On or about August 5, 2013, an amended contract between PAS/Somnia and SNA, reflecting Ms. O'Neill's resignation as Chief CRNA, was drawn and became effective.

84.     On October 18, 2013, there were four concurrent cases plus cases listed in the OB department that Dr. Winston charted and billed as *medically directing*.  In addition, one of the cases was charted and billed as *personally performed*. He could not be *personally performing* a case and *medically directing* at the same time.

85.     On October 25, 2013, there were two concurrent cases involving anesthesia care.  One of the cases was documented and billed as *medically directed* and the other case was charted and billed as *personally performed*.  An anesthesiologist who is personally performing a procedure is not immediately available to medically direct other rooms.  Thus, TEFRA guidelines were not met and charting and billing the services for one case as Medical Direction was fraudulent.

86.     One of the problems contributing to the absent/false documentation was the fact that PAS/Somnia ignored repeated requests for more staff. MDAs could be scheduled to concurrently work shifts in the Main or Cardiac OR and simultaneously be on emergency call. Often these cases would be in separate buildings. For instance, on December 1, 13, and 15, 2013, Dr. Bart Lee was assigned to work Cardiac call at the same time he was scheduled for Call 2. Call 2 required Dr. Lee to be available for emergency cases in the Main OR and to simultaneously "medically direct" CRNAs in another building. On December 14 and 22, 2013, he was scheduled for first call in the Main OR as well as Cardiac. In addition, the Saturday, 8-hour shift was understaffed. Ms. O'Neill was told that PAS/Somnia would never pay to cover these shifts.

87.     Dr. Adam Dorin replaced Dr. Winston as Chief of Anesthesiology on or about January 1, 2014. Immediately he tried to alleviate the staffing problem. In an email dated January 2, 2014, he outlined his plan. This plan was rejected by Robert Goldstein.

88.     On or about March 3, 2014, PAS/Somnia engaged PST Services and/or its predecessors, a company providing services to the healthcare industry, to handle their billing and to "fix" the problems that were becoming too obvious and overwhelming to manage.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**THE FRAUDULENT BILLING PRACTICES CONTINUE AFTER PST SERVICES WAS HIRED BY SOMNIA TO HANDLE BILLING FOR ANESTHESIA SERVICES**

89.     After PST Services (and/or its predecessors) was engaged to take over the billing processes at the Hospital in early March of 2014, there was an attempt by Somnia to change the way the EMR system functioned – specifically, the requirement that an MDA be listed as *medically directing* anesthesia services even if that was not accurate.  On March 30, 2014, Somnia's Margaret See drafted an email that was sent by Kaweah's on-site practice manager notifying staff that the EMR functionality would be modified so that CRNAs could have the option to select "Facilitating MD" instead of "Medical Direction of a CRNA" if the circumstances so required it.  In the email, Somnia stated that the change would mean that "MDs won't have to ensure" they meet "all the elements of medical direction as required by CMS".

90.     In response to this email, Dr. Mendenhall sent a question to the Somnia Practice manager "What are the criteria for Medical direction?"  This question reflects the lack of a compliance program, education, and that TEFRA regulations were not being performed by anesthesiologists.

91.     However, even after the "Facilitating MD" option was added, it was still impossible for a CRNA to close out a patient's medical chart unless an anesthesiologist was documented as "medically directing" the services.  Thus, the "Facilitating MD" option was essentially useless.

92.     In other words, the Hospital's electronic medical records program was *still* programmed in such a way as to mandate coding of anesthesia services as "Medical Direction" even if they should not have been.

93.     Relator O'Neill attempted to use the "Facilitating MD" option on the EMR for a patient, but was unable to close the patient's chart after selecting that option.  Ms. O'Neill contacted Michelle Martinez, an applications analyst employed by Kaweah, about the problem.

94.     Ms. Martinez informed Ms. O'Neill that it was against the Hospital bylaws for CRNAs to practice independently at Kaweah.  Thus, per the orders of the hospital administration, the EMR functionality would not be modified to permit cases to be closed with only a "Facilitating MD" option listed.  In other words, it remained the case that the EMR required that an MDA be listed as medically directing the anesthesia services.

95.     Indeed, around this same time, Dr. Dorin wrote an April 22, 2014 letter to Dr. Goldstein stating that although hospital administration recognized that the EMR functionality change was only for "billing purposes" it was an "absolute no-go" for the Hospital.  In an email between Dr. Goldstein and Dr. Dorin, it was decided that the deviation from the required 4:1 ratio would be "imperceptible" and that "we will be fine".

96.     Defendants, including PST Services, knew or should have known that the change to the EMR functionality did not solve the problem.  Rather, because the EMR system still required an MDA to be listed as medically directing, anesthesia services were still being falsely charted via the EMR, closed out, and billed to the Government, as medically directed when they did not qualify.

97.     After PST Services and/or its predecessors became involved in the billing, the EMR functionality was also changed to include computer "pop-up" compliance reminders. These pop-up reminders would occur daily during the charting of anesthesia services for all Hospital patients.  The pop-ups provided alerts like "Dr. M is already in 4 rooms, are you sure you want to proceed and place him in another location?"

