JOHN C.J. BARNES (State Bar No. 216694)
W. SCOTT CAMERON (State Bar No. 229828)
**KING & SPALDING LLP**
621 Capitol Mall, Suite 1500
Sacramento, CA 95814
Telephone:   (916) 321-4800
Facsimile:   (916) 321-4900
Email:  jbarnes@kslaw.com
         scameron@kslaw.com

Attorneys for Defendant
PST SERVICES, LLC

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES and the STATE OF CALIFORNIA *ex rel.* NICOLE O'NEILL, <br><br> Plaintiffs/Relator, <br><br> v. <br><br> SOMNIA, INC., PRIMARY ANESTHESIA SERVICES, PST SERVICES, LLC, ROBERT GOLDSTEIN, M.D., ROY WINSTON, M.D., BYRON MENDENHALL, M.D., QUINN GEE, M.D., and MARGARET VASSILEV, M.D., and DOES 1 through 10, inclusive, <br><br> Defendants. | **CASE NO. 1:15-cv-00433-DAD-EPG** <br><br> **DEFENDANT PST SERVICES, LLC'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6)** <br><br> Complaint Filed:  March 19, 2015 <br><br> **Date**: Tuesday, November 7, 2017 <br> **Time:** 9:30 a.m. <br><br> **Judge:** Hon. Dale A. Drozd |

**TABLE OF CONTENTS**

Page

I. INTRODUCTION ..................................................................................................... 1

II. BACKGROUND AND SUMMARY OF RELATOR'S ALLEGATIONS ................ 2

III. ARGUMENT ............................................................................................................. 6

    A. Legal Standard .............................................................................................. 6

    B. Relator Fails to Meet the Pleading Standard of Either Rule 8 or Rule 9(b) .......................................................................................................... 7

    C. Relator Fails to Meet the Pleading Requirements of Either the Federal or California False Claims Act .......................................................... 10

IV. CONCLUSION ....................................................................................................... 15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Albrecht v. Lund*,
    845 F.2d 193 (9th Cir. 1988) ...............................................................................................12, 14

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) .................................................................................................................6, 11

*Bell At. Corp. v. Twombly*,
    550 U.S. 544 (2007) .....................................................................................................................6

*Bly—Magee v. California*,
    236 F.3d 1014 (9th Cir. 2001) ......................................................................................................6

*Cal. Soc. Of Anesthesiologists v. Super. Ct. (Brown)*,
    204 Cal. App. 4th 390 (2012) ...........................................................................................3, 9, 11, 13

*City of Pomona v. Super. Ct. (James Jones Co.)*,
    89 Cal. App. 4th 793 (2001) .......................................................................................................10

*Eibeid ex rel. United States v. Lungwitz*,
    616 F.3d 993 (9th Cir. 2010) ...............................................................................................6, 7, 12

*Kearns v. Ford Motor Co.*,
    567 F.3d 1120 (9th Cir. 2009) ...................................................................................................6, 9

*Kendall v. Visa U.S.A., Inc.*,
    518 F.3d 1042 (9th Cir. 2008) ....................................................................................................12

*Li v. Kerry*,
    710 F.3d 995 (9th Cir. 2013) ........................................................................................................6

*Manzarek v. St. Paul Fire & Marine Ins. Co.*,
    519 F.3d 1025 (9th Cir. 2008) ......................................................................................................6

*Schreiber Distributing Co. v. Serv–Well Furniture Co.*,
    806 F.2d 1393 (9th Cir. 1986) ....................................................................................................12

*In re Stac Elecs. Sec. Litig.*,
    89 F.3d 1399 (9th Cir. 1996) ........................................................................................................9

*Swartz v. KPMG LLP*,
    476 F.3d 756 (9th Cir. 2007) ....................................................................................................1, 9

*United States v. Bourseau*,
    531 F.3d 1159 (9th Cir. 2008) ....................................................................................................13

ii
**PST SERVICES, LLC'S P&A ISO MOTION TO DISMISS PLAINTIFFS' COMPLAINT**

*United States v. Rivera*,
   55 F.3d 703 (1st Cir. 1995) ..................................................................................................7

*United States ex rel. Aflatooni v. Kitsap Physicians Serv.*,
   314 F.3d 995 (9th Cir. 2002) ...........................................................................................7, 11

*United States ex rel. Cafasso v. Gen. Dynamics C4 Sys., Inc.*,
   637 F.3d 1047 (9th Cir. 2011) ..................................................................................... *passim*

*U.S. ex rel. Lee v. Corinthian Colls.*,
   655 F. 3d 984 (9th Cir. 2011) ...............................................................................................9

*United States ex rel. Hendow v. Univ. of Phx.*,
   461 F.3d 1166 (9th Cir. 2006) .......................................................................................10, 14

