1  MICHAEL R. LINDSAY (SBN 110845)
   mlindsay@nixonpeabody.com
2  JASON GONZALEZ (SBN 178768)
   jgonzalez@nixonpeabody.com
3  ERIN J. HOLYOKE (SBN 288137)
   eholyoke@nixonpeabody.com
4  MAE HAU (SBN 293641)
   mhau@nixonpeabody.com
5  NIXON PEABODY LLP
   300 S. Grand Avenue, Suite 4100
6  Los Angeles, CA  90071-3151
   Tel:    213-629-6000
7  Fax:    213-629-6001

8  BRIAN K. FRENCH (Admitted *Pro Hac Vice*)
   bfrench@nixonpeabody.com
9  NIXON PEABODY LLP
   100 Summer Street
10 Boston, MA 02110-2131
   Tel:    617-345-1000
11 Fax:    617-345-1300

12 Attorneys for Defendants
   SOMNIA, INC., PRIMARY ANESTHESIA
13 SERVICES, BYRON MENDENHALL, M.D.,
   QUINN GEE, M.D., AND MARGARET VASSILEV, M.D.
14

15                 **UNITED STATES DISTRICT COURT**

16                 **EASTERN DISTRICT OF CALIFORNIA**

17

| | |
|---|---|
| 18  UNITED STATES and the STATE OF CALIFORNIA ex rel.  NICOLE O'NEILL. NICOLE O'NEILL | Case No.:  1:15-CV-00433-DAD-EPG |
| 19 | |
| 20                              Plaintiff, | **DEFENDANT SOMNIA, INC., PRIMARY ANESTHESIA SERVICES, BYRON MENDENHALL, M.D., QUINN GEE, M.D., AND MARGARET VASSILEV, M.D.'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS FIRST AMENDED COMPLAINT** |
| 21               vs. | |
| 22  SOMNIA, INC., PRIMARY ANESTHESIA SERVICES, PST SERVICES LLC, ROBERT GOLDSTEIN, M.D., ROY WINSTON, M.D., BRYON MENDENHALL, M.D., QUINN GEE, M.D., AND MARGARET VASSILEV, M.D, AND DOES 1 through 10 inclusive, | |
| 23 | |
| 24 | Date:  October 2, 2017 |
| 25                          Defendants. | Time: 9:30 AM Ctrm: 5 |
| 26 | Date Action Filed:  March 19, 2015 |
| 27 | [Filed concurrently with Notice of Motion and Motion; Request for Judicial Notice] |
| 28 | |

## <u>TABLE OF CONTENTS</u>

**Pages**

I.     **INTRODUCTION** ........................................................................................... 1

II.    **BACKGROUND** ............................................................................................. 2

    A.     **Parties And Relevant Factual Summary** ................................... 2

    B.     **Medicare Part B Reimbursement For Anesthesia Services** ................ 3

    C.     **CRNA Supervision And The Opt-Out Provision Under Medicare Part A** ........................................................................................ 5

III.    **LEGAL STANDARDS** ................................................................................ 6

    A.     **Rule 12(b)(6)** ............................................................................. 6

    B.     **Rule 9(b)** .................................................................................... 6

    C.     **FCA Violation** ........................................................................... 7

IV.    **RELATOR'S FAC SHOULD BE DISMISSED** ......................................... 7

    A.     **Relator's FCA Claims In Counts I-III Are Deficient Under** ............. 7

         1.     **The FAC fails to plead the submission of false claims with sufficient particularity** ................................................... 8

         2.     **Relator has failed to allege a viable FCA claim based on Defendants' purported use of the QZ modifier** ................ 12

         3.     **Relator Has Not Adequately Alleged Economic Harm to the Government** ................................................................ 15

         4.     **Relator Has Failed to Plead Scienter** ............................... 16

    B.     **Relator's FCA Retaliation Claims In Counts IV-V Fail to Satisfy** ... 16

         1.     **Relator has not alleged that she was engaged in protected activity under the statutes** ................................. 17

         2.     **Relator fails to allege facts sufficient to demonstrate that Somnia/PAS had knowledge she was engaged in protected activity under the FCA** ............................... 18

         3.     **Relator fails to allege facts to establish a causal connection between her protected activity and the termination of the Sarasate contract** ................................................ 19

**C.**      **Claim VI Under Health & Safety Code Section 1278.5 Should Be Dismissed Because Relator Fails To Show A Causal Connection Between Her Complaint And The Contract Termination** ............................... 20

**D.**      **Claims VII-VIII For Wrongful Termination Under The California Whistleblower Protection Act And California Public Policy Should Be Dismissed For Failure To Satisfy Rule 12(b)(6)** ................................ 20

   **1.**      **Relator fails to allege facts sufficient to establish that she was an employee of Somnia/PAS** .................................................. 21

   **2.**      **Relator fails to allege the required causal connection** ............................ 22

   **3.**      **To the extent claims for the underlying statutory violations supporting Relator's wrongful termination in violation of California public policy are dismissed, the wrongful termination claim must also be dismissed** ...................................... 23

**E.**      **Claim IX For IIED Should Be Dismissed Because Relator Fails To Allege Extreme Or Outrageous Conduct Or Severe Emotional Distress** ........ 23

   **1.**      **Relator does not allege facts to establish extreme and outrageous conduct by Somnia/PAS** ................................................ 23

   **2.**      **Relator does not allege facts sufficient to show that she suffered severe or extreme emotional distress** ................................................ 24

**F.**      **Claim X For NIED Should Be Dismissed Because Relator Fails To Allege Any Negligent Conduct By Somnia/PAS** ................................... 25

**V.      CONCLUSION** ............................................................................................ 25

4817-9687-5341.2

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**FEDERAL CASES**

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ........................................................................ 6, 12, 13, 16

*Bell Atlantic Corp. v. Twombly,*
    550 U.S. 544 (2007) ................................................................................ 6, 12, 21

*Bursese v. Paypal, Inc.,*
    2007 WL 485984 (N.D. Cal. 2007) ................................................................ 21

*Corsello v. Lincare, Inc.,*
    428 F.3d 1008 (11th Cir. 2005) ...................................................................... 11

*Cuevas v. SkyWest Airlines,*
    17 F. Supp. 3d 956 (N.D. Cal. 2014) ............................................................. 23

*Doe 1 v. Wal-Mart Stores, Inc.,*
    572 F.3d 677 (9th Cir. 2009) .......................................................................... 22

*Ebeid ex. rel. U.S. v. Lungwitz,*
    616 F.3d 993 (9th Cir. 2010) ............................................................................ 8

*Edwards v. U.S. Fid. & Guar. Co.,*
    848 F. Supp. 1460 (N.D. Cal. 1994) .............................................................. 25

*Gordian Med. Inc. v. Sebelius,*
    2012 WL 781596 (C.D. Cal. 2012) ................................................................ 14

*Holden v. Target Corp.,*
    2016 WL 3938950 (N.D. Cal. 2016) .............................................................. 24

*Mikes v. Straus,*
    274 F.3d 687 (2d Cir. 2001) ........................................................................... 15

*Moore v. Cal. Inst. of Tech. Jet Propulsion Lab.,*
    275 F.3d 838 (9th Cir. 2002) .......................................................................... 17

*Navarro v. Block,*
    250 F.3d 729 (9th Cir. 2001) ............................................................................ 6

*Ortiz v. Lopez,*
    688 F. Supp. 2d 1072 (E.D. Cal. 2010) .......................................................... 21

*Rivera v. Amtrak,*
    331 F.3d 1074 (9th Cir. 2003) ........................................................................ 21

DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION TO DISMISS
FIRST AMENDED COMPLAINT

*Sabow v. U.S.*,
   93 F.3d 1445 (9th Cir. 1996) ........................................................................ 23

*Schultz v. Stericycle, Inc.*,
   2013 WL 4776517 (E.D. Cal. 2013) ............................................................. 24

*Semegen v. Weidner*,
   780 F.2d 727 (9th Cir. 1985) .......................................................................... 7

*Starr v. Baca*,
   652 F.3d 1202 (9th Cir. 2011) ........................................................................ 6

*Swartz v. KPMG LLP*,
   476 F.3d 756 (9th Cir. 2007) .......................................................................... 7

*U.S. ex rel., Hopper v. Anton, et. al.*,
   91 F.3d 1261 (9th Cir. 1996) ................................................................... 17, 18

*U.S. ex rel. Aflatooni v. Kitsap Physicians Serv.*,
   314 F.3d 995 (9th Cir. 2002) ............................................................... 8, 9, 11

*U.S. ex rel. Aquino v. Univ. of Miami*,
   2017 WL 1655592 (S.D. Fla. Apr. 26, 2017) .............................................. 11

*U.S. ex rel. Cafasso v. Gen. Dynamics C4 Sys., Inc.*,
   637 F.3d 1047 (9th Cir. 2011) ................................................................... 8, 20

*U.S. ex rel. Campie v. Gilead Sciences, Inc.*,
   2017 WL 2884047 (9th Cir. July 7, 2017) ............................................. 18, 19

*U.S. ex rel. Gravett v. Methodist Med. Ctr.*,
   82 F. Supp. 3d 835 (C.D. Ill. 2015) ............................................................. 10

