1 | MICHAEL R. LINDSAY (SBN 110845)
mlindsay@nixonpeabody.com
2 | JASON GONZALEZ (SBN 178768)
jgonzalez@nixonpeabody.com
3 | ERIN J. HOLYOKE (SBN 288137)
eholyoke@nixonpeabody.com
4 | MAE HAU (SBN 293641)
mhau@nixonpeabody.com
5 | NIXON PEABODY LLP
300 S. Grand Avenue, Suite 4100
6 | Los Angeles, CA  90071-3151
Tel:    213-629-6000
7 | Fax:    213-629-6001

8 | BRIAN K. FRENCH (Admitted *Pro Hac Vice*)
bfrench@nixonpeabody.com
9 | NIXON PEABODY LLP
100 Summer Street
10 | Boston, MA 02110-2131
Tel:    617-345-1000
11 | Fax:    617-345-1300

12 | Attorneys for Defendants
SOMNIA, INC., PRIMARY ANESTHESIA
13 | SERVICES, BYRON MENDENHALL, M.D.,
QUINN GEE, M.D., AND MARGARET VASSILEV, M.D.

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| UNITED STATES and the STATE OF CALIFORNIA ex rel.  NICOLE O'NEILL. NICOLE O'NEILL<br><br>Plaintiff,<br><br>vs.<br><br>SOMNIA, INC., PRIMARY ANESTHESIA SERVICES, PST SERVICES LLC, ROBERT GOLDSTEIN, M.D., ROY WINSTON, M.D., BRYON MENDENHALL, M.D., QUINN GEE, M.D., AND MARGARET VASSILEV, M.D, AND DOES 1 through 10 inclusive,<br><br>Defendants. | Case No.:  1:15-CV-00433-DAD-EPG<br><br>**DEFENDANTS' SOMNIA, INC., PRIMARY ANESTHESIA SERVICES, BYRON MENDENHALL, M.D., QUINN GEE, M.D., AND MARGARET VASSILEV, M.D.'S REPLY MEMORANDUM IN SUPPORT OF MOTION TO DISMISS FIRST AMENDED COMPLAINT**<br><br>Date:  November 7, 2017<br>Time: 9:30 AM<br>Ctrm: 5<br><br>Date Action Filed: March 19, 2015 |

# TABLE OF CONTENTS

Page

I. INTRODUCTION ..................................................................................................... 1

II. RELATOR'S FAC SHOULD BE DISMISSED ...................................................... 2

    A. Relator's FCA Claims In Counts I-III Are Deficient Under Rules 9(b) And 12(b)(6) ............................................................................................................ 2

        1. The FAC fails to plead the submission of false claims with sufficient particularity ........................................................................................... 2

        2. Relator has failed to allege a viable FCA claim based on Defendants' purported use of the QZ modifier ........................................................ 6

        3. The unchallenged fact that the Medicare administrative contractor authorized billing under the QZ modifier for procedures that do not meet the requirements of Medical Direction requires dismissal of Relator's claims .................................................................................... 7

        4. Relator has not adequately alleged economic harm to the government ......... 8

        5. Relator has failed to plead scienter .............................................................. 10

    B. Relator's Attempt To Preserve Her FCA And CFCA Retaliation Claims Fail ................................................................................................................. 11

    C. Relator's Health & Safety Code Section 1278.5 Claim Fails ............................... 13

    D. Relator Fails To Allege Facts Sufficient To State Claims For Wrongful Termination Under The California Whistleblower Protection Act And California Public Policy ....................................................................................... 13

    E. Relator Fails To State A Claim For IIED Or NIED ............................................. 14

III. CONCLUSION ....................................................................................................... 15

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Ambrosini v. Universal Cable Holdings, Inc.*,
   No. CV 14-00896 RS, 2014 WL 3362244 (N.D. Cal. July 7, 2014) ...................................... 15

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ............................................................................................................... 10

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ............................................................................................................... 10

*Corsello v. Lincare, Inc.*,
   428 F.3d 1008 (11th Cir. 2005) ................................................................................................ 5

*Doe 1 v. Wal-Mart Stores, Inc.*,
   572 F.3d 677 (9th Cir. 2009) .................................................................................................. 13

*Ebeid ex rel. U.S. v. Lungwitz*,
   616 F.3d 993 (9th Cir. 2010) ............................................................................................ passim

*Edwards v. U.S. Fidelity & Guar. Co.*,
   848 F. Supp. 1460 (N.D. Cal. 1994) ...................................................................................... 15

*Joshi, v. St. Luke's Hosp., Inc.*,
   441 F.3d 552 (8th Cir. 2006) .................................................................................................... 5

*McKenna v. Permanente Med. Grp.*,
   894 F. Supp. 2d 1258 .............................................................................................................. 15

*Mikes v. Straus*,
   274 F.3d 687 (2d Cir. 2001) ..................................................................................................... 8

*Miller v. Yokohama Tire Corp.*,
   358 F.3d 616 (9th Cir. 2004) .................................................................................................... 1

*U.S. ex rel. Aquino v. Univ. of Miami*,
   2017 WL 1655592 (S.D. Fla. Apr. 26, 2017) .......................................................................... 5

*U.S. ex rel. Bennett v. Medtronic, Inc.*,
   747 F. Supp. 2d 745 (S.D. Tex. 2010) ..................................................................................... 8

