1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                    FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   UNITED STATES and the STATE OF            No. 1:15-cv-00433-DAD-EPG
     CALIFORNIA ex rel. NICOLLE
12   O'NEILL, and NICOLLE O'NEILL,

13                   Plaintiffs/Relator,        ORDER GRANTING IN PART AND
                                                DENYING IN PART DEFENDANTS'
14           v.                                 MOTIONS TO DISMISS

15   SOMNIA, INC., PRIMARY                      (Doc. Nos. 45, 48)
     ANESTHESIA SERVICES, PST
16   SERVICES LLC, ROBERT GOLDSTEIN,
     M.D., ROY WINSTON, M.D., BYRON
17   MENDENHALL, M.D., QUINN GEE,
     M.D., AND MARGARET VASSILEV,
18   M.D., and DOES 1 through 10, inclusive,

19                   Defendants.

20

21           This matter is before the court on defendants' motions to dismiss relator's first amended

22   complaint. (Doc. Nos. 45, 48.) A hearing on these motions was held on November 7, 2017.

23   Attorneys Wilmer J. Harris and Andrea Gold appeared on behalf of relator Nicolle O'Neill.

24   Assistant United States Attorney Vincente Tennerelli appeared on behalf of party in interest

25   United States of America. Attorneys W. Scott Cameron and Bradley Lingo appeared on behalf of

26   defendants PST Services LLC ("PST"). Attorney Jason Gonzalez appeared on behalf of all other

27   defendants (the "Somnia defendants"). Having reviewed the parties' briefing and heard oral

28   /////

                                                  1

argument, and for the reasons that follow, defendants' motions to dismiss will be granted in part and denied in part.

## BACKGROUND

On March 19, 2015, relator filed her complaint under seal, alleging violations of the federal False Claims Act ("FCA"), the California False Claims Act ("CFCA"), retaliation, violation of California's Health and Labor Code, whistleblower retaliation, wrongful termination, and intentional and negligent infliction of emotional distress. (Doc. No. 1.) On November 21, 2016, the United States notified the court that it was declining to intervene in this action. (Doc. No. 16.) On November 30, 2016, the state of California did the same. (Doc. No. 17.) On December 16, 2016, the court ordered the complaint be unsealed and served on defendants by the relator. (Doc. No. 18.) The operative complaint was filed on July 7, 2017. (Doc. No. 41 ("FAC").) On August 21, 2017, defendants filed their respective motions to dismiss the FAC. (Doc. Nos. 45, 48.)

In the FAC, relator alleges as follows. On or about March 22, 2012, relator entered into a contract with defendants Primary Anesthesia Services ("PAS") and Somnia, Inc. to provide anesthesia services to patients in the Kaweah Delta Healthcare District (the "District") in Visalia, California.[1] (FAC at ¶¶ 16–17.) Pursuant to that contract, relator was employed as Chief Certified Registered Nurse Anesthetist ("CRNA"). (*Id.* at ¶¶ 1, 18.) PAS/Somnia contracted with the District to provide professional services in the Anesthesia Department at Kaweah Delta Medical Center ("Kaweah"), a hospital operated by the District. (*Id.* at ¶ 19.)[2]

The contract with the District required PAS/Somnia to maintain electronic medical records in accordance with the Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. No. 97–

---

[1] Relator alleges that PAS and Somnia, although separately incorporated, "have an interrelation of operations, common management, centralized control of labor relations, uniform management and employment practices and policies, and common ownership and financial control, creating an integrated enterprise." (FAC at ¶ 11.) Defendants PAS and Somnia concede for the purposes of their motion to dismiss that they are in fact an integrated enterprise. (Doc. No. 48-1 at 10.) The court therefore will treat them jointly herein.

[2] It appears that relator's employment was carried out exclusively at Kaweah.

248, as well as applicable state and federal regulations.  (*Id.* at ¶ 21.)  As relevant here, there are four ways in which anesthesia services are provided and billed, based on the level of involvement by a Medical Doctor of Anesthesiology ("MDA").  (*Id.* at ¶ 30.)  First, the service is classified as "Personally Performed" if the MDA performs all anesthesia services exclusively by him or herself, which is denoted by the code AA.  (*Id.* at ¶ 31.)  Second, it is classified as "Medical Direction" when an MDA is directly involved in providing the anesthesia services, but receives assistance from another qualified individual, such as a CRNA.[3]  (*Id.* at ¶ 32.)  "Medical Direction" services are denoted by codes QK, QX, or QY.  Third, services are classified as "Medical Supervision," denoted by code AD, where the MDA is involved with more than four simultaneous procedures or does not fulfill the seven requirements to qualify for Medical Direction.  (*Id.* at ¶ 34.)  Finally, if no MDA is involved, the service is classified as "CRNA Independent," denoted by the QZ code.  (*Id.* at ¶ 35.)  When a service is billed as "Medical Supervision," the hospital is reimbursed at a lower rate than billing at any of the other levels.  (*Id.* at ¶ 42.)  Thus, for instance, if a provider bills the government at a "Medical Direction" rate where the "Medical Supervision" rate was the proper classification of the service provided, the government is overcharged for the service.

Generally speaking, the FAC makes two types of allegations.  First, it alleges that the various defendants committed fraud against both the United States and California by repeatedly submitting incorrect billing codes to the government for reimbursement.[4]  The allegations by relators in the FAC in this regard are voluminous.  To take but one example, relator alleges that an MDA billed for services at the "Medical Direction" level while playing golf off-site, despite

/////

---

[3] In order to be billed under Medical Direction, the MDA must meet certain conditions or perform certain tasks, such as monitoring the administration of anesthesia at certain intervals and remaining available to diagnose and treat emergencies.  (FAC at ¶ 33) (citing 42 C.F.R. §§ 414.46(d)(i), 415.110).  In addition, a physician may medically direct no more than four procedures simultaneously.  (*Id.*) (citing 42 C.F.R. § 414.46(d)(i)).

[4] Approximately 72% of Kaweah's patients receive healthcare funded through government entities.  (FAC at ¶ 17.)

the fact that "Medical Direction" requires the MDA to be physically present.  (*Id.* at ¶ 74.)  There are many similar allegations.

Second, the FAC sets forth allegations relevant only to use of the QZ code, which signifies billing as "CRNA Independent."  By default, federal regulations require CRNAs to be supervised by MDAs when performing anesthesia services.  42 C.F.R. § 482.52(a)(4).  However, those same provisions also permit states to opt out of this requirement.  *Id.* § 482.52(c).  On June 10, 2009, former Governor Arnold Schwarzenegger exercised his discretion under federal law and did so.  *See Cal. Soc'y of Anesthesiologists v. Superior Court*, 204 Cal. App. 4th 390, 395 (2012).  Despite this, relator alleges that CRNAs were still not permitted to operate independently because doing so is prohibited by the District's bylaws.  (FAC at ¶¶ 47–49.)  As such, according to relator, by submitting claims as "CRNA Independent" under code QZ, defendants violated the FCA by falsely certifying that they were in compliance with those bylaws.

Upon being hired by PAS/Somnia in 2011, relator was informed that she could either be employed as a formal employee without benefits, or else she could form an S corporation which would then contract with PAS/Somnia.  (*Id.* at ¶ 113.)  Relator opted for the latter arrangement, forming a closely-held corporation known as Sarasate Nursing Anesthesia, P.C. ("Sarasate").  (*Id.* at ¶ 8.)  Sarasate then signed a contract with the District on March 2, 2012.  (*Id.* at ¶ 113.)

Relator's FAC is replete with allegations of improper billing which allegedly occurred over several years.  On May 7, 2014, relator met with Dr. James Paskert, Kaweah's Chief Medical Officer, and informed him that she believed Kaweah was engaged in fraudulent billing.  (*Id.* at ¶ 116.)  On May 13, 2014, defendant Goldstein, the Vice President and Chief Medical Officer of PAS/Somnia, traveled to Kaweah from New York to meet with staff about these allegations.  (*Id.* at ¶¶ 116, 118.)  On or about June 13, 2014, relator received a letter from PAS/Somnia stating that she was terminated "without cause."  (*Id.* at ¶ 120.)  Relator contends she was terminated "because of her complaints about the systemic fraudulent documentation and billing, of which Somnia was well aware."  (*Id.* at ¶ 123.)

Most of the allegations of the FAC relate to events occurring during 2012 and 2013.  However, defendant PST is not identified in any of those factual allegations until March 3, 2014,

at which time "PAS/Somnia engaged PST Services and/or its predecessors, a company providing services to the healthcare industry, to handle their billing and to 'fix' the problems that were becoming too obvious and overwhelming to manage." (*Id.* at ¶ 88.) Relator makes two specific factual allegations with respect to defendant PST. First, relator alleges that Karen Berkey, a PST employee, alerted a contact at Somnia via email that she was running into circumstances where a doctor was billed as personally performing the service "when he/she should be *medically directing* which causes errors, or where they are *medically directing* 5 rooms at once." (*Id.* at ¶ 102.) Second, relator telephoned PST's predecessor, McKesson, to inquire about its billing practices. (*Id.* at ¶ 127.) Relator was informed by a McKesson employee that because the company's goal was to maximize reimbursement, "we bill everything at 100%." (*Id.*) Relator claims that this statement supports an inference that it was a "nationwide practice" by McKesson to submit false claims to the government, and specifically to default to "CRNA Independent." (*Id.* at ¶ 128.)

Plaintiff brings a total of ten claims in this action. Claims one and two allege violations of the FCA. (*Id.* at ¶¶ 129–136.) Claim three alleges a violation of the CFCA. (*Id.* at ¶¶ 137–142.) Claims four and five allege that plaintiff was retaliated against for investigating such violations. (*Id.* at ¶¶ 143–154.) Claim six alleges a violation of California Health and Safety Code § 1278.5. (*Id.* at ¶¶ 155–159.) Claim seven alleges retaliation against a whistleblower in violation of California Labor Code § 1102.5 *et seq.* (*Id.* at ¶¶ 160–168.) Claim eight alleges wrongful termination in violation of California public policy. (*Id.* at ¶¶ 169–175.) Claims nine and ten allege intentional and negligent infliction of emotion distress, respectively. (*Id.* at ¶¶ 176–186.)

## LEGAL STANDARD

The purpose of a motion to dismiss pursuant to Rule 12(b)(6) is to test the legal sufficiency of the complaint. *N. Star Int'l v. Ariz. Corp. Comm'n*, 720 F.2d 578, 581 (9th Cir. 1983). "Dismissal can be based on the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990). A plaintiff is required to allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A

claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

In determining whether a complaint states a claim on which relief may be granted, the court accepts as true the allegations and construes those allegations in the light most favorable to the plaintiff. *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984); *Love v. United States*, 915 F.2d 1242, 1245 (9th Cir. 1989). However, the court need not assume the truth of legal conclusions cast in the form of factual allegations. *U.S. ex rel. Chunie v. Ringrose*, 788 F.2d 638, 643 n.2 (9th Cir. 1986). While Rule 8(a) does not require detailed factual allegations, "it demands more than an unadorned, the defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678. A pleading is insufficient if it offers mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555; *see also Iqbal*, 556 U.S. at 676 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). Moreover, it is inappropriate to assume that the plaintiff "can prove facts which it has not alleged or that the defendants have violated the . . . laws in ways that have not been alleged." *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 526 (1983).

## DISCUSSION

Defendants move to dismiss each of the causes of action set forth in plaintiff's FAC. Defendants also request that the court take judicial notice of various documents. Before turning to the arguments made by defendants in support of their motions to dismiss, the court will first address defendants' request for judicial notice.

### A.     Request for Judicial Notice

Defendants ask the court to take judicial notice of the following: (1) a copy of the Exclusive Provider Agreement for Anesthesia Services between the District and PAS/Somnia, dated July 27, 2011; (2) a copy of the Amended and Restated Exclusive Provider Agreement for Anesthesia Services between the District and PAS/Somnia, dated February 1, 2015; (3) a copy of the Medicare Claims Processing Manual, Chapter 12; and (4) a copy of the Frequently Asked

Questions issued by Medicare Administrative Contractor Noridian Healthcare Solutions LLC (the "Noridian FAQs"). (Doc. No. 49 at 3.)

The court will take judicial notice of the first three documents because they have been incorporated by reference into plaintiff's FAC. *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003). The court will take judicial notice of the fourth document because it is a matter of public record, and the facts do not appear subject to any reasonable dispute. *Intri-Plex Techs. v. Crest Grp., Inc.*, 499 F.3d 1048, 1052 (9th Cir. 2007); *see also U.S. ex rel. Modglin v. DJO Glob. Inc.*, 48 F. Supp. 3d 1362, 1384 (C.D. Cal. 2014), *aff'd*, 678 Fed. App'x 594 (9th Cir. 2017) (taking judicial notice of documents available on the website of a Medicare Administrative Contractor).

## B.    FCA Claims

A complaint alleging fraud, as does relator's FAC, must satisfy the heightened pleading requirements of Rule 9(b). Rule 9(b) requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). "Fraud can be averred by specifically alleging fraud, or by alleging facts that necessarily constitute fraud (even if the word fraud is not used)." *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009) (internal quotation marks omitted). "When an entire complaint, or an entire claim within a complaint, is grounded in fraud and its allegations fail to satisfy the heightened pleading requirements of Rule 9(b), a district court may dismiss the complaint or claim." *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1107 (9th Cir. 2003) (citing *Bly-Magee v. California*, 236 F.3d 1014, 1019 (9th Cir. 2001)). Under Rule 9(b), the circumstances constituting the alleged fraud must be specific enough to give each defendant notice of its particular misconduct so that the defendant can defend against the charge instead of merely denying that it did anything wrong. *Kearns*, 567 F.3d at 1124 (citing *Bly-Magee*, 236 F.3d at 1019). To satisfy the particularity standard of Rule 9(b), the plaintiff must set forth more than the neutral facts necessary to identify the transaction at issue. *Id.* (citing *In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1548 (9th Cir. 1994) (en banc), *superseded by statute on other grounds as stated in SEC v. Todd*, 642 F.3d 1207, 1216 (9th Cir. 2011)); *see also Vess*, 317 F.3d at 1106 (internal quotation marks omitted)

("Averments of fraud must be accompanied by the who, what, when, where, and how of the misconduct charged").

Relator alleges that defendants committed two violations of the FCA as well as a violation of the CFCA. The CFCA was modeled on the FCA, and state courts turn to federal FCA case law for guidance in interpreting the CFCA. *Mao's Kitchen v. Mundy*, 209 Cal. App. 4th 132, 146 (2012). As with claims alleging violations of the FCA, claims brought under the CFCA must also meet a heightened pleading standard. *United States v. Sequel Contractors, Inc.*, 402 F. Supp. 2d 1142, 1152 (N.D. Cal. 2005) (citation omitted).

Relator's first cause of action alleges a violation of 31 U.S.C. § 3729(a)(1)(A), which makes it unlawful to "knowingly present[ ], or cause[ ] to be presented, a false or fraudulent claim for payment or approval." (FAC at ¶ 130.) Relator's second cause of action alleges a violation of 31 U.S.C. § 3729(a)(1)(B), making it unlawful to "knowingly make[ ], use[ ], or cause[ ] to be made or used, a false record or statement material to a false or fraudulent claim."[5] (*Id.* at ¶ 134.) Relator's third cause of action alleges a violation the CFCA, which contains language identical to that in 31 U.S.C. § 3729(a)(1)(A). Cal. Gov't Code § 12651(a)(1). As such, the court analyzes these three claims in tandem. *See United States v. Safran Grp.*, No. 15-cv-00746-LHK, 2017 WL 235197, at *4 (N.D. Cal. Jan. 19, 2017) (citing *Fassberg Const. Co. v. Hous. Auth. of City of L.A.*, 152 Cal. App. 4th 720, 735 (2007) (as modified)) ("Where, as here, the statutory provisions of the federal FCA and California FCA are the same, courts apply the same analysis to federal and California FCA claims").

The "archetypal" False Claims action involves a private company overcharging under a government contract, such that "the claim for payment is itself literally false or fraudulent." *U.S. ex rel. Hendow v. Univ. of Phx.*, 461 F.3d 1166, 1170 (9th Cir. 2006) (citation omitted). Such claims are referred to as "factually false" claims. *U.S. ex rel. Campie v. Gilead Scis., Inc.*, 862 F.3d 890, 900 (9th Cir. 2017) (quoting *U.S. ex rel. Wilkins v. United Health Grp., Inc.*, 659 F.3d

---

[5] Relator's FAC states that it was brought pursuant to 31 U.S.C. § 3729(a)(2), however § (a)(2) does not provide a cause of action. (*See* FAC at 34.) The court interprets the complaint as instead referring to § (a)(1)(B).

295, 305 (3d Cir. 2011)).  That said, the FCA is not limited to such claims, but rather is "intended to reach all types of fraud, without qualification, that might result in financial loss to the Government." *Hendow*, 461 F.3d at 1170 (quoting *United States v. Neifert-White Co.*, 390 U.S. 228, 232 (1968)).  For instance, the FCA also encompasses the so-called "implied false certification" theory of liability.  Under this theory, "when a defendant submits a claim, it impliedly certifies compliance with all conditions of payment.  But if the claim fails to disclose the defendant's violation of a material statutory, regulatory, or contractual requirement . . . the defendant has made a misrepresentation that renders the claim 'false or fraudulent' under § 3729(a)(1)(A)." *Campie*, 862 F.3d at 901 (quoting *Universal Health Servs., Inc. v. United States (Escobar)*, ___ U.S. ___, 136 S. Ct. 1989, 1995 (2016)).[6]  Under either theory, relator here must allege facts demonstrating (1) a false statement or fraudulent course of conduct; (2) made with scienter; (3) that was material; causing (4) the government to pay out money or forfeit moneys due. *Id.* at 902.

 1. <u>Factually False Theory</u>

 Defendants argue that as to relator's factually false theory of liability, allegations sufficient to satisfy the first, second, and fourth elements of an FCA claim are lacking.  The court addresses each argument in turn below.

 a. *Falsity*

 First, relator must allege with requisite particularity that the claims themselves were false.  "An actual false claim is the *sine qua non* of an FCA violation." *Cafasso, U.S. ex rel. v. Gen.*

 /////

---

[6]  Although relator has not explicitly identified them as such, the court interprets most of relator's allegations as falling under the "factually false" theory, since relator alleges that defendants misrepresented the nature of the anesthesia services provided. *See Wilkins*, 659 F.3d at 305; *see also* 8 Bus. & Com. Litig. Fed. Cts. § 87:84 (4th ed.) ("One example of a 'factually false' theory particularly relevant to health care is the practice of 'upcoding,' which occurs when a health care institution charges the government for a more expensive service than the one actually provided"). However, the court interprets relator's allegations relating to use of the QZ code as relying upon the implied false certification theory, because there relator alleges that defendants submitted claims for payment but failed to reveal that they had violated "statutory, regulatory, or contractual requirements." *Escobar*, 136 S. Ct. at 1999.

1  *Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1056 (9th Cir. 2011) (internal quotation marks and
2  brackets omitted).

3       In cases alleging that defendants' claims for reimbursement were factually false, "proving
4  falsehood is relatively straightforward:  A relator must generally show that the government payee
5  has submitted an incorrect description of goods or services provided or a request for
6  reimbursement for goods or services never provided."  *U.S. ex rel. Conner v. Salina Reg'l Health*
7  *Ctr., Inc.*, 543 F.3d 1211, 1217 (10th Cir. 2008) (internal quotation marks omitted) (citing *Mikes*
8  *v. Straus*, 274 F.3d 687, 697 (2d Cir. 2001)).

9       The court first examines whether relator has sufficiently alleged facts which, if true,
10  would establish that defendant PST made false statements.  Relator's primary allegation against
11  PST centers on Berkey, a PST employee.  As noted above, relator alleges that on April 10, 2014,
12  Berkey alerted a contact at Somnia via email that she was running into issues where a doctor was
13  billed as personally performing the service "when he/she should be *medically directing* which
14  causes errors, or where they are *medically directing* 5 rooms at once."  (FAC at ¶ 102.)  As a
15  result of those errors, Berkey stated that "we cannot post any charges for the entire date of service
16  until these errors get resolved."  (*Id.*)  The court understands this allegation to mean that the
17  billing system was producing error messages prohibiting the billing requests from processing.  In
18  response to this email, a McKesson employee by the name of Lisa Zigarovich emailed a response
19  the next day directing others to "disregard Karen's email below, we are able to process the below
20  mentioned cases as *non-medically directed* CRNA."  (*Id.* at ¶ 103.)

21       These emails suggest that three separate things were occurring.  First, Berkey's email
22  stated that an anesthesia service was coded as "Personally Performed" (AA) when it should have
23  been coded as "Medically Directed."  Second, that email suggested that a service was coded as
24  "Medically Directed" even though it is impermissible for an MDA to medically direct more than
25  four procedures simultaneously.  Third, Zigarovich's response indicated an intent to process all
26  such claims as "CRNA Independent" (QZ).

27       Upon an examination of Chapter 12 of the Medicare Claims Processing Manual (the
28  "Manual") submitted by defendants, supervision of more than four anesthesia procedures at the

same time corresponds to use of the AD code to indicate "Medical Supervision." (*See* Doc. No. 49-3 at 124) (defining when physicians may report the AA, AD, QK, and QY codes). Here, by contrast, the statement by Berkey indicated that the physician used the "Medically Directed" code even though the MDA was overseeing five procedures simultaneously. (*Id.*) Relator has therefore plausibly alleged that the service was not coded in conformity with the Manual. Moreover, to the extent that Zigarovich's instructions were followed—and the procedure was billed as QZ—that would also appear to violate the provisions of the Manual, since the procedure was not performed independently by a CRNA. Thus, relator's allegations satisfy the falsity requirement as to defendant PST.

The court next examines whether any of the statements made by the Somnia defendants constitute a false statement for purposes of the FCA or CFCA. To take one example, on March 1, 2013, defendant Winston and relator allegedly performed an anesthesia service on a patient insured under Medi-Cal. (FAC at ¶ 74.) Defendant Winston was purportedly not present when this service was performed. (*Id.*) After attempting to contact defendant Winston several times via text message, relator was informed that defendant Winston was not responding because he had left the premises and was playing golf. (*Id.*) Despite being away from the Hospital, and despite apparently providing no direction to relator throughout the entire procedure, the claim was billed to the government as "Medically Directed" by Dr. Winston. (*Id.*)

Turning again to the Manual, the "Medically Directed" code may be used in two circumstances. First, it may be used if there is "[m]edical direction of two, three or four concurrent anesthesia procedures involving qualified individuals." (Doc. No. 49-3 at 124.) Second, it may be used for "[m]edical direction of one qualified nonphysician anesthetist by an anesthesiologist." (*Id.*) In both cases, therefore, the physician must provide actual "medical direction" in order to bill for that service. The facts alleged by relator in the FAC, if proven, would tend to show defendant Winston failed to provide any such medical direction, and did not interact with relator or the patient at all throughout the procedure. If so, the code employed for billing did not conform to the service provided under the terms of the Manual. *See Hendow*, 461 F.3d at 1170 ("In an archetypal *qui tam* False Claims action . . . the claim for payment itself is

literally false or fraudulent").  Thus, relator's allegations satisfy the first element of an FCA claim in this regard.

### b. *Scienter*

Next, relator must allege facts establishing that each defendant acted with scienter. Specifically, she must "allege a false statement or course of conduct made knowingly and intentionally." *Campie*, 862 F.3d at 904.

Turning first to defendant PST's motion to dismiss, defendant PST claims that relator's first amended complaint fails because it "alleges ***no facts*** that make it plausible, as opposed to merely conceivable, that PST knew that any claims were false." (Doc. No. 45-1 at 16.)  To the contrary, in the FAC relator alleges an email exchange between two PST employees explicitly acknowledging that the anesthesia services were coded in a manner that did not reflect the actual service that was provided.  This allegation, if proven, tends to show intent on the part of multiple PST employees to submit claims which they knew did not accurately reflect the service provided. Therefore, scienter has been sufficiently alleged in this case.

Similarly, the Somnia defendants contend that "Relator's vague allegations of discussions she purportedly had with PAS/Somnia representatives about 'charting' and safety concerns fall far short of showing that PAS/Somnia knew that it was submitting false claims as a result of the billing practices that Relator raises in the FAC." (Doc. No. 48-1 at 24.)  The court disagrees. Among other allegations, the FAC describes in detail how relator alerted defendant Goldstein to her allegations of fraudulent billing.  (*See* FAC at ¶ 119.)  In addition, relator alleges that she sent an email to defendant Winston regarding improper billing which stated that "[w]hen a physician leaves the hospital the CRNA has to be notified and the chart documented appropriately . . . This is fraud." (*Id.* at ¶ 78.)   The allegations of the FAC sufficiently allege facts supporting the contention that defendants possessed the requisite scienter.

### c. *Payment of Claims*

Finally, relator must allege facts tending to show that the claim caused the government to pay out money.  Defendants argue that relator has failed to do so because the facts alleged do not support a contention that the claims were ever actually submitted for payment, nor do they

support a contention that the claims were reimbursed by the government, as opposed to a private health insurance provider. In particular, defendants claim the FAC is deficient because relator lacks "personal knowledge" that the false claims were actually submitted for payment. (Doc. No. 45-1 at 8; Doc. No. 48-1 at 17.)

Unlike other circuits, the Ninth Circuit has not embraced the rule that a relator must identify representative examples of false claims to support every allegation of fraud. *Ebeid ex rel. U.S. v. Lungwitz*, 616 F.3d 993, 998 (9th Cir. 2010) ("We do not embrace the district court's categorical approach that would, as a matter of course, require a relator to identify representative examples of false claims to support every allegation . . . ."); *contra U.S. ex rel. Bledsoe v. Cmty. Health Sys.*, 501 F.3d 493, 510 (6th Cir. 2007); *U.S. ex rel. Joshi v. St. Luke's Hosp., Inc.*, 441 F.3d 552, 557 (8th Cir. 2006); *U.S. ex rel. Karvelas v. Melrose-Wakefield Hosp.*, 360 F.3d 220, 233 (1st Cir. 2004); *U.S. ex rel. Clausen v. Lab. Corp. of Am.*, 290 F.3d 1301, 1312 n.21 (11th Cir. 2002). Instead, the Ninth Circuit has followed the Fifth Circuit rule that a plaintiff alleging fraud under Rule 9(b) must only allege "particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." *Ebeid*, 616 F.3d at 998 (quoting *U.S. ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 190 (5th Cir. 2009)); *see also U.S. ex rel. Chorches for Bankr. Estate of Fabula v. Am. Med. Response, Inc.*, 865 F.3d 71, 89 (2d Cir. 2017) (citing to *Ebeid* and adopting this more lenient pleading standard).

The court finds that relator has sufficiently alleged that the claims at issue in this case were submitted to the government for payment. Relator has alleged with specificity that multiple employees improperly coded bills for anesthesia services. Relator provided both the names of the individuals and the precise dates on which the services in question were performed. (FAC at ¶¶ 102–03.) Relator has alleged that one of the employees stated in an email that "we are able to process the below mentioned cases," thereby giving rise to an inference that the claims were in fact processed and submitted for payment. (FAC at ¶ 103.) Plaintiff's FAC has therefore provided both "particular details" of the scheme and "reliable indicia" that the claims were processed. To the extent defendants contend that relator's complaint is inadequate because it does not allege that relator actually witnessed the processing of claims, the Second Circuit in

*Chorches* considered and rejected such a contention:

> An interpretation of Rule 9(b) that requires *qui tam* plaintiffs to plead billing details regarding the submission of specific false claims, even when knowledge of such details is peculiarly within the defendant's purview, would discourage the filing of meritorious *qui tam* suits that can expose fraud against the government. Under that approach, by simply insulating its accounting department from personnel with operational knowledge, a corporate fraudster could ensure that few employee relators could successfully plead both the falsity of recorded information and the presentment of a claim containing those falsehoods.

*Chorches*, 865 F.3d at 86. The court is persuaded by this analysis. In addition, relator has alleged that approximately 72 percent of Kaweah's patients received government-funded healthcare. (FAC at ¶ 17.) The fact that well over half of Kaweah's patients receive government funded healthcare allows the court to draw a "strong inference" that at least some of the claims described in the FAC were submitted to the government for payment, as opposed to being directed to private insurance providers. The court therefore finds the FAC has sufficiently alleged that the allegedly false claims were submitted to the government for payment.

### d. *Economic Loss*

The Somnia defendants also contend that the FAC is deficient because it "fails to adequately plead that Somnia/PAS' alleged billing practices caused, or would cause, economic loss to the government." (Doc. No. 48-1 at 24.) Relator responds that the FAC alleges that the government has suffered economic harm because use of the "Medical Supervision" (AD) code results in a lower reimbursement rate. To the extent that the AD code was appropriate, but another code was instead employed, this resulted in the government paying more for the service provided than it should have.

The court fails to understand the significance of this dispute. As the United States points out in its statement of interest (Doc. No. 63 at 2), defendants' argument that an FCA claim requires an allegation of economic loss to the government is contrary to controlling authority. See *Bly-Magee*, 236 F.3d at 1017 (citing *In re Schimmels*, 85 F.3d 416, 419 n.1 (9th Cir. 1996) and *U.S. ex rel. Hagood v. Sonoma Cty. Water Agency*, 929 F.2d 1416, 1421 (9th Cir. 1991)). The court therefore declines to dismiss relator's FCA claims on this basis.

1          2.        False Certification Theory

2          The court next addresses relator's argument with respect to the alleged use of the QZ

3   code, which relator advances on a theory of implied false certification.  Defendants raise multiple

4   arguments as to why the FAC fails to state a claim on its implied false certification theory.

5   Focusing on the materiality element of an FCA claim, the Somnia defendants contest the

6   materiality of the use of the QZ code, arguing that "[b]illing Medicare for services allegedly

7   provided in violation of a contractual provision between Kaweah Hospital and Somnia/PAS does

8   not render the claim false or fraudulent" because such a provision was immaterial.  (Doc. No. 48-

9   1 at 21.)

10         "Under the False Claims Act, a falsehood is material if it has 'a natural tendency to

11  influence, or be capable of influencing, the payment or receipt of money or property.'"  *Campie*,

12  862 F.3d at 904–05 (quoting 31 U.S.C. § 3729(b)(4)).  In a recent decision the Supreme Court has

13  stated that "[t]he materiality standard is demanding," and is not met "merely because the

14  Government designates compliance with a particular statutory, regulatory, or contractual

15  requirement of payment."  *Escobar*, 136 S. Ct. at 2003.  The court emphasized that the False

16  Claims Act is not a "vehicle for punishing garden-variety breaches of contract or regulatory

17  violations."  *Id.*  The Court also specifically rejected the notion that a violation of a statutory,

18  regulatory, or contractual requirement is material simply because the Government *could* have

19  withheld payment on the basis of the violation.  *Id.* at 2004; *see also U.S. ex rel. Kelly v. Serco,*

20  *Inc.*, 846 F.3d 325, 334 (9th Cir. 2017) ("[T]he possibility that the government would be entitled

21  to refuse payment if it were aware of [the] alleged violations is insufficient by itself to support a

22  finding of materiality").  Thus, the question is not whether the government could have withheld

23  payment due to the alleged violation.  Instead, in order to sufficiently allege materiality, a

24  plaintiff must plausibly allege that "in the mine run of cases," the government "would not have

25  paid these claims had it known of these violations."  *Escobar*, 136 S. Ct. at 2003–04.

26         Relator made no mention of materiality in her FAC, nor does relator's opposition brief

27  respond to defendants' argument with respect to materiality.  At oral argument, relator contended

28  that the false claims in this case were material because they violated the District's bylaws, which

forbid CRNAs to work without the supervision of an anesthesiologist. This argument appears to the undersigned to amount to an assertion that any violation of an applicable law, regulation, or contract provision is inherently material. This contention is inconsistent with the Supreme Court's holding in *Escobar*. Here, relator has not alleged any facts in her FAC suggesting the alleged misuse of the QZ code was material for purposes of an FCA claim. *See U.S. ex rel. Ferris v. Afognak Native Corp.*, No. 3:15-CV-0150-HRH, 2016 WL 9088706, at *3 (D. Alaska Sept. 28, 2016) ("The relator must allege some facts that show that the government actually does not pay claims if they involve the statutory violations in question"); *United States v. Scan Health Plan*, No. CV 09-5013-JFW (JEMx), 2017 WL 4564722, at *6 (C.D. Cal. Oct. 5, 2017) (dismissing the complaint because it "includes only conclusory allegations that the . . . Defendants conduct was material"). This deficiency is fatal to relator's claim based upon the alleged use of the QZ and a theory of implied false certification.

Therefore, defendants' motion to dismiss with respect to use of the QZ code will be granted.

## C.    Retaliation Claims

Relator's fourth and fifth causes of action allege that the Somnia defendants retaliated against relator for complaining about the alleged FCA and CFCA violations. (FAC at ¶ 144.) This retaliation took the form of termination of relator's job. (*Id.* at ¶ 145.) Because the CFCA is modeled on the FCA, retaliation is analyzed identically under both statutes. *Kaye v. Bd. of Trs. of San Diego Cty. Pub. Law Library*, 179 Cal. App. 4th 48, 59–60 (2009). To establish retaliation under either state or federal law, relator must allege facts showing: (1) she engaged in activity protected under the statutes; (2) the employer knew she engaged in protected activity; and (3) the employer discriminated against her *because* she engaged in protected activity. *U.S. ex rel. Hopper v. Anton*, 91 F.3d 1261, 1269 (9th Cir. 1996).[7] The court examines each element in turn below.

---

[7] Even where a FCA *qui tam* action is unsuccessful (or not even pursued), a relator may still maintain a claim under the FCA's anti-retaliation provision. *U.S. ex rel. Ramseyer v. Century Healthcare Corp.*, 90 F.3d 1514, 1522 (10th Cir. 1996); *U.S. ex rel. Satalich v. City of Los Angeles*, 160 F. Supp. 2d 1092, 1108 (C.D. Cal. 2001) (citations omitted).

1          1.     Protected Activity

2          An employee engages in a protected activity by "investigating matters which are

3   calculated or reasonably could lead to a viable [False Claims Act] action." *Campie*, 862 F.3d at

4   907 (quotation marks and citations omitted).  To satisfy this element, relator must allege facts

5   showing that (1) the employee in good faith believes, and (2) a reasonable employee in the same

6   or similar circumstance might believe, that the employer is possibly committing fraud against the

7   government." *Id.* at 908 (quoting *Moore v. Cal. Inst. of Tech. Jet Propulsion Lab.*, 275 F.3d 838,

8   845 (9th Cir. 2002)).

9          Here, the court finds numerous factual allegations in the FAC demonstrating a good faith

10  belief by relator that fraud was occurring at Kaweah.  (*See, e.g.*, FAC at ¶ 71) (email stating to

11  defendant Mendenhall that the manner in which a procedure was billed "is fraud").  Moreover,

12  although defendants contest the notion that an FCA violation occurred in this case, defendants

13  have provided no support for the conclusion that relator's belief to the contrary was an

14  unreasonable one.  As such, the court finds the FAC plausibly alleges that relator engaged in

15  protected activity.

16         2.     Notice

17         Defendants next argue that relator's FAC is deficient as to the second element of a

18  retaliation claim because it alleges no facts demonstrating that defendants had notice of the fact

19  that relator planned to file a FCA claim.  (Doc. No. 48-1 at 27.)

20         In *Campie,* the Ninth's Circuit set out a two-part test for determining whether a relator has

21  placed defendants on adequate notice.  First, the court asks whether "the monitoring and reporting

22  activities outlined by relators are by and large the types of activities [relator] was required to

23  undertake as part of [her] job." 862 F.3d at 908.  If not, a relator is required to meet a lower

24  threshold in order to place defendants on notice.  *See id.* (finding notice sufficient where relator

25  complained to defendants that they were "violating FDA regulations in order to sell its drugs to

26  the Government and States notwithstanding their lack of compliance with [regulatory

27  requirements]"); *see also Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir.

28  /////

2008) (finding that plaintiff's vague statement to defendant that it was engaging in "civil violations" was sufficient for giving defendant notice of alleged Medicare fraud).

By contrast, if the relator has filed an FCA claim based on activities the relator was required to undertake as part of her job, a more comprehensive notice is required. In such circumstances, a defendant is put on notice only where relator has suggested that she intends to use the alleged noncompliance as the basis for an FCA claim, or else intends to report the misconduct to government officials. *Campie*, 862 F.3d at 908 (citing *Ramseyer*, 90 F.3d at 1523 and *Robertson v. Bell Helicopter Textron, Inc.*, 32 F.3d 948, 952 (5th Cir. 1994)). Thus, when a relator files an FCA retaliation claim based on the reporting of activities within the scope of her employment, a relator must allege (1) that the law is being violated, and (2) that the relator intends to report that violation.

As applied to this case, the first question is whether issues relating to the alleged improper billing were within relator's scope of employment. Relator asserts in her opposition that her job duties "have no relation to the monitoring and reporting of fraud." (Doc. No. 54 at 29.) Based on the allegations of the FAC, the court agrees. In *Ramseyer*, the case principally relied on by defendants, the plaintiff was responsible for "monitor[ing] compliance with applicable Medicaid requirements." *Ramseyer*, 90 F.3d at 1517. The Tenth Circuit required plaintiff to notify her employer that she was intending to pursue an FCA action because "the monitoring and reporting activities described in plaintiff's complaint were exactly those activities plaintiff was required to undertake in fulfillment of her job duties." *Id.*

*Ramseyer* is easily distinguishable from the present case because here, there is nothing indicating that relator's job duties included any reporting or compliance matters. Rather, according to the FAC, relator was employed to administer anesthesia services to Kaweah patients. (FAC at ¶ 18.) As such, relator need only satisfy the lower threshold with respect to providing notice to defendants. *See Campie*, 862 F.3d at 908 (noting that this lower threshold of knowledge "is not a high bar"). The FAC sufficiently alleges that such notice was provided here. As discussed above, the FAC describes in detail how relator alerted defendant Goldstein to her allegations of fraudulent billing. (*See id.* at ¶ 119.) In addition, relator sent an email to defendant

18

Winston regarding improper billing, stating that "[w]hen a physician leaves the hospital the CRNA has to be notified and the chart documented appropriately . . . This is fraud." (*Id.* at ¶ 78.) The court therefore finds that the allegations of the FAC are sufficient with respect to notice.

3.  Causation

Finally, the court considers whether the FAC alleges the requisite causal connection between relator's protected activity and her termination. Defendants argue that the FAC does not plausibly allege "that Somnia/PAS terminated the contract with Sarasate **because** relator was engaged in protected activity under the FCA." (Doc. No. 48-1 at 27.)

Unlike claims alleging substantive violations of the FCA and CFCA, a claim alleging retaliation need only meet the notice pleading standard under Rule 8(a). *Mendiondo*, 521 F.3d at 1104; *Ante v. Office Depot Business Services*, 641 F. Supp.2d 906, 912 (N.D. Cal. 2009) ("As the plaintiff's claim focused on the retaliation, rather than the defendant's allegedly fraudulent conduct, the plaintiff was not required to plead under the FRCP 9(b) standard."). The FAC alleges that relator informed Kaweah's Chief Medical Officer Paskert about the alleged billing fraud on May 7, 2014. (FAC at ¶ 116.) It also alleges on information and belief that Paskert relayed relator's concerns to defendant Goldstein, the Vice President and Chief Medical Officer of PAS/Somnia. (*Id.*) A week later, on May 13, 2014, defendant Goldstein flew from New York to meet with the Kaweah CRNAs, at which time he told relator that "he was very disturbed to learn that the CRNAs are reporting that there is fraudulent billing occurring." (*Id.* at ¶ 119.) Finally, on June 13, 2014, relator received a letter of termination from PAS/Somnia. (*Id.* at ¶ 120.) On the basis of these allegations, the court finds that relator has plausibly alleged that her termination was motivated by her engaging in protected activity. *See Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987) ("Causation . . . may be inferred from circumstantial evidence, such as the employer's knowledge that the plaintiff engaged in protected activities and the proximity in time between the protected action and the allegedly retaliatory employment decision"); *see also Dawson v. Entek Int'l*, 630 F.3d 928, 937 (9th Cir. 2011) ("In some cases, temporal proximity can by itself constitute sufficient circumstantial evidence of retaliation . . . .")
/////

The Somnia defendants argue that the FAC is deficient because it "fails to allege who made the decision to terminate the contract and whether this decisionmaker had knowledge of her alleged protected activity." (Doc. No. 48-1 at 27–28.)  However, the only case cited by defendants in support of this argument addressed the granting of summary judgment, not whether the allegations of a complaint were sufficient to survive a motion to dismiss.  *See Cafasso*, 637 F.3d at 1060.  The precise identity of the individual employed by PAS/Somnia who made the decision to terminate relator is a subject for discovery.  *See Mendiondo*, 521 F.3d at 1097 ("It suffices at this pleading stage for [relator] to simply give notice that she believes [the employer] terminated her because of her investigation into the practices she specified in the complaint").  Relator has plausibly alleged that her termination was caused by her engaging in protected activities.  The court will therefore deny defendants' motion to dismiss relator's fourth and fifth causes of action.

**D.      Health and Safety Code Claim**

Relator's sixth cause of action alleges a violation of California Health and Safety Code § 1278.5, which protects health care workers from retaliation.  Cal. Health & Safety Code § 1278.5(b)(1).  Defendants contend this claim must be dismissed because relator does not sufficiently allege a causal connection between her activity and her termination.

This argument is unpersuasive for the reasons discussed immediately above.  In short, relator has plausibly alleged how defendants became aware that she was investigating allegedly improper billing, and has also alleged a sufficient causal connection between her engagement in that activity and her dismissal.  Therefore, defendants' motion to dismiss the sixth cause of action will also be denied.

**E.      Whistleblower Retaliation Claim**

Relator's seventh cause of action alleges whistleblower retaliation in violation of California Labor Code § 1102.5 *et. seq*.  To establish liability under § 1102.5, an employee must show:  (1) that she engaged in protected activity; (2) that she was thereafter subjected to an adverse employment decision by her employer; and (3) that there was a causal link between the protected activity and the adverse employment action.  *Soukup v. Law Offices of Herbert Hafif*,

1  39 Cal. 4th 260, 287-88 (2006); *Morgan v. Regents of Univ. of Cal.*, 88 Cal. App. 4th 62, 69

2  (2000); *United States v. Heath*, Case No. 13-cv-01924-SI, 2016 WL 3540954, at *13 (N.D. Cal.

3  June 29, 2016) . Defendants contend that this claim must be dismissed because relator has not

4  alleged facts establishing that she is an "employee."

5      Relator alleges that she "was actually an employee of Defendants PAS/Somnia" despite

6  her use of an S Corporation to contract with PAS/Somnia. (FAC at ¶ 18.) Defendants are correct

7  that "[t]he Court need not accept Relator's conclusory allegation that she was Somnia/PAS'

8  employee for the purposes of a motion to dismiss." (Doc. No. 48-1 at 30) (citation omitted).

9  However, relator goes on to allege specific facts about the nature of her employment, including

10 that PAS/Somnia "controlled the hours and days that Ms. O'Neill worked," was "responsible for

11 the billing for her services," and that relator "was assigned an operating room and cases by

12 PAS/Somnia and medical doctors told her what type of anesthesia services should be

13 administered." (FAC ¶ 18.) The court concludes that, under the balancing test used to determine

14 whether an organization is an employer, relator has sufficiently pleaded that she was an employer

15 under California law for purposes of the pending motion to dismiss. *See Vernon v. State*, 116 Cal.

16 App. 4th 114, 125 (2004) (considering factors such as "payment of salary . . . the ownership of

17 the equipment necessary to performance of the job, the location where the work is performed . . .

18 [and] the extent to which [the work] is done under the direction of a supervisor"). Accordingly,

19 defendants' motion to dismiss relator's seventh cause of action will be denied.

20 **F.    Public Policy Claim**

21     Relator's eighth cause of action alleges wrongful termination in violation of public policy.

22 As defendants correctly point out, relator's public policy claim is wholly derivative of relator's

23 other causes of action. (*See* Doc. No. 48-1 at 31) (citing *Cuevas v. SkyWest Airlines*, 17 F. Supp.

24 3d 956, 967 (N.D. Cal. 2014)). Because the court has denied defendants' motion to dismiss those

25 claims, it will also deny defendants' motion to dismiss relator's public policy claim.

26 **G.    IIED Claim**

27     Relator's ninth cause of action alleges intentional infliction of emotional distress (IIED).

28 Defendants contend that relator fails to state a claim for IIED because none of the facts alleged in

relator's FAC meet the definition of extreme and outrageous conduct. To state an IIED claim, relator must allege facts showing: "(1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the relator's suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the defendant's outrageous conduct." *Davidson v. City of Westminster*, 32 Cal. 3d 197, 209 (1983) (citations omitted). "Behavior may be considered outrageous if a defendant (1) abuses a relation or position which gives him power to damage the plaintiff's interest; (2) knows the plaintiff is susceptible to injuries through mental distress; or (3) acts intentionally or unreasonably with the recognition that the acts are likely to result in illness through mental distress." *Molko v. Holy Spirit Ass'n*, 46 Cal. 3d 1092, 1122 (1988). While this element of such a claim is commonly seen as a factual issue, *see Yun Hee So v. Sook Ja Shin,* 212 Cal. App. 4th 652, 672 (2013), the court may, under certain circumstances, conclude the specific conduct alleged is insufficiently outrageous to support a claim for intentional infliction of emotional distress as a matter of law. *See Davidson*, 32 Cal. 3d at 210.

Relator argues that her IIED claim is properly pled because "California law is clear that conduct in violation of state statutes . . . suffices to establish the outrageous conduct element of intentional infliction of emotional distress claims." (Doc. No. 54 at 31–32.) Relator cites two cases in support of this contention, but neither stands for relator's proposition that violation of California state law is *per se* outrageous conduct for the purposes of an IIED claim. *See Soldinger v. Nw. Airlines, Inc.*, 51 Cal. App. 4th 345, 378–79 (1996) (finding that an employer's termination of a Jewish employee for observance of Passover was potentially outrageous because of evidence that the employer did not punish similar behavior by Christians); *Magpali v. Farmers Grp., Inc.*, 47 Cal. App. 4th 1024, (1996) (holding that an employer's instructions "to write more insurance policies to minorities and to avoid writing policies for members of [plaintiff's] own ethnic tribe because they were poor risks could constitute . . . extreme and outrageous conduct"). Finding relator's argument in this regard to be unpersuasive, the court can discern no other factual allegations in the FAC that could plausibly rise to the level of extreme or outrageous conduct on the part of defendants. The fact that relator was terminated from employment clearly does not,

without more, rise to the level of extreme or outrageous conduct for this purpose. *Miklosy v. The Regents of the Univ. of Cal.*, 44 Cal.4th 876, 903 (2008) (dismissing a plaintiff's IIED claim that was based on the same allegations as plaintiff's claims for whistleblower retaliation and wrongful termination in violation of a public policy); *Ferretti v. Pfizer*, No. 11-CV-04486-LHK, 2012 WL 3638541, at *11-12 (N.D. Cal. Aug. 22, 2012); *see also Pitman v. City of Oakland*, 197 Cal. App. 3d 1037, 1047 (1988) ("Being dismissed from a job is not an uncommon occurrence in modern society"). Therefore, relator's IIED claim will be dismissed and, out of an abundance of caution, leave to amend will be granted.

## H.     NIED Claim

Finally, defendants move for dismissal of relator's tenth cause of action, which alleges negligent infliction of emotional distress (NIED). In order to state a claim for NIED, relator must allege facts showing: (1) duty; (2) breach; (3) severe emotional distress; and (4) actual and proximate cause. *Carney v. Rotkin, Schmerin & McIntyre*, 206 Cal. App. 3d 1513 (1988).

In opposing dismissal of this claim relator argues that "senior-level officials at Somnia had a duty to intervene to prevent the intentional retaliatory actions of others directed at Ms. O'Neill, but failed to do so." (Doc. No. 54 at 32.) Relator cites no authority for the proposition that an employer's failure to act to prevent harm to an employee is a cognizable tort in California. Defendants have persuasively argued that it is not. *See Hine v. Dittrich*, 228 Cal. App. 3d 59, 65 (1991) (allegations that an employer acted unreasonably or "should have" done something different "do not establish a tort of negligence independent of the discharge itself"). The court will therefore grant defendants' motion to dismiss relator's NIED claim. Again, out of an abundance of caution, the court will do so while granting relator leave to amend if she so chooses.

## CONCLUSION

For the foregoing reasons:

1.     Defendant PST's motion to dismiss (Doc. No. 45) is denied;

2.     Defendants' motion to dismiss causes of action one through three (Doc. No. 48) is granted only to the extent those causes of action are based upon defendants' alleged use of the QZ code;

3. Defendants' motion to dismiss causes of action four and five (Doc. No. 48) is denied;

4. Defendants' motion to dismiss causes of action six through eight (Doc. No. 48) is denied;

5. Defendants' motion to dismiss causes of action nine and ten (Doc. No. 48) is granted; and

6. If relator wishes to amend her complaint to cure any of the deficiencies identified herein with respect to dismissed causes of action, relator is directed to file with the court a second amended complaint no later than twenty-eight days from the date of service of this order.

IT IS SO ORDERED.

Dated:   **February 2, 2018**

_____
UNITED STATES DISTRICT JUDGE