MICHAEL R. LINDSAY (SBN 110845)
mlindsay@nixonpeabody.com
JASON GONZALEZ (SBN 178768)
jgonzalez@nixonpeabody.com
ERIN J. HOLYOKE (SBN 288137)
eholyoke@nixonpeabody.com
MAE HAU (SBN 293641)
mhau@nixonpeabody.com
NIXON PEABODY LLP
300 S. Grand Avenue, Suite 4100
Los Angeles, CA  90071-3151
Tel:     213-629-6000
Fax:    213-629-6001

BRIAN K. FRENCH (Admitted *Pro Hac Vice*)
bfrench@nixonpeabody.com
NIXON PEABODY LLP
100 Summer Street
Boston, MA 02110-2131
Tel:     617-345-1000
Fax:    617-345-1300

Attorneys for Defendants
SOMNIA, INC., PRIMARY ANESTHESIA
SERVICES, BYRON MENDENHALL, M.D.,
QUINN GEE, M.D., AND MARGARET VASSILEV, M.D.

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES and the STATE OF CALIFORNIA ex rel.  NICOLE O'NEILL. NICOLE O'NEILL<br><br>                              Plaintiff,<br><br>        vs.<br><br>SOMNIA, INC., PRIMARY ANESTHESIA SERVICES, MCKESSON CORPORATION, ROBERT GOLDSTEIN, M.D., ROY WINSTON, M.D., BRYON MENDENHALL, M.D., QUINN GEE, M.D., AND MARGARET VASSILEV, M.D, AND DOES 1 through 10 inclusive,<br><br>                              Defendants. | Case No.:  1:15-CV-00433-DAD-EPG<br><br>**DEFENDANT SOMNIA, INC., PRIMARY ANESTHESIA SERVICES, BYRON MENDENHALL, M.D., QUINN GEE, M.D., AND MARGARET VASSILEV, M.D.'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS SECOND AMENDED COMPLAINT**<br><br>Date:  May 1, 2018<br>Time: 9:30 a.m.<br>Ctrm: 5<br><br>Date Action Filed:  March 19, 2015<br><br>[Filed concurrently with Notice of Motion and Motion] |

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ......................................................................................................... 1

II.    BACKGROUND ........................................................................................................... 1

    A.     Procedural History ........................................................................................ 1

    B.     The Parties ...................................................................................................... 2

    C.     Medicare Part B Reimbursement for Anesthesia Services ............................ 2

    D.     CRNA Supervision and the Opt-Out Provider under Medicare Part A ................... 4

III.   LEGAL STANDARDS ................................................................................................. 5

    A.     Rule 12(b)(6) .................................................................................................. 5

    B.     Rule 9(b) ......................................................................................................... 6

    C.     FCA Violation ................................................................................................ 6

IV.    THE FIRST, SECOND, AND THIRD CAUSES OF ACTION OF THE SAC
       SHOULD BE DISMISSED WITH PREJUDICE TO THE EXTENT THEY ARE
       BASED ON DEFENDANTS' USE OF THE QZ MODIFIER ...................................... 7

    A.     Defendants Did Not Submit Claims Under the QZ Modifier that Contained
          Misleading Representations ............................................................................ 8

    B.     The SAC Does Not Adequately Allege Materiality ..................................... 12

    C.     Relator's FCA Allegations Do Not Satisfy Rule 9(b) ................................. 14

V.     CONCLUSION .......................................................................................................... 15

DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION TO DISMISS SECOND AMENDED
COMPLAINT

1

# **TABLE OF AUTHORITIES**

2

**Page(s)**

3

**FEDERAL CASES**

4

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ...........................................................................................5, 6

5

*Bell Atlantic Corp. v. Twombly,*

6
    550 U.S. 544 (2007) ...................................................................................................6

7

*U.S. ex rel. Dresser v. Qualium Corp.,*
    2016 WL 3880763 (N.D. Cal. July 18, 2016) .........................................................14

8

9

*Gordian Med. Inc. v. Sebelius,*
    2012 WL 781596 (C.D. Cal. 2012) ..........................................................................10

10

11

*U.S. ex rel. Landers v. Baptist Mem'l Health Care Corp.,*
    525 F. Supp.2d 972 (W.D. Tenn. 2007) .....................................................................4

12

*Moore v. Kayport Package Exp., Inc.,*
    885 F.2d 531 (9th Cir. 1989) ....................................................................................14

13

14

*Navarro v. Block,*
    250 F.3d 729 (9th Cir. 2001) ......................................................................................5

15

16

*Semegen v. Weidner,*
    780 F.2d 727 (9th Cir. 1985) ................................................................................6, 14

17

*Starr v. Baca,*
    652 F.3d 1202 (9th Cir. 2011) ................................................................................5, 6

18

19

*Swartz v. KPMG LLP,*
    476 F.3d 756 (9th Cir. 2007) ................................................................................6, 14

20

21

*U.S. v. Kiewit Pac. Co.,*
    41 F. Supp. 3d 796 (N.D. Cal. 2014) .........................................................................6

22

*Ebeid ex rel. U.S. v. Lungwitz,*
    616 F.3d 993 (9th Cir. 2010) ....................................................................................14

23

24

*U.S. v. Mackby,*
    261 F.3d 821 (9th Cir. 2001) ..................................................................................6, 7

25

26

*U.S. v. Sequel Contractors, Inc.,*
    402 F. Supp. 2d 1142 (C.D. Cal. 2005) ..................................................................6, 7

27

*Universal Health Servs., Inc. v. U.S. ex rel. Escobar,*
    136 S. Ct. 1989 (2016) ...................................................................................... *passim*

28

DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION TO DISMISS SECOND AMENDED
COMPLAINT

**STATE CASES**

*Cal. Soc'y of Anesthesiologists v. Sup. Ct.*,
    204 Cal. App. 4th 390 (2012)...........................................................................4, 5

*Mao's Kitchen, Inc. v. Mundy*,
    209 Cal. App. 4th 132 (2012)...................................................................................6

**FEDERAL STATUTES**

31 U.S.C. § 3729(a)(1) .............................................................................................*passim*

31 U.S.C. § 3730(b) ..........................................................................................................1

42 U.S.C. §§ 1395ff(f)(2)(B), 1395kk-1(a)(4) ...............................................................10

**STATE STATUTES**

Cal. Gov't Code § 12651(a)(1)-(3) .............................................................................1, 6, 7

**RULES**

Fed. R. Civ. Proc. 9(b) ..............................................................................................*passim*

Fed. R. Civ. Proc.12(b)(6) ...............................................................................................5

**REGULATIONS**

42 C.F.R. § 414.46 .................................................................................................2, 3, 4, 9

42 C.F.R. § 414.60 .............................................................................................2, 3, 9, 12

42 C.F.R. § 415.110(a)(1) ..................................................................................................3

42 C.F.R. § 482 ...................................................................................................................4

42 C.F.R. § 482.52 .........................................................................................................4, 12

51 Fed. Reg. 22010, 22028 (June 17, 1986) ...................................................................12

60 Fed. Reg. 63124, 63178 (Dec. 8, 1995) .....................................................................12

63 Fed. Reg. 58814, 58843 (Nov. 2, 1998) .......................................................................4

65 Fed. Reg. 65376, 65413 (Nov. 1, 2000) .....................................................................10

66 Fed. Reg. 56762, 56765 (Nov. 13, 2001) .....................................................................5

66 Fed. Reg. 56762, 56767 (Nov. 13, 2001) ...................................................................12

DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION TO DISMISS SECOND AMENDED COMPLAINT

I.    **INTRODUCTION**

On February 2, 2018, this Court dismissed the First, Second, and Third Causes of Action of the First Amended Complaint ("FAC") to the extent those claims were based on allegations that defendants Somnia, Inc. ("Somnia"), Primary Anesthesia Services ("PAS"), Dr. Byron Mendenhall, Dr. Quinn Gee, and Dr. Margaret Vassilev (collectively, the "Defendants") violated the federal False Claims Act ("FCA") and California False Claims Act ("CFCA") through their alleged misuse of the QZ billing modifier (the "Order").  ECF No. 70.  The Court dismissed these claims because relator Nicole O'Neill ("Relator") failed to allege "any facts in her FAC suggesting the alleged misuse of the QZ code was material for purposes of an FCA claim," as required under *Universal Health Servs., Inc. v. U.S. ex rel. Escobar*, 136 S. Ct. 1989 (2016).  *Id.* at 16.  To address this "fatal" deficiency, *id.*, Relator filed her Second Amended Complaint ("SAC"), ECF No. 74, which adds a new section on the purported materiality of Defendants' alleged false claims. SAC at ¶¶ 64-70.  These new allegations do not cure the fatal defects in Relator's FCA causes of action.

The SAC fails to state a viable FCA claim because, like the FAC, it does not adequately allege that Defendants misrepresented their compliance with any statutory, regulatory, or contractual requirements **that were material to the government's payment decision**.  In addition, Relator has not pled her allegations regarding Defendants' alleged misuse of the QZ modifier with the level of particularity required by Rule 9(b).  Since this is Relator's **third attempt** to state a viable FCA claim, the Court should dismiss the SAC's First, Second, and Third Causes of Action with prejudice to the extent those claims are based on Defendants' alleged misuse of the QZ modifier.

II.   **BACKGROUND**

A.    **Procedural History**

Relator filed this action on March 19, 2015, pursuant to the *qui tam* provisions of the FCA. 31 U.S.C. § 3730(b).  The Complaint was unsealed in December 2016, after both the United States and State of California declined to intervene in the action.  ECF Nos. 16-18.  Defendants moved to dismiss the Complaint on June 7, 2017.  ECF No. 31.  Instead of opposing Defendants' motion,

1   Relator filed her FAC.  ECF No. 41.  Defendants moved to dismiss the FAC on August 21, 2017,

2   ECF No. 48, which the Court granted in part and denied in part on February 2, 2018.  ECF No. 70.

3   Relevant to this Motion, the Court dismissed the First, Second, and Third Causes of Action to the

4   extent those claims were based on Defendants' alleged misuse of the QZ modifier.  *Id.* at 16, 23.

5   Relator filed her SAC on February 28, 2018.  ECF No. 74.

6   **B.    The Parties**

7        PAS contracts with the Kaweah Delta Health Care District ("District") to provide

8   anesthesia services at Kaweah Hospital.  *See* Defendants' Request for Judicial Notice ("Defs'

9   RJN"), Exs. A-B.  ECF No. 49.[1]  Somnia is a separate legal entity that contracts with PAS to

10  manage its anesthesia practices.  SAC at ¶¶ 9-11.  Relator alleges in her SAC that although

11  separately incorporated, Somnia and PAS are an integrated enterprise.  *Id.* at ¶ 11.  Although

12  Defendants deny that allegation, they will treat Somnia and PAS (hereinafter, "Somnia/PAS") as

13  an integrated enterprise for purposes of this Motion only.  Relator is a Certified Registered Nurse

14  Anesthetist ("CRNA") and president, director, and principal shareholder in Sarasate Nursing

15  Anesthesia, P.C. ("Sarasate").  *Id.* at ¶¶ 7-8.  On March 22, 2012, Sarasate entered into a contract

16  with Somnia/PAS to provide Relator's anesthesia services as Chief CRNA at Kaweah Hospital.

17  *Id.* at 18.[2]

18  **C.    Medicare Part B Reimbursement for Anesthesia Services**

19       Regulations and guidance issued by the Centers for Medicare & Medicaid Services

20  ("CMS") distinguish between four categories of services provided by anesthesiologists or CRNAs

21  that are reimbursable under Medicare Part B: (1) "personally performed" services; (2) "medically

22  directed" services; (3) "medically supervised" services; and (4) CRNA services "not medically

23  directed."  42 C.F.R. §§ 414.46(c), (d), (f), 414.60(a).  The basic requirements for each billing

24  category are as follows:

25       1.   "Personal performance" occurs when an anesthesiologist "performs the entire
26            anesthesia service alone."  42 C.F.R. §414.46(c)(1)(i).

27  [1] The Court granted Defendants' Request for Judicial Notice in its entirety.  Order at 6-7.

28  [2] Later in the SAC, Relator alleges that Sarasate entered into a contract with the District.  SAC at ¶ 120.

-2-

2. "<u>Medical direction</u>" occurs when an anesthesiologist directs a qualified individual, such as a CRNA, in up to four concurrent anesthesiology cases, and the anesthesiologist:

- Performs a pre-anesthetic examination and evaluation;
- Prescribes the anesthesia plan;
- Personally participates in the most demanding aspects of the anesthesia plan, including, if applicable, induction and emergence;
- Ensures that any procedures in the anesthesia plan that he does not perform are performed by a qualified individual;
- Monitors the course of anesthesia administration at frequency intervals;
- Remains physically present and available for immediate diagnosis and treatment of emergencies; and
- Provides indicated post-anesthesia care.

42 C.F.R. §§414.46(d)(1), 415.110(a)(1).

3. "<u>Medical supervision</u>" occurs when an anesthesiologist is involved in directing more than four cases concurrently or performs other services while directing the concurrent procedures.  42 C.F.R. § 414.46(f); Defs. RJN, Ex. C at § 50.D.

4. "<u>CRNA services not medically directed</u>" involve anesthesia services performed by a CRNA without medical direction by the anesthesiologist.  Such services are billed to Medicare using the QZ modifier.  42 C.F.R. §414.60(a); Defs' RJN, Ex. C at §140.3.3.

Medicare Part B reimburses an anesthesiology practice the same amount regardless of whether the service is billed as "personally performed," "medically directed," or "CRNA services not medically directed."  When the service is billed as "personally performed," 100% of the Medicare fee schedule amount is paid to the anesthesiologist.  42 C.F.R. §414.46(c)(2); Defs' RJN, Ex. C at § 50.B.  When a service is billed as "medically directed," 50% of the Medicare fee schedule amount is paid to the anesthesiologist and the other 50% is paid to the CRNA.  42 C.F.R. §§ 414.46(d)(3)(v), 414.60(a); Defs' RJN, Ex. C at §§ 50.C, 140.4.2.  Finally, when a CRNA performs the anesthesiology services without medical direction, 100% of the Medicare fee schedule amount is paid to the CRNA.  42 C.F.R. § 414.60(a), (b).  Accordingly, for group practices like Somnia/PAS, the manner in which services in any one of these three categories are billed impacts only the distribution of payment to the anesthesiologist or CRNA, not the overall reimbursement amount that the practice receives.

The only time Medicare Part B potentially reimburses anesthesia services at a lower rate is when they are billed as "medical supervision." As noted above, this occurs when an anesthesiologist is involved in directing more than four procedures concurrently or performs other services while directing the concurrent procedures. 42 C.F.R. § 414.46(f); Defs' RJN, Ex. C at § 50.D. Under the "medical supervision" rate, the CRNA receives 50% of the Medicare fee schedule amount – the same payment that he or she would receive for medically directed services. The anesthesiologist, however, is not reimbursed under the fee schedule, but instead is paid three base units per procedure (plus one additional time unit if the physician is present at induction), an amount that may be less than what the physician would receive if the services were medically directed, depending on the procedure involved. 42 C.F.R. § 414.46(f); Defs' RJN, Ex. C at § 50.D; SAC at ¶ 44.

### D. CRNA Supervision and the Opt-Out Provider under Medicare Part A

Separate and apart from the regulations discussed above regarding **Medicare Part B** reimbursement for anesthesiology services, CMS requires a CRNA to be "under the supervision of the operating practitioner or of an anesthesiologist who is immediately available if needed" as a condition of **the hospital's** participation in **Medicare Part A**. 42 C.F.R. § 482.52(a)(4). This general supervision requirement is among the quality of care standards that hospitals must meet to participate in Medicare Part A and is distinct from, and should not be confused with, the separate concepts of "medical direction" or "medical supervision," which involve reimbursement to anesthesiologists and CRNAs under Medicare Part B.[3]

Significantly, the Part A regulations also provide that a state's Governor may write to CMS and opt out of the CRNA general supervision requirement. 42 C.F.R. § 482.52(c)(1). In June 2009, California's Governor notified CMS of his decision to exempt California from the CRNA

---

[3] CMS has recognized that the "medical direction requirements specify the activities that the medically directing physician . . . must perform in order for the [MAC] to allow payment for a physician's service under the physician fee schedule" and "are not quality of care standards." 63 Fed. Reg. 58814, 58843 (Nov. 2, 1998). *Cf. U.S. ex rel. Landers v. Baptist Mem'l Health Care Corp.*, 525 F. Supp.2d 972, 978 (W.D. Tenn. 2007) (Medicare regulations for hospitals under 42 C.F.R. § 482 "are quality of care standards directed toward an entity's continued ability to participate in the Medicare program rather than a prerequisite to a particular payment").

supervision requirement.  *See Cal. Soc'y of Anesthesiologists v. Sup. Ct.*, 204 Cal. App. 4th 390, 395 (2012).  Thus, the Part A regulations requiring hospitals to ensure that CRNAs are under the general supervision of the operating physician or an immediately available anesthesiologist do not apply to Somnia/PAS' operations in California.

Despite the state's decision to opt out of these Part A regulations, California hospitals may still require some level of physician supervision of CRNAs as a condition of practice within their facilities.  *See Cal. Soc'y of Anesthesiologists*, 204 Cal. App. 4th at 397-98 (citing 66 Fed. Reg. 56762, 56765 (Nov. 13, 2001)).  Thus, in section 2.1(g) of the Bylaws, the District required that "the ratio of supervised CRNAs to Physicians providing services under this Agreement [must not] exceed 4:1."  Defs' RJN, Ex. A.[4]  These Bylaws, however, do not govern Somnia/PAS' right to bill Medicare Part B for the services it provides to patients at Kaweah Hospital.  To the contrary, the Bylaws expressly state: "[Somnia/PAS] shall be responsible for billing directly to patients or their respective third-party payers for professional services rendered by [Somnia/PAS]; District shall have no interest in or any responsibility with respect thereto or for the collection of said fees."  *Id.* at § 7.1(a).

## III.     LEGAL STANDARDS

### A.     Rule 12(b)(6)

Rule 12(b)(6) permits a court to dismiss all or part of an action for "failure to state a claim upon which relief can be granted."  On a motion to dismiss, the court accepts the material facts alleged in the complaint, together with all reasonable inferences to be drawn from those facts, as true.  *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001).  However, "the tenet that a court must accept a complaint's allegations as true is inapplicable to threadbare recitals of a cause of action's elements, supported by mere conclusory statements."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'"  *Id.* at 678.  Nor does a complaint suffice if it tenders "naked assertion[s]" devoid of "further factual enhancement."  *Id.* (citations omitted).  To be entitled to

---

[4] Notably, the word "supervised" was later removed from section 2.1(g) of the Bylaws effective February 1, 2015.  Defs' RJN, Ex. B.

1  the presumption of truth, a complaint's allegations "must contain sufficient allegations of

2  underlying facts to give fair notice and to enable the opposing party to defend itself effectively."

3  *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011).

4      To survive a motion to dismiss, a plaintiff must plead "enough facts to state a claim to

5  relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

6  Plausibility does not mean probability, but it requires "more than a sheer possibility that a

7  defendant has acted unlawfully." *Iqbal*, 556 U.S. at 687.  "A claim has facial plausibility when

8  the plaintiff pleads factual content that allows the court to draw the reasonable inference that the

9  defendant is liable for the misconduct alleged." *Id.*

10     **B.**   **Rule 9(b)**

11     An FCA complaint must also meet the heightened pleading standard of Rule 9(b), which

12  requires the plaintiff to "state with particularity the circumstances constituting the fraud." *U.S. v.*

13  *Kiewit Pac. Co.*, 41 F. Supp. 3d 796, 801 (N.D. Cal. 2014); Fed. R. Civ. P. 9(b).  The allegations

14  must be specific enough to give a defendant notice of the particular misconduct alleged to

15  constitute the fraud such that the defendant may defend against the charge. *Semegen v. Weidner*,

16  780 F.2d 727, 731 (9th Cir. 1985).  Generally, allegations of fraud must contain "an account of the

17  time, place, and specific content of the false representation as well as the identities of the parties to

18  the misrepresentations." *Swartz v. KPMG LLP*, 476 F.3d 756, 765 (9th Cir. 2007) (citation and

19  quotation omitted).

20     **C.**   **FCA Violation**

21     To establish a cause of action for fraud under the FCA and California False Claims Act,[5] a

22  plaintiff must plead and prove three elements, including (1) a "false or fraudulent" claim; (2)

23  which was presented, or caused to be presented, by a defendant to the United States (or, with

24  respect to the CFCA, to the state or a political subdivision of the state) for payment or approval;

25  (3) with knowledge that the claim was false.  31 U.S.C. § 3729(a)(1); Cal. Gov't Code §

26

27  [5] The CFCA was modeled on the federal FCA and California courts turn to federal cases for guidance in interpreting the CFCA.  *See Mao's Kitchen, Inc. v. Mundy*, 209 Cal. App. 4th 132, 146 (2012).  For the sake of brevity, Defendants have combined their analysis of claims under the FCA and CFCA.  Where

28  Defendants reference the FCA, they are also referencing the CFCA.

12651(a)(1)-(3); *U.S. v. Mackby*, 261 F.3d 821, 826 (9th Cir. 2001); *U.S. v. Sequel Contractors, Inc.*, 402 F. Supp. 2d 1142, 1151-52 (C.D. Cal. 2005).  The false statement must also be "material" to the government's decision to pay the claim.  *Universal Health Serv., Inc. v. U.S. ex rel. Escobar*, 136 S. Ct. 1989, 2003 (2016).

## IV.   THE FIRST, SECOND, AND THIRD CAUSES OF ACTION OF THE SAC SHOULD BE DISMISSED WITH PREJUDICE TO THE EXTENT THEY ARE BASED ON DEFENDANTS' USE OF THE QZ MODIFIER

Relator purports to bring two causes of action under the FCA and one cause of action under the CFCA, neither of which states a viable claim or alleges fraud with the requisite level of particularity.  Relator's First and Third Causes of Action allege that "Defendants knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval to officers or employees of the United States Government" and the California State Government.  SAC at ¶¶ 137, 145.  Her Second Cause of Action alleges that "Defendants knowingly made, used, or caused to be made or used, false records and statements to obtain the United States Government's payment of false or fraudulent claims."  *Id.* at ¶ 141.

This Court dismissed the identical First, Second, and Third Causes of Action in the FAC to the extent those claims were based on Defendants' use of the QZ modifier.  Order at 16, 23.  The Court found that Relator had advanced these FCA claims on an "implied false certification theory" of liability.  *Id.* at 15.  Under this theory, "when a defendant submits a claim, it impliedly certifies compliance with all conditions of payment.  But if the claim fails to disclose the defendant's violation of a material statutory, regulatory, or contractual requirement . . . the defendant has made a misrepresentation that renders the claim 'false or fraudulent' under [the FCA]."  *Escobar*, 136 S. Ct. at 1995.  To rely on an implied false certification theory, the plaintiff must show (1) that defendant submitted a claim for payment that made "specific representations about the goods or services provided," and that defendant's "failure to disclose noncompliance with material statutory, regulatory, or contractual requirements made[d] those representations misleading half-truths"; and (2) that the misleading representation was "material to the Government's payment decision."  *Id.* at 2001-02.

This Court recognized that Defendants had raised multiple arguments as to why the FAC failed to state a claim under the implied false certification theory, but focused its decision solely on the materiality element in discussing Relator's claims.  The Court proceeded to dismiss the FCA causes of action because Relator failed to allege "any facts in her FAC suggesting the alleged misuse of the QZ code was material for purposes of an FCA claim."  Order at 15.  As discussed below, the SAC still does not satisfy the demanding materiality requirement, nor does it allege facts showing that Defendants submitted claims for payment under the QZ modifier that contained misleading representations.  Finally, the FAC's claims are not pled with sufficient particularity to satisfy the heightened pleading requirements of Rule 9(b).

### A.   Defendants Did Not Submit Claims Under the QZ Modifier that Contained Misleading Representations

To state a claim under the implied false certification theory, Relator must allege facts showing that Defendants submitted claims for payment that made specific representations about the services provided and that Defendants' failure to disclose their noncompliance with a material statutory, regulatory, or contractual requirement made those representations misleading.  *Escobar*, 136 S. Ct. at 1995, 2001.  Relator attempts to meet this burden by alleging that when Defendants "used the billing code QZ, [they] made an express representation to the government that a CRNA, alone and without any supervision by an anesthesiologist, performed the services in question."  SAC at ¶ 66.  Relator contends that Defendants violated the FCA by submitting claims under the QZ modifier that they knew failed to comply with the requirements for "medical direction" and should have been billed as "medical supervision."  *Id.* at ¶ 62.  These allegations are flat wrong and do not support a viable FCA claim.

Initially, Relator grossly misstates the meaning of the QZ modifier as "**CRNA only**," SAC at ¶ 36, and uses that mischaracterization to contend, without any supporting authority, that "when Defendants used the billing code QZ, [they] made an express representation to the government that a CRNA, **alone and without any supervision by an anesthesiologist**, performed the services in question."  *Id.* at ¶ 66 (emphasis added).  Relator appears to have manufactured these allegations from whole cloth.  They are entirely baseless.

1   CMS specifically defines the QZ modifier as "**CRNA service:  Without medical**

2   **direction by a physician**."  Defs' RJN, Ex. D at § 140.3.3 (emphasis added).  Moreover, the

3   regulations categorize CRNA services as either "**medically directed or not medically directed**."

4   42 C.F.R. § 414.60(a) (emphasis added).  There is simply no support, either in the SAC or in the

5   regulations, for Relator's bald assertion that the QZ modifier can only be used if a CRNA works

6   entirely alone and without any form of supervision.

7   Had CMS intended to limit use of the QZ modifier to instances in which a CRNA provides

8   services "alone and without any supervision by an anesthesiologist," it could have done so

9   explicitly.  For example, CMS has expressly stated that in order for an anesthesiologist to bill for

10   "personally performed" services, the physician must "perform[] the entire anesthesia service

11   alone."  42 C.F.R. § 414.46(c)(1)(i).  CMS did not include a similar provision in the regulations

12   governing CRNA billing, directing, for example, that the QZ modifier can only be used when the

13   CRNA "performs the entire anesthesia service alone."  Instead, CMS has categorized CRNA

14   services as either "medically directed or not medically directed," 42 C.F.R. § 414.60(a),

15   underscoring that CRNAs are not required to operate entirely alone in order to bill under the QZ

16   modifier.

17   Consequently, because the QZ modifier indicates that a CRNA provided services "without

18   medical direction," there was nothing misleading about the Defendants' use of that code if, as

19   Relator alleges, Defendants' used the code when they knew that the requirements for "medical

20   direction" had not been met for a particular procedure.  To the contrary, the QZ code was by

21   definition an appropriate code to use in those circumstances because the CRNA's services were

22   provided "without medical direction."

23   Relator has not cited any authority to support her contention that if an anesthesiologist

24   failed to satisfy all of the requirements for "medical direction," Defendants could not use the QZ

25   modifier, but were required to bill the services as "medical supervision."  SAC at ¶ 62.  Based on

26   CMS regulations and guidance, "medical supervision" occurs when an anesthesiologist is involved

27   in directing "more than four procedures concurrently or is performing other services while

28   directing the concurrent procedures."  Defs' RJN, Ex. C at § 50.D.  *See also* 42 C.F.R. §414.46(f).

-9-

These provisions, however, relate to Medicare claims for the **anesthesiologist's services**.  The "medical supervision" category was apparently established to compensate anesthesiologists who are involved in more than four concurrent procedures or perform other services while directing the concurrent procedures and therefore do not qualify for reimbursement under the "medical direction" rate.  But the regulations do not prohibit a practice from foregoing compensation for the anesthesiologist in order to receive full payment for the CRNA's services under the QZ code as "not medically directed."

Furthermore, even if the CMS regulations and guidance did not support the use of the QZ modifier in cases of incomplete medical direction, Somnia/PAS would still be authorized to use that code based on guidance issued by Noridian Healthcare Solutions, the Medicare Administrative Contractor ("MAC") responsible for administering Medicare Part B in California and certain other states.[6]  CMS has recognized, for example, that it does "not have a national policy that instructs [MACs] on the method of payment for a service when the anesthesiologist does not fulfill all the medical direction requirements."  65 Fed. Reg. 65376, 65413 (Nov. 1, 2000).  Thus, MACs have discretion over how such services should be billed.  In that regard, Noridian has issued guidance in the form of Frequently Asked Questions ("FAQs") stating the following:

> Q1.  Are there any instances where a Certified Registered Nurse Anesthetist (CRNA) would **not** append the QZ modifier?
>
> A1.  A CRNA would not append the QZ modifier if they are:
>
> - A Qualified nonphysician anesthetist with medical direction by a physician; or
> - For monitored anesthesiology services;[7] or

---

[6] CMS acts through private fiscal agents known as MACs to administer Medicare Part B within geographic jurisdictions.  *See Gordian Med. Inc. v. Sebelius*, 2012 WL 781596, at *1 (C.D. Cal. 2012).  MACs may issue Local Coverage Determinations ("LCD") describing when items or services may be covered by Medicare on a jurisdiction-wide basis, and supply information for health care provider training, education, and technical assistance on Medicare coverage issues.  *See* 42 U.S.C. §§ 1395ff(f)(2)(B), 1395kk-1(a)(4).

[7] "Monitored anesthesia care" services are not the same as "medically directed" or "medically supervised" services.  Monitored anesthesia care involves the monitoring of a patient undergoing a surgical procedure for possible adverse physiological reactions and/or for the possible need to convert to general anesthesia if necessary.  It also may include the administration of sedatives or pain medication, such as

DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION TO DISMISS SECOND AMENDED COMPLAINT

- Medical direction of one qualified nonphysician anesthetist by an anesthesiologist.

Defs' RJN, Ex. D (emphasis added).  Under the plain terms of this guidance, in cases of incomplete medical direction by an anesthesiologist, Noridian allows anesthesia providers in California, such as Somnia/PAS, to bill Medicare for the CRNA's services (delivered "without medical direction") at the full fee schedule amount under the QZ modifier (provided, of course, that the physician's services are not also billed to Medicare in those instances).

Although the SAC is not a model of clarity, Relator also appears to contend that Defendants' use of the QZ modifier was improper because the Bylaws "prohibited independent CRNA practice" and "billing a QZ modifier was [therefore] not allowed at Kaweah Hospital." SAC at ¶¶ 48-49.  These allegations also fail to state a viable FCA claim.  Indeed, Relator predicates this apparent theory on a single provision of the 48-page Bylaws – § 2.1(g) – which states that "the ratio of supervised CRNAs to Physicians providing services under the Agreement [must not] exceed 4:1."  SAC at ¶ 48; Defs' RJN, Ex. A at § 2.1(g).  Relator contends, without any supporting authority, that because of this provision, billing under the QZ modifier was not permitted at Kaweah Hospital.  SAC at ¶¶ 48-49.  As the Bylaws reflect, however, § 2.1(g) pertains only to Defendants' **operational** responsibilities at Kaweah Hospital and is unrelated to, and does not address, the separate and distinct billing concepts of "medical direction" and "medical supervision" under the Medicare Part B regulations.  *See, e.g.*, Bylaws at Recital G ("District and [Somnia/PAS] desire to enter into this Agreement in order to provide a full statement of their respective rights and responsibilities in connection with the operation of the [Anesthesiology Department] and the provision of professional services at District") and § 7.1(a) ("[Somnia/PAS] shall be responsible for billing directly to patients or their respective third-party payers for professional services rendered by [Somnia/PAS]; District shall have no interest in or any responsibility with respect thereto or for the collection of said fees").[8]

---

Valium or Demerol, without general anesthesia.  Defs' RJN, Ex. C at § 50.H.  Relator does not allege that the services at issue here were "monitored."

[8] Notably, the government is not a party to the Agreement establishing the Bylaws, and government approval of such agreements is not required by any statute or regulation.

DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION TO DISMISS SECOND AMENDED COMPLAINT

The Bylaws do not define the meaning of "supervised CRNA" as that term appears in § 2.1(g).  However, § 2.11 of the Bylaws, a provision that addresses the use of CRNAs at Kaweah Hospital and which also references the 4:1 supervision ratio, confirms that the Bylaws merely contemplate that CRNAs will work under the general oversight of a physician, not that a physician will be physically present with the CRNA in the operating room or direct the anesthesia services that the CRNA provides to a patient.  Section 2.11 states that "the ratio of supervised CRNAs to Physicians providing services **or on call to provide services** under this Agreement [must not] at any time exceed 4:1."  (Emphasis added).  In other words, the Bylaws permit a CRNA to work independently and without the direct involvement of an anesthesiologist as long as the CRNA is operating under the general supervision of a physician.

Although California has opted out of the CMS regulations requiring that CRNAs work under the supervision of a physician as a condition of a hospital's participation in Medicare Part A, the history of these regulations is nevertheless instructive.  In 1986, CMS adopted in its current form the Part A regulations for hospitals located at 42 C.F.R. § 482.52(a)(4), requiring that a CRNA work under the supervision of the operating physician or an immediately available anesthesiologist.  51 Fed. Reg. 22010, 22028, 22049 (June 17, 1986).  Nine years later, CMS adopted 42 C.F.R. § 414.60(a)(2), which provides that CRNA services that are not medically directed by a physician may be paid at the same rate an anesthesiologist would receive for personally performing those same services.  60 Fed. Reg. 63124, 63178 (Dec. 8, 1995).  Since CMS did not adopt the rule permitting states to opt out of the CRNA supervision requirement until 2001, 66 Fed. Reg. 56762, 56767, 56769 (Nov. 13, 2001), the agency clearly understood that CRNAs could be reimbursed 100% of the Medicare fee schedule amount for providing non-medically directed services notwithstanding the separate Part A requirement that physicians oversee CRNAs from an operational standpoint.  Thus, if CMS recognized that use of the QZ modifier was appropriate notwithstanding the regulation requiring operational supervision of CRNAs, then §2.1(g) of the Bylaws certainly does not preclude Somnia/PAS from billing under that code.

**B.**     **The SAC Does Not Adequately Allege Materiality**

This Court dismissed aspects of Relator's FCA claims in the FAC because Related failed to "allege[] any facts . . . suggesting the alleged misuse of the QZ code was material for purposes of an FCA claim." Order at 16. To be actionable under the FCA, a misleading representation "must be material to the Government's payment decision." *Escobar*, 136 S. Ct. at 2002. The materiality standard is "demanding" because the FCA is not "an all-purpose antifraud statute," or "a vehicle for punishing garden-variety breaches of contract." *Id.* at 2003. To satisfy the materiality requirement, it is not enough to show that "the Government designates compliance with a particular statutory, regulatory, or contractual requirement as a condition of payment" or that "the Government would have the option to decline to pay if it knew of the defendant's noncompliance." *Id.* at 2003. Materiality also "cannot be found where noncompliance is minor or insubstantial." *Id.* Rather, materiality "look[s] to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation." *Id.* at 2002.

The Supreme Court has provided guidance as to what conduct might or might not satisfy the FCA's materiality requirement:

> [P]roof of materiality can include, but is not necessarily limited to, evidence that the defendant knows that the Government consistently refuses to pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual requirement. Conversely, if the Government pays a particular claim in full despite its actual knowledge that certain requirements were violated, that is very strong evidence that those requirements are not material.

*Id.* at 2003.

The SAC does not satisfy the demanding materiality standard. Relator alleges that Medicare would not have paid Defendants at the QZ rate had it known that "CRNAs were not practicing independently." SAC at ¶¶ 66-67. However, as discussed in Section IV(a) above, these allegations misstate the nature of the QZ code, which does not require that CRNAs function alone in order to qualify for reimbursement. Moreover, Relator's allegations fail to state **why** Medicare would have refused payment under the QZ modifier merely because anesthesiologists provided the kind of operational oversight contemplated by the Bylaws.

As discussed above, the Bylaws' requirement that CRNAs operate under the general supervision of a physician is entirely unrelated to the concepts of "medical direction" and "medical supervision" for purposes of Medicare billing.  Relator has not alleged any facts indicating that Medicare would have declined to pay Defendants under the QZ modifier merely because the Bylaws contemplate some level of operational oversight of the CRNAs, such as examples of past consistent refusals by Medicare to pay QZ claims under similar circumstances, *see Escobar*, 136 S. Ct. at 2003, or even a single example of such a refusal.  Relator's conclusory materiality allegations are not enough to save its FCA claims.  *See U.S. ex rel. Dresser v. Qualium Corp.*, 2016 WL 3880763, at *6 (N.D. Cal. July 18, 2016) (FCA claim dismissed for failing to satisfy materiality requirement; complaint alleged that the government would not have paid defendants' claims had it known of defendants' fraudulent conduct, but did not explain why). Indeed, if simply including a bare allegation that Medicare "would not have paid had it known" were sufficient to plead materiality, *Escobar*'s "demanding" and "rigorous" materiality requirement would become a mere formality to be recited in rote fashion in an FCA complaint.

**C.**     **Relator's FCA Allegations Do Not Satisfy Rule 9(b)**

To satisfy Rule 9(b), a plaintiff must state with particularity the "who, what when, where, and how" of the alleged fraudulent conduct." *Ebeid ex rel. U.S. v. Lungwitz*, 616 F.3d 993, 998 (9th Cir. 2010).  The allegations must be specific enough to give a defendant notice of the particular misconduct alleged to constitute the fraud such that the defendant may defend against the charge. *Semegen*, 780 F.2d at 731.  Mere conclusory allegations of fraud are insufficient. *Moore v. Kayport Package Exp., Inc.*, 885 F.2d 531, 540 (9th Cir. 1989).  Generally, allegations of fraud must contain "an account of the time, place, and specific content of the false representation as well as the identities of the parties to the misrepresentations." *Swartz*, 476 F.3d at 765 (citation and quotation omitted).

The SAC includes a number of examples in which Defendants allegedly billed Medicare for "personally performed" and "medically directed" services despite knowing that the requirements for those billing categories were not met.  However, the SAC **does not include a single example** of a situation in which Defendants used the QZ modifier, but allegedly

misrepresented the services billed.  Instead, Relator relies entirely on conclusory allegations, such as:

- Defendants . . . falsely billed anesthesia services as CRNA Independent when they should not have been."  SAC at ¶ 46.

- "Due to these District bylaws, billing a QZ modifier was not allowed at Kaweah Hospital.  Yet PAS/Somnia . . . expressly violated applicable regulations by routinely billing under the QZ modifier . . . when the conditions for payment as *medical direction* were not met."  *Id.* at ¶ 49.

- "[A]nesthesia services that should have been coded and billed as Medical Supervision were fraudulently billed as Medical Direction or CRNA Independent."  *Id.* at ¶ 51.

- "PAS/Somnia . . . violated the [FCA] when they submitted claims that they knew failed to comply with *medical direction*, as non-medically directed service (QZ) with 100% reimbursement, rather than properly submit them as *medically supervised. Id.* at ¶62.

These vague, general, and conclusory allegations fall far short of meeting the heightened pleading requirements of Rule 9(b).  The SAC does not include any information that would enable Defendants to defend against Relators' FCA claims, such as the dates of procedures that were improperly billed under the QZ code, the physicians or CRNAs involved in those procedures, or the circumstances indicating why the services should not have been billed using the QZ modifier. In the absence of **any** allegations regarding Defendants' purported misuse of the QZ modifier that would satisfy Rule 9(b), the Court should dismiss Relator's FCA claims regarding the QZ code.

## V.    CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court dismiss the First, Second, and Third Causes of Action of the Second Amended Complaint with prejudice to the extent those claims are based on Defendants' alleged misuse of the QZ modifier.

Dated:  March 14, 2018                      NIXON PEABODY LLP


                                            By:____/s/ Michael Lindsay_____
                                                 Michael R. Lindsay
                                                 Attorneys for Defendants
                                                 SOMNIA, INC., PRIMARY ANESTHESIA
                                                 SERVICES, BYRON MENDENHALL QUINN
                                                 GEE, M.D., and MARGARET VASSILEV, M.D.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION TO DISMISS SECOND AMENDED
COMPLAINT