98.     The compliance reminders were presumably added to attempt to maintain the 4:1 ratio required for Medical Direction. That attempt was unsuccessful and Defendants knew, or should have known, that it did not work.

99.     For instance, Defendants did not formally instruct the CRNAs as to how to proceed if such pop-up alerts occurred.  Thus, the CRNAs clicked "ignore" and

1   proceeded to document the patient charts with MDAs medically directing the cases.

2   Despite the pop-up alert, the EMR system still allowed the cases to be documented as

3   medically directed.   One CRNA, M.S., was actually told by Somnia staff to ignore

4   the pop-up alerts and click past them.

5       100.   After these attempts at changing the EMR functionality failed, the

6   problems with charting and overbilling anesthesia services continued at the Hospital.

7       101.   In a letter from Dr. Dorin dated March 3, 2014, to Margaret See, Vice

8   President, Facility Operations/Somnia Anesthesia, and Mattie Cantu, Dr. Dorin

9   mentioned the overlapping Cardiac and Main OR call and talked about the "near-

10   miss" the day before when Dr. Bart Lee covered two calls and was needed in both

11   places when an "emergency heart came through while Bart was doing emergency

12   cases in the Main operating room."  Dr. Dorin also mentioned that a similar situation

13   occurred the previous Friday.

14       102.   On April 10, 2014 at 11:04 a.m., Karen Berkey, an employee of PST

15   Services and/or its predecessors, emailed Mattie Cantu, to whom she was referred as

16   a contact at Somnia. She stated she was running into issues where there was a doctor

17   *personally performing* "when he/she should be *medically directing* which causes

18   errors, or where they are *medically directing* 5 rooms at once." She asked Mattie

19   Cantu for help in resolving the issue as "we cannot post any charges for the entire

20   date of service until these errors get resolved." Mattie Cantu then emailed Dr. Dorin

21   for guidance. He responded that Somnia decided, in accordance with CA and Federal

22   Law that CRNAs can be operating independently. He added that there may be further

23   nuances and "Billing at a CMS-type 4:1 'direction' ratio appears to be immaterial to

24   the changes afoot, but I defer to Somnia's leadership." Ms. Berkey forwarded the

25   email to Lisa A. Zigarovich, CPC, CANPC, McKesson.  Thus, rather than change

26   their charting and billing practices to accurately reflect how anesthesia services were

27   being performed at the Hospital, Defendants continued to fraudulently bill the

28   Government for "medical direction" even though they understood that compliance

1  with TEFRA was not occurring or being documented.  Further, Independent Practice

2  by CRNAS was *not* permitted by CMS regulations, as the Hospital was a Level III

3  Trauma Center that collects Medicare Part A reimbursement, nor was it permitted by

4  District bylaws.

5      103.    On April 11, 2014, Lisa Zigarovich emailed Dr. Dorin, copying Matti

6  Cantu, and Margaret See. She stated that Dr. Dorin was correct, "CRNAs may work

7  independently in the state of California." She directed them to "Please disregard

8  Karen's email below, we are able to process the below mentioned cases as *non-*

9  *medically directed* CRNA.  . . ." PST Services and its predecessors' practice violated

10 applicable CMS regulations and District bylaws to default to Medical Supervision

11 when MDAs go over the 4:1 ratio.

12     104.    Dr. Dorin likely precipitated his own demise with PAS/Somnia by

13 having the audacity to put Defendants' fraudulent practices in writing.  In an email

14 sent to Dr. Goldstein, Dr. Dorin presented a scathing indictment of Defendants'

15 unlawful conduct. "With endo and short-staffed days, a facilitating doc would have

16 more than 4 rooms under his purview; how is it that you can act to the hospital as if

17 you have a 'traditional' 1:4 ratio, have your docs' names on a board with more than 4

18 rooms, and not expect the nurses and surgeons and administrators to notice? . . . . I

19 asked over a month ago if the 'contract' and 'med-staff issues' were covered and you

20 said 'yes.' The charting/board/perception all fit together in a real setting of medical

21 care. You cannot formulate a plan and expect others not to notice something is

22 different if the staffing is different. So here we are.  There is no way to finesse a

23 change of this sort without violating the nature, spirit and perception of the Contract

24 and Med Staff Bylaws at Kaweah." Dr. Dorin also urged that for a smooth operation,

25 "I believe Somnia needs a nonclinical physician who is not beholden to policy

26 makers in the NY office . . ."

27     105.    On April 23, 2014, Robert Goldstein admonished Dr. Dorin for

28 discussing these things online, stating "I will not engage in an email back and forth."

He stated he is available by phone.

106.   On May 2, 2014, CRNA Erin Hawkins, performed anesthesia for a C Section at 4:00 pm in afternoon.  Dr. Dorin was listed on the chart as medically directing.  A massive hemorrhage occurred and Dr. Dorin was called but he had already left the building without notifying the CRNA.   A call was made down to the Main OR for another anesthesiologist, Dr. Palacios. However, this doctor was personally performing another anesthetic and could not leave his patient. Therefore, the hospital code team was called to help manage the emergency until Dr. Palacios came to assist over an hour later.  The patient was transported intubated and on a ventilator to Intensive Care Unit.  The next day the OB Nurse Manager, Tracie Plunkett, asked Ms. O'Neill why Dr. Dorin's name is on the chart when he was nowhere to be found.  The case was brought to risk management and reviewed by the hospital committee.  The chart was fraudulently documented as Medical Direction even though the anesthesiologist documented was never in the building.

107.   On July 31, 2014, anesthesia services for a patient undergoing a pericardial debridement were charted and billed to Medicare as Medical Direction by Dr. Mendenhall even though he was actually performing his own anesthetic (i.e. *personally performing*) at the same time in another cardiac room.

108.   On or about Monday, July 28, 2014, Ms. O'Neill performed an anesthesia service for Dr. Ian Duncan, an orthopedic surgeon. He asked Ms. O'Neill who the supervising MDA was for the procedure and explained that the Hospital had suddenly changed the surgeons' documentation requirements. Surgeons could now only chart that an MDA had performed the anesthesia procedure. He stated, "This makes no sense since it is a CRNA who is in the room." This change came on the heels of Ms. O'Neill's recent report to the Hospital of billing fraud. Ms. O'Neill believes the purpose of this new requirement was an attempt to ensure the MDAs' presence as mandated by the Hospital bylaws. Whatever Kaweah's purpose, it shows that false documentation was so blatant that even an orthopedic surgeon was calling it

into question. The result was the creation of a false surgical record and a continuation of fraudulent billing.

109. Ms. O'Neill worked until August 1, 2014 when she was suddenly removed from the operating room. During the remainder of her employment, violations of the applicable regulations continued to be rampant.

110. Ms. O'Neill obtained a copy of some of the schedules after her termination: On August 13 and 14, 2014, Dr. Mendenhall supposedly *medically directed* cases on the second floor of the Acequia building at the same time he was required to be "immediately available" to the CRNA on the first floor of the Mineral King building.

111. Subsequent to her termination, Relator learned that Defendants' practice of improper coding and billing continued. For example, around October 2015, another CRNA working for Somnia reported that he received texts or emails asking him to alter his document to include a "facilitating anesthesiologist" on the chart if he forget to do so. This CRNA was informed by Somnia that an anesthesiologist needs to be listed on the chart even on the weekends when he is doing cases alone and there is no anesthesiologist in house. This practice of improperly listing MDAs as being present when they are not results in false overbilling to the Government, given that approximately 70 percent of the patients are Government-insured.

## MS. O'NEILL IS WRONGFULLY TERMINATED

112. Nicolle O'Neill was employed by PAS/Somnia, to provide services as a CRNA and Chief CRNA.

113. Nicolle O'Neill first began as a *locum tenens* starting on or about December 13, 2011. She received a letter of understanding on or about January 31, 2012 while the contract for Chief CRNA was being negotiated. She was told that her only option was to work as an employee, with no benefits, or to form an S corporation. After a prolonged negotiation, a contract was finally signed on March 22, 2012 between Sarasate and District d/b/a Kaweah Delta Medical Center

1    ("Hospital").

2        114.   Ms. O'Neill's duties are outlined in Schedule 2 of the contract. In

3    relevant part, as Chief CRNA, Ms. O'Neill was in charge of developing a weekly

4    schedule for CRNAs in consultation with PAS/Somnia personnel; managing and

5    leading staff CRNAs assigned to specific ORs; coordinating OR activity and OR

6    nurse management to create efficient patient flow; managing room turnover and prep

7    toward high quality anesthesia services. In addition, Ms. O'Neill was to keep and

8    maintain the medical charts as well as all data required to allow defendant

9    PAS/Somnia to properly bill for services provided. (Schedule 2.6). As Chief CRNA,

10   Ms. O'Neill was charged with executing all documentation necessary for

11   PAS/Somnia to be a participating provider in any third-party reimbursement

12   programs PAS/Somnia requested. (Schedule 2.14).

13       115.   It was not long after Ms. O'Neill began that she noticed inadequate

14   staffing was systemic. It became evident to Ms. O'Neill was that her employer was

15   not complying with applicable rules and regulations regarding charting and billing

16   and that public and patient safety were routinely being compromised. There was a

17   history of chronic understaffing that endangered the public and patient safety of

18   anesthesiology patients at Kaweah.  As discussed herein, Ms. O'Neill frequently

19   complained to her employers about the unsafe conditions and fraudulent charting and

20   billing.

21       116.    On or about May 7, 2014, Dr. James Paskert, Chief Medical Officer of

22   Kaweah, asked Ms. O'Neill about problems in the anesthesia department.  She met

23   with him privately and informed him that she believed there was billing fraud.  Ms.

24   O'Neill is informed and believes and therefore alleges that Dr. Paskert shared her

25   concerns with Defendant Somnia because (as discussed below), shortly thereafter, Dr.

26   Robert Goldstein, Vice President and Chief Medical Officer of PAS/Somnia,

27   travelled to the Hospital to meet with staff about the allegations of fraudulent billing

28   that Ms. O'Neill raised.

117.   She later sent a text to Brian Piercy, Nurse Manager of Surgical Services, indicating that she had discussed some very serious billing concerns she had with the CMO and Benton Duckett, Chief of Surgical Services who in the prior week had encouraged her to talk to Dr. Paskert.  Dr. Paskert said that Somnia had told him that despite the problems Ms. O'Neill had reported that the billing system was fine.

118.   On or about May 13, 2014, Ms. O'Neill received a text from Tom Hong, the Chief CRNA at Somnia's other site in French Camp.  He stated, "Wow there must be something really wrong there as Goldstein made an emergency flight up to Kaweah over the weekend."

119.   On May 13, 2014, Dr. Robert Goldstein unexpectedly flew in from New York to meet with all the CRNAs. He told Ms. O'Neill that he was very disturbed to learn that the CRNAs are reporting that there is fraudulent billing occurring.  He stated that he was so disturbed that he immediately flew in from New York.  Ms. O'Neill explained that charts were not documented appropriately, and that CRNAs do not know who is supervising them at various points during the day since they don't know who is in house. Two other PAS/Somnia executives, Margaret See and Fitz George, arrived at the Hospital shortly thereafter to also meet with staff.

120.   On or about June 13, 2014, Ms. O'Neill received a letter of termination from PAS/Somnia terminating her pursuant to §6.2 of our contract – termination without cause. This required a 90-day notice per the SNA contract with PAS/Somnia. Thereafter, Ms. O'Neill sent a letter to all the surgeons in the OR notifying them that Somnia had terminated her contract "without cause" and with no reason given.  She received a reply back from Dr. Ian Duncan.  "Wow, very sorry to hear that!  I was always suspicious of Somnia be a shady company, but now I'm certain as I believe you are one of the best CRNA's we have."

121.   On or about June 22, 2014, the OB/GYN doctors, fueled by Ms. O'Neill's inexplicable termination, wrote a letter to Dr. Paskert and others about the "unacceptable" short staffed anesthesia service in the OB Department. "While we are

1   short CRNAs, we have one, Nicolle O'Neill, that all of us respect as one of the best

2   CRNAs being let go by Somnia. We don't even know why."

3      122.   On or about June 27, 2014, Dr. Dorin was terminated "with cause" after

4   responding to the OB department's complaints and admitting that that there was not

5   enough staff and that he had complained to Somnia but that they did not respond to

6   his requests to hire more people.

7      123.   Ms. O'Neill was terminated under §6.2 of her contract with

8   PAS/Somnia, (i.e. "without cause") at a time when the Hospital was dangerously

9   short staffed. The reason was because of her complaints about the systemic fraudulent

10  documentation and billing, of which Somnia was well aware.

11     124.   Defendants chose profits over public and patient safety, violated the

12  implied covenants of good faith and fair dealing in their contracts with Plaintiffs,

13  retaliated against Plaintiff for making numerous complaints about the severe shortage

14  of staff and personnel by Defendants at Kaweah, and terminated Plaintiff in bad faith,

15  attempting to cover up the severe shortcomings of Defendants' operations at Kaweah.

16     125.   The acts of Defendants were despicable, oppressive, and were conducted

17  with malice and with a conscious disregard of Plaintiff's rights, so as to justify the

18  imposition of punitive damages in an amount to be shown according to proof at trial.

19  **MS. O'NEILL'S FURTHER INVESTIGATION REGARDING FALSE**

20  **BILLING BY PST SERVICES' PREDECESSOR, MCKESSON**

21     126.   After her termination, Ms. O'Neill did some research regarding PST

22  Services' predecessor, McKesson. On October 1, 2014, Ms. O'Neill made a call to

23  McKesson posing as an anesthesiologist exploring their billing options for EMR on

24  behalf of a hospital in Alabama (Ms. O'Neill had an Alabama area code on her cell

25  phone). Ms. O'Neill first spoke with a Marvin Jones who answered their main line.

26  He put Ms. O'Neill in touch with Jerald Hendrix who she contacted on his cell phone.

27  Ms. O'Neill stated she had used all the major EMRs and noticed that McKesson's

28  program didn't seem to have a way anesthesiologists could indicate their involvement

in a case and her hospital was concerned about compliance. Mr. Hendrix only spoke broadly about different programs. However, he put Ms. O'Neill in touch with a Mr. Lane Dowling who he said could answer all of her questions.

127.   Later that day, Mr. Hendricks put Ms. O'Neill on a conference call with Mr. Dowling. Hendricks remained on the line.  Since Mr. Dowling stated he only knew about billing, Ms. O'Neill asked him how the coding worked with *medical direction* and *medical supervision*. He stated that McKesson handles everything: OR log charges and capturing data from the anesthesia record and submitting to payer. He said that a standard case might go for 11 units, but if there were 5 concurrent cases it would no longer be *medical direction*. Rather Medicare would consider it *medical supervision* and the allowable units would drop to 3 [plus one if MDA is present for induction]. As an illustration of how much money was lost on a *medical supervision claim*, he stated that depending on the geographic location, you might have a $75 per unit case drop from about an $800 reimbursement to about $200. He also gave the example of spinal fusions which allowed 20 units dropping to only 3 units for *medical supervision*. He explained that when the ratio went over 4:1 [CRNAs to MDAs], McKesson would not list a modifier for the anesthesiologist, which would properly have been AD/QX for *medical supervision*. Rather they would use the CRNA modifier "QZ" which indicates there was no MDA directing or supervising, and reimburses at 100%.  When Ms. O'Neill questioned him about this, he stated that McKesson would drop the modifier for the MDA, send it out unmodified, and indicate that it was autonomous. Since he believed Ms. O'Neill was inquiring for an Alabama hospital – a state that had not opted out and required CRNAs be supervised, she asked him how McKesson could do that. Ms. O'Neill also pointed out that many hospitals in opt-out states still have bylaws that require supervision. He said, "Bylaws don't mean anything to billers. Too much money is lost to bill it as *medical supervision."* He stated that McKesson's goal was to maximize reimbursement, "we bill everything at 100%." He then admitted, "Yes, it is a bit of a sticky subject. We

1  think the OIG is tapped up to start investigating it."

2      128.   Mr. Dowling's remarks lead Ms. O'Neill to conclude that McKesson has

3  a nationwide practice of defaulting to the QZ modifier (resulting in a higher

4  reimbursement rate to both McKesson and its clients) when the conditions for

5  *medical direction* were not met.  Instead of billing for independent CRNA practice,

6  McKesson should have defaulted to the lower rate of reimbursement available for

7  *medical supervision.*

8  ### FIRST CAUSE OF ACTION

9  **VIOLATION OF FEDERAL FALSE CLAIMS ACT**

10  **31 U.S.C. §3729(a)(1)**

11  **(BY RELATOR O'NEILL AGAINST ALL DEFENDANTS)**

12      129.   Paragraphs 1 through 128 are incorporated herein.

13      130.   Defendants knowingly presented, or caused to be presented, false or

14  fraudulent claims for payment or approval to officers or employees of the United

15  States Government.

16      131.   Moreover, Defendants knowingly retained, or caused to be retained,

17  overpayments received from the United States Government, as a result of the conduct

18  alleged herein.

19      132.   As a result of these false or fraudulent claims, the United States

20  Government suffered damages.

21  ### SECOND CAUSE OF ACTION

22  **VIOLATION OF FEDERAL FALSE CLAIMS ACT**

23  **31 U.S.C. §3729(a)(2)**

24  **(BY RELATOR O'NEILL AGAINST ALL DEFENDANTS)**

25      133.   Paragraphs 1 through 132 are incorporated herein.

26      134.   Defendants knowingly made, used, or caused to be made or used, false

27  records and statements to obtain the United States Government's payment of false or

28  fraudulent claims.

135.   The false records and statements included, but may not be limited to, the representations made in Defendants' billings to the United States Government and its agents, through explicit and implicit certifications of compliance with federal regulations, statutes, and program instructions in order to get paid by the United States government.

136.   As a result of these false records or statements, the United States Government suffered damages.

### THIRD CAUSE OF ACTION

### VIOLATION OF CALIFORNIA FALSE CLAIMS ACT

### CAL. GOVT. CODE §§ 12651 et seq.

### (BY RELATOR O'NEILL AGAINST ALL DEFENDANTS)

137.   Paragraphs 1 through 136 are incorporated herein.

138.   Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the California State Government for payment or approval.

139.   Defendants also knowingly retained overpayments from the State of California based upon its campaign of unlawful billing for anesthesia services.

140.   By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used, false records and statements, and omitted material facts, to induce the California State Government to approve and pay such false and fraudulent claims.

141.   The California State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants, as alleged herein.

142.   By reason of Defendants' acts, the State of California has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## FOURTH CAUSE OF ACTION

## RETALIATION FEDERAL FALSE CLAIMS ACT

## (BY PLAINTIFF AGAINST PAS/SOMNIA AND DOES 6-10)

143.   Paragraphs 1 through 142 are incorporated herein.

144.   alleged herein, Ms. O'Neill made specific complaints to her employer and other interested persons that fraudulent bills for anesthesia services were being submitted by Defendants.  In retaliation for her complaints of these fraudulent practices, Ms. O'Neill was wrongfully terminated from her employment.

145.   As a direct and proximate result of this unlawful retaliation resulting in the termination of relator's employment, Nicolle O'Neill has suffered substantial general and special damages, including lost wages, medical expenses, earnings capacity, emotional distress and special damages associated with his efforts to obtain alternate employment, in an amount to be proven at trial.

146.   As a direct and proximate result of this unlawful retaliation, Plaintiff O'Neill seeks the imposition of punitive damages because Defendants and their managers, officers, and/or directors committed the acts alleged herein maliciously, fraudulently, and oppressively, with the wrongful intention of injuring Ms. O'Neill and acted with an improper and evil motive amounting to malice or oppression, and in conscious disregard of Ms. O'Neill's rights. Moreover, Defendants and their managers, officers, and/or directors authorized or ratified the wrongful conduct of their employees and/or are personally guilty of oppression, fraud, or malice. As such, Ms. O'Neill is entitled to recover punitive damages from Defendants in an amount according to proof.

147.   Ms. O'Neill also seeks to recover her attorneys' fees, costs of suit and any other relief deemed appropriate by the Court.

**FIFTH CAUSE OF ACTION**

**RETALIATION CALIFORNIA FALSE CLAIMS ACT**

**(BY PLAINTIFF AGAINST PAS/SOMNIA AND DOES 6-10)**

148.   Paragraphs 1 through 147 are incorporated herein.

149.   At all times herein mentioned, Government Code §§ 12653(a) was in full force and effect and was binding upon Defendants, and each of them. Government Code §12653(a) provides:

> (a) Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of his or her employment because of lawful acts done by the employee, contractor, agent, or associated others in furtherance of an action under this section or other efforts to stop one or more violations of this article.

150.   As alleged herein, Ms. O'Neill made specific complaints to her employer other interested persons that fraudulent bills for anesthesia services were being submitted by Defendants.  In retaliation for her complaints of these fraudulent practices, Ms. O'Neill was wrongfully terminated from her employment.

151.   As a direct and proximate result of the unlawful practices described herein, Plaintiff has suffered damage and injury as herein alleged.

152.   Pursuant to Government Code §12653(b) Plaintiff is entitled to all relief necessary to make the employee whole, including reinstatement with the same seniority status that the employee would have had but for the termination, two times the amount of back pay, interest on the back pay, compensation for any special damage sustained as a result of the termination.

153.   As a direct and proximate result of this unlawful retaliation, Plaintiff O'Neill seeks the imposition of punitive damages because Defendants and their managers, officers, and/or directors committed the acts alleged herein maliciously,

1  fraudulently, and oppressively, with the wrongful intention of injuring Ms. O'Neill
2  and acted with an improper and evil motive amounting to malice or oppression, and
3  in conscious disregard of Ms. O'Neill's rights. Moreover, Defendants and their
4  managers, officers, and/or directors authorized or ratified the wrongful conduct of
5  their employees and/or are personally guilty of oppression, fraud, or malice. As such,
6  Ms. O'Neill is entitled to recover punitive damages from Defendants in an amount
7  according to proof.

8      154.   Ms. O'Neill also seeks to recover her attorneys' fees, costs of suit and
9  any other relief deemed appropriate by the Court.

10               **SIXTH CAUSE OF ACTION**
11               **HEALTH AND SAFETY CODE**
12                  **SECTION 1278.5**
13  **(BY PLAINTIFF O'NEILL AGAINST DEFENDANTS PAS/SOMNIA AND**
14                      **DOES 6-10)**

15      155.   Paragraphs 1 through 154 are incorporated herein.

16      156.   By virtue of the conduct alleged herein, defendants violated Health &
17  Safety Code Section 1278.5 which provides:

18      a.      No health facility shall discriminate or retaliate, in any manner, against
19              any patient, employee, member of the medical staff, or any other health
20              care worker of the health facility because that person has done either of
21              the following:

22          i.      Presented a grievance, complaint, or report to the facility, to an
23                  entity or agency responsible for accrediting or evaluating the
24                  facility, or the medical staff of the facility, or to any other
25                  governmental entity.

26          ii.     Has initiated, participated, or cooperated in an investigation or
27                  administrative proceeding related to, the quality of care, services,
28                  or conditions at the facility that is carried out by an entity or

1    agency responsible for accrediting or evaluating the facility or its

2    medical staff, or governmental entity.

3    157.   As alleged herein, Ms. O'Neill made specific complaints to her

4    employer and other interested persons regarding by the quality of medical care being

5    provided, including allegations of fraud, understaffing and inaccurate medical

6    documentation. In retaliation for her complaints of these unlawful and improper

7    practices, Ms. O'Neill was wrongfully terminated from her employment.

8    158.   As a result of defendants' violation of this section, Nicolle O'Neill is

9    entitled to a $25,000 civil penalty, lost wages and work benefits, noneconomic

10   damages, including substantial emotional distress, costs of suit and reasonable

11   attorney's fees pursuant to Health & Safety Code Section 1278.5(g) and/or Code of

12   Civil Procedure Section 1021.5.

13   159.   As a direct and proximate result of this unlawful retaliation, Plaintiff

14   O'Neill seeks the imposition of punitive damages because Defendants and their

15   managers, officers, and/or directors committed the acts alleged herein maliciously,

16   fraudulently, and oppressively, with the wrongful intention of injuring Ms. O'Neill

17   and acted with an improper and evil motive amounting to malice or oppression, and

18   in conscious disregard of Ms. O'Neill's rights.  Moreover, Defendants and their

19   managers, officers, and/or directors authorized or ratified the wrongful conduct of

20   their employees and/or are personally guilty of oppression, fraud, or malice. As such,

21   Ms. O'Neill is entitled to recover punitive damages from Defendants in an amount

22   according to proof.

23                  **SEVENTH CAUSE OF ACTION**

24   **WHISTLEBLOWER RETALIATION- LABOR CODE § 1102.5 *et. seq.***

25   **(BY PLAINTIFF O'NEILL AGAINST PAS/SOMNIA AND DOES 6-10**

26   160.   Paragraphs 1 through 159 are incorporated herein.

27   161.   At all times herein mentioned, Labor Code § 1102.5(a) was in full force

28   and effect and was binding upon Defendants, and each of them.  Labor Code §

FIRST AMENDED COMPLAINT

39

1102.5(a) provides: "An employer may not make, adopt, or enforce any rule, regulation, or policy preventing an employee from disclosing information to a government or law enforcement agency, where the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation or noncompliance with a state or federal rule or regulation."

162.   At all times herein mentioned, Labor Code § 1102.5(b) was in full force and effect and was binding upon Defendants, and each of them.  Labor Code § 1105(b) provides: "An employer may not retaliate against an employee for disclosing information to a government or law enforcement agency, where the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation or noncompliance with a state or federal rule or regulation."

163.   At all times herein mentioned, Labor Code §1102.5(c) was in full force and effect and was binding upon Defendants, and each of them.  Labor Code §1102.5(c) provides: "An employer may not retaliate against an employee for refusing to participate in an activity that would result in a violation of state or federal statute, or a violation or noncompliance with a state or federal rule or regulation."

164.   As set forth fully herein, Defendants retaliated against Plaintiff as a result of her refusal to participate in Defendants' fraudulent schemes and/or for disclosing information to Kaweah Delta Medical Center, a government entity, about Defendants' fraudulent schemes.

165.   As set forth herein, Defendants retaliated against Plaintiff for protesting about waste, fraud, and abuse.

166.   As a direct and proximate result of the unlawful employment practices described herein, Plaintiff has suffered damage and injury as herein alleged.

167.   As a direct and proximate result of this unlawful retaliation, Plaintiff O'Neill seeks the imposition of punitive damages because Defendants and their managers, officers, and/or directors committed the acts alleged herein maliciously,

fraudulently, and oppressively, with the wrongful intention of injuring Ms. O'Neill and acted with an improper and evil motive amounting to malice or oppression, and in conscious disregard of Ms. O'Neill's rights. Moreover, Defendants and their managers, officers, and/or directors authorized or ratified the wrongful conduct of their employees and/or are personally guilty of oppression, fraud, or malice. As such, Ms. O'Neill is entitled to recover punitive damages from Defendants in an amount according to proof.

168.   Moreover, Ms. O'Neill is entitled to costs of suit and reasonable attorney's fees pursuant to Code of Civil Procedure Section 1021.5.

## EIGHTH CAUSE OF ACTION
### WRONGFUL TERMINATION IN
### VIOLATION OF PUBLIC POLICY
### (BY PLAINTIFF O'NEILL AGAINST (AGAINST PAS/SOMNIA AND DOES 6 THROUGH 10)

169.   Paragraphs 1 through 168 are incorporated herein.

170.   At all times during her employment with Defendants, Ms. O'Neill performed her duties in an exemplary fashion.

171.   Ms. O'Neill is informed and believes and thereon alleges that Defendants' termination of Ms. O'Neill from employment, as alleged herein, was based on the fact that Ms. O'Neill had refused to participate in illegal conduct, complained of and/or reported illegal conduct by Defendants that violated the both the United States and California False Claims Acts, as well as Health & Safety Code Section 1278.5, Labor Code Section 1102.5, among others.

172.   By reason of the aforementioned conduct and circumstances, Defendants violated the fundamental public policies of the United States and the State of California.

173.   As a direct, foreseeable, and legal result of Defendants' acts and omissions, Ms. O'Neill has incurred and continues to incur expenses and substantial

1  losses in earnings and job benefits, and has suffered and continues to suffer

2  humiliation, embarrassment, mental and emotional distress, and discomfort, all to her

3  damage, the precise amount of which will be proven at trial.

4      174.   Ms. O'Neill is informed and believes and thereon alleges that

5  Defendants and their managers, officers, and/or directors committed the acts alleged

6  herein maliciously, fraudulently, and oppressively, with the wrongful intention of

7  injuring Ms. O'Neill and acted with an improper and evil motive amounting to malice

8  or oppression, and in conscious disregard of Ms. O'Neill's rights.  Moreover,

9  Defendants and their managers, officers, and/or directors authorized or ratified the

10  wrongful conduct of their employees and/or are personally guilty of oppression,

11  fraud, or malice. As such, Ms. O'Neill is entitled to recover punitive damages from

12  Defendants in an amount according to proof.

13      175.   Moreover, Ms. O'Neill is entitled to costs of suit and reasonable

14  attorney's fees pursuant to Code of Civil Procedure Section 1021.5.

15                    **NINTH CAUSE OF ACTION**

16            **INTENTIONAL INFLICTION EMOTIONAL DISTRESS**

17      **(BY PLAINTIFF O'NEILL AGAINST PAS/SOMNIA AND DOES 6 -10)**

18      176.   Paragraphs 1 through 175 are incorporated herein.

19      177.   Defendants engaged in outrageous conduct towards Plaintiff with the

20  intention to cause, or reckless disregard for probability of causing, Plaintiff to suffer

21  severe emotional distress, and with wanton and reckless disregard for injurious result

22  to Plaintiff. In particular, the PAS/Somnia Defendants engaged in outrageous acts by

23  placing profit over patient safety and compliance with the applicable laws and

24  regulations by terminating her in retaliation for her complaints about their illegal and

25  unethical conduct. As a result, Ms. O'Neill suffered severe emotional distress,

26  including fear, anxiety, insomnia, and weight loss, for which she received medical

27  treatment.

28      178.   By the aforesaid acts and omissions of Defendants, and each of them,

---

FIRST AMENDED COMPLAINT

42

Plaintiff has been directly and legally caused to suffer actual damages including, but not limited to, loss of earning and future earning capacity, costs of suit, and other pecuniary loss not presently ascertained.

179.   As a further direct and legal result of the acts and conduct of Defendants, and each of them, as aforesaid, Plaintiff has been caused to and did suffer and continues to suffer severe emotional and mental distress, anguish, humiliation, embarrassment, fright, pain, discomfort, and anxiety. The exact nature and extent of said injuries is presently unknown to Plaintiff, who will seek leave of Court to assert the same when they are ascertained.

180.   By aforesaid acts and omissions of Defendants, and each of them, Plaintiff has been directly and legally caused to suffer actual damages including, but not limited to, loss of earnings and future earning capacity, and other pecuniary loss not presently ascertained.

181.   Plaintiff is informed and believes and thereon alleges that Defendants and their managers, officers, and/or directors, including, without limitation, committed the acts alleged herein maliciously, fraudulently, and oppressively, with the wrongful intention of injuring Plaintiff and acted with an improper and evil motive amounting to malice or oppression, and in conscious disregard of Plaintiff's rights. Moreover, Defendants and their managers, officers, and/or directors authorized or ratified the wrongful conduct of their employees and/or are personally guilty of oppression, fraud, or malice. As such, Plaintiff is entitled to recover punitive damages from Defendants in an amount according to proof.

## **TENTH CAUSE OF ACTION**

### **NEGLIGENT INFLICTION EMOTIONAL DISTRESS**

### **(BY PLAINTIFF O'NEILL AGAINST PAS/SOMNIA AND DOES 6 -10)**

182.   Paragraphs 1 through 181 are incorporated herein.

183.   As an employee of Defendants, Plaintiff was owed a duty of due care by, Defendants, and each of them, to ensure that Plaintiff was not exposed to foreseeable

1  harms.

2      184.   Defendants, and each of them, knew, or should have known, that

3  Plaintiff was being, or would be, subjected to the conduct as alleged herein, and

4  knew, or should have known, that subjecting Plaintiff to such conduct and/or failing

5  to exercise due care to any other employee, officer, agent or supervisor from

6  engaging in such conduct, could and would cause Plaintiff to suffer severe emotional

7  distress.  Defendants, and each of them, breached their duty of due care by engaging

8  in such conduct, by failing to take any and all reasonable steps to half such conduct

9  and/or prevent such conduct from occurring, and by failing to take appropriate

10  corrective action following such conduct.

11      185.   By the aforesaid acts and omissions of Defendants, and each of them,

12  Plaintiff has been directly and legally caused to suffer actual damages including, but

13  not limited to, loss of earning and future earning capacity, interest, costs of suit, and

14  other pecuniary loss not presently ascertained.

15      186.   As a further direct and legal result of the acts and conduct of Defendants,

16  and each of them, as aforesaid, Plaintiff has been caused to and did suffer and

17  continues to suffer severe emotional and mental distress, anguish, humiliation,

18  embarrassment, fright, pain, discomfort, and anxiety. The exact nature and extent of

19  said injuries is presently unknown to Plaintiff, who will seek leave of Court to assert

20  the same when they are ascertained.

21                              **PRAYER**

22      WHEREFORE, Plaintiff prays for the following relief:

23      1.  A permanent injunction requiring Defendants to cease and desist from

24          violating the federal False Claims Act and the California False Claims Act,

25      2.  Judgment against Defendants in an amount equal to three times the amount

26          of damages the United States has sustained as a result of the Defendants'

27          unlawful conduct;

28      3.  Judgment against Defendants in an amount equal to three times the amount

of damages the state of California has sustained as a result of the Defendants' unlawful conduct;

4.  Civil monetary penalties for each false and fraudulent claim submitted to the United States and the State of California by Defendants;

5.  An award to Relator pursuant to 31 U.S.C. §3730(d);

6.  An award to Relator pursuant to Cal. Govt. Code §12652;

7.  An award of reasonable attorneys' fees, costs, and expenses pursuant to 31 U.S.C. §3730(d), Cal. Govt. Code §12652;

8.  A $25,000 civil penalty pursuant to Health & Safety Code Section 1278.5;

9.  A $10,000 civil penalty pursuant to Labor Code Section 1102.5;

10. Such other relief as the Court deems just and equitable.

DATED:  July 7, 2017                SCHONBRUN SEPLOW
                                    HARRIS & HOFFMAN LLP


                                        */s/ Michael D. Seplow*
                                    By: _____
                                        Wilmer J. Harris
                                        Michael D. Seplow
                                        Attorneys for Relator/Plaintiff,
                                        Nicolle O'Neill

1

## JURY DEMAND

2

Plaintiff hereby demands a jury trial on all issues triable to a jury.

3

4  DATED:  July 7, 2017                    SCHONBRUN SEPLOW

HARRIS & HOFFMAN LLP

5

6                                                 */s/ Michael D. Seplow*

7                                      By: _____

8                                            Wilmer J. Harris

Michael D. Seplow

9                                            Attorneys for Relator/Plaintiff,

Nicolle O'Neill

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FIRST AMENDED COMPLAINT

46