*United States ex rel. Minn. Ass'n of Nurse Anesthetists v. Allina Health Sys. Corp.*,
   276 F.3d 1032 (8th Cir. 2002) .............................................................................................13

*United States ex rel. Swoben v. United Healthcare Ins. Co.*,
   848 F.3d 1161 (9th Cir. 2016) .............................................................................................13

*Universal Health Servs., Inc. v. United States ex rel. Escobar*,
   136 S. Ct. 1989 (2016) ........................................................................................................12

**Statutes**

False Claims Act, 31 U.S.C. § 3729 ............................................................................... *passim*

California False Claims Act, Cal. Gov't Code §§ 12651 *et seq.* .......................................2, 10, 11

Tax Equity and Fiscal Responsibility Act of 1982 ..................................................................2, 3, 4

**Other Authorities**

42 C.F.R. § 482.52(c) ..................................................................................................................3

Federal Rule of Civil Procedure (9)(b) .............................................................................. *passim*

Federal Rules of Civil Procedure 8 ..............................................................................................6

Federal Rules of Civil Procedure 12(b)(6) ..................................................................................6

## I. INTRODUCTION

Plaintiff/Relator Nicolle O'Neill accused McKesson Corporation, and now Defendant PST Services, LLC ("PST"), of fraud.[1] McKesson Corporation moved to dismiss Relator's initial Complaint because it did not allege that McKesson participated in, or had any knowledge of, the facts that form the basis of the alleged fraud. Rather than oppose the motion, Relator filed a First Amended Complaint ("FAC"). The FAC fares no better. While Relator added a few inconsequential details in the FAC, she did not cure the deficiencies in pleading a claim against PST. In fact, in a complaint that spans nearly 190 paragraphs, only five describe actual conduct by PST, and those paragraphs lack the essential allegation that must be included in a claim arising under the federal and state False Claims Acts: a non-conclusory factual allegation that PST knowingly submitted false claims.

The FAC is completely silent as to PST's purported role in, or knowledge of, submitting false claims. Instead, Relator grasps at two isolated communications with McKesson employees, claiming that these communications demonstrate that McKesson, and apparently by extension PST, has culpability for the practices alleged elsewhere in the FAC to be improper. But as explained in detail below, neither of these communications, even if they did occur, reveal that PST committed or even knew of any wrongdoing.

Fraud claims are subject to the heightened pleading standard of Federal Rule of Civil Procedure (9)(b). Moreover, when more than one defendant is sued for fraud – as is the case here – the complaint must allege specifically what *each defendant* did to separately put them on notice of their allegedly fraudulent conduct. *Swartz v. KPMG LLP*, 476 F.3d 756, 764-65 (9th Cir. 2007). The Complaint here does not meet either of these requirements. Therefore, it does not meet the pleading requirements under either the Federal Rules of Civil Procedure or the False Claims Acts. PST requests that the claims against it be dismissed.

---

[1] Relator's original Complaint was brought against McKesson Corporation ("McKesson") rather than PST. However, the entity that actually contracted with Somnia was PST, not McKesson. Accordingly, in response to McKesson's request, Relator substituted PST for McKesson in the First Amended Complaint.

**PST SERVICES, LLC'S P&A ISO MOTION TO DISMISS PLAINTIFFS' COMPLAINT**
DMSLIBRARY01\30887031.v1

## II. BACKGROUND AND SUMMARY OF RELATOR'S ALLEGATIONS

Relator filed her complaint as a *qui tam* relator on behalf of the United States and the State of California on March 19, 2015, alleging ten claims. Both the United States and the State of California refused to intervene, and the Complaint was unsealed in December 2016. The Complaint was served on McKesson in April 2016. McKesson moved to dismiss the complaint for failure to state a claim. Rather than oppose the motion to dismiss, Relator sought leave to file an amended complaint. Relator filed her FAC on July 7, 2017, and substituted PST for McKesson. The first three claims in the FAC are brought against all defendants and allege violations of the Federal and California False Claims Acts, 31 U.S.C. § 3729(a)(1) and (a)(2), and California Government Code §§ 12651 *et seq*. The remaining seven claims are not asserted against PST, and therefore will not be addressed in this motion.

The FAC generally concerns the conduct of the anesthesiology department at Kaweah Delta Medical Center ("Kaweah"). Defendant Somnia, Inc. ("Somnia") had the exclusive contract to provide anesthesia services to Kaweah. FAC ¶ 19. Relator Nicolle O'Neill was a Certified Registered Nurse Anesthetist ("CRNA"), and began working for Somnia in December 2011 as an independent contractor. Shortly thereafter, she became the Chief CRNA for Kaweah. *Id.* ¶ 18. The FAC describes Relator's various duties as Chief CRNA (*Id.* ¶ 114), but notably, the FAC does not allege that Relator had any role in the billing for services provided, or that she ever saw or reviewed a bill that was submitted to either the federal or state government.

A significant portion of the FAC is dedicated to describing a variety of alleged wrongdoings by Primary Anesthesia Services ("PAS"), Somnia, and the defendant physician anesthesiologists ("MDA(s)") that occurred in 2012 and 2013. The allegations include that these defendants listed cases as being *medically directed* when the MDA had not documented compliance with the requirements under the Tax Equity and Fiscal Responsibility Act of 1982 ("TEFRA"); that they listed cases as being *personally performed* when they should not have been (*Id.* ¶¶ 69-71, 84-85)[2]; and that individual MDAs left the hospital to play golf while they

---

[2] *Medically directed*, *medically supervised*, and *personally performed* reflect different levels of MDA involvement in patient care, and billing under these designations results in different levels of reimbursement from Medicare,

2

were supposedly performing anesthesia services (*Id.* ¶¶ 68-69, 74, 76). Relator includes various other allegations of wrongdoing at Kaweah. *Id.* ¶¶ 70-87. The common thread joining all of these allegations is that they allegedly occurred in 2012-2013, which Relator admits was well before PST was engaged by PAS/Somnia. *Id.* ¶ 88.

On March 3, 2014, PAS/Somnia engaged PST "to handle their billing. . . ." *Id.* ¶ 88. The FAC alleges that a month later, a PST employee, Karen Berkey, alerted Somnia to "issues where there was a doctor *personally performing* 'when he/she should be *medically directing*, which causes errors, or where they are *medically directing* 5 rooms at once.'" *Id.* ¶ 102. PST asked Somnia to resolve these issues because PST "cannot post any charges for the entire date of service until these errors get resolved." *Id.* Somnia responded that "in accordance with California and Federal Law[,] CRNAs can be operating independently." *Id.* Another PST employee confirmed that Somnia "was correct, 'CRNAs may work independently in the state of California.' She directed them to 'Please disregard Karen's email below, we are able to process the below mentioned cases as *non-medically directed* CRNA . . . .'" *Id.* ¶ 103. That correct statement of law is the only factual allegation offered in support of plaintiff's contention that PST's "practice violated applicable CMS regulations" without specifying what regulations those might be. *Id.* Indeed, the FAC concedes elsewhere that California "is an 'opt-out' state allowing CRNAs to work independently. . . ." *Id.* ¶ 47.[3]

The above exchange is the only factual averment regarding PST that occurred between the date PST and Somnia executed their contract and the date plaintiff was terminated. There are allegations that "[e]ven after PST Services and its predecessors were engaged to 'fix' the billing

---

Medicaid, and Medi-Cal. *Id.* ¶¶ 31-34. Somnia's motion to dismiss contains a discussion of the difference in reimbursement in Section II(B). Rather than repeat that discussion, PST Services joins that portion of Somnia's motion to dismiss. Relator italicizes these terms throughout the First Amended Complaint, and for consistency we adopt that convention here.

[3] Federal regulations allow a state to opt out of the requirement that CRNAs be supervised by an MDA, and therefore work independently. 42 C.F.R. § 482.52(c). On June 10, 2009, California Governor Schwarzenegger exercised his discretion to opt out of the supervision requirement. *Cal. Soc. Of Anesthesiologists v. Super. Ct. (Brown)*, 204 Cal. App. 4th 390, 394 (2012). The FAC states that the CRNAs at Kaweah could not operate independently without supervision because Kaweah is a Level III trauma center. The FAC cites no authority for the proposition that CMS requires supervision of all anesthesia operations in any trauma center. There is no regulation or provision in the CMS Claims Processing Manual that requires such supervision.

1  and charting problems, they would bill as *medical direction*. However, MDAs would not sign
2  the electronic medical record and there was no documentation of TEFRA guidelines being met."
3  *Id.* ¶ 67 d). But, Relator does not allege that she reviewed or even had access to bills for services
4  provided, and does not allege that PST knew or had reason to know that a medical record was
5  not signed or did not meet TEFRA guidelines, or that PST actually billed any claims (or who was
6  billed). Relator also alleges that several MDAs would leave for the day at 3:00 p.m. without
7  documenting who was then *medically directing* in the OR, and other similar improprieties. *Id.* ¶
8  67. But again, there is no allegation even supporting an inference that PST would have had any
9  knowledge of when any MDA left the hospital. In fact, Relator admits that some of the alleged
10 wrongdoing expressly stopped when PST "took over." *Id.* ¶ 67 m).

11       The FAC alleges that 72% of the patients at Kaweah are government supported, either
12 through Medicare, Medicaid or from the County of Tulare. *Id.* ¶ 17. The FAC also identifies a
13 number of examples of what Relator contends are examples of alleged improper billing of
14 Medicare patients. *Id.* ¶¶ 69-70. But these examples have two notable deficiencies. First, with
15 one exception (for services allegedly provided on August 1, 2014), all of the examples occurred
16 prior to PST's contract with Somnia. *Id.* ¶ 70. Even that one exception does not allege that PST
17 submitted the bill to the government, or that Relator saw the bill to the government. Nor is there
18 an allegation that Relator had any personal knowledge of what was actually billed for any of
19 these patients. Indeed, nowhere in Relator's FAC (or in the original complaint) is there a single
20 allegation that Relator has any actual personal knowledge of what was billed for any patient, that
21 she has ever seen a bill for any patient. Second, the so-called examples of improper billing do
22 not provide any specifics about what Relator alleges was improper. Rather, the FAC states that
23 in each example, the "requirements for Medical Direction were unmet." The FAC does not
24 allege which "requirements" were unmet, why Relator contends any requirements were unmet,
25 or any other specifics about why Relator believes these are meaningful examples of improper
26 billing practices.

27       The FAC alleges that "Defendants use the information recorded on the [Electronic
28 Medical Record ("EMR")] and/or medical charts as the basis for billing the Federal and

California healthcare programs." *Id.* ¶ 54.  The FAC then alleges that "[p]ursuant to Defendants' policy and practice of submitting medical bills that are consistent with the information in the EMR/medical charts, Defendants submitted false bills to the government for the incidents described herein." *Id.* ¶ 57.  But the FAC does not allege that Relator has any knowledge of PST's policies or practices, has any knowledge of PST's procedures for billing anesthesia services, any knowledge of how PST generates bills, or any knowledge of even a single bill that PST actually sent to the government for anesthesia services at Kaweah.

In a new set of allegations, the FAC alleges that Kaweah's EMR system required an MDA to be listed as medically directing the anesthesia services regardless of the actual type of anesthesia services being provided.  *Id.* ¶ 52.  Relator describes an attempt by Somnia to change the functionality of the EMR system to allow the CRNA to select "Facilitating MD" instead of "Medical Direction of a CRNA, but alleges that the CRNA still had to list an MD as Medically Directing in order to close the chart.  *Id.* ¶¶ 89-95.  Relator alleges that "Defendants, including PST Services, knew or should have known that the change to the EMR functionality did not solve the problem."  *Id.*¶ 96.  The FAC does not allege that PST had any knowledge of the functionality of the EMR system at Kaweah, or that PST had any reason to know of the functionality of the EMR system.  The FAC describes "pop-up compliance reminders" that were added to the EMR system, but the FAC does not allege that PST was aware of these compliance reminders or had any reason to be aware of them.

Finally, the FAC alleges that Relator - after being fired - called McKesson, "posing as an anesthesiologist exploring their billing options for EMR on behalf of a hospital in Alabama." *Id.* ¶ 126-127.  Nothing about this alleged telephone call is related to Kaweah, or any hospital in California.  Moreover, Relator does not establish any link between anything allegedly said on this call and any bill that was submitted to the government.  Rather, based on one person's remarks on one phone call regarding an inquiry about an Alabama hospital, Relator "**conclude[d]** that McKesson has a nationwide practice of defaulting to the QZ modifier (resulting in a higher reimbursement rate to both McKesson and its clients) when the conditions for *medical direction* were not met."  *Id.* ¶ 128 (emphasis added).

## III. ARGUMENT

### A. Legal Standard

Pursuant to Federal Rules of Civil Procedure 8 and 12(b)(6), a complaint must contain sufficient factual allegations to "raise a right to relief above the speculative level." *Bell At. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted). In other words, it must contain enough "factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). Mere legal conclusions, "formulaic recitation of the elements of a cause of action," or "naked assertions" will not suffice. *Id*.

"Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Li v. Kerry*, 710 F.3d 995, 999 (9th Cir. 2013) (quoting *Iqbal*, 556 U.S. at 678-79); *see also United States ex rel. Cafasso v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1055 (9th Cir. 2011) (applying *Iqbal/Twombly* to a False Claims Act claim). A motion to dismiss should be granted where, "accept[ing] factual allegations in the complaint as true and constru[ing] the pleadings in the light most favorable to the nonmoving party," the pleadings fail to state a claim upon which relief can be granted. *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

Moreover, allegations of fraud must be pleaded with particularity. Fed. R. Civ. P. 9(b); *Eibeid ex rel. United States v. Lungwitz*, 616 F.3d 993, 998 (9th Cir. 2010). "Rule 9(b) demands that the circumstances constituting the alleged fraud 'be specific enough to give defendants notice of the particular misconduct . . . so that they can defend against the charge and not just deny that they have done anything wrong.'" *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009) (quoting *Bly—Magee v. California*, 236 F.3d 1014, 1019 (9th Cir. 2001)). To satisfy this additional hurdle, the complaint must allege "particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually

1  submitted." *Ebeid*, 616 F.3d at 998-999. "The heightened pleading standard of Rule 9(b)
2  governs FCA claims." *Cafasso*, 637 F.3d at 1054. These particulars include "matters such as the
3  time, place, and contents of the false representations or omissions, as well as the identity of the
4  person making the misrepresentation . . . and what the defendant obtained thereby." 5A Charles
5  A. Wright et al., Federal Practice & Pro. § 1297 (3d ed. 1998). Thus, Relator "must identify 'the
6  who, what, when, where, and how of the misconduct charged.'" *Cafasso*, 637 F.3d at 1055.

   **B.       Relator Fails to Meet the Pleading Standard of Either Rule 8 or Rule 9(b)**.

8       Far from alleging the who, what, when, where, and how PST submitted any false claims,
9  the complaint did not describe *anything* about the role PST purportedly played in the submission
10 of claims, or what its obligations were under its arrangement with Somnia. That was the basis
11 for McKesson's motion to dismiss, and Relator has done nothing to correct these deficiencies.
12 PST has been substituted in for McKesson, but the FAC does not add any details about PST's
13 role. Nor does the FAC describe what information PST was provided by Kaweah or Somnia, or
14 what PST was required to (or even could) do to validate any such information. All of this is fatal
15 to Relator's allegations against PST. "'It seems to be a fairly obvious notion that a False Claims
16 Act suit ought to require a false claim.' *United States ex rel. Aflatooni v. Kitsap Physicians Serv.*,
17 314 F.3d 995, 997 (9th Cir. 2002). '[T]he [FCA] attaches liability, not to the underlying
18 fraudulent activity or to the government's wrongful payment, but to the 'claim for payment.'
19 *United States v. Rivera*, 55 F.3d 703, 709 (1st Cir. 1995)." *Cafasso*, 637 F.3d at 1055.

20      Instead of detailing any facts showing that PST *knowingly* submitted false claims, the
21 FAC relies on examples of alleged wrongdoing by others that occurred well before PST became
22 involved with Kaweah. *See, e.g.*, FAC ¶¶ 67, 70-87. As for the few acts of alleged wrongdoing
23 that occurred after PST became involved, there is no allegation that PST knew of the conduct or
24 had any reason to know of them. For example, the FAC alleges that MDAs left at three o'clock
25 to go home or to play golf. FAC ¶¶ 76, 67 e). Even if that is true, there is no allegation that PST
26 had any way of knowing when or if the MDA left the hospital. In another example, the FAC
27 alleges that Somnia attempted to change the EMR system to allow for claims to be billed as
28 *medically supervised* instead of the apparent default of *medical direction,* but that did not resolve

the problem because "it was still impossible for a CRNA to close out a patient's medical chart unless an anesthesiologist was documented as 'medically directing' the services. FAC ¶ 91, Again, there is no allegation that PST knew or had any way of knowing that Somnia – or anyone else for that matter – had attempted to revise the EMR system. These various allegations, even if true, do not support even an inference that PST *knowingly* submitted false claims. Similarly, an MDA was alleged to have been *medically directing* two patients in different buildings. FAC ¶ 110. But there is no allegation that PST had any way of knowing this, that these claims were submitted to PST for billing together (or whether they were submitted by different facilities), or that there was any way that PST could discern that the MDA could not have been *medically directing* both patients.

The only allegation Relator includes in the FAC that attempts to tie these events to a purported false claim to the government is the allegation that "[b]ills to the Government for anesthesia services are derived from the patient EMR and/or medical charts." FAC ¶ 54. She further alleges that "Defendants use the information recorded on the EMR and/or medical charts as the basis for billing the Federal and California healthcare programs." *Id.* But Relator does not, and cannot, allege that she actually has any knowledge of how PST Services bills for anesthesia services. In fact, her FAC refutes the allegation by showing that PST Services did not just blindly follow the medical records when there was a potential issue regarding the billing. Rather, PST Services confirmed the proper and permissible way to bill the services, even if it was not exactly what was reflected in the chart. *Id.* ¶¶ 102-103.

The other fact Relator uses to support the fraud claim is the summary of a purported telephone call Relator made to McKesson "posing as an anesthesiologist" from Alabama. FAC ¶ 126. Notwithstanding the questionable (and potentially illegal) tactics used in making this call, nothing in the description of the call is tied in any way to the services that are the subject of the FAC, the hospital at issue in the FAC, any claims submitted by that hospital, or even the state in which the malfeasance in the FAC was alleged to have occurred. In fact, the call to McKesson is not even linked to PST Services. Indeed, it is difficult to discern what point Relator was trying to make by reciting her conversation with the McKesson employee about hypothetical billing

8

issues, other than to capitalize on the comment that "McKesson's goal was to maximize reimbursement", which in itself is not actionable conduct.  To the extent Relator was trying to demonstrate that the billing for medical supervision by CRNA's at Kaweah was improper, she fails because California is an "opt-out" state, meaning that a CRNA can operate independently[4] and the services can be billed using the QZ modifier.  There is nothing improper about the use of this approved modifier in California.  *Cal. Soc. Of Anesthesiologists*, 204 Cal. App. 4th at 408 (citing "*multiple* authoritative sources uniformly concluding that CRNA's are allowed to administer anesthesia in California without physician supervision") (emphasis original).

"Rule 9(b) serves three purposes: (1) to provide defendants with adequate notice to allow them to defend the charge and deter plaintiffs from the filing of complaints 'as a pretext for the discovery of unknown wrongs'; (2) to protect those whose reputation would be harmed as a result of being subject to fraud charges; and (3) to 'prohibit [ ] plaintiff[s] from unilaterally imposing upon the court, the parties and society enormous social and economic costs absent some factual basis.'"  *Kearns*, 567 F.3d at 1125 (quoting *In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1405 (9th Cir. 1996).  This case highlights the importance of Rule 9(b):  PST has been dragged into a fraud claim despite the absence of allegations about what PST did wrong.  "Rule 9(b) does not allow a complaint to merely lump multiple defendants together but require[s] plaintiffs to differentiate their allegations when suing more than one defendant . . . and inform each defendant separately of the allegations surrounding his alleged participation in the fraud."  *Swartz*, 476 F.3d at 746-65 (internal quotations and citation omitted).  Plaintiffs must, "at a minimum identify the role of each defendant in the alleged fraudulent scheme" as well as each defendant's "role in making a false statement" to the government."  *U.S. ex rel. Lee v. Corinthian Colls.*, 655 F. 3d 984, at 997–98 (9th Cir. 2011) (quotation omitted); see also *U.S. ex rel Lawson v. Aegis Therapies, Inc.*, 2103 WL 5816501, at *3 (S.D. Ga. Oct. 29, 2013) (plaintiff in FCA case "must satisfy Rule 9(b) with respect to *each defendant*, and [include] some

---

[4] Relator alleges that Kaweah's contract with Somnia prohibited the practice, FAC ¶ 48, but does not allege that McKesson was aware of the provision or knew anything about Somnia's contractual relationship with the hospital. Moreover, violation of a contractual provision between Somnia and the hospital cannot turn an otherwise permitted practice into a fraudulent claim.

allegation as to *each defendant's role* in the fraud") (emphases added) (internal quotation omitted).

Relator received McKesson's Motion to Dismiss before it filed the FAC. Despite knowing that PST was contending that there were not sufficient allegations against PST to support a claim, Relator has not cured the deficiencies with the FAC. Rather, the FAC perpetuates the same tactic employed in the original complaint -- it paints all of the defendants with the same brush, without alleging specific facts about each defendant necessary to allow the defendants to understand the nature of the allegations against them. As a result, PST has no notice of what **PST** is alleged to have done wrong, thereby preventing PST the opportunity to prepare a defense.

In sum, although there are numerous allegations of potential wrongdoing in the FAC, there are no allegations that PST committed any wrongdoing that meet even the more relaxed standard of Rule 8. And certainly there are no allegations that meet the heightened pleading standard of Rule 9(b), which requires Relator to "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b).

**C.   Relator Fails to Meet the Pleading Requirements of Either the Federal or California False Claims Act.**

The FAC alleges PST violated the federal False Claims Act and the California False Claims Act ("CFCA"). "[T]he essential elements of [federal] False Claims Act liability [are]: (1) a false statement or fraudulent course of conduct, (2) made with scienter, (3) that was material, causing (4) the government to pay out money or forfeit moneys due." *United States ex rel. Hendow v. Univ. of Phx.*, 461 F.3d 1166, 1174 (9th Cir. 2006). The CFCA is "[p]atterned on [the federal False Claims Act]", and permits recovery from any person who, "[k]nowingly presents or causes to be presented [to the state or any political subdivision] . . . a false claim for payment or approval." Cal. Gov't Code § 12651(a)(1); *City of Pomona v. Super. Ct. (James Jones Co.)*, 89 Cal. App. 4th 793, 801 (2001). Because the CFCA is modeled after the federal False Claims Act, California state courts look to the federal False Claims Act and related case law for guidance in interpreting the CFCA. *See, e.g., City of Pomona*, 89 Cal. App. 4th at 802

("Given the lack of California authority and the very close similarity of [the CFCA] to [the FCA], it is appropriate to turn to federal cases for guidance in interpreting the act."). Thus, the analysis of the California False Claims Act claim is the same as the analysis for the federal claim. The FAC fails to state a claim under either the federal False Claims Act or the CFCA because it fails to allege at least three of the necessary elements for a false claims allegation.

### 1. The FAC Does Not Allege PST Made A False Statement.

"[A]n actual false claim is 'the *sine qua non* of a[n FCA] violation.'" *Cafasso*, 637 F.3d at 1055 (quoting *Aflatooni,* 314 F.3d at 1002). However, as detailed above, Relator alleges numerous instances of potential false statements made by other defendants, but fails to allege any false statements made by PST. The FAC alleges that "Defendants" submitted false claims where MDAs improperly documented services in medical records, or indicated they were *medically directing* services when they were actually not. FAC. ¶ 59. But this conclusory statement does not allege that PST ever knew of, or participated in the making of, any statement that was based on or endorsed these practices. To the contrary, the FAC alleges that when PST was concerned that there might be improper coding of cases as being *medical directed*, it brought its concern to Somnia's attention. *Id.*¶ 102. But as Somnia correctly responded, and PST confirmed, *id.* ¶ 103, California law specifically permits submission of claims for *non-medically directed* CRNA services.[5] *Cal. Soc. Of Anesthesiologists*, 204 Cal. App. 4th at 408.

The FAC also alleges that "Defendants" submitted false claims for *medical direction* when the MDA had not complied with TEFRA's documentation requirements. Again, Relator does not allege that PST ever knew of, or participated in the making of, these alleged false claims. Nor does Relator specify if any of these alleged false claims occurred during the time PST had a contract with Somnia or if Relator was involved in the making of, or even actually saw, any of the bills for these services that form the basis for the alleged false claims. The few

---

[5] The allegation in paragraph 47 of the FAC that all "CRNAs must be directly supervised by an anesthesiologist if they are working in Level I, II, and/or III Trauma Centers and the institution seeks to collect Medicare Part A reimbursement" is not a factual allegation, it is a legal conclusion, and the Court need not accept it as true in a motion to dismiss. *Iqbal*, 556 U.S. at 678 (stating "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). Moreover, the allegation is wrong on the law.

examples of claims that Relator contends were improperly billed were either for a time period in which PST was not engaged by Somnia, or were so devoid of specifics about the alleged wrongdoing that there is no way for PST to respond. In short, the FAC lacks any description of "particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." *Ebeid*, 616 F.3d at 998-999. Based on the dearth of specific allegations against PST, is entirely speculative whether PST had any role in the alleged wrongdoing here.

Moreover, the defects in the complaint cannot be cured by amendment. No additional facts can change the fact that California law permits a CRNA to operate without physician supervision and bill accordingly. And despite two attempts in exhaustive, 100+ paragraph complaints with ten separate causes of action, Relator has not and cannot allege that she has seen bills sent by PST, or otherwise knows how PST actually billed any particular case. Because "the 'allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency,' [ ] dismissal without leave to amend is proper." *Albrecht v. Lund*, 845 F.2d 193, 195 (9th Cir. 1988) (quoting *Schreiber Distributing Co. v. Serv–Well Furniture Co.,* 806 F.2d 1393, 1401 (9th Cir. 1986)). Moreover, leave to amend need not be granted when, as is the case here, the plaintiff has already been granted leave to amend once and failed to cure the deficiencies in the complaint. *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1051-52 (9th Cir. 2008).

2. The FAC Does Not Allege PST Acted with the Requisite Scienter.

The FAC also fails to meet the False Claims Act's pleading requirement that PST acted with the requisite scienter. "The Act's scienter requirement defines 'knowing' and 'knowingly' to mean that a person has 'actual knowledge of the information,' 'acts in deliberate ignorance of the truth or falsity of the information,' or 'acts in reckless disregard of the truth or falsity of the information.'" *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 1996 (2016) (quoting 31 U.S.C. § 3729(b)(1)(A)). The scienter requirement is "rigorous." *Id.* at 2002.

Far from meeting this "rigorous" standard, the FAC alleges **no facts** that make it plausible, as opposed to merely conceivable, that PST knew that any claims were false. *Cafasso*,

637 F. 3d at 1055.  "The question on intent here is whether [PST] knew (or would have known absent deliberate blindness or reckless disregard) that [its] bills would lead the government to believe that [the MDAs] had provided services that they actually did not provide." *United States ex rel. Minn. Ass'n of Nurse Anesthetists v. Allina Health Sys. Corp.*, 276 F.3d 1032, 1053 (8th Cir. 2002).  The answer based on the facts alleged here is clearly no.[6]

The "knowing" standard under the False Claims Act "reaches 'what has become known as the ostrich type situation where an individual has buried his head in the sand and failed to make simple inquiries which would alert him that false claims are being submitted.'" *United States ex rel. Swoben v. United Healthcare Ins. Co.*, 848 F.3d 1161, 1176 (9th Cir. 2016) (quoting *United States v. Bourseau*, 531 F.3d 1159, 1168 (9th Cir. 2008)).  In *Swoben*, the allegation was that Medicare Advantage organizations conducted "retrospective reviews of medical records designed to identify and report only under-reported diagnosis codes (diagnosis codes erroneously not submitted to CMS despite adequate support in an enrollee's medical records), not over-reported codes (codes erroneously submitted to CMS despite the absence of adequate record support)." *Id.* at 1166.  The court found that *United Healthcare* in effect buried its head in the sand by refusing to look for any instances where codes were over-reported and therefore overcharged.  That is clearly not the case with PST.  In fact, just a month after PST started, it alerted Somnia to what it believed were errors in the coding of some charts.  FAC ¶ 102.  But PST was advised, correctly, that in California the CRNAs can work without supervision, so a case can correctly be billed using the *non-medically directed* CRNA modifier.  *Id.* ¶ 103; *Cal. Soc. Of Anesthesiologists*, 204 Cal. App. 4th at 408.

---

[6] PST anticipates that Relator may try to rely on *Allina Health*.  Any such reliance would be misplaced.  Although the claimed wrongdoing is similar to the instant case – MDAs were alleged to have billed for personally performing services when they were unavailable for emergencies on those cases, including where they had left the building -- there is a critical difference between the two.  *Id.* at 1055.  *Allina Health* focused on the knowledge of the **MDAs**, not a third party company like PST.  *Id.* at 1056.  In *Allina Health*, the court found that the MDA who was performing and billing for these services knew that it was wrong to bill as *personally performing* services when the MDA was not even in the building.  *Id.*  The same does not hold true for a third-party company like PST.  There are no allegations in the FAC that plausibly put PST on notice that any of this conduct was occurring.  And as the court pointed out, "it is important to remember that the standard for liability is knowing, not negligent, presentation of a false claim." *Id.* at 1053.

13

Relator adds allegations about the EMR system used at Kaweah, and alleges that Somnia attempted to change the way the EMR system functioned to allow CRNAs the option of selecting "Facilitating MD" rather than "Medical Direction of a CRNA."  FAC ¶ 89.  But the FAC alleges that the changes didn't work, and that "Defendants knew, or should have known, that it didn't work."  *Id.* ¶ 98.  But the FAC does not allege that PST Services had any knowledge of the EMR system used in Kaweah, or any changes made to that system.  There is no factual allegation that would even permit an inference that PST Services was aware of how the EMR system at Kaweah operated, or whether any changes to the system would have solved the alleged problem of improper billing.  Thus, this allegation cannot be the basis for a claim under the False Claims Act.  *Cafasso*, 637 F.3d at 1055.

Relator cannot and does not allege that PST knew, or was deliberately indifferent to, what the MDAs were doing at Kaweah.  Nor can she amend her complaint to make a false claim out of a practice that is expressly allowed by federal regulation and state law – CRNAs in California are not required to be supervised by an MDA.  Denial of leave to amend is appropriate here. *Albrecht*, 845 F.2d at 195

### 3. The Complaint Does Not Allege PST Caused the Government to Pay Out Money.

Finally, in order to state a claim under the False Claims Act, the false statement must actually cause the government to pay money.  *Hendow*, 461 F.3d at 1174.  Much like there is no allegation that any of the wrongdoing asserted against the MDAs here was known to PST, the only allegation that PST submitted a bill to the federal or state government or that the government actually paid a single false claim is too conclusory to withstand challenge.

/ / /
/ / /
/ / /
/ / /
/ / /
/ / /

## IV.  CONCLUSION

Relator's FCA fails to state a claim under the federal or state False Claims Acts against PST. The bottom line is Relator has no knowledge of what was actually included in any of the bills sent by PST, or what PST billed for. Relator's claims that PST billed for medically directed services when they should have been medical supervision is pure speculation. This speculation cannot state a claim under the False Claims Act. Therefore, PST respectfully requests that its motion to dismiss be GRANTED.

Dated:  August 21, 2017                     KING & SPALDING LLP


                                            By:   /s/  W. Scott Cameron
                                                  W. Scott Cameron

                                                  Attorneys for Defendant
                                                  PST Services, LLC