*U.S. ex rel. Hagood v. Sonoma County Water Agency*,
   929 F.2d 1416 (9th Cir. 1991) ...................................................................... 16

*U.S. ex rel. Hochman v. Nackman*,
   145 F.3d 1069 (9th Cir. 1998) ...................................................................... 16

*U.S. ex rel. Joshi v. St. Luke's Hosp., Inc.*,
   441 F.3d 552 (8th Cir. 2006) ........................................................................ 11

*U.S. ex rel. Landers v. Baptist Mem'l Health Care Corp.*,
   525 F. Supp. 2d 972 (W.D. Tenn. 2007) ........................................................ 5

*U.S. ex rel. Ramseyer v. Century Healthcare Corp.*,
   90 F.3d 1514 (10th Cir. 1996) ................................................................ 18, 19

*U.S. ex rel. Sanders v. Am.-Amicable Life Ins. Co. of Texas*,
   545 F.3d 256 (3d Cir. 2008) ................................................................... 15, 16

-iv-

4817-9687-5341.2

*U.S. v. Kiewit Pac. Co.*,
   41 F. Supp. 3d 796 (N.D. Cal. 2014) ............................................................... 6

*U.S. v. Mackby*,
   261 F.3d 821 (9th Cir. 2001) ........................................................................... 7

*U.S. v. Sequel Contractors, Inc.*,
   402 F. Supp. 2d 1142 (C.D. Cal. 2005) .......................................................... 7

*Universal Health Serv., Inc. v. U.S. ex rel. Escobar*,
   136 S. Ct. 1989 (2016) ............................................................................. 7, 13

*Velente-Hook v. E. Plumas Health Care*,
   368 F. Supp. 2d 1084 (E.D. Cal. 2005) ......................................................... 20

**STATE CASES**

*Cal. Soc'y of Anesthesiologists v. Sup. Ct.*,
   204 Cal. App. 4th 390 (2012) .......................................................................... 5

*Carney v. Rotkin, Schmerin & McIntyre*,
   206 Cal. App. 3d 1513 (1988) ....................................................................... 25

*Cole v. Fair Oaks Fire Prot. Dist.*,
   43 Cal. 3d 148 (1987) .................................................................................... 25

*Davidson v. City of Westminster*,
   32 Cal. 3d 197 (1982) .................................................................................... 23

*Hughes v. Pair*,
   46 Cal. 4th 1035 (2009) ........................................................................... 24, 25

*Kaye v. Bd. of Tr. of the San Diego County Public Law Library*,
   179 Cal. App. 4th 48 (2009) .......................................................................... 17

*Mao's Kitchen, Inc. v. Mundy*,
   209 Cal. App. 4th 132 (2012) .......................................................................... 7

*Pitman v. City of Oakland*,
   197 Cal. App. 3d 1037 (1988) .................................................................. 23, 24

*Potter v. Firestone Tire & Rubber Co.*,
   6 Cal. 4th 965 (1993) .................................................................................... 24

*Serv. Emps. Int'l Union v. County of L.A.*,
   225 Cal. App. 3d 761 (1990) ......................................................................... 22

*Vernon v. State*,
   116 Cal. App. 4th 114 (2004) ........................................................................ 22

**FEDERAL STATUTES**

31 U.S.C. § 3729(a)(1) ................................................................................................ 7

31 U.S.C. § 3729(b) .................................................................................................... 16

31 U.S.C. § 3730(b) ...................................................................................................... 1

31 U.S.C. § 3730(h) ................................................................................... 1, 16, 17, 18

42 U.S.C. § 1395ff(f)(2)(B) ........................................................................................ 14

42 U.S.C. § 1395kk-1(a)(4) ........................................................................................ 14

**STATE STATUTES**

Cal. Gov't Code § 12651(a)(1)-(3) ............................................................................... 7

California Government Code § 12653 ......................................................................... 16

California Whistleblower Protection Act (Labor Code § 1102.5) ................................... 20, 21, 23

Health & Safety Code § 1278.5(b) .................................................................... 1, 20, 23

**RULES**

Federal Rules of Civil Procedure 9(b) ................................................................. passim

Federal Rules of Civil Procedure 12(b)(6) .......................................................... passim

**REGULATIONS**

42 C.F.R. pt. 482 .......................................................................................................... 5

42 C.F.R. §§ 414.46(b)-(c), (d)(3)(v), 414.60(a), (b) .................................................. 4

42 C.F.R. § 414.46(c)(1)(i) ........................................................................................... 3

42 C.F.R. §§ 414.46(c), (d), (f), 414.60(a) .................................................................. 3

42 C.F.R. §§ 414.46(d)(1) ............................................................................................ 4

42 C.F.R. § 414.46(f) ................................................................................................ 4, 5

42 C.F.R. § 414.60(a) .................................................................................................... 4

42 C.F.R. § 414.60(a)(2) ............................................................................................. 14

42 C.F.R. § 482.52(a)(4) ........................................................................................ 5, 14

42 C.F.R. § 482.52(c)(1) ............................................................................................... 5

4817-9687-5341.2

51 Fed. Reg. 22010, 22028 (June 17, 1986) ........................................................... 14

60 Fed. Reg. 63124, 63178 (Dec. 8, 1995) ............................................................. 14

63 Fed. Reg. 58814, 58843 (Nov. 2, 1998) .............................................................. 5

65 Fed. Reg. 65413 (Nov. 1, 2000) ........................................................................ 14

66 Fed. Reg. 56762 (Nov. 13, 2001) ...................................................................... 14

DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION TO DISMISS
FIRST AMENDED COMPLAINT

4817-9687-5341.2

## I.   **INTRODUCTION**

Nicole O'Neill ("Relator") filed this action on March 19, 2015, pursuant to the *qui tam* provisions of the False Claims Act ("FCA").  31 U.S.C. § 3730(b).  After investigating Relator's allegations, both the United States and State of California filed notice in November 2016 of their respective decisions not to intervene in the action.  ECF No. 18.  The Court ordered the Complaint unsealed the following month.  *Id.*  Defendants Somnia, Inc. ("Somnia"), Primary Anesthesia Services ("PAS"), Dr. Byron Mendenhall, Dr. Quinn Gee, and Dr. Margaret Vassilev (collectively, the "Defendants") moved to dismiss the Complaint on June 7, 2017.  ECF No. 31.  Instead of opposing Defendants' motion, Relator filed her First Amended Complaint ("FAC") on July 7, 2017.  ECF No. 41.

Relator's FAC alleges that Defendants violated the FCA by submitting fraudulently "upcoded" claims to Medicare for reimbursement of anesthesiology services.  Relator also asserts claims for wrongful termination under the FCA, Health and Safety Code section 1278.5, the California Whistleblower Protection Act, and a state common law claim based on an alleged public policy violation.  Relator contends that Somnia and PAS terminated her contract because she complained about Defendants' purported submission of fraudulent claims.  Finally, Relator asserts claims for intentional and negligent infliction of emotional distress.

First, Relator's FCA claims should be dismissed for failure to satisfy the heightened pleading requirements of Federal Rules of Civil Procedure 9(b) and the pleading requirements for FCA cases generally.  Second, Relator's FCA and Health and Safety Code retaliation claims fail because Relator has not pled sufficient facts to support her contention that she was terminated "because of" her complaints.  31 U.S.C. § 3730(h)(1).  In addition, none of the allegations in the FAC demonstrate that Relator knew about or investigated any false claims for payment made to the government, attempted to prevent the submission of any false claims to the government, or that Somnia or PAS knew about any such investigation or efforts involving the alleged false claims.  *Id.*  Third, Relator's wrongful termination claims under the California Whistleblower Protection Act and California public policy fail because neither Somnia nor PAS was Relator's employer, and thus cannot be held liable.  Fourth, Relator's claim for intentional infliction of emotional

4817-9687-5341.2

1  distress ("IIED") should be dismissed because Relator fails to allege any conduct that is either

2  extreme or outrageous, or that she suffered severe or extreme emotional distress.  Relator's claim

3  for negligent infliction of emotional distress ("NIED") similarly fails because she does not identify

4  what negligent conduct by Somnia or PAS caused her severe emotional distress.

5  Accordingly, Relator's FAC should be dismissed in its entirety because each of the

6  theories that Relator advances is inadequately pled and fails to state a viable cause of action under

7  Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure.

8  **II.** **BACKGROUND**

9  **A.** **Parties And Relevant Factual Summary**

10  PAS contracts with Kaweah Delta Health Care District to provide anesthesia services at

11  Kaweah Delta Medical Center ("Kaweah Hospital").  *See* Defendants' Request for Judicial Notice

12  (Defs' RJN), Ex. A-B.  Somnia is a separate legal entity that contracts with PAS to manage its

13  anesthesia practices.  FAC ¶¶ 9-11.  Relator alleges in her FAC that although separately

14  incorporated, Somnia and PAS are an integrated enterprise.  *Id.* at ¶ 11.  Defendants deny that

15  Somnia and PAS are an integrated enterprise, but for the purposes of this Motion only, Defendants

16  will treat Somnia and PAS (hereinafter "Somnia/PAS") as an integrated enterprise.  Relator's FAC

17  is silent as to Drs. Quinn Gee, Margaret Vassilev, and Byron Mendenhall's employment

18  relationships, and while not relevant to this Motion, all physicians are affiliated with PAS and

19  provide anesthesia services through PAS at Kaweah Hospital.

20  Relator is a Certified Registered Nurse Anesthetist ("CRNA") and president, director, and

21  principal shareholder in Sarasate Nursing Anesthesia, P.C. ("Sarasate").  *Id.* at ¶¶ 7-8.  On March

22  22, 2012, Sarasate entered into a contract with Somnia/PAS to provide Relator's anesthesia

23  services as Chief CRNA to Kaweah Hospital.  *Id.* at ¶ 18.[1]  Relator alleges that pursuant to her

24  contract, as Chief CRNA, she was in charge of several facets of the anesthesiology department

25  including, but not limited to, leading staff CRNAs assigned to specific operating rooms ("OR");

26  coordinating OR activity and OR nurse management to create efficient patient flow; keeping and

27

28

---

[1] Later in the Complaint, Relator alleges that Sarasate entered into a contract with Kaweah Delta Health Care District.  FAC ¶ 113.

4817-9687-5341.2

1  maintaining the medical charts and data required to properly bill for services provided; and

2  executing all documentation necessary for third-party reimbursements.  *Id.* at ¶ 114.

3      On or about March 21, 2013, Relator resigned her position as Chief CRNA noting her

4  concerns with the anesthesiologists' availability.  *Id*. ¶¶ 77-78.  On or about August 5, 2013,

5  Somnia/PAS and Sarasate amended their contract to reflect Relator's resignation as Chief CRNA.

6  *Id.* at ¶ 83.  Relator continued to provide services at Kaweah Hospital as a CRNA pursuant to the

7  amended contract.  On June 13, 2014, Somnia/PAS gave notice that it was terminating the contract

8  with Sarasate without cause.  *Id.* at ¶ 120.  Relator ceased providing services to Kaweah Hospital

9  on or around August 1, 2014.  *Id.* at ¶ 109.

10      Relator contends that Defendants fraudulently billed the government for "medically

11  directed" anesthesia services when they should have been billed under the "medical supervision"

12  category, which Relator claims is reimbursed at a lower rate.  *Id*. at ¶ 39.  Relator also argues that

13  Defendants fraudulently billed the government for anesthesia services as "not medically directed,"

14  when they should have billed under the "medical supervision" category.  During her time as Chief

15  CRNA, Relator allegedly raised concerns about inaccurate charting and billing practices, as well

16  as the lack of doctors' supervision of patient care.  *Id*. at ¶¶ 79, 115-117.

17      **B.    Medical Part B Reimbursement For Anesthesia Services**

18      Medicare Part B reimburses providers of anesthesia services under four categories.  These

19  include services that are: (1) personally performed by an anesthesiologist, (2) performed by a

20  CRNA under medical direction, (3) performed by a CRNA under medical supervision, and (4)

21  performed by a CRNA and not medically directed.  42 C.F.R. §§ 414.46(c), (d), (f), 414.60(a).

22  The requirements for each category are as follows:

23   1.  "Personal performance" occurs when an anesthesiologist "performs the entire
24       anesthesia service alone."  42 C.F.R. § 414.46(c)(1)(i).

25   2.  "Medical direction" generally occurs when an anesthesiologist directs CRNAs in up to
         four concurrent cases, and the anesthesiologist:
26
         •  Performs a pre-anesthetic examination and evaluation;
27       •  Prescribes the anesthesia plan;
28       •  Personally participates in the most demanding aspects of the anesthesia plan,

-3-
4817-9687-5341.2

including, if applicable, induction and emergence;

- Ensures that any procedures in the anesthesia plan that he does not perform are performed by a qualified individual;
- Monitors the course of anesthesia administration at frequent intervals;
- Remains physically present and available for immediate diagnosis and treatment of emergencies; and
- Provides indicated post-anesthesia care.

42 C.F.R. §§ 414.46(d)(1); 415.110(a)(1).

3. Medical supervision" occurs when both the physician and CRNA are involved in delivering anesthesia services to a patient, but the physician's level of involvement cannot be classified as medical direction.  The physician may be considered supervising, as opposed to directing, for purposes of Part B reimbursement if he or she is involved in directing more than four concurrent cases or performs other services while directing the concurrent cases.  42 C.F.R. § 414.46(f); Defs' RJN, Ex. C, at Ch. 12, § 50.D.

4. "Not medically directed" anesthesia services are performed by the CRNA without any medical direction or supervision by a physician.  Such services are billed using the modifier "QZ."  42 C.F.R. § 414.60(a); Defs' RJN, Ex. C, at Ch. 12, § 140.3.3.

The Medicare Part B Program reimburses an anesthesiology practice the same amount regardless of whether the anesthesiology service is billed as "personally performed," "medically directed," or "not medically directed."  When the service is billed as "personally performed," 100% of the Medicare fee schedule amount is provided to the anesthesiologist.  When the service is billed as "medically directed," 50% of the payment is provided to the anesthesiologist and 50% of the payment is provided to the CRNA.  Finally, when the service is billed as "not medically directed," 100% of the payment is provided to the CRNA.  Accordingly, the manner in which services in one of these three categories are billed impacts only the distribution of pay to the anesthesiologist or CRNA, not the overall amount that the practice receives.  See 42 C.F.R. §§ 414.46(b)-(c), (d)(3)(v), 414.60(a), (b); Defs' RJN, Ex. C, at Ch. 12 §§ 50(B)-(C), 140.3.3.

The only time Medicare Part B potentially reimburses anesthesia services at a lower rate is when they are provided under "medical supervision."  For medically supervised services, the CRNA receives 50% of the Medicare fee schedule amount – the same payment the CRNA would receive for medically directed services.  The physician, however, is not reimbursed under the fee schedule, but instead is paid three base units per procedure (plus one additional time unit if the physician is present at induction), an amount that may be less than what the physician would

4817-9687-5341.2

1   receive if the services were medically directed, depending on the procedure involved.  42 C.F.R. §

2   414.46(f); Defs' RJN, Ex. C, at Ch. 12, § 50.D; FAC ¶ 44.

3          **C.**      **CRNA Supervision And The Opt-Out Provision Under Medicare Part A**

4         Aside from the regulations regarding Medicare Part B reimbursement for anesthesiology

5   services described above, Medicare also generally requires that a CRNA be supervised by a

6   physician in order for **the hospital** to receive reimbursement **under Medicare Part A**.  42 C.F.R.

7   § 482.52(a)(4).  This operational requirement is part of the quality of care standards that hospitals

8   must meet to participate in Medicare Part A and should not be confused with the above-described

9   concepts of "medical direction" or "medical supervision" in the billing context, which involve

10   matters of reimbursement to anesthesiologists and CRNAs under the Part B program.[2]

11         More importantly, these Part A regulations also provide that a state's Governor may write

12   to CMS and opt out of the CRNA supervision requirement.  42 C.F.R. § 482.52(c)(1).  In June

13   2009, California's Governor notified CMS of his decision to exempt California from the CRNA

14   supervision requirement.  *See Cal. Soc'y of Anesthesiologists v. Sup. Ct.*, 204 Cal. App. 4th 390,

15   395 (2012); *see also* FAC ¶ 47 (recognizing that "California is an 'opt-out' state allowing CRNAs

16   to work independently").

17         Despite the state's decision to opt out of the CRNA supervision requirement, California

18   hospitals may adopt stricter standards and require physician supervision of CRNAs as a condition

19   of practice within their facilities.  *See Cal. Soc'y of Anesthesiologists*, 204 Cal. App. 4th at 748-49

20   (citing 66 Fed. Reg. 56762, 56765 (Nov. 13, 2001)).  Thus, section 2.1(g) of the Exclusive

21   Provider Agreement for Anesthesia Services between Kaweah Hospital and Somnia/PAS (the

22   "Hospital Contract") dated July 27, 2011, provides that "the ratio of supervised CRNAs to

23   Physicians providing services under this Agreement [must not] exceed 4:1."  Defs' RJN, Ex. A.

24

25   [2] The Centers for Medicare & Medicaid Services ("CMS") has recognized that the "medical direction
     requirements specify the activities that the medically directing physician . . . must perform in order for the
26   carrier to allow payment for a physician's service under the physician fee schedule," and are "not quality of
     care standards."  63 Fed. Reg. 58814, 58843 (Nov. 2, 1998).  *Cf. U.S. ex rel. Landers v. Baptist Mem'l*
27   *Health Care Corp.*, 525 F. Supp. 2d 972, 978 (W.D. Tenn. 2007) (Medicare regulations for hospitals under
     42 C.F.R. Part 482 "are quality of care standards directed towards an entity's continued ability to
28   participate in the Medicare program rather than a prerequisite to a particular payment").

4817-9687-5341.2

1   Notably, the word "supervised" was later removed from section 2.1(g) in the Amended and

2   Restated Exclusive Provider Agreement for Anesthesia Services effective February 1, 2015.  Defs'

3   RJN, Ex. B.

4   **III.    LEGAL STANDARDS**

5        **A.    Rule 12(b)(6)**

6        Rule 12(b)(6) permits a court to dismiss all or part of an action for "failure to state a claim

7   upon which relief can be granted."  On a motion to dismiss, the Court accepts the material facts

8   alleged in the complaint, together with all reasonable inferences to be drawn from those facts, as

9   true.  *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001).  However, "the tenet that a court must

10  accept a complaint's allegations as true is inapplicable to threadbare recitals of a cause of action's

11  elements, supported by mere conclusory statements."  *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009).

12  "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a

13  cause of action will not do.'"  *Id.* at 678.  Nor does a complaint suffice if it tenders "naked

14  assertion[s]" devoid of "further factual enhancement."  *Id.* (citations omitted).  To be entitled to

15  the presumption of truth, a complaint's allegations "must contain sufficient allegations of

16  underlying facts to give fair notice and to enable the opposing party to defend itself effectively."

17  *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011).

18       To survive a motion to dismiss, a plaintiff must plead "enough facts to state a claim to

19  relief that is plausible on its face."  *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570 (2007).

20  Plausibility does not mean probability, but it requires "more than a sheer possibility that a

21  defendant has acted unlawfully."  *Iqbal*, 556 U.S. at 687.  "A claim has facial plausibility when

22  the plaintiff pleads factual content that allows the court to draw the reasonable inference that the

23  defendant is liable for the misconduct alleged."  *Id.*

24       **B.    Rule 9(b)**

25       An FCA complaint must also meet the heightened pleading standard of Rule 9(b), which

26  requires the plaintiff to "state with particularity the circumstances constituting the fraud."  *U.S. v.*

27  *Kiewit Pac. Co.*, 41 F. Supp. 3d 796, 801 (N.D. Cal. 2014); Fed. R. Civ. P. 9(b).  The allegations

28  must be specific enough to give a defendant notice of the particular misconduct alleged to

1   constitute the fraud such that the defendant may defend against the charge. *Semegen v. Weidner*,

2   780 F.2d 727, 731 (9th Cir. 1985). Generally, allegations of fraud must contain "an account of the

3   time, place, and specific content of the false representation as well as the identities of the parties to

4   the misrepresentations." *Swartz v. KPMG LLP,* 476 F.3d 756, 765 (9th Cir. 2007) (citation and

5   quotation omitted).

6       **C.    FCA Violation**

7       To establish a cause of action for fraud under the FCA and California False Claims Act

8   ("CFCA"),[3] a plaintiff must plead and prove three elements, including: (1) a "false or fraudulent"

9   claim; (2) which was presented, or caused to be presented, by the defendant to the United States

10  [or, with respect to the CFCA, to the state or a political subdivision of the state] for payment or

11  approval; (3) with knowledge that the claim was false. 31 U.S.C. § 3729(a)(1); Cal. Gov't Code §

12  12651(a)(1)-(3); *U.S. v. Mackby*, 261 F.3d 821, 826 (9th Cir. 2001); *U.S. v. Sequel Contractors,*

13  *Inc.*, 402 F. Supp. 2d 1142, 1151-52 (C.D. Cal. 2005). The false statement in the claim must also

14  be "material" to the government's decision to pay the claim. *See Universal Health Serv., Inc. v.*

15  *U.S. ex rel. Escobar*, 136 S. Ct. 1989, 2003 (2016).

16  **IV.   RELATOR'S FAC SHOULD BE DISMISSED**

17      **A.    Relator's FCA Claims In Counts I-III Are Deficient Under Rules 9(b) And**
        **12(b)(6)**
18

19      Relator purports to bring two causes of action under the FCA and one cause of action

20  under the CFCA, neither of which states a viable claim or alleges fraud with the requisite level of

21  particularity demanded by Rule 9(b). Relator's First and Third Causes of Action allege that

22  "Defendants knowingly presented, or caused to be presented, false or fraudulent claims for

23  payment or approval to officers or employees of the United States Government" and the California

24  State Government. FAC ¶¶ 130, 138. Her Second Cause of Action alleges that "Defendants

25  knowingly made, used, or caused to be made or used, false records and statements to obtain the

26  _____

27  [3] The CFCA was modeled on the federal FCA and California courts turn to federal cases for guidance in interpreting the CFCA. *See Mao's Kitchen, Inc. v. Mundy*, 209 Cal. App. 4th 132, 146 (2012). For the sake of brevity, Defendants have combined its analysis of claims under the FCA and CFCA. Where

28  Defendants reference the FCA, Defendants are also referencing the CFCA.

4817-9687-5341.2

United States Government's payment of false or fraudulent claims." *Id.* at ¶ 134.

Each of these FCA claims should be dismissed because Relator has not provided a single example of an allegedly false claim submitted to a government payor.  Nor has she alleged particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that false claims were actually submitted.  In addition, Relator has not established that "medically supervised" anesthesiology services were reimbursed at a lower rate than the services that were actually billed, or that the alleged mis-billings caused or would cause economic loss to the government.  In sum, the FAC falls far short of the heightened pleading requirements of Rules 12(b)(6) and 9(b) because it offers no more than speculative assertions that false claims were submitted to any government payor.

### 1.     The FAC fails to plead the submission of false claims with sufficient particularity

To establish liability under the FCA, Relator must show "*an actual false claim* for payment being made to the Government."  *U.S. ex rel. Aflatooni v. Kitsap Physicians Serv.*, 314 F.3d 995, 1002 (9th Cir. 2002) (emphasis in original).  "Evidence of an actual false claim is the *sine qua non* of a False Claims Act violation."  *Id.* (citations and quotations omitted).  Thus, the FCA "attaches liability, not to the underlying fraudulent activity or to the government's wrongful payment, but to the 'claim for payment.'"  *U.S. ex rel. Cafasso v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1055 (9th Cir. 2011) (citation omitted); *see also Aflatooni*, 314 F.3d at 1002 (FCA "focuses on the submission of a claim, and does not concern itself with whether or to what extent there exists a menacing underlying scheme").

To satisfy Rule 9(b), Relator must state with particularity the "who, what, when, where, and how" of the alleged fraudulent conduct.  *Ebeid ex. rel. U.S. v. Lungwitz*, 616 F.3d 993, 998 (9th Cir. 2010).  To do so, Relator must either identify "representative examples" of false claims or "allege particular details of a scheme to submit false claims paired with **reliable indicia** that lead to a **strong inference** that claims were actually submitted."  *Id.* at 998-99 (quotation and citation omitted) (emphasis added).  The FAC does neither.  Instead, Relator has simply amended her initial Complaint to add a series of conclusory and speculative assertions that Defendants

-8-

4817-9687-5341.2

1  billed Medicare in the handful of examples she offers in which a physician purportedly failed to

2  meet the requirements for medically directing or personally performing anesthesiology services.

3  *Compare* initial Complaint at ¶¶ 54, 55, 62, 63, 75, *with* FAC at ¶¶ 69, 74, 84, 85, 107,

4  respectively.  For example, Relator amended paragraph 62 of the initial Complaint (now included

5  in the FAC at paragraph 84) by adding the phrase "and billed," while leaving the remaining

6  language unchanged:

7
8      On October 18, 2013, there were four concurrent cases plus cases listed in the OB
       department that Dr. Winston charted **__and billed__** as *medically directing*.  In addition, one of
       the cases was charted **__and billed__** as *personally performed*.  He could not be *personally*
9      *performing* a case and *medically directing* at the same time.

10  FAC at ¶ 84 (emphasis in bold underlines added).  These conclusory allegations fail to satisfy Rule

11  9(b).  *See Aflatooni*, 314 F.3d at 1002 ("It is not enough for [relator] to describe a private scheme

12  in detail but then to allege simply and without any stated reason for his belief that claims

13  requesting illegal payments must have been submitted") (quotations and citation omitted).[4]

14      Nowhere in the FAC does Relator allege that she had **any** personal knowledge that false

15  claims were actually submitted to the government.  Instead, she provides vague descriptions of the

16  electronic medical record ("EMR") system used by clinicians to document the services provided to

17  patients at Kaweah Hospital and alleges, without any factual support, that the bills submitted to the

18  government were necessarily consistent with the information included in the EMR system.

19  Specifically, Relator alleges (1) that the EMR system required that a physician be listed as

20  medically directing the anesthesia services in order to close a chart for billing, regardless of the

21  actual level of supervision of the anesthesia services provided to the patient;[5] (2) that the bills

22  submitted to the government for anesthesia services were derived from each patient's EMR; (3)

23  that Defendants' billing personnel were not permitted to "alter or amend the patient EMR"; and

24

25  [4] Relator has also added three additional examples in which Defendants allegedly billed Medicare at the
    medical direction rate even though the requirements for that level were purportedly not met.  FAC ¶ 70.
26  Those allegations, however, are devoid of details such as physician names, patient names, the
    circumstances surrounding the procedures, or facts showing how or why the medical direction requirements
    were purportedly not met.

27
28  [5] This allegation is contradicted by other allegations in the FAC in which Relator contends that certain
    cases were charted and billed as personally performed, not medically directed.  FAC ¶¶ 84-85.

DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION TO DISMISS
FIRST AMENDED COMPLAINT

4817-9687-5341.2

1   (4) that Defendants therefore billed the government at the medically directed level. FAC ¶¶ 52-55.

2   These allegations fall well short of providing the "reliable indicia" necessary to support a "strong

3   inference" that false claims were actually submitted to the government.

4           Notably, Relator worked for Somnia/PAS as a CRNA, a position in which she provided

5   clinical anesthesiology services to patients at Kaweah Hospital. *Id.* at ¶ 18.  Relator does not

6   allege that she worked in Somnia/PAS' billing department, nor does she assert facts showing that

7   her clinical duties somehow provided her with knowledge of, or enabled her to participate in,

8   Somnia/PAS' billing procedures, such as the way in which billing personnel reviewed and

9   assessed information contained in patients' medical records, determined the appropriate billing

10  and reimbursement codes, and processed invoices for submission to Medicare and other payers.

11  Without allegations demonstrating Relator's personal knowledge of, or involvement in,

12  Somnia/PAS' billing procedures, the FAC's conclusory allegations that whatever level of service

13  was listed in the clinical chart was necessarily billed to Medicare fails to provide sufficient indicia

14  of reliability to substitute for the identification of a specific false claim submitted to the

15  government.

16          Several courts have dismissed FCA complaints under similar facts.  For example, in *U.S.*

17  *ex rel. Gravett v. Methodist Med. Ctr.*, 82 F. Supp. 3d 835 (C.D. Ill. 2015), the relator, a former

18  emergency room physician, brought an FCA action against his former employer, a provider of

19  managed emergency room services, and the hospital where he was placed to provide services.  The

20  relator alleged that the defendants were responsible for fraudulently upcoding services provided at

21  the hospital and submitting false claims to government payers.  In dismissing the case under Rule

22  9(b), the court observed that "Courts of Appeal are in agreement that unless the relator is in a

23  special position of personal knowledge or involvement in the billing practices of the defendant

24  that affords some indicia of reliability to the allegations, the failure to provide specific information

25  of at least a single false claim that was actually submitted for payment is fatal to relator's action

26  under the FCA." *Id.* at 842-43 (citing *Aflatooni* and other cases).  Though the relator in *Gravett*

27  was involved in filling out patient charts and had personally observed that the hospital's EMR

28  system "had a tendency to inflate the otherwise applicable CPT code for both physician and

1   hospital services," *id.* at 841, "there was no indication that [relator] was responsible for or ha[d]

2   other first hand knowledge of Defendants' actual billing practices, submission of claims for

3   payment, or receipt of payments from Government payors." *Id.* at 843. The court concluded that

4   the relator's "lack of involvement in the claims or billing practices of either Defendant" rendered

5   his allegations "akin to a reliance on rumor or innuendo that has been found to lack the indicia of

6   reliability necessary to support a FCA action under Rule 9(b)." *Id.* at 843-44.

7        Likewise, without any showing of Relator's personal knowledge of, or involvement in,

8   Somnia/PAS' billing practices, the FAC fails to provide sufficient indicia of reliability to

9   substitute for the identification of a specific false claim submitted to the government. *See U.S. ex*

10  *rel. Joshi v. St. Luke's Hosp., Inc.*, 441 F.3d 552, 557 (8th Cir. 2006) (dismissing FCA action

11  where relator "did not work in the billing department . . . [or] allege any details concerning false

12  claims actually submitted; rather, he vaguely alleged the fraudulent schemes were pervasive and

13  wide ranging in scope, and . . . must have [resulted in the submission of] fraudulent claims");

14  *Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1011 (11th Cir. 2005) (Although relator described "a

15  pattern of improper practices of the defendants," and vaguely alleged that he was "aware of"

16  standard billing practices, his role in the sales department meant that he had no personal

17  knowledge of the actual submission of fraudulent bills); *Aflatooni*, 314 F.3d at 1002 ("It is not

18  enough for [relator] to describe a private scheme in detail but then to allege simply and without

19  any stated reason for his belief that claims requesting illegal payments must have been submitted")

20  (internal quotations and citation omitted); *U.S. ex rel. Aquino v. Univ. of Miami*, 2017 WL

21  1655592, at *9 (S.D. Fla. Apr. 26, 2017) (FCA complaint failed to support an inference that false

22  claims were submitted for payment where the relator, a patient access coordinator, "had access to

23  and kept doctors' and patients' records that were eventually forwarded to the . . . billing

24  department for claims submission", but "did not have any duties which gave her knowledge of or

25  participation in Defendants' actual submission of Medicare claims").

26       Finally, Relator's FCA claims are not saved by her allegation that Kaweah Hospital "has a

27  patient population that is approximately 72% government-supported, with Kaweah receiving

28  approximately 37% of its payments for medical services from Medicare, 31% from Medicaid, and

4817-9687-5341.2

4% from the County of Tulare." FAC ¶ 17. This allegation does not provide a "strong inference" that false claims were actually submitted to the government. Notwithstanding the fact that both the United States and State of California declined to pursue Relator's claims, the allegation here is largely irrelevant. Because Relator has not shown that Somnia/PAS submitted false claims to any payor, the mix of government vs. private payors, whatever it may be, adds nothing to Relator's allegations. Relator also does not identify the source of her statistics or provide any other basis on which to assess the reliability of her allegation. In addition, the percentages that Relator cites relate to the breakdown of government payments received **by Kaweah Hospital**, not by Somnia/PAS. These figures are irrelevant to Relator's FCA action because, as she herself acknowledges, Somnia/PAS submits its own claims for reimbursement directly to Medicare and other payers and is not reimbursed through the hospital. *See* FAC ¶ 21 (Hospital Contract "required PAS/Somnia to bill its patients and third-party payers (including Medicare) directly"). The FAC does not include any allegations that link Relator's statistics to claims submitted by Somnia/PAS, nor do the percentages she cites create more than a **mere possibility** that false claims were submitted to government payers. This is not enough to survive a motion to dismiss. *See Twombly*, 550 U.S. at 570 (plaintiff must plead enough facts to state a claim "that is plausible on its face"); *Iqbal*, 556 U.S. at 687 (plausibility requires "more than a sheer possibility that a defendant has acted unlawfully").

> **2.    Relator has failed to allege a viable FCA claim based on Defendants' purported use of the QZ modifier**

Relator alleges, without providing a single supporting detail, that Defendants violated the FCA by billing for CRNA services at the "not medically directed" rate (described by Relator as "CRNA Independent") under the QZ modifier in cases in which the physician failed to satisfy the requirements for "medical direction." FAC ¶¶ 46, 62. Relator contends that these services should have been billed at the lower "medically supervised" rate. *Id.* at ¶ 62. In addition, Relator asserts that Defendants were not allowed to bill under the QZ modifier at all because unsupervised CRNA services were purportedly prohibited at Kaweah Hospital. *Id.* at ¶¶ 48-49. These allegations fail to support a viable FCA claim.

First, Relator has not offered a single example in which Defendants billed Medicare under the QZ modifier when an anesthesiologist failed to satisfy the requirements for medical direction. The FAC contains only one vague reference to an email in which it was mentioned that CRNA services could be billed as non-medically directed.  *Id.* at ¶ 103.  As discussed in more detail in Section IV(A)(1) above, Relator's failure to identify any representative examples of claims improperly submitted under the QZ modifier or otherwise to plead sufficient facts to create a strong inference that false claims were submitted to the government is fatal to Counts I-III.

Moreover, Relator's assertion that Defendants were not permitted to bill under the QZ modifier for CRNA anesthesia services because unsupervised CRNA services are purportedly prohibited at Kaweah Hospital is simply wrong and does not rise to the level of an FCA violation in any event.  Billing Medicare for services allegedly provided in violation of a contractual provision between Kaweah Hospital and Somnia/PAS does not render the claim false or fraudulent.  Moreover, even violations of federal Medicare regulations must meet the high standard of materiality set forth in *Universal Health Services, Inc. v. U.S. ex rel. Escobar*, 136 S. Ct. 1989, 2003 (2016).  That standard – that the government would not have paid the claim had it known of the violation – cannot possibly be met where the alleged violation merely involves a contractual provision to which the government was not a party.  *See id.*  Put simply, submission of a claim to the Medicare program does not impliedly certify compliance with the provider's contracts with a hospital.  Somnia/PAS' compliance or non-compliance with its contracts with Kaweah Hospital has no bearing whatsoever on whether the claims it submits to the Medicare program are false or fraudulent or material to the government's payment decision.

In addition, Relator's allegation is based on section 2.1(g) of the initial Hospital Contract, which provided that "the ratio of supervised CRNAs to Physicians providing services under this Agreement [must not] exceed 4:1."  FAC ¶ 48.  As the Hospital Contract makes clear, however, this provision relates only to Defendants' **operational** responsibilities under the agreement and is wholly unrelated to the concepts of "medical direction" and "medical supervision" for purposes of Part B reimbursement for services provided by physicians and CRNAs.  *See* Defs' RJN, Ex. A at § 2.1(g) and other provisions of Section 2.

1    Relator fails to cite any authority to support the proposition advanced in her FAC that

2  general operational oversight is somehow the equivalent of "medical supervision" for purposes of

3  Medicare Part B reimbursement.  This is not surprising in light of the applicable regulatory

4  framework, which draws a clear distinction between these two concepts.  In 1986, CMS adopted

5  in its current form the Medicare regulation for hospitals located at 42 C.F.R. § 482.52(a)(4),

6  requiring that a CRNA must be under the **operational** supervision of the operating practitioner or

7  of an anesthesiologist.  *See* 51 Fed. Reg. 22010, 22028 (June 17, 1986).  Nine years later, CMS

8  adopted 42 C.F.R. § 414.60(a)(2), which provides that CRNA services that are not directed by a

9  physician may be paid at the same Medicare rate as an anesthesiologist would receive for

10  personally performed services.  60 Fed. Reg. 63124, 63178 (Dec. 8, 1995).  Since CMS did not

11  adopt the rule permitting states to opt out of the CRNA supervision requirement of the Medicare

12  regulation until 2001, 66 Fed. Reg. 56762 (Nov. 13, 2001), the agency clearly recognized that

13  CRNAs could be reimbursed 100% of the Medicare fee schedule amount for providing non-

14  medically directed services notwithstanding the Part A requirement that physicians oversee

15  CRNAs from an operational standpoint.

16    Finally, to the extent that a physician failed to meet all of the requirements for medical

17  direction, Noridian Healthcare Solutions ("Noridian"), the Medicare Administrative Contractor

18  ("MAC") responsible for administering Medicare Part B in California, permits the services to be

19  billed as non-medically directed (CRNA Independent), using modifier QZ, instead of medically

20  supervised.[6]  CMS has recognized that it does "not have a national policy that instructs carriers

21  [MACs] on the method of payment for a service when the anesthesiologist does not fulfill all the

22  medical direction requirements."  65 Fed. Reg. 65413 (Nov. 1, 2000).  Accordingly, MACs have

23  discretion over whether to require providers to bill cases of incomplete medical direction as

24  "medical supervision" or to permit the provider to bill the services as "not medically directed"

25  under the QZ modifier.  In that regard, Noridian has issued guidance in the form of FAQs stating

26  ─────────────────
[6] CMS acts through private fiscal agents known as MACs to administer Medicare Part B within geographic
27  jurisdictions.  *See Gordian Med. Inc. v. Sebelius*, 2012 WL 781596, at *1 (C.D. Cal. 2012).  MACs may
issue Local Coverage Determinations ("LCD") describing when items or services may be covered by
28  Medicare on a jurisdiction-wide basis, and supply information for health care provider training, education,
and technical assistance on Medicare coverage issues.  *See* 42 U.S.C. §§ 1395ff(f)(2)(B), 1395kk-1(a)(4).

the following:

> Q1.  Are there any instances where a Certified Registered Nurse Anesthetist (CRNA) would not append the QZ modifier?
>
> A1.  A CRNA would not append the QZ modifier if they are:
>
> - A Qualified nonphysician anesthetist with medical direction by a physician; or
> - For monitored anesthesiology services;[7] or
> - Medical direction of one qualified nonphysician anesthetist by an anesthesiologist.

*See* Defs' RJN, Ex. D.  In other words, in cases of incomplete medical direction by an anesthesiologist, providers like Somnia/PAS can appropriately bill Medicare for the CRNA's services at the full fee schedule amount under the QZ modifier (provided, of course, that the physician's services are not billed to Medicare in those instances).  Accordingly, there is no merit to Relator's assertion that Somnia/PAS violated the FCA by billing under the QZ modifier in cases of incomplete medical direction.

### 3.  Relator Has Not Adequately Alleged Economic Harm to the Government

A false or fraudulent claim is a claim "aimed at extracting money the government otherwise would not have paid."  *Mikes v. Straus*, 274 F.3d 687, 696 (2d Cir. 2001).  The FCA covers only those instances of fraud "that might result in financial loss to the Government"; thus, a false or fraudulent claim is actionable only where such claims "cause or would cause economic loss to the government."  *U.S. ex rel. Sanders v. Am.-Amicable Life Ins. Co. of Texas*, 545 F.3d 256, 259 (3d Cir. 2008) (quotations and citations omitted).

Relator fails to adequately plead that Somnia/PAS' alleged billing practices caused, or would cause, economic loss to the government.  She contends only that "medically supervised" anesthesiology services "allow[] reimbursement for the [doctor's] services at only 3 units (plus

---

[7] "Monitored anesthesiology care" services are not the same as "medically directed" or "medically supervised" services.  Monitored anesthesia care involves the monitoring of a patient undergoing a surgical procedure for possible adverse physiological reactions and/or for the possible need to convert to general anesthesia if necessary.  It also may include the administration of sedatives or pain medication, such as Valium or Demerol, without general anesthesia.  *See* Defs' RJN, Ex. C at Ch. 12, § 50.H.  Relator does not allege that the services at issue here were "monitored."

4817-9687-5341.2

one unit if the MDA was present for induction)", and that "[t]his results in less than 100% of the otherwise allowable payment."  FAC at ¶ 43.  Relator does not offer any factual allegations, nor does she cite to specific regulations, to show that the units provided for "personally performed," "medically directed," or "not medically directed" anesthesiology services were necessarily greater than the three to four units she claims would have been allocated had the services been billed as "medically supervised."  Relator's conclusory allegations that Somnia/PAS received greater reimbursement than it was entitled to are not enough to show that Somnia/PAS' alleged billing practices necessarily "cause[d] or would cause economic loss to the government."  *Sanders*, 545 F.3d at 259; *see also Iqbal*, 556 U.S. at 687 (a plausible cause of action requires "more than a sheer possibility that a defendant has acted unlawfully").

### 4.    Relator Has Failed to Plead Scienter

Liability for the submission of a false claim requires *scienter*.  Under the FCA, a person is deemed to have acted "knowingly" when he or she acts with actual knowledge or in deliberate ignorance or reckless disregard of the truth or falsity of the information.  31 U.S.C. § 3729(b).  "The requisite intent is the knowing presentation of what is known to be false."  *U.S. ex rel. Hagood v. Sonoma County Water Agency*, 929 F.2d 1416, 1421 (9th Cir. 1991).  Differing interpretations of applicable requirements or standards, a reasonable mistake, or even negligence by the defendant is not enough to impose liability.  *See id.*; *U.S. ex rel. Hochman v. Nackman*, 145 F.3d 1069 (9th Cir. 1998).  Here, Relator's vague allegations of discussions she purportedly had with Somnia/PAS representatives about "charting" and safety concerns fall far short of showing that Somnia/PAS knew that it was submitting false claims as a result of the billing practices that Relator raises in the FAC.

### B.    Relator's FCA Retaliation Claims In Counts IV-V Fail to Satisfy Rules 9(b) And 12(b)(6)

Relator fails to allege facts sufficient to meet the requisite elements to sustain a claim for retaliation in violation of 31 U.S.C. § 3730(h) or California Government Code section 12653.  To establish a prima facie case under either section, Relator must show that she (1) engaged in activity protected under the statutes; (2) that the employer knew she engaged in protected activity;

and (3) that the employer discriminated against her *because* she engaged in protected activity.

*U.S. ex rel., Hopper v. Anton, et. al.,* 91 F.3d 1261,1269 (9th Cir. 1996); *Moore v. Cal. Inst. of Tech. Jet Propulsion Lab.*, 275 F.3d 838, 845 (9th Cir. 2002).[8]  As shown below, Relator's FAC fails to allege facts sufficient to meet all three elements.

> **1.      Relator has not alleged that she was engaged in protected activity under the statutes**

Since the 2010 amendments, 31 U.S.C. § 3730(h)(1) has provided:

> Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment **because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section <u>or other efforts to stop 1 or more violations of this subchapter.</u>**

31 U.S.C. § 3730(h)(1) (emphases added).

Here, Relator's FAC fails to allege that any of her conduct while working at Kaweah Hospital, including her alleged complaints, were made "in the furtherance" of an FCA action or as part of an effort to prevent a false claim from being submitted to the government.  Nor does the FAC allege that during her time at Kaweah Hospital, Relator ever contemplated pursuing an FCA action, or that she was investigating or otherwise assisting in the development of an FCA claim. The FAC instead offers countless allegations that Relator was concerned about patient safety, including that anesthesiologists were not adequately overseeing patient care, were leaving the premise without properly notifying CRNAs, and were improperly documenting and charting procedures.  This is not enough.  Relator's alleged conduct and complaints were nothing more than an attempt to secure compliance with applicable hospital rules and to ensure patient safety— not an attempt to recover funds on behalf of the government or to prevent the submission of false claims to the government.  *See Hopper,* 91 F.3d at 1269 (Ninth Circuit held that numerous written complaints to an employer in an attempt to ensure its compliance with Federal and state

---

[8] Because the CFCA is patterned on the FCA, cases interpreting the FCA can guide interpretation of the CFCA, including retaliation claims.  *Kaye v. Bd. of Tr. of the San Diego County Public Law Library*, 179 Cal. App. 4th 48, 59-60 (2009).

4817-9687-5341.2

1   regulations was insufficient to establish that the employee was acting in furtherance of an action

2   under the FCA because the employee was not seeking to recover money for the government).

3   Relator's allegations are insufficient as a matter of law to meet the first prima facie element of a

4   retaliation claim under the FCA.

5          **2.      Relator fails to allege facts sufficient to demonstrate that Somnia/PAS had knowledge she was engaged in protected activity under the FCA**

6

7          Relator also fails to allege facts sufficient to meet the second prima facie element of her

8   retaliation claims—that Somnia/PAS had knowledge of her protected activity.  Relator bears the

9   burden of pleading facts demonstrating that Somnia/PAS was put on notice that Relator was

10  engaging in protected activity, i.e. either taking action in furtherance of a private qui tam action or

11  assisting in an FCA action brought by the government.  *See id.*; *see also U.S. ex rel. Campie v.*

12  *Gilead Sciences, Inc.*, 2017 WL 2884047, *12 (9th Cir. July 7, 2017); *U.S. ex rel. Ramseyer v.*

13  *Century Healthcare Corp.*, 90 F.3d 1514, 1522 (10th Cir. 1996), citing *Robertson v. Bell*

14  *Helicopter Textron,* 32 F.3d 948, 950 (5th Cir. 1994) (holding that a claim under section 3730(h)

15  requires discharge in retaliation for actions taken "in an effort to bring, or to help the government

16  bring a FCA suit.")  In *Ramseyer*, the relator, a clinical director, advised her superiors that the

17  hospital was not complying with the minimum program requirements of Medicaid (such as

18  shortcomings in patient records).  The court found that because the relator never suggested to her

19  employer that she intended to utilize such noncompliance in furtherance of an FCA action or that

20  she planned to report such noncompliance to government officials, the defendants were never put

21  on notice for purposes of retaliation.  *Ramseyer,* 90 F.3d at 1523; *see also Hopper*, 91 F.3d at 1269

22  (unless the employer is aware that the employee was investigating fraud, the employer could not

23  possess necessary retaliatory intent).

24         The Ninth Circuit cited to the *Ramseyer* holding in its recent decision in *Campie*, 2017 WL

25  2884047, at *12.  The Court held that unlike the employee in *Ramseyer* who "gave no suggestion

26  that she was going to report the noncompliance to government officials" and therefore no notice

27  was given, the employee in *Campie* "threatened to inform the FDA if the employer continued its

28  fraudulent conduct," which was sufficient to provide notice.  *Id.*  And unlike the employee in

*Ramseyer*, regulatory compliance was not in the *Campie* employee's job description. *Id.*

Here, Relator's FAC is silent with respect to the notice requirement. Like the relator in *Ramseyer*, even if Relator made complaints to Somnia/PAS about issues such as short staffing, improper or fraudulent charting, and violations of patient care, her FAC contains no factual allegations demonstrating that Somnia/PAS had knowledge of or was placed on notice that she planned to report the alleged fraudulent conduct to the government, that she would initiate her own FCA claim, or that she was attempting to prevent the submission of a false claim. Instead, the complaints and reports alleged in the FAC are the same activities that Relator was required to undertake as part of her job duties (i.e. coordinating OR activity and maintaining patient charts for proper billing), and there are no allegations indicating that she was doing more than merely warning Somnia/PAS about the conduct. *See Ramseyer,* 90 F.3d at 1523. Without allegations that Somnia/PAS had notice of Relator acting in furtherance of a FCA claim, the retaliation claims fail.

### 3. Relator fails to allege facts to establish a causal connection between her protected activity and the termination of the Sarasate contract

Assuming, arguendo, that Relator alleged facts sufficient to satisfy the first two elements of her FCA retaliation claims, the claims still fail because she has not alleged facts to establish that Somnia/PAS terminated the contract with Sarasate **because** Relator was engaged in protected activity under the FCA. Relator's claim is premised on the conclusory allegation that "[t]he reason [for her contract termination] was because of her complaints about the systemic fraudulent documentation and billing." FAC ¶ 123. She attempts to support this claim by alleging that she complained to Dr. James Paskert, Chief Medical Officer of Kaweah, on or about May 7, 2014, and that Dr. Paskert *likely* shared her concerns with Somnia because Dr. Robert Goldstein, Vice President and Chief Medical Officer of PAS/Somnia, held a meeting on May 13, 2014, to discuss the subject of her complaint. *Id.* at ¶¶ 116, 118. Relator also makes several inferences in her FAC as to the Somnia/PAS executives who may have been aware of her complaints, but she does not identify any individual who was responsible for terminating her contract. Indeed, she does not allege that Dr. Goldstein terminated her contract even though he was the Somnia/PAS executive who was purportedly aware of her complaints. Relator fails to allege who made the decision to

-19-

1   terminate the contract and whether this decisionmaker had knowledge of her alleged protected

2   activity.  Without this requisite allegation, Relator's claim should be dismissed because she fails to

3   show that Somnia/PAS retaliated against her because of her protected activity.  *See Cafasso*, 637

4   F.3d at 1060 (decision by official to eliminate relator's employment was not causally related to her

5   actions in furtherance of a FCA claim, where official who eliminated the position did not know

6   about her protected activity at the time of the decision).

7       **C.    Claim VI Under Health & Safety Code Section 1278.5 Should Be Dismissed
             Because Relator Fails To Show A Causal Connection Between Her Complaint
8            And The Contract Termination**

9           Health & Safety Code section 1278.5(b) provides that no health care facility "shall

10  discriminate or retaliate, in any manner, against any…member of the medical staff…because that

11  person has done either of the following: (a) presented a grievance, complaint, or report to the

12  facility…; [or] initiated, participated, or cooperated in an investigation…related to, the quality of

13  care, services, or conditions at the facility...."  This claim fails for reasons similar to those

14  articulated in Section IV(B)(3).

15          The plain language of the statute requires Relator to show that Somnia/PAS terminated her

16  contract "because" she engaged in protected conduct.  As discussed in Section IV(B)(3) above,

17  Relator does not identify any individual who was responsible for terminating her contract.

18  Relator's Section 1278.5 claim, like the FCA retaliation claims, should be dismissed because she

19  fails to allege who made the decision to terminate her contract and whether the decisionmaker had

20  knowledge of her purported complaints, and thus cannot show that Somnia/PAS retaliated against

21  her because of her complaints.  *See Velente-Hook v. E. Plumas Health Care*, 368 F. Supp. 2d

22  1084, 1102 (E.D. Cal. 2005) (dismissing plaintiff's section 1278.5 claim because "[w]ithout

23  knowledge of the plaintiff's complaints, the defendant could not retaliate against the protected

24  whistleblowing activity").

25      **D.    Claims VII-VIII For Wrongful Termination Under The California
             Whistleblower Protection Act And California Public Policy Should Be
26           Dismissed For Failure To Satisfy Rule 12(b)(6)**

27          Relator contends that she was wrongfully terminated in violation of the California

28  Whistleblower Protection Act (Labor Code § 1102.5) and California public policy.  To establish a

-20-

4817-9687-5341.2

prima facie case under Labor Code section 1102.5, Relator must show that she: (1) engaged in protected activity; (2) that she was thereafter subjected to adverse employment action by her employer; and (3) that there was a causal link between the protected activity and adverse employment action. *Bursese v. Paypal, Inc*., 2007 WL 485984 (N.D. Cal. 2007), citing *Morgan v. Regents of Univ. of Cal.,* 88 Cal. App. 4th 52, 69 (2000).  Similarly, to establish her claim for wrongful termination in violation of California public policy, Relator must allege that her employment was terminated in violation of a policy that is: (1) embodied in a statute or constitutional provision; (2) beneficial to the public; (3) articulated at the time of discharge; and (4) fundamental. *Rivera v. Amtrak*, 331 F.3d 1074, 1078 (9th Cir. 2003).  These two claims impose liability only on an **employer**.  Relator's claims fail because neither Somnia nor PAS was her employer and because Relator fails to allege the requisite causal connection.

### 1.    Relator fails to allege facts sufficient to establish that she was an employee of Somnia/PAS

The cornerstone of Relator's two wrongful termination claims is the requirement that Relator be an employee of Somnia/PAS.  *Ortiz v. Lopez*, 688 F. Supp. 2d 1072, 1079 (E.D. Cal. 2010), citing *Miklosy v. Regents of the Univ. of Cal.,* 44 Cal.4th 876, 900 (2008) (a Tameny action for wrongful discharge can only be asserted against the employer); Cal. Labor Code § 1102.5 (the plain language of the statute provides that "[a]n *employer* may not retaliate against an *employee*") (emphases added).

In this instance, Relator alleges that she was an independent contractor and that she contracted with Somnia/PAS through Sarasate to provide her services to Kaweah Hospital.  FAC ¶¶ 8, 18.  Relator provides the dates the contract was entered into, when the contract was amended, the names of parties to the contract, and the terms of the contractual relationship.  *Id.* at ¶¶ 8, 18, 113-114.  Despite these clear allegations of an independent contractor relationship, Relator makes the unfounded and contradictory claim "in the alternative" that she was instead an employee because PAS/Somnia retained control over her work.  *Id.* at ¶ 18.  Relator alleges the elements of an employee relationship but does not provide specific facts to support this claim.  *See Twombly,* 550 U.S. at 545 (a plaintiff's "obligation to provide the 'grounds' of his 'entitle[ment] to relief'

requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.")  The Court need not accept Relator's conclusory allegation that she was Somnia/PAS' employee for the purposes of a motion to dismiss.  *See Doe 1 v. Wal-Mart Stores, Inc.*, 572 F.3d 677, 682 (9th Cir. 2009) (affirming Rule 12(b)(6) dismissal of plaintiff's claim to be Wal-Mart "employees" as a "conclusory allegation of law" that a court "need not accept" as true).

The chief factor in analyzing whether an entity is an employer is the "right to control and direct the activities of the person rendering service, or the manner and method in which the work is performed." *Serv. Emps. Int'l Union v. County of L.A.*, 225 Cal. App. 3d 761, 769 (1990).  The right to control requires "a comprehensive and immediate level of 'day-to-day' authority over employment decisions." *Vernon v. State*, 116 Cal. App. 4th 114, 127-28 (2004).  Here, Relator offers conclusory allegations that PAS/Somnia "controlled the hours and days that [she] worked and was responsible for the billing for her services" and that "she was assigned an operating room and cases by PAS/Somnia and medical doctors told her what type of anesthesia services should be administered" which are not enough.  FAC ¶ 18.  Relator fails to allege specific facts demonstrating the requisite degree of control by Somnia/PAS over her conduct.  Absent from the FAC are factors that courts consider when evaluating the employment relationship, including that Somnia/PAS paid Relator's salary; that it trained her; that it had the authority to hire, transfer, promote, discipline, or discharge her; or that it had a right to determine Relator's compensation. *Vernon*, 116 Cal. App. 4th at 125.  Moreover, Relator explicitly acknowledges that both parties understood the relationship to be one of an independent contractor.  FAC ¶¶ 18, 22.  Because there are no facts to support Relator's claim that she was Somnia/PAS' employee, her wrongful termination claims should be dismissed.

### 2.   Relator fails to allege the required causal connection

As explained in Section IV(B)(3) and (C), even if Relator has alleged sufficient facts to show that she was an employee of Somnia/PAS, her wrongful termination claims should be dismissed because she fails to establish a causal connection between the termination of her contract and her protected activity (i.e., who terminated her contract and whether they knew of her protected activity).

4817-9687-5341.2

**3.     To the extent claims for the underlying statutory violations supporting Relator's wrongful termination in violation of California public policy are dismissed, the wrongful termination claim must also be dismissed**

Relator's claim for wrongful termination in violation of California public policy is dependent on her claims under the FCA, CFCA, Health & Safety Code section 1278.5, and Labor Code section 1102.5. Each of these claims can support a claim for wrongful termination in violation of public policy. Because Relator has not sufficiently pled any of those claims, however, Relator's companion claim for wrongful termination also fails. *See Cuevas v. SkyWest Airlines*, 17 F. Supp. 3d 956, 967 (N.D. Cal. 2014), citing *Stevenson v. Sup. Ct.*, 16 Cal.4th 880, 904 (1997) (plaintiff has to establish the substantive violation of the underlying statute in order to bring a companion public policy claim).

**E.     Claim IX For IIED Should Be Dismissed Because Relator Fails To Allege Extreme Or Outrageous Conduct Or Severe Emotional Distress**

To state a claim for IIED, a plaintiff must show: (1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress, and (3) actual and proximate causation of the emotional distress by defendant's outrageous conduct. *Sabow v. U.S.*, 93 F.3d 1445, 1454 (9th Cir. 1996), citing *Christensen v. Sup. Ct.*, 54 Cal.3d 868 (1991). Relator here has failed to allege facts to satisfy the first or second elements of the IIED claim.

**1.     Relator does not allege facts to establish extreme and outrageous conduct by Somnia/PAS**

Relator's claim for IIED should be dismissed because she fails to plead facts indicating extreme, outrageous, and intentional conduct designed to cause emotional distress and that did cause severe emotional distress. Relator must allege conduct that is "so extreme [it] exceed[s] all bounds of that usually tolerated in a civilized community." *Davidson v. City of Westminster*, 32 Cal. 3d 197, 209 (1982). Here, rather than point to or identify specific acts that were extreme or outrageous, Relator recites the elements of the cause of action and vaguely cites to Defendants' "outrageous acts [of] placing profit over patient safety" and Defendants' termination of Relator's contract. FAC ¶ 177. As an initial matter, Somnia/PAS' termination of Relator's contract is not extreme or outrageous conduct. *See Pitman v. City of Oakland*, 197 Cal. App. 3d 1037, 1047

1  (1988) ("Being dismissed from a job is not an uncommon occurrence in modern society").

2  Furthermore, Relator sheds no light on how the "act of placing profit over patient safety"

3  constitutes outrageous conduct or how this act in particular caused her emotional distress.

4       Relator also states in conclusory fashion that "Defendants engaged in outrageous conduct

5  towards Plaintiff with the intention to cause…severe emotional distress."  FAC ¶ 177.  She fails to

6  allege a single fact to support the claim that Somnia/PAS' conduct was ***intended*** to inflict injury

7  on her.  *Id.* at ¶ 133; *Schultz v. Stericycle, Inc.,* 2013 WL 4776517, at *8 (E.D. Cal. 2013), citing

8  *Potter v. Firestone Tire & Rubber Co.*, 6 Cal. 4th 965, 1001 (1993) (defendant's conduct must be

9  intended to inflict injury or engaged in the realization that injury will result).  Without any

10  allegations of intent or outrageous conduct, Relator's IIED claim fails.

11
      **2.**      **Relator does not allege facts sufficient to show that she suffered severe or extreme emotional distress**

12

13       Relator's FAC is also devoid of facts sufficient to establish that she suffered "severe or

14  extreme emotional distress."  Relator baldly asserts that she suffers from "severe emotional,

15  including fear, anxiety, insomnia, and weight loss, for which she received medical treatment."

16  FAC ¶ 177.  These allegations fail to satisfy the threshold standard for an IIED claim.  Indeed, the

17  court has set a high bar for showing severe emotional distress.  *Hughes v. Pair*, 46 Cal. 4th 1035,

18  1051 (2009).  "Severe emotional distress means emotional distress of such substantial quality or

19  enduring quality that no reasonable [person] in civilized society should be expected to endure it."

20  *Schultz*, 2013 WL 4776517, at *8.  A complaint lacks facts to support severe emotional distress

21  where the complaint "[makes] sweeping references to pain and suffering, extreme and severe

22  mental anguish and emotional distress with no facts to support such symptoms

23  or conditions."  *Id.; see also Holden v. Target Corp*., 2016 WL 3938950, at *5 (N.D. Cal. 2016),

24  citing *Angie M. v. Sup. Ct.*, 37 Cal. App. 4th 1217, 1227 (1995) (plaintiff must plead facts

25  demonstrating the nature and extent of the emotional distress suffered.)

26       Here, Relator makes no factual allegations regarding the nature, extent, or duration of her

27  emotional distress.  The claims that she suffered severe emotional distress and received medical

28  treatment for weight loss without further factual explanation does not meet the requirement of

-24-

4817-9687-5341.2

specificity called for in *Hughes*.  Therefore, the FAC fails to allege severe emotional distress and the IIED claim should be dismissed.

**F.   Claim X For NIED Should Be Dismissed Because Relator Fails To Allege Any Negligent Conduct By Somnia/PAS**

A prima facie case of NIED requires Relator to show: (1) duty; (2) breach; (3) severe emotional distress; and (4) actual and proximate cause.  *Carney v. Rotkin, Schmerin & McIntyre,* 206 Cal. App. 3d 1513 (1988).  Relator's NIED claim should be dismissed because she fails to allege what conduct by Somnia/PAS caused her severe emotional distress.  Relator's FAC offers vague allegations that Somnia/PAS "subjected [Relator] to the conduct as alleged herein" and "breached their duty of due care by engaging in such conduct, by failing to take any and all reasonable steps to half [*sic*] such conduct and/or prevent such conduct from occurring, and by failing to take appropriate corrective action following such conduct."  FAC ¶ 184.  It is unclear what "such conduct" is.  To the extent Relator contends that Somnia/PAS is liable for NIED because they terminated her contract, this claim fails because the act of terminating the contract is *intentional.  See Cole v. Fair Oaks Fire Prot. Dist.*, 43 Cal. 3d 148, 160 (1987) (finding that employment decisions are inherently intentional); *Edwards v. U.S. Fid. & Guar. Co.,* 848 F. Supp. 1460, 1466 (N.D. Cal. 1994) ("[W]here the conduct is intentional, it cannot be used as the basis for a negligent infliction of emotional distress claim.").

## V.   CONCLUSION

For the foregoing reason, Defendants respectfully request that the Court dismiss Relator's FAC in its entirety with prejudice.

Dated:  August 21, 2017                NIXON PEABODY LLP


                                         By:____/s/ Michael Lindsay_____
                                              Michael R. Lindsay
                                              Attorneys for Defendants
                                              SOMNIA, INC., PRIMARY ANESTHESIA
                                              SERVICES, BYRON MENDENHALL QUINN
                                              GEE, M.D., and MARGARET VASSILEV, M.D.

4817-9687-5341.2