*U.S. ex rel. Cafasso v. Gen. Dynamics C4 Sys., Inc.*,
   637 F.3d 1047 (9th Cir. 2011) ............................................................................................. 3, 4

*U.S. ex rel. Campie v. Gilead Sciences, Inc.*,
   862 F.3d 890 (9th Cir. 2017) .................................................................................................. 12

*U.S. ex rel. Chorches for Bankruptcy Estate of Fabula*,
    865 F.3d 71 (2d Cir. 2017) ............................................................................................. 5

*U.S. ex rel. Hopper v. Anton, et. al.*,
    91 F.3d 1261 (9th Cir. 1996) ........................................................................................ 11

*U.S. ex rel. Modglin v. DJO Global Inc.*,
    114 F. Supp. 3d 993, 1024 (C.D. Cal. 2015) ............................................................... 10

*U.S. ex rel. Sanders v. Am.-Amicable Life Ins. Co. of Texas*,
    545 F.3d 256 (3d Cir. 2008) ..................................................................................... 8, 10

*U.S. ex rel. Thayer v. Planned Parenthood of the Heartland*,
    765 F.3d 914 (8th Cir. 2014) ...................................................................................... 4, 5

*U.S. v. Prabhu*,
    442 F. Supp.2d 1008 (D. Nev. 2006) ............................................................................. 8

**STATE CASES**

*Gomes v. Countrywide Home Loans, Inc.*,
    192 Cal. App. 4th 1149 (2011) .................................................................................... 13

*Hine v. Dittrich*,
    228 Cal. App. 3d 59 (1991) ......................................................................................... 15

*Janken v. GM Hughes Elec.*,
    46 Cal. App. 4th 55 ...................................................................................................... 14

*Smith v. Brown-Forman Distillers Corp.*,
    196 Cal. App. 3d 503 (1987) ....................................................................................... 14

**FEDERAL STATUTES**

31 U.S.C. § 3730(h)(1) ......................................................................................................... 11

**STATE STATUTES**

Health & Safety Code § 1278.5 ............................................................................................ 13

**RULES**

Rule 9(b) ......................................................................................................................... passim

Rule 12(b)(6) ............................................................................................................... 2, 10, 15

## I. INTRODUCTION

Relator Nicole O'Neill ("Relator") has not, and cannot, state facts showing that she has any plausible claim against defendants Somnia, Inc., Primary Anesthesia Services (together, Somnia, Inc. and Primary Anesthesia Services shall be referred to as "Somnia"), Dr. Byron Mendenhall, Dr. Quinn Gee, or Dr. Margaret Vassilev (collectively, the "Defendants"). Relator ignores the heightened pleading requirements for an action under the False Claims Act ("FCA") and fails to plead facts that would support a "strong inference" that Defendants actually submitted false claims for payment to a government payor. Relator does not provide any "detailed" and "specific" examples of any such false claims, but instead centers her First Amended Complaint ("FAC") on unsupported allegations of false billing even though Relator had no exposure to Defendants' billing practices. Relator also offers only conclusory allegations to support her claims that Defendants' alleged billing practices caused economic harm to the government or that Defendants acted knowingly in submitting the purported claims. Furthermore, the Court should dismiss Relator's retaliation claims because she does not allege the requisite causal connection between her alleged complaints and the termination of her contract. Relator also fails to allege any facts showing that she suffered severe emotional distress in support of her claims for intentional infliction of emotional distress ("IIED") and negligent infliction of emotional distress ("NIED"), or that Defendants' alleged misconduct was sufficiently outrageous to impose liability for IIED.

This Court should grant Defendants' motion to dismiss *without* leave to amend, as further amendment would be futile. Where a plaintiff "has previously filed an amended complaint…the district court's discretion to deny leave to amend is 'particularly broad.'" *Miller v. Yokohama Tire Corp.*, 358 F.3d 616, 622 (9th Cir. 2004) (citation omitted). Defendants' initial motion to dismiss highlighted the deficiencies in Relator's original Complaint, yet Relator failed to cure these issues in her FAC. Moreover, Relator's FAC does not identify any proposed allegation to be added to an amended pleading should the Court grant her leave to amend. The Court should dismiss the FAC with prejudice because allowing Relator a second opportunity to amend the Complaint would be futile.

-1-

DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF MOTION TO DISMISS
FIRST AMENDED COMPLAINT

## II. RELATOR'S FAC SHOULD BE DISMISSED

### A. Relator's FCA Claims In Counts I-III Are Deficient Under Rules 9(b) And 12(b)(6)

#### 1. The FAC fails to plead the submission of false claims with sufficient particularity

To satisfy Rule 9(b), a complaint alleging FCA violations must either identify representative examples of false claims for payment or allege "particular details of a scheme to submit false claims **paired with reliable indicia** that lead to a **strong inference** that claims were actually submitted." *Ebeid ex rel. U.S. v. Lungwitz*, 616 F.3d 993, 998-99 (9th Cir. 2010) (emphasis added). The FAC does neither.

Relator seeks to avoid dismissal of her FCA claims by asserting throughout her Opposition that the FAC includes "numerous," "detailed," and "specific" examples of Defendants' alleged false billing to the government. Opp. 3-5, 8-9, 11. But no matter how many times Relator repeats these incantations, the facts alleged in the FAC do not support her claims. Relator contends, for example, that the "FAC **specifically pleads illustrative violations** of the False Claims Act where the Somnia defendants **improperly billed** for Personal Participation when [physicians] were not personally performing all aspects of the anesthesia services." Opp. 4:8-10 (emphasis added). To support this argument, Relator cites to eight different paragraphs in the FAC. *Id.* None of those paragraphs, however, offers any example of an actual false claim for payment, nor do they allege facts sufficient to support even the weakest of inferences that false claims were submitted to the government.[1]  Relator cannot defeat a motion to dismiss by simply claiming in her Opposition that

---

[1] Indeed, five of the eight paragraphs to which Relator cites make no mention of any physicians providing, charting, or billing for Personal Performance. FAC ¶¶ 68, 83, 86, 103-04. One paragraph alleges that a doctor left the operating room while personally providing anesthesia services, but does not allege that Somnia billed the government at the Personal Performance rate; in fact, Relator does not even allege that the example involved Medicare or Medi-Cal. FAC ¶ 82. Another paragraph includes only a conclusory allegation that an anesthesiologist "continued to bill" for Personally Performed services despite leaving the operating room on certain unspecified occasions. FAC ¶ 67(a). This paragraph does not include any supporting details, such as the dates or circumstances of the alleged incidents, nor does it indicate whether government payers were involved or how Relator knew that services were billed for Personal Performance. Finally, in the last paragraph, Relator alleges that an unnamed physician "charted and billed" a case as Personally Performed despite providing medical direction in a concurrent case. FAC ¶ 85. She does not provide any supporting details, such as the doctor's name, whether the cases involved Medicare or Medi-Cal, or how she knows that claims were submitted. In amending this paragraph from her initial Complaint, Relator simply bolted the phrase, "and billed" to her prior allegations without providing any supporting facts. *Compare* initial Complaint ¶ 63, *with* FAC ¶ 85.

-2-

she has provided "detailed" and "specific" examples of false claims for payment when the actual allegations in the FAC fail to support those contentions.

Relator has alleged merely a handful of instances, occurring over a two-and-a-half year period, in which physicians supposedly provided anesthesiology services in a manner that Relator claims would not have allowed Defendants to bill under the Personal Performance or Medical Direction categories.[2]  Relator's pleading does not take the next – and necessary – step of alleging facts that would support a "**strong inference**" that Defendants actually billed a government payer under the Personal Performance or Medical Direction categories.  Without this critical element, the FAC fails to state a viable FCA claim.  *See U.S. ex rel. Cafasso v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1055 (9th Cir. 2011) (FCA "attaches liability, not to the underlying fraudulent activity…, but to the 'claim for payment'"); *Ebeid*, 616 F.3d at 998-99 (Rule 9(b) requires a relator to allege "particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted") (citation omitted).

Relator's FCA claims are not saved by the vague descriptions she provides of the electronic medical record ("EMR") system used to document anesthesiology services at Kaweah Hospital.[3]  FAC ¶¶ 52-57.  Relator does not identify any actual false claims that were submitted to

---

[2] Most of the examples alleged in the FAC are devoid of details necessary to satisfy Rule 9(b), such as physician names, dates of service, whether or not government payers were involved, or actual facts showing how or why the physicians allegedly failed to meet the requirements for personal performance or medical direction.  *See* FAC ¶¶ 67-68, 70-71, 85, 107.  Other examples are based on information Relator supposedly "learned about" from unnamed sources.  *Id.* at ¶ 67.

[3] The EMR allegations are so muddled and contradictory as to border on the nonsensical.  Relator claims that clinicians falsely charted anesthesia services as either Personal Performance, Medical Direction, or CRNA Independent.  Opp. 9:5-8; FAC ¶¶ 84-85.  In her next breath, however, she claims that clinicians were **required** to chart the services provided to patients as **Medical Direction only**.  Opp. 9:11-12; *see also* FAC ¶ 52 ("[T]he EMR system…required…that [a physician] was listed as medically directing the anesthesia services").  Relator then alleges that billing personnel could not alter the information reflected in a patient's record, which, according to Relator, must have listed the level of care delivered as Medical Direction.  Opp. 9:12-15; *see also* FAC ¶ 55 ("Defendants' employees…who generated the bills to the Government were not permitted to alter or amend the patient EMR and/or medical charts.  Thus, when a patient's EMR and/or medical chart indicated that the anesthesia services were performed…as Medical Direction, the anesthesia services were then billed to the Government as Medical Direction").  Despite these allegations, Relator asserts that false claims were nevertheless "submitted to the government as Personal Participation, Medical Direction or Independent CRNA Practice."  Opp. 9:12-15.  In other words, despite alleging (a) that services had to be charted as Medically Directed, and (b) that Somnia's billing personnel were prohibited from altering the Medical Direction designation, Relator simultaneously contends that Somnia charted and billed anesthesiology services, not just

the government based on the EMR system.  Thus, to survive a motion to dismiss, the EMR allegations must afford enough indicia of reliability to support a strong inference that false claims were actually submitted to government payers as part of a fraudulent scheme.  *See Cafasso*, 637 F.3d at 1056; *Ebeid*, 616 F.3d at 998-99.

Relator worked for Somnia as a CRNA providing clinical anesthesiology services to patients at Kaweah Hospital.  FAC ¶ 18.  The FAC does not include any factual allegations indicating that Relator was privy to the purported interplay between the EMR system used at the hospital and the bills that Somnia generated and submitted to third-party payers.  Relator does not claim that she worked in Somnia's billing department, nor does she allege that her clinical duties provided her with knowledge of, or involved her in, Somnia's billing practices or procedures.

Relator alleges that Somnia's "[b]ills to the Government for anesthesia services are **derived from** the patient EMR and/or medical charts," FAC ¶ 54, an apparent acknowledgment that the EMR system used at Kaweah Hospital and Somnia's billing system are not one and the same.  The FAC, however, does not include any allegations indicating that Relator was exposed to the billing side of the equation, such as the way in which Somnia's billing personnel reviewed and assessed information derived from a patient's medical record, determined the appropriate billing and reimbursement codes, and processed invoices to Medicare and other payers.

In short, the EMR-related allegations do not provide sufficient indicia of reliability to support a strong inference that false claims were submitted to the government.  *See Cafasso*, 637 F.3d at 1056-57 (where relator fails to identify a specific false claim, the court assesses whether the complaint warrants an inference that false claims were submitted; however, the court "will not draw [an] unwarranted and implausible inference"); *U.S. ex rel. Thayer v. Planned Parenthood of the Heartland*, 765 F.3d 914, 919-20 (8th Cir. 2014) (relator's allegations that clinic submitted false claims to the government had sufficient "indicia of reliability" where relator alleged that her position as clinic manager gave her access to its centralized billing system, pleaded specific details about the clinic's billing systems and practices, and alleged that she had personal knowledge of the

---

for Medical Direction, but also under the Personal Performance and CRNA Independent categories.  These allegations hardly provide **reliable indicia** of false claims.

clinic's submission of false claims; however, relator's additional allegations that the clinic caused other hospitals to submit false claims lacked indicia of reliability because relator did not allege that she had access to the billing systems of the other hospitals, nor that she had knowledge of their billing practices).[4]

Relator's heavy reliance on the Second Circuit's decision in *U.S. ex rel. Chorches for Bankruptcy Estate of Fabula*, 865 F.3d 71 (2d Cir. 2017) is unavailing. The relator in *Chorches*, an emergency medical technician ("EMT"), alleged that his employer, the defendant ambulance company, routinely made EMTs revise or recreate the patient care reports ("PCRs") they prepared in the field to include false statements that would show that the ambulance services provided were medically necessary and, thus, reimbursable by Medicare. *Id.* at 76. The court found that while the relator lacked knowledge about the defendant's specific billing procedures, the complaint nevertheless offered sufficient facts to support a strong inference that false claims were submitted to the government. The court noted that the complaint alleged that the relator was **explicitly told** by supervisors working for the defendant – individuals who were involved in directing the fraudulent scheme – that the falsifications they instructed the relator and other EMTs to make to their PCRs were necessary to qualify the ambulance services for Medicare reimbursement. *Id.* at 85. Because the supervisors had specifically referenced Medicare reimbursement as the reason for the falsifications, the court concluded that the complaint supported the inference that false claims were actually submitted to the government. *Id.* The FAC here does not include similar allegations that could support a strong inference that Defendants submitted false claims for payment.

---

[4] Relator seeks to distinguish cases from the Eighth and Eleventh Circuits by arguing that those courts have a higher pleading standard than the Ninth Circuit. Opp. 14:10-13. In *Ebeid*, the Ninth Circuit observed that the Eighth and Eleventh Circuits required relators to identify "representative examples" of false claims to satisfy Rule 9(b). 616 F.3d at 998. The *Ebeid* court determined that, while use of representative examples is one means of meeting the pleading obligation, it is also sufficient for a relator to allege "particular details of a scheme to submit false claims paired with **reliable indicia** that lead to a strong inference that claims were actually submitted." *Id.* at 998-99 (emphasis added). All of Somnia's arguments are based on the broader standard announced in *Ebeid*. In addition, the decisions that Somnia cites from the Eighth and Eleventh Circuits focused on whether the relators' allegations had sufficient "**indicia of reliability**" to support their allegations that false claims were submitted for reimbursement in the absence of representative examples of actual false claims. *See Thayer*, 765 F.3d at 917-19; *Joshi, v. St. Luke's Hosp., Inc.*, 441 F.3d 552, 557-58 (8th Cir. 2006); *Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1013-14 (11th Cir. 2005); *U.S. ex rel. Aquino v. Univ. of Miami*, 2017 WL 1655592, *8-10 (S.D. Fla. Apr. 26, 2017).

Finally, Relator's unsupported allegations that Kaweah Hospital "has a patient population that is approximately 72% government-supported, with Kaweah receiving approximately 37% of its payments for medical services from Medicare, 31% from Medicaid, and 4% from the County of Tulare," FAC ¶ 17, do not satisfy Rule 9(b).  As discussed in Defendants' Initial Memorandum, Relator does not identify the source of her statistics or provide any basis on which to assess the reliability of her allegations.  In addition, the percentages that Relator cites relate to reimbursements purportedly received by **Kaweah Hospital**, not by Somnia.  These figures are irrelevant to Relator's action against Defendants because Somnia submits its own claims for reimbursement directly to Medicare and other payers and is not reimbursed through the hospital.  *See* FAC ¶ 21.  Relator does not provide any basis for determining that the percentages of reimbursement that Kaweah Hospital purportedly receives from government payers for "medical services" generally are likely to mirror the percentages of reimbursement that Somnia receives for delivering anesthesia services only.  Relator does not address these deficiencies in her Opposition.

### 2. Relator has failed to allege a viable FCA claim based on Defendants' purported use of the QZ modifier

Relator contends that Defendants violated the FCA by billing for CRNA services at the "not medically directed" rate, or what Relator describes as CRNA Independent or Independent CRNA Practice, under the QZ modifier in cases in which the physician failed to satisfy all of the requirements for Medical Direction.  FAC ¶¶ 46, 62.  In the FAC, Relator alleges that "billing a QZ modifier was not allowed at Kaweah Hospital" because of a contractual provision in the Hospital Contract between Kaweah and Somnia, which provided that "the ratio of supervised CRNAs to Physicians providing services under this Agreement [must not] exceed 4:1."  FAC ¶¶ 48-49.  As discussed in Defendants' Initial Memorandum, however, the contractual provision cited by Relator, which relates only to Somnia's **operational** responsibilities under the agreement, is entirely unrelated to the concepts of "medical direction" and "medical supervision" for purposes of Medicare Part B reimbursement for anesthesiology services.  Initial Mem. 13-14.  Relator does not refute these arguments in her Opposition, but contends instead that:

> [B]ills submitted by defendants to the Government for Independent CRNA anesthesia services were false and fraudulent because the CRNAs were not, in fact, providing proper independent CRNA services.  Instead, the Independent CRNA

> Practice coding was often being used as a "default" method when Medical Direction requirements were not met, as Independent CRNA Practice is reimbursed by the Government at a higher amount than Medically Supervised services.

Opp. 11:15-20.

Not surprisingly, the FAC does not provide a single example in which Somnia billed Medicare or other government payers under the QZ modifier when an anesthesiologist failed to satisfy the requirements for Medical Direction, or in any other circumstances. Although Relator represents in her Opposition that "the FAC pleads **specific instances** where the Somnia defendants billed at the higher Independent CRNA Practice rate when CRNAs were actually supervised," Opp. 11:8-9, she does not cite to any such examples in the FAC – because there are none. The FAC includes nothing more than generalized allegations, such as unsupported claims that "Defendants also falsely billed anesthesia services as CRNA Independent when they should not have been," or that Defendants "routinely billed under the QZ modifier…when the conditions for payment as *medical direction* were not met." FAC ¶¶ 46, 49 (emphasis in original). Such allegations do not satisfy Rule 9(b). *See Ebeid*, 616 F.3d at 998 (Rule 9(b) requires a party to "state with particularity the circumstances constituting fraud," including the "who, what, when, where, and how of the misconduct charged") (citation omitted).

### 3. The unchallenged fact that the Medicare administrative contractor authorized billing under the QZ modifier for procedures that do not meet the requirements of Medical Direction requires dismissal of Relator's claims

As discussed in Defendants' Initial Memorandum, Noridian Healthcare Solutions ("Noridian"), the Medicare Administrative Contractor ("MAC") responsible for administering Medicare Part B in California, permits anesthesia services to be billed as CRNA Independent using modifier QZ, when a physician fails to meet all of the requirements necessary to bill for Medical Direction. Initial Mem. 14-15. Relator does not address, much less refute, this fact in her Opposition, which is fatal to her argument that Defendants violated the FCA by billing CRNA services under the QZ modifier when the Medical Direction requirements were not met.[5] Indeed, even if Noridian's interpretation of the regulations is incorrect, which it is not, it is not a violation

---

[5] The guidance from Noridian addressing this issue is attached as Exhibit D to Defendants' Request for Judicial Notice (ECF No. 49). Relator failed to oppose that request.

-7-

of the FCA for Somnia to bill in accordance with the directions of the responsible MAC. *See U.S. v. Prabhu*, 442 F. Supp.2d 1008, 1029 (D. Nev. 2006) ("[A] [d]efendant does not knowingly submit false claims when he follows Government instructions regarding the claims").

Noridian's authoritative guidance is also fatal to Relator's claims that it was fraud to bill services as Medically Directed, when the requirements for Medical Direction were not met. Even if the Medically Directed code was not the correct code, to state a claim for billing under an incorrect code, or "upcoding," a relator must allege not only that an incorrect code was used, but also (a) that there was a different, correct code, reimbursed at a lower rate, (b) that this different code "was the only correct code" for the procedure performed, and (c) that the defendant knew this to be true. *U.S. ex rel. Bennett v. Medtronic, Inc.*, 747 F. Supp. 2d 745, 783 (S.D. Tex. 2010). Thus, even if Relator had sufficiently identified claims where the requirements for Medical Direction were not met, but the services were billed as Medically Directed (which she has not), Relator would not have stated a claim for upcoding because the "different, correct code, reimbursed at a lower rate," that Relator contends Somnia was required to use – the Medical Supervision code – was **not** the "only correct code." As the guidance from Noridian demonstrates, billing the services as CRNA Independent under the QZ modifier would **also** have been a correct code to bill where the requirements for Medical Direction were not met. The amount of Medicare reimbursement is the same under both Medical Direction and CRNA Independent. *See* Initial Mem. 3:17-5:2. Consequently, even if Somnia incorrectly used the Medically Directed code for Medically Supervised services, because Somnia also had the option to use the QZ modifier to bill for such services, incorrectly using the Medical Direction code could not possibly have "extract[ed] money the government otherwise would not have paid," since Somnia would have been reimbursed the same amount had it used the QZ modifier. *Mikes v. Straus*, 274 F.3d 687, 696 (2d Cir. 2001).

### 4. Relator has not adequately alleged economic harm to the government

Relator does not adequately plead that Somnia's alleged billing practices caused, or would cause, economic loss to the government. *See U.S. ex rel. Sanders v. Am.-Amicable Life Ins. Co. of Texas*, 545 F.3d 256, 259 (3d Cir. 2008). She contends only that Medically Supervised

-8-

anesthesiology services "allow[] reimbursement for the [doctor's] services at only 3 units (plus one unit if the [physician] was present for induction)", and that "[t]his results in less than 100% of the otherwise allowable payment." FAC ¶ 43. Relator's claims presuppose that the Medicare reimbursement provided for anesthesiology procedures is always lower when the procedures are Medically Supervised than when they are Personally Performed or Medically Directed by the anesthesiologist (or independently performed by the CRNA). Neither the FAC nor Relator's Opposition cites any authority for this erroneous proposition, nor do the facts alleged in the FAC support the notion that Somnia would have necessarily received less in Medicare reimbursements had all of the procedures at issue been billed at the Medically Supervised level.

In an effort to address this fatal shortcoming, Relator provides an example in her Opposition – unsupported by any citations to Medicare regulations or guidance – in which a **hypothetical patient** receives anesthesia services for a procedure of the neck, which Relator claims is covered by CPT Code 00350. Opp. 16:23-17:10. Relator contends that Medicare allocates ten base units to this CPT code (again, without citing any support). Thus, according to Relator, reimbursement to Somnia would have been greater if the services were billed as Medically Directed instead of Medically Supervised because Medicare would only pay for three base units for Medically Supervised procedures. *Id.*

This hypothetical example cannot salvage Relator's claims. First, it ignores that, as discussed above, the anesthesiology services at issue could have been billed under the QZ modifier, which would have paid Somnia the same amount as if the services were Medically Directed. Second, unlike the **hypothetical** example that Relator included in her Opposition, the FAC does not include any **actual examples** of procedures for which Relator identifies a CPT code and the corresponding number of base units available for reimbursement. Without these allegations, it is simply not the case that Somnia would have necessarily received a lower reimbursement amount from Medicare if the services were Medically Supervised. Finally, even if the Court were to give any credence to Relator's hypothetical (which appears only in the Opposition), all that this example shows is that there is a **possibility** that, in some circumstances, reimbursement could be lower under Medical Supervision than under the other reimbursement

categories.  A mere possibility, however, is not enough to satisfy either Rule 9(b) or Rule 12(b)(6).  *See Ashcroft v. Iqbal*, 556 U.S. 662, 687 (2009) (plausibility requires "more than a sheer possibility that a defendant has acted unlawfully).  In sum, Relator's speculative and conclusory allegations that Somnia might have received more reimbursement than it was entitled to are not enough to show that Somnia's alleged billing practices necessarily caused, or would cause, economic loss to the government.  *See Sanders*, 545 F.3d at 259.

### 5. Relator has failed to plead scienter

Relator argues that the FAC is "replete with allegations that defendants acted knowingly and/or intentionally in submitting false claims to the government."  Opp. 17:12-16.  To support this claim, Relator cites a series of conclusory allegations in the FAC, which simply assert that Defendants acted "knowingly."  *Id.*  She also argues that the FAC "describes how Relator… complained to management about defendants' wrongful practices, including false charting and billing."  *Id.*  These arguments are insufficient.

Although Rule 9(b) does not require particularized allegations of knowledge or intent, a complaint must nevertheless provide "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A relator fails to plead *scienter* when she relies only on conclusory allegations that the defendant knowingly submitted false claims.  *See U.S. ex rel. Modglin v. DJO Global Inc.*, 114 F. Supp. 3d 993, 1024 (C.D. Cal. 2015).

Relator's allegations that she complained to Somnia management about alleged charting and billing issues do not provide sufficient support for her otherwise conclusory assertions that Defendants' acted "knowingly" in submitting false claims to government payers.  Indeed, as discussed in Section II(A)(1) above, Relator does not allege that she was involved in, or had access to, Somnia's billing procedures.  Since Relator has not pled sufficient facts to support an inference that false claims were submitted to the government, Relator's allegations that she complained to management about Somnia's billing practices are neither plausible nor sufficient to show that Defendants **knowingly** submitted false claims for payment.

### B. Relator's Attempt To Preserve Her FCA And CFCA Retaliation Claims Fail

Relator's attempts to save her FCA and CFCA retaliation claims fail. First, Relator does not allege facts necessary to demonstrate that she engaged in a protected activity, and her contention that the 2010 amendment to the FCA saves her claim falls short. Opp. 19:7-19, 18-24. Relator's alleged acts are not protected because they were not made in an attempt to prevent false claims from being submitted nor was she seeking to recover money for the government. *U.S. ex rel., Hopper v. Anton, et. al.,* 91 F.3d 1261, 1269 (9th Cir. 1996). Relator instead acted to ensure patient safety and compliance with hospital rules. Initial Mem. 19:2-12. She sidesteps the issue as to whether her conduct is in fact protected by arguing – without citation to any authority – that the legal standard established in *Hopper* (i.e. that an employee must be working to prevent a false claim from being submitted or must be seeking to recover money for the government) changed with the 2010 amendment. However, the plain language of the statute states that the 2010 amendment simply protects ***additional*** acts an employee can take to prevent false claims.[6] Here, Relator was not taking any action to prevent false claims and therefore was not engaged in protected activity.

Relator also grossly overstates her position that she personally informed several individuals at Somnia of the billing fraud in her effort to show that Somnia had knowledge of her protected activity. At best, Relator alleges that she complained to Dr. Winston that, "when a physician leaves the hospital the CRNA has to be notified and the chart documented appropriately…this is *fraud*." (FAC ¶ 77.) Her remaining alleged complaints do not include any statements of explicit fraud, let alone complaints of violations of the law. They include her complaints (1) that she explained to Dr. Goldstein that charts were not documented appropriately

---

[6] Since the 2010 amendments, 31 U.S.C. § 3730(h)(1) has provided:
> Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section or **other efforts** to stop 1 or more violations of this subchapter.

and CRNAs did not know who was supervising them; (2) she told Margaret See "that some of the anesthesiologists were playing gold, leaving the hospital in the middle of anesthesia cases, and not notifying CRNAs of their whereabouts"; and (3) describing the alleged fraudulent conduct to Brent Sommers, but not explicitly stating it was fraud.[7]  (FAC ¶¶ 78, 79, 119.)  This is not enough.

Relator mistakenly relies on *Mendiondo* and *Campie* to support her position that Somnia had notice.  In those cases, the employees explicitly complained about violations of the law.  The employee's reference to "criminal and civil violations" in *Mendiondo* could reasonably be construed as reference to Medicare fraud, and in *Campie* the employee explicitly complained his employer was violating federal regulations.  Here, Relator expressly used the term "fraud" only once and in that instance was referring to inappropriate charting, not to fraudulent billing or any other violation of the law.  Relator therefore has failed to put Somnia on notice of her alleged protected activities.

Moreover, because Relator's alleged complaints relate to her duties as Chief CRNA, she is required to allege facts demonstrating that she ***explicitly*** informed Somnia of her plan to initiate a FCA action or to report the alleged fraud to the government.  *U.S. ex rel. Campie v. Gilead Sciences, Inc.,* 862 F.3d 890, 908 (9th Cir. 2017).  Relator's conclusory statement that her job duties did not include monitoring and reporting of fraud does not dispel the fact that – as she pleads in the FAC – such monitoring and reporting of certain aspects of the fraud was integral to her job duties. Opp. 21:2-5.  Relator admits that her duties as Chief CRNA included monitoring and maintaining operating room activity and medical charts—areas for which she now alleges fraudulent activity.  FAC ¶ 114.  Similar to the Clinical Director in *Ramseyer* – a case directly applicable and which Relator ignores even though the Ninth Circuit has found it instructive in *Campie* – an individual in charge of coordinating operating room activity and maintaining medical charts is expected to raise concerns to her superiors that "when a physician leaves the hospital the CRNA has to be notified and the chart documented appropriately", FAC ¶ 77, and that "anesthesiologists [are] playing golf, leaving the hospital in the middle of anesthesia case, and not

---

[7] Relator's alleged complaints to Dr. James Paskert and Benton Duckett of "billing fraud" do not satisfy the second element because neither is employed by Somnia.  FAC ¶¶ 116, 117.

-12-

notifying CRNAs of their whereabouts." FAC ¶ 78.  Thus, because Relator's complaints were all concerns that she was required to consider as part of her duties, she is required allege that she explicitly complained to Somnia about her plan to initiate a FCA action or to report the alleged fraud to the government.  Relator does not make any of these allegations and her retaliation claims should be dismissed.

### C.     Relator's Health & Safety Code Section 1278.5 Claim Fails

Relator's claim under Health and Safety Code section 1278.5 should be dismissed because she fails to establish the requisite causal connection between her protected activity and her termination.  Relator's retaliation claims are based solely on her information and belief that the Chief Medical Officer of Kaweah shared her complaints regarding billing practices with Somnia.  FAC ¶ 116.  A "[p]laintiff may allege on information and belief any matters that are not within his personal knowledge, if he has information leading him to believe that the allegations are true.  *Gomes v. Countrywide Home Loans, Inc.*, 192 Cal. App. 4th 1149, 1158 (2011) (quotations and citation omitted).  In this case, Relator's only support for her allegation that Somnia was aware of her complaints was that Dr. Robert Goldstein visited the CRNAs to discuss the hospital's billing practices.  FAC ¶¶ 116, 119.  Relator also states in passing that two other Somnia executives, Margaret See and Fitz George, met with staff, but does not provide any information as to the purpose of this meeting or the issues discussed.  FAC ¶ 119.  These vague allegations are insufficient to establish that Dr. Goldstein, Margaret See, or Fitz George had any knowledge of Relator's complaints or that they played any role in terminating her contract.  In the absence of a causal connection, Relator's retaliation claims should be dismissed.

### D.     Relator Fails To Allege Facts Sufficient To State Claims For Wrongful Termination Under The California Whistleblower Protection Act And California Public Policy

Relator's wrongful termination claims should be dismissed because she does not allege facts to establish that Somnia was her employer or that there was a causal connection between the termination of her contract and her protected activity.  Relator does not contest that on a motion to dismiss, the Court need not accept conclusory allegations of an employment relationship as true. *Doe 1 v. Wal-Mart Stores, Inc.*, 572 F.3d 677, 682 (9th Cir. 2009).  The Court should find no employment relationship here because Relator's FAC offers only conclusory and oftentimes

contradictory claims that she is an employee of Somnia and that Somnia exercised control over her position. Relator fails to allege the necessary facts to show "a comprehensive and immediate level of day-to-day authority over employment decisions," and instead relies on vague conclusions to establish her claim. Relator claims that she was an employee of Somnia because Somnia allegedly controlled the hours and days that she worked, assigned her to operating rooms and cases, and billed for her services. FAC ¶ 18. These vague conclusions are not enough to establish the control necessary for an employer relationship.

### E. Relator Fails To State A Claim For IIED Or NIED

Even under the federal "notice pleading" standard, Relator's claims for IIED and NIED must fail. Relator contends that she has adequately pled a claim for IIED because "conduct in violation of state statutes…suffices to establish the outrageous conduct element of intentional infliction of emotional distress claims." Opp. 23:27-24:1. This is not the law. Conduct that would support a claim for wrongful discharge does not presumptively rise to the threshold of extreme or outrageous conduct required to establish an IIED claim. *See Smith v. Brown-Forman Distillers Corp.*, 196 Cal. App. 3d 503, 509 (1987) (affirming judgment for plaintiff's wrongful discharge claim, but dismissing plaintiff's IIED claim because "defendants did not engage in outrageous conduct with intent to cause plaintiff severe emotional distress").

Relator has not shown how her termination for allegedly complaining about Somnia's billing practices, or the alleged act of putting profits over patient safety, constitutes extreme or outrageous conduct. The facts here pale in comparison to the facts in other cases where IIED claims were dismissed. *See, e.g., Janken v. GM Hughes Elec.*, 46 Cal. App. 4th 55, 79 (claims of wrongful demotion/termination, threats of layoff, disparagement, and refusal to pay appropriate salaries insufficiently outrageous). Relator also fails to address the argument that Somnia's alleged conduct was not intended to inflict injury on her, thereby conceding that there was such no intent to cause her harm. Moreover, Relator fails to establish the requisite severe emotional distress. She states that "Ms. O'Neill has clearly pleaded the severe emotional distress necessary to state a claim for both intentional and negligent infliction of emotional distress." Opp. 24:4-5. These conclusory allegations do not address the nature or extent of her alleged suffering, and are

-14-

insufficient to support her claims for IIED and NIED. *See McKenna v. Permanente Med. Grp.*, 894 F. Supp. 2d 1258, 1274-76 (dismissing IIED and NIED claims on a demurrer where the plaintiff "ma[de] sweeping references to 'anguish, embarrassment, anxiety, nervousness, humiliation, worry…and shame' with no facts to support such symptoms or conditions").

There is also no ground to support Relator's NIED claim, which is based on the allegation that "senior-level officials at Somnia had a duty to intervene to prevent the intentional retaliatory actions of others directed at Ms. O'Neill, but failed to do so." Opp. 24:15-17. Indeed, "California does not recognize a common law tort claim for a supervisor's negligent failure to prevent discrimination" or retaliation. *Ambrosini v. Universal Cable Holdings, Inc.*, No. CV 14-00896 RS, 2014 WL 3362244, at *3 (N.D. Cal. July 7, 2014); *see also Hine v. Dittrich*, 228 Cal. App. 3d 59, 65 (1991) (allegations that employer acted unreasonably or "should have" done something different "do not establish a tort of negligence independent of the discharge itself"). Relator's NIED claim should be dismissed because she fails to "establish a tort of negligence independent of the discharge itself." *Hine*, 228 Cal. App. 3d at 65. To the extent that the court finds that Relator is an employee (as she argues in her Opposition), Relator's NIED claim is barred by the exclusive remedy provisions of California's workers' compensation statutes. *See Edwards v. U.S. Fidelity & Guar. Co.*, 848 F. Supp. 1460, 1466 (N.D. Cal. 1994) (ruling that NIED claim was precluded as a matter of law because finding otherwise "would eviscerate the exclusivity provisions of the California workers compensation scheme").

### III.  CONCLUSION

Plaintiff has failed to allege facts demonstrating any plausible basis for relief. For the foregoing reasons, Defendants respectfully request that the Court dismiss the FAC without leave to amend pursuant to Rules 9(b) and 12(b)(6).

Dated:  October 18, 2017         NIXON PEABODY LLP

By: ____/s/ Michael Lindsay_____
Michael R. Lindsay
Attorneys for Defendants
SOMNIA, INC., PRIMARY ANESTHESIA SERVICES, BYRON MENDENHALL QUINN GEE, M.D., and MARGARET VASSILEV, M.D.

-15-