Wilmer J. Harris, SBN 150407
wharris@sshhlaw.com
Stephanie T. Yu, SBN 294405
syu@sshhlaw.com
**SCHONBRUN SEPLOW**
**HARRIS & HOFFMAN LLP**
715 Fremont Ave., Suite A
South Pasadena, CA. 91030
Telephone No.: (626) 441-4129
Facsimile No.: (626) 283-5770
[Additional counsel on following page]

Attorneys for Plaintiff Nicolle O'Neill

# UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES and the STATE OF CALIFORNIA *ex rel.* NICOLLE O'NEILL, NICOLLE O'NEILL<br><br>    Plaintiffs/Relator<br><br>  vs.<br><br>SOMNIA, INC., PRIMARY ANESTHESIA SERVICES, PST SERVICES LLC , ROBERT GOLDSTEIN, M.D., ROY WINSTON, M.D., BYRON MENDENHALL, M.D., QUINN GEE, M.D., AND MARGARET VASSILEV, M.D, and DOES 1 through 10, inclusive<br>      Defendants. | Case No.  1:15-cv-00433-DAD-EPG<br><br>**PLAINTIFF/RELATOR NICOLLE O'NEILL'S OPPOSITION TO DEFENDANT PST SERVICES, LLC'S MOTION TO DISMISS SECOND AMENDED COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>**Date: May 1, 2018**<br>**Time: 9:30 a.m.**<br>**Ctrm: 5**<br>**Judge: Hon. Dale A. Drozd**<br><br>**Complaint filed: 09/15/2015**<br>**Trial date:  02/25/2020** |

1   Andrea Gold (*admitted pro hac vice*, DC Bar. No. 502607)
2   agold@tzlegal.com
    **TYCKO & ZAVAREEI LLP**
3   1828 L Street NW, Suite 1000
    Washington, DC 20036
4   Telephone No.: (202) 973-0900
5   Facsimile No.: (202) 973-0950

6   Michael D. Seplow, SBN 150183
    mseplow@sshhlaw.com
7   **SCHONBRUN SEPLOW**
8   **HARRIS & HOFFMAN LLP**
    11543 W. Olympic Blvd.
9   Los Angeles, CA 90064
    Telephone No.: (310) 396-0731
10  Facsimile No.: (310) 399-7040

11

12  Attorneys for Plaintiff Nicolle O'Neill

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................ 1

II.   FACTUAL SUMMARY ...................................................................................... 2

III.  PROCEDURAL HISTORY ............................................................................... 4

IV.  ARGUMENT .................................................................................................... 5

  A.  Legal Standard ........................................................................................... 5

  B.  PST'S Motion is an Improper Motion for Reconsideration and Should Be Denied. ........ 6

    1.   The Court Need Not Consider PST's Arguments About the QZ Modifier Because PST Failed to Raise Them Before. ........................................... 9

    2.   The Court Need Not Consider PST's Arguments About the Scope of its Liability Because the Court Has Already Rejected Them. ...................................... 10

  C.  The Second Amended Complaint Sufficiently Alleges Violation of the False Claims Act Against Defendant PST for Submitting False Claims for Anesthesia Services. ............. 12

    1.   Legal Standard ................................................................................. 12

    2.   Relator Properly Alleges an Express False Certification .......................... 12

    3.   Relator Properly Alleges Implied False Certification ............................... 18

V.   CONCLUSION ................................................................................................ 20

**TABLE OF AUTHORITIES**

***Federal Cases***

*Allen v. Similasan Corp.*,

    No. 12CV0376-BTM-WMC, 2013 WL 12061830 (S.D. Cal. Aug. 7, 2013)....................9, 10

*Amaretto Ranch Breedables, LLC v. Ozimals, Inc.*,

    No. C 10-05696 CRB, 2011 WL 2690437 (N.D. Cal. July 8, 2011) ........................8

*Ashcroft v. Iqbal*,

    556 U.S. 662 (2009) ...........................................................................5

*Bell Atl. Corp. v. Twombly*,

    550 U.S. 544 (2007) ...........................................................................5

*Bly-Magee v. California*,

    236 F.3d 1014 (9th Cir. 2001)................................................................5

*Brooks v. Caswell*,

    No. 3:14-CV-01232-AC, 2016 WL 866303 (D. Or. Mar. 2, 2016) ........................9

*Brown v. S. Nevada Adult Mental Health Servs.*,

    No. 2:13-CV-1039 JCM PAL, 2014 WL 2807688 (D. Nev. June 20, 2014)........................11

*Cachil Dehe Band of Wintun Indians of Colusa Indian Cmty. v. California*,

    649 F. Supp. 2d 1063 (E.D. Cal. 2009) ....................................................8, 10, 11

*Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc.*,

    637 F.3d 1047 (9th Cir. 2011) ...............................................................5

*City of Los Angeles, Harbor Div. v. Santa Monica Baykeeper*,

    254 F.3d 882 (9th Cir. 2001) .................................................................7

*Conservation Force v. Salazar*,

    646 F.3d 1240, 1242 (9th Cir. 2011) .........................................................5

*Ebeid ex rel. U.S. v. Lungwitz*,

    616 F.3d 993 (9th Cir. 2010) .................................................................6

*Elvig v. Calvin Presbyterian Church*,

    375 F.3d 951 (9th Cir. 2004) .................................................................9

*Epstein v. Washington Energy Co.*,

    83 F.3d 1136 (9th Cir. 1996) ................................................................................................ 5

*Frazier ex rel. U.S. v. Iasis Healthcare Corp.*,

    392 F. App'x 535 (9th Cir. 2010) ................................................................................ 14, 17

*G.P.P., Inc. v. Guardian Prot. Prod., Inc.*,

    No. 1:15-CV-00321-SKO, 2017 WL 698335 (E.D. Cal. Feb. 21, 2017)................................ 9

*Irving v. Lennar Corp.*,

    No. 2:12-CV-0290 KJM EFB, 2014 WL 1573552 (E.D. Cal. Apr. 17, 2014) ........................ 8

*Lee v. City of Los Angeles*,

    250 F.3d 668 (9th Cir. 2001)................................................................................................ 5

*Richardson v. United States*,

    841 F.2d 993 (9th Cir. 1988)................................................................................................ 6

*Self v. Equinox Holdings, Inc.*,

    No. CV1404241MMMAJWX, 2015 WL 13298571 (C.D. Cal. May 1, 2015) ..................... 10

*Taylor v. Higgins*,

    No. C 07-5295MHP(PR), 2009 WL 224953 (N.D. Cal. Jan. 29, 2009) ................................ 8

*Thomas v. Hickman*,

    No. CV F06-0215 AWISAMS, 2008 WL 2233566 (E.D. Cal. May 28, 2008) ...................... 6

*Townsend Farms v. Goknur Gida Madderleri Enerji Imalat Ithalat Ihracat Ticaret Ve Sanayi*

    *A.S.*,

    No. SACV150837DOCJCGX, 2016 WL 10570248 (C.D. Cal. Aug. 17, 2016) ................... 10

*United States ex rel. Campie v. Gilead Scis., Inc.*,

    862 F.3d 890 (9th Cir. 2017)................................................................................................ 19

*United States ex rel. Poehling v. UnitedHealth Grp., Inc.*,

    No. CV1608697MWFSSX, 2018 WL 1363487 (C.D. Cal. Feb. 12, 2018)........................... 19

*United States v. Alexander*,

    106 F.3d 874 (9th Cir. 1997)................................................................................................ 6

*United States v. Cuddy*,

147 F.3d 1111 (9th Cir. 1998) ............................................................................ 6

*United States v. Planned Parenthood Gulf Coast, Inc.,*

21 F. Supp. 3d 825 (S.D. Tex. 2014) ................................................................. 18

*United States v. Westlands Water Dist.,*

134 F. Supp. 2d 1111 (E.D. Cal. 2001) ............................................................ 11

*Universal Health Servs., Inc. v. United States ex rel. Escobar,*

136 S. Ct. 1989 (2016) ....................................................................... 12, 18, 19

*Wallace v. Olson,*

No. 3:16-CV-1917-AJB-NLS, 2017 WL 1346825 (S.D. Cal. Apr. 12, 2017) ................. 10, 11

*Welenco, Inc. v. Corbell,*

No. CIV. S-13-0287 KJM, 2014 WL 130526 (E.D. Cal. Jan. 14, 2014) ...................... 6, 7

### *Federal Statutes*

31 U.S.C. § 3729(b)(4) ...................................................................................... 12

Pub. L. 97-248 .................................................................................................. 18

### *Federal Rules*

Fed. R. Civ. P. 9(b) ............................................................................................. 5

E.D. Cal. L. R. 230(j)(3) ....................................................................................... 7

### *Federal Regulations*

42 C.F.R. § 414.46 ............................................................................................ 17

42 C.F.R. § 414.46(d)(3) .................................................................................... 17

42 C.F.R. § 414.46(f) ......................................................................................... 14

42 C.F.R. § 414.60(a) ........................................................................................ 16

42 C.F.R. § 414.60(a)(1) .................................................................................... 17

42 C.F.R. § 414.60(a)(2) .................................................................................... 17

42 C.F.R. § 415.110(b) .................................................................................. 4, 18

# I.     INTRODUCTION

Relator Nicolle O'Neill brought this case on behalf of the United States of America and the State of California to hold Defendants accountable for their longstanding, pervasive practice of overbilling the Government for anesthesia services provided at Kaweah Hospital. The Second Amended Complaint alleges that Defendants knowingly and systematically submitted false claims for payment to the Centers for Medicare and Medicaid Services ("CMS") stating that medical doctors were medically directing anesthesia services when, in reality, such services were actually being performed by Certified Registered Nurse Anesthetists ("CRNAs") with little or no oversight by the doctors. Worse, when Defendant PST Services, LLC ("PST") was hired to take over coding and billing practices at Kaweah Hospital, PST perpetuated the fraudulent billing practices.

This Court has already concluded that Relator has stated a claim against PST, and that none of Relator's claims against PST should be dismissed. *See* Dkt. 70 at 23 (denying PST's Motion to Dismiss the First Amended Complaint in its entirety). PST then filed an Answer to the First Amended Complaint. Dkt. 72. Yet now, because the Court granted leave to amend certain claims that the Court dismissed as to the *other* defendants (the "Somnia Defendants"), PST has come back for a second bite at the apple. There is no basis for PST's pending Motion to Dismiss the Second Amended Complaint, Dkt. 77. PST's Motion is little more than a procedurally improper motion for reconsideration and should be denied on that basis alone.

Apart from the procedural impropriety of PST's Motion, its new arguments for dismissal have no more merit than the arguments it made the first time around. The Second Amended Complaint is identical to the First Amended Complaint that the Court already concluded stated a claim against PST, except that Relator added allegations regarding the materiality of a specific billing code modifier (the "QZ modifier") that Defendants fraudulently utilized to inflate their rates of reimbursement. PST's arguments that the QZ modifier claims should be dismissed fail because Relator has sufficiently alleged that Defendants' representations to the Government through the use of specific billing codes linked to particular rates of reimbursement were material to the Government's reimbursement decisions.

1     PST uses the remainder of its Motion to rehash the argument that it should be permitted

2     to avoid responsibility for the fraud because the false billing practices began before PST took

3     over billing for Kaweah Hospital. The Court has already rejected this argument because, as

4     Relator explained the first time around, the detailed allegations against it "put PST directly into

5     the middle of the fraud in 2014 and beyond." Dkt. 55 at 9.

6         Relator stated a claim against PST in the First Amended Complaint. Nothing in the

7     Second Amended Complaint changes that basic fact. PST's Motion is baseless, and thus Relator

8     requests that the Court again deny PST's motion to dismiss in its entirety.

9     **II.    FACTUAL SUMMARY**

10        The Second Amended Complaint ("SAC") alleges that Relator began working for

11    Defendant Somnia, Inc. in March of 2012, providing anesthesia services to patients of Kaweah

12    Hospital as Chief CRNA. Dkt. 74, SAC ¶¶ 8, 18. Kaweah is a general acute care hospital known

13    as Delta Medical Center (the "Hospital"), located in Visalia, California. SAC ¶ 19. The Hospital

14    is a certified Medicare/Medicaid supplier, and approximately 72% of the patient population at

15    Kaweah is government-supported. *Id.* ¶¶ 17, 19.

16        Anesthesia services like those Relator provided at Kaweah Hospital are generally billed

17    in one of four categories: (1) Personally Performed Services: work personally performed by a

18    Medical Doctor of Anesthesiology ("MDA"); (2) Medical Direction: work performed by a

19    MDA medically directing the work of up to, but no more than, four other professionals,

20    including CRNAs; (3) Medical Supervision: work performed by a MDA medically supervising

21    the work of more than four professionals, and (4) Independent CRNA Practice: work performed

22    by a CRNA entirely free of supervision by an MDA. *Id.* ¶¶ 30-50. Both Medical Direction and

23    Independent CRNA Practice are reimbursed at higher rates than Medical Supervision. *Id.* ¶¶ 44,

24    49. The billing modifiers that indicate these types of services are as follows:

25        Personally performed:      MDA only    = AA

26        Medically Directed:         MDA         = QK

27                                     MDA         = QY (MDA medically directing only

28                                                      one CRNA)

| | | | |
|---|---|---|---|
| | | CRNA | = QX |
| | Medically Supervised: | MDA | = AD |
| | | CRNA | = QX |
| | CRNA Independent: | CRNA | = QZ |

*Id.* ¶ 36.

Despite these seemingly clear billing rules, Relator witnessed rampant fraud in the charting and billing of anesthesia services throughout her time working as a CRNA at the Hospital. Defendants knowingly engaged in a scheme wherein they falsely charted and billed services to the Government (a) using the higher "Medical Direction" rate, even when the established requirements for such coding were not met and the procedure should have been billed as "Medical Supervision"; (b) not sufficiently documenting patient charts with information about the work performed by MDAs yet charting and billing the work as "Medical Direction"; (c) charting and billing concurrent cases by MDAs as "Personally Performed"; and (d) using "CRNA Independent" as a default when the requirements for Medical Direction were not met, regardless of what actually occurred. *Id.* ¶¶ 58-70.

With respect to the improper use of the CRNA Independent or "QZ" billing code, the SAC alleges that Defendants' use of the "QZ" code modifier was wrongful in multiple ways. First, the Kaweah Hospital bylaws specifically mandate that "under no circumstances shall the ratio of supervised CRNAs to Physicians . . . exceed 4:1." *Id.* ¶¶ 47-48. Thus, CRNA Independent practice is not permitted, and use of the QZ modifier is not allowed. *Id.* ¶ 49.

Second, by using the QZ modifier as a default when the requirements for Medical Direction were not met, Defendants knowingly concealed from the Government that some procedures billed using the more lucrative QZ modifier were not in fact CRNA Independent practice, but rather should have been billed as less lucrative Medical Supervision procedures. Medicare requires documentation of anesthesia service, including documenting all providers involved in the service. *Id.* ¶ 50. Thus, for instance, if an MDA was supervising more than four CRNAs during a given procedure, it was fraudulent for Defendants to hide the fact that an MDA was present in order to use the more lucrative QZ modifier, rather than the Medical

1   Supervision modifiers, which would have resulted in a lower rate of reimbursement.

2       Nevertheless, Defendants realized that when a physician oversaw more than four

3   concurrent procedures purported to be "medically directed," they would receive *more* payment

4   from the Government if they simply omitted the physician's presence when billing to CMS.

5   Defendants did this by removing the AD modifier (medically supervised MDA) and converting

6   the QX (medically supervised CRNA) to QZ (independent CRNA).

7       Of course, Defendants' scheme is particularly flagrant because their initial classification

8   of the procedure as "medically directed" required the anesthesiologist to represent full

9   compliance with the Tax Equity and Fiscal Responsibility Act (TEFRA) regulations. These

10  regulations require that the "medically directing" anesthesiologist document that he or she

11  personally directed seven critical steps in the anesthesia process from pre-sedation evaluation to

12  emergence. 42 C.F.R. § 415.110(b). When Defendants simply changed the purported "medical

13  direction" to "independent CRNA practice," they did so in express derogation of the regulatory

14  requirements that they document personal participation in, and close oversight of, the CRNA's

15  work throughout the anesthesia process. *Id.* ¶¶ 69-70. In so doing, Defendants misled and

16  tricked the Government into making overpayments to them for services they had not provided.

17  **III.    PROCEDURAL HISTORY**

18      After Relator filed the First Amended Complaint ("FAC"), both PST and the Somnia

19  Defendants moved to dismiss. *See* Dkt. Nos. 45, 48. At the end of its 24-page written opinion,

20  the Court denied PST's motion outright. *Id.* at 23.

21      The Court also denied the Somnia Defendants' motion as to most of the claims against

22  them. *Id.* at 23-24. However, while PST did not raise the issue of materiality in its motion, the

23  Somnia Defendants contested the materiality of the QZ modifier claims and argued that Relator

24  had not shown that use of the QZ modifier was material to the Government's reimbursement

25  decisions. *Id.* at 15. The Court granted the Somnia Defendants' "motion to dismiss causes of

26  action one through three (Dkt. 48) . . . only to the extent those causes of action are based upon

27  defendants' alleged use of the QZ code," and gave Relator 28 days to file an amended

28  complaint. *Id.* at 23-24. PST filed an Answer on February 16, 2018. Dkt. 72. Relator filed the

1  SAC on February 28, 2018. Dkt. 74.

2  **IV.    ARGUMENT**

3      **A.    Legal Standard**

4      A motion to dismiss under Rule 12(b)(6) tests "the legal sufficiency of a complaint's

5  allegations." *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001). The factual

6  allegations in the complaint "are taken as true and construed in the light most favorable to" the

7  plaintiff. *Lee*, 250 F.3d 668 (citing *Epstein v. Washington Energy Co.*, 83 F.3d 1136, 1140 (9th

8  Cir. 1996)). As long as the complaint contains "sufficient facts to state a facially plausible claim

9  to relief," the motion to dismiss should be denied. *Conservation Force v. Salazar*, 646 F.3d

10  1240, 1242 (9th Cir. 2011). "A complaint has facial plausibility when the plaintiff pleads factual

11  content that allows the court to draw the reasonable inference that the defendant is liable for the

12  misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v.

13  Twombly*, 550 U.S. 544, 556 (2007)). "The plausibility standard is not akin to a 'probability

14  requirement,' but it asks for more than a sheer possibility that defendant has acted unlawfully."

15  *Id.* "Determining whether a complaint states a plausible claim for relief will ... be a context-

16  specific task that requires the reviewing court to draw on its judicial experience and common

17  sense." *Ashcroft*, 556 U.S. at 679 (citation omitted).

18      The heightened pleading standard of Rule 9(b) governs FCA claims. *Cafasso, U.S. ex

19  rel. v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1054 (9th Cir. 2011) (citing *Bly-Magee v.

20  California*, 236 F.3d 1014, 1018 (9th Cir. 2001)). "Rule 9(b) provides that '[i]n alleging fraud

21  or mistake, a party must state with particularity the circumstances constituting fraud or

22  mistake." *Id.* at 1054–55 (quoting Fed. R. Civ. P. 9(b)). Rule 9(b)'s particularity requirement

23  gives notice to defendants of the specific fraudulent context against which they must defend,

24  and deters the filing of complaints as a pretext for the discovery of unknown wrongs. *Bly-

25  Magee*, 236 F.3d at 1018 (internal citations omitted). Allegations of fraud should be specific

26  enough to give defendants notice of the particular misconduct so that they can defend against

27  the charge, and not just deny that they have done anything wrong. *Id.* at 1019. However, a

28  relator need not allege "all facts supporting every instance of fraud," and instead is required

only to allege "particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." *Ebeid ex rel. U.S. v. Lungwitz*, 616 F.3d 993, 999 (9th Cir. 2010).

**B.    PST'S Motion is an Improper Motion for Reconsideration and Should Be Denied.**

Although the Court has already determined that Relator has sufficiently alleged *all* of her claims against PST, PST seeks to take advantage of the Court's order dismissing some of the claims against the Somnia Defendants in order to revisit that ruling. In other cases where defendants file duplicative motions to dismiss that improperly asked the court to revisit its rulings on earlier such motions, courts deny the latter motions as improper motions for reconsideration. The Court should do the same in this case.

Under the "law of the case" doctrine, courts are ordinarily precluded from reexamining issues previously decided by the same court, or a higher court, in the same case. *See, e.g.*, *Richardson v. United States*, 841 F.2d 993, 996 (9th Cir. 1988). *See also Welenco, Inc. v. Corbell*, No. CIV. S-13-0287 KJM, 2014 WL 130526, at *4 (E.D. Cal. Jan. 14, 2014) (denying duplicative motion to transfer venue as an improper motion for reconsideration under the "law of the case" doctrine). A court may have discretion to depart from the "law of the case" where: (1) the first decision was clearly erroneous; (2) an intervening change in the law has occurred; (3) the evidence is substantially different; (4) other changed circumstances exist; or (5) a manifest injustice would otherwise result. *Welenco, Inc.*, 2014 WL 130526, at *4 (quoting *United States v. Cuddy*, 147 F.3d 1111, 1114 (9th Cir. 1998); *see also United States v. Alexander*, 106 F.3d 874, 876 (9th Cir. 1997). Failure to apply the "law of the case" doctrine absent one of the requisite conditions constitutes an abuse of discretion. *Alexander*, 106 F.3d at 876.

For example, in *Thomas v. Hickman*, No. CV F06-0215 AWISAMS, 2008 WL 2233566 (E.D. Cal. May 28, 2008), the court denied a defendant's second motion to dismiss because "Defendant previously filed a Rule 12(b)(6) motion to dismiss the amended operative complaint . . . . Under Ninth Circuit law, this brings the present motion under the purview of the 'law of

the case doctrine.'" Because not one of the five factors was present, the court rejected the

defendant's renewed arguments:

> In this case, the Court previously considered and decided precisely the same issues raised in Defendant's instant motion. The motion filed on Defendant's behalf on November 28, 2006 argued that Plaintiff's first, third, eighth, ninth and tenth causes of action against Defendant should be dismissed for failure to state a claim upon which relief can be granted.[1] Each of Defendant's arguments was addressed in detail and rejected by this Court.[2] Nonetheless, Defendant now re-raises the same issues.
> . . .
> The law of the case doctrine exists so that, for important policy reasons, parties in such situations are not allowed "a second bite at the apple." Accordingly, Defendant's motion to dismiss Plaintiff's first, third, eighth, ninth and tenth causes of action against Defendant is denied.

*Id.* at *3. Similarly, in *Welenco, Inc.*, the court denied a motion to transfer venue filed by one

defendant. A few months later, two other defendants filed a motion to transfer venue supported

by the same declaration and exhibits submitted in connection with the first motion. The court

denied the second motion to transfer, holding that the "law of the case" doctrine, which "applies

to a district court's earlier decision in the same case," barred reconsideration of the second

motion absent one of the five factors. *Welenco, Inc.*, 2014 WL 130526, at *4.

Even where the court does not explicitly reference the "law of the case," courts still

routinely deny renewed motions to dismiss, such as PST's motion, that are simply revisiting an

earlier order. Under those circumstances, the court treats the motion as one for reconsideration.

To succeed on a motion for reconsideration, "a party must show what new or different facts or

circumstances are claimed to exist which did not exist or were not shown upon such prior

motion, or what other grounds exist for the motion." E.D. Cal. L. R. 230(j)(3).[1] "A party should

not use a motion for reconsideration to raise arguments or present new evidence for the first

time when it could reasonably have been raised earlier in the litigation, nor should the party ask

---

[1] There is no specific Federal Rule of Civil Procedure that provides a basis for a motion like Defendants', which seeks to revisit issues decided in a non-final, interlocutory order. Rule 59(e) and Rule 60(b) apply only to final judgments and appealable interlocutory orders. However, the district court "possesses the inherent procedural power to reconsider, rescind, or modify an interlocutory order for cause seen to it to be sufficient." *City of Los Angeles, Harbor Div. v. Santa Monica Baykeeper*, 254 F.3d 882, 885 (9th Cir. 2001).

the court to rethink matters already decided." *Irving v. Lennar Corp.*, No. 2:12-CV-0290 KJM EFB, 2014 WL 1573552, at *2 (E.D. Cal. Apr. 17, 2014) (citations omitted). Rather, reconsideration is appropriate only where (1) there has been an intervening change in the controlling law, (2) new evidence has been made available, or the order is necessary to (3) correct clear error or (4) prevent manifest injustice. *See Cachil Dehe Band of Wintun Indians of Colusa Indian Cmty. v. California*, 649 F. Supp. 2d 1063, 1069–70 (E.D. Cal. 2009).

For example, in *Amaretto Ranch Breedables, LLC v. Ozimals, Inc.*, No. C 10-05696 CRB, 2011 WL 2690437 (N.D. Cal. July 8, 2011), the court considered a motion to dismiss the second amended complaint, which was filed after the court partially granted the defendant's motion to dismiss the first amended complaint. The defendant raised arguments that the court had already denied in the first motion. The court denied the motion, explaining, "The April 22, 2011 Order held that [Plaintiff's] UCL claim was plausibly pleaded. That means that this Court held that the UCL claim was, as pleaded, factually and legally viable. . . . Thus, [Defendant's] Motion to Dismiss the UCL claim from the SAC is really an unauthorized motion for reconsideration and is DENIED." *Id. See also Taylor v. Higgins*, No. C 07-5295MHP(PR), 2009 WL 224953, at *4 (N.D. Cal. Jan. 29, 2009) (finding that a motion to dismiss was actually a motion for reconsideration because it sought "to have the court revisit a decision already made," specifically "that the complaint *did* state a claim upon which relief may be granted").

Here, whether the Court considers the five factors articulated under the "law of the case" standard, or the four similar factors relevant to a motion for reconsideration, PST's Motion should be denied because neither standard is met. Indeed, PST has not even attempted to articulate why the Court should reconsider its previous decision that Relator had stated a claim against it. There has been no change in the law. There is no new evidence. The Court did not err in its previous order, and PST does not contend that it did. There is no manifest injustice, and there are no new circumstances warranting reconsideration of the Court's earlier conclusion.

PST's Motion to Dismiss the SAC merely asks the Court to revisit its February 2, 2018 decision holding that all of Relator's claims against PST were plausibly pleaded, and that they were legally and factually viable. The Court granted leave to amend so that Relator could

address the Court's decision to dismiss some of her claims against the Somnia Defendants—not PST. Part of PST's Motion raises new arguments that PST failed to raise in its earlier motion (despite having had the opportunity to do so), and the rest of the Motion rehashes old arguments that the Court has already rejected. Neither argument is procedurally proper, and neither provides a basis for dismissal of any of Relator's claims.

Another basis to deny the Motion is the fact that PST filed an Answer to the First Amended Complaint prior to filing the instant Motion. As the U.S. District Court for the District of Oregon has explained, "[a]llowing a post-answer motion to dismiss on an amended complaint where the amendment merely substantiates existing claims would render the Rule 12(b) restriction on post-answer motions meaningless." *Brooks v. Caswell*, No. 3:14-CV-01232-AC, 2016 WL 866303, at *3 (D. Or. Mar. 2, 2016). Moreover, "post-answer 12(b) motions on original complaints are untimely where there is no mention or reference to whether not the defense on which the motion was based was asserted in the original answer." *Id.* (citing *Elvig v. Calvin Presbyterian Church*, 375 F.3d 951, 955 (9th Cir. 2004)).

In sum, PST's Motion is nothing more than an unauthorized motion for reconsideration, and, like the motions in *Welenco, Inc.*, *Thomas*, *Taylor*, and *Amaretto Ranch Breedables*, should be denied.

**1.**     **The Court Need Not Consider PST's Arguments About the QZ Modifier Because PST Failed to Raise Them Before.**

The Court need not consider PST's arguments about the materiality of the QZ modifier because PST failed to make those arguments before, despite ample opportunity to do so. A motion for reconsideration is not the appropriate place to introduce new legal arguments. *See Allen v. Similasan Corp.*, No. 12CV0376-BTM-WMC, 2013 WL 12061830, at *2 (S.D. Cal. Aug. 7, 2013).

PST was free to raise arguments about the materiality of the QZ modifier in its motion to dismiss the first amended complaint, as the Somnia Defendants did, but did not. "As such, [PST] may not now raise these arguments in the posture of a motion for reconsideration." *G.P.P., Inc. v. Guardian Prot. Prod., Inc.*, No. 1:15-CV-00321-SKO, 2017 WL 698335, at *5

1  (E.D. Cal. Feb. 21, 2017). While the Court granted leave to amend so that Relator could address

2  the Court's partial dismissal of the claims against the Somnia Defendants, that ruling does not

3  provide a grounds for PST to make belated arguments that it failed to make in the first instance

4  despite reasonable opportunity to do so.[2] The Motion should be denied. *See, e.g.*, *Self v.*

5  *Equinox Holdings, Inc.*, No. CV1404241MMMAJWX, 2015 WL 13298571, at *3–4 (C.D. Cal.

6  May 1, 2015) (declining to grant reconsideration based on new arguments where the moving

7  party "d[id] not explain his failure to raise these arguments in his motion to dismiss or in his

8  reply"); *Allen*, 2013 WL 12061830, at *2 (declining to consider "an argument that [the moving

9  party] has not previously raised" on a motion for reconsideration); *Cachil*, 649 F. Supp. 2d at

10  1069 (denying reconsideration of an interlocutory order because the moving party's arguments

11  could have been raised earlier).

12      This is particularly true because PST filed an Answer to the First Amended Complaint.

13  Dkt. 72; *see also Townsend Farms v. Goknur Gida Madderleri Enerji Imalat Ithalat Ihracat*

14  *Ticaret Ve Sanayi A.S.*, No. SACV150837DOCJCGX, 2016 WL 10570248, at *6 (C.D. Cal.

15  Aug. 17, 2016) ("[A]mending a complaint does not automatically revive defenses and

16  objections the defendant had previously waived. . . Holding that an amended complaint allows a

17  defendant a fresh opportunity to bring a 12(b)(6) motion to dismiss as to claims raised by a

18  prior—answered—complaint would undermine the requirements of the Federal Rule.").

19      **2.    The Court Need Not Consider PST's Arguments About the Scope of its**

20      **Liability Because the Court Has Already Rejected Them.**

21      Motions to reconsider are not "vehicles permitting the unsuccessful party to rehash

22  arguments previously presented." *Wallace v. Olson*, No. 3:16-CV-1917-AJB-NLS, 2017 WL

23  1346825, at *2 (S.D. Cal. Apr. 12, 2017), *aff'd*, *Wallace v. Olson*, 715 F. App'x 797 (9th Cir.

24  2018). Ultimately, a party seeking reconsideration must show more than a disagreement with

25

26  [2] To the extent PST argues that page 12 of its original motion to dismiss, in which it argued,

27  "No additional facts can change the fact that California law permits a CRNA to operate without

a physician supervision and bill accordingly," sufficiently raised this issue, its Motion is still

28  improper because even in light of that argument the Court thereafter denied PST's motion in its

entirety. *See* Dkts. 46-1, 70.

the court's decision, and recapitulation of the cases and arguments considered by the court before rendering its original decision fails to carry the moving party's burden. *United States v. Westlands Water Dist.*, 134 F. Supp. 2d 1111, 1131 (E.D. Cal. 2001). Thus, it is not appropriate for a party to file a motion "merely to force the court to think about an issue again in the hope that it will come out the other way the second time." *Wallace*, 2017 WL 1346825, at *2 (quoting *Brown v. S. Nevada Adult Mental Health Servs.*, No. 2:13-CV-1039 JCM PAL, 2014 WL 2807688, at *2 (D. Nev. June 20, 2014)). Yet by raising the argument that PST is not liable for claims submitted before March 3, 2014, that is exactly what PST is trying to do.

In its original motion to dismiss, PST tried to escape liability by arguing that only a "few acts of alleged wrongdoing . . . occurred after PST became involved," and that Relator had not alleged that PST had any reason to know of them. Dkt. 45 at 7. PST also argued that Relator did not "specify if any of these alleged false claims occurred during the time PST had a contract with Somnia." *Id.* at 11. PST went on: "The few examples of clams that Relator contends were improperly billed were either for a time period in which PST was not engaged by Somnia, or were so devoid of specifics about the alleged wrongdoing that there is no way for PST to respond." *Id.* at 11-12. Many of PST's arguments focused on its assertion that the FAC did not sufficiently allege PST's knowledge, in large part because, according to PST, some of the alleged fraudulent activity occurred before it was hired.

None of these arguments persuaded the Court the first time around, and thus, the Court need not revisit such arguments now. Part B of PST's Motion, Dkt. 77 at 11-12, simply asks the Court to revisit its ruling that none of the claims against PST should be dismissed. PST is merely reframing its unsuccessful efforts to shirk responsibility for the entirety of the fraud, hoping that the Court will change its mind as to whether the allegations in the SAC—which are identical to the allegations in the FAC, except for the additional allegations regarding use of the QZ modifier—state a claim against PST. PST has not provided any reason why it should be permitted to rehash its previously unsuccessful arguments, and the Motion should therefore be denied.[3] *See Cachil*, 649 F. Supp. 2d at 1069 (noting that motions to reconsider are "also not

---

[3] To the extent these arguments were not raised in PST's earlier motion, they could have been,

1    vehicles permitting the unsuccessful party to rehash arguments previously presented").

2    **C.    The Second Amended Complaint Sufficiently Alleges Violation of the False**

3    **Claims Act Against Defendant PST for Submitting False Claims for**

4    **Anesthesia Services.**

5    Apart from being procedurally improper, PST's arguments lack merit. The Second

6    Amended Complaint sufficiently alleges that use of specific billing codes tied to particular rates

7    of reimbursement was material to the Government's reimbursement decisions. Thus, PST's

8    fraudulent misuse of the QZ modifier states a claim under the False Claims Act.

9    **1.    Legal Standard**

10    "[A] misrepresentation about compliance with a statutory, regulatory, or contractual

11    requirement must be material to the Government's payment decision in order to be actionable

12    under the False Claims Act." *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 136

13    S. Ct. 1989, 2002 (2016). "The term 'material' means having a natural tendency to influence, or

14    be capable of influencing, the payment or receipt of money or property." *Id.* (quoting 31 U.S.C.

15    § 3729(b)(4)).

16    **2.    Relator Properly Alleges an Express False Certification**

17    The SAC alleges that Defendants submitted demands for payment to the Government

18    that contained express false certifications of services—specifically, false certifications that

19    particular procedures met the requirements for particular billing codes when those requirements

20    were not met. The use of particular billing codes is material to the Government's payment

21    decisions because the billing codes are tied to particular rates of reimbursements. As noted in

22    Part II above, when Defendants used the billing code AA, Defendants made an express

23    representation to the Government that the services in question were performed *solely* by an

24    anesthesiologist with no assistance from any other physician or CRNA. SAC ¶ 64. Likewise,

25    when Defendants billed with code QK, they made an express representation to the Government

26    that the services in question were performed by an anesthesiologist supervising four or fewer

27    CRNAs. *Id.* ¶ 65. And when Defendants billed with code QZ, they made an express

28

and PST's failure to raise them at that time is its own mistake. *See* Part IV(B)(1).

1    representation that the services were performed by a CRNA working alone, without any

2    supervision. *Id.* ¶ 66. The use of each of these billing codes was directly tied to a higher

3    reimbursement rate than is available for procedures billed with codes AD/QX (Medical

4    Supervision).

5        When Defendants coded procedures with billing codes AA, QK, or QZ, even though the

6    requirements for those codes were not met, Defendants made express false representations to

7    the Government about the value of the services rendered, which resulted in overpayments to

8    Defendants. *Id.* ¶¶ 67-68. Specifically, "when Defendants, used the billing code QZ, Defendants

9    made an express representation to the government that a CRNA, alone and without any

10   supervision by an anesthesiologist, performed the services in question." *Id.* ¶ 66. This was done

11   with the knowledge that the Government would not have paid Defendants for the requested

12   rates had they known that CRNAs were not practicing independently when the QZ modifier was

13   used. *Id.* ¶ 67. Ultimately, defendants "falsely described the services for which they sought

14   reimbursement and actively concealed their failure to comply with the conditions of payment

15   the government set forth in the regulations described above" and "[*h*]*ad Medicare known the

16   truth, it would not have reimbursed Defendants at the rates they requested*." *Id.* ¶ 68 (emphasis

17   added).

18       In addition to alleging the materiality of Defendants' fraudulent misuse of the QZ

19   modifier, Relator alleges the contours of the fraudulent scheme, describes specific examples of

20   the fraudulent misuse of the QZ modifier, and provides a sufficient basis to infer that

21   Defendants expressly certified that the requirements of each modifier were met before

22   submitting demands for payment. *Id.* ¶¶ 64-70, 49-50, 109-110, 134-35. Defendants

23   fraudulently billed by two different means. *First*, Defendants would bill CMS for physicians'

24   "medical direction" of anesthesia services (i.e. directing four or fewer CRNAs) when, in reality,

25   such services were actually being performed by *more than four* CRNAs and should have billed

26   at a less lucrative "medical supervision" rate. Specifically, when a physician supervised more

27   than four CRNAs, Defendants engaged in a scheme of billing the first four supervised CRNAs

28   at the "medically directed" rate and using the QZ code to bill for the services provided by the

1    extra CRNAs—thus making it appear to CMS that the number of CRNAs directed by a

2    physician was fewer than four. This maximized and inflated Defendants' rates of

3    reimbursement by allowing them to avoid billing to the lower "medical supervision" rate.

4    *Second*, in the same scenario when a physician supervised more than four CRNAs, Defendants

5    alternatively engaged in the practice of billing each procedure to the QZ code—thus

6    representing that all services were provided by the CRNAs alone—in order to get reimbursed at

7    the higher QZ billing rate. This, however, erased all evidence of the physician's oversight over

8    the procedures and misrepresented to CMS that no physician supervision of the CRNAs ever

9    occurred. Relator even alleges specific evidence showing that PST was involved in modifying

10   billing codes after the fact. *Id.* ¶¶ 109-110. These detailed allegations more than satisfy the

11   pleading standards. *See Frazier ex rel. U.S. v. Iasis Healthcare Corp.*, 392 F. App'x 535, 537

12   (9th Cir. 2010) (stating that relator "need not provide representative examples to plead express

13   false certification, so long as he sufficiently alleges an" illegal scheme that violates applicable

14   law and "provides a sufficient basis to infer that" the defendant "expressly certified compliance

15   with those provisions as part of submitting Medicare and Medicaid claims").

16        PST claims that Relator has not alleged that the use of the QZ modifier in place of the

17   Medical Supervision modifiers was fraudulent because, according to PST, QZ does not mean

18   that the CRNA acted "alone and without any supervision." Dkt. 77-1 at 8. PST asserts that the

19   Medicare Claims Manual describes "QZ" as "CRNA service: Without medical direction by a

20   physician," and therefore Relator has not alleged that use of the QZ modifier in place of

21   Medical Supervision was fraudulent. PST's arguments fail for four reasons.

22        *First*, even if PST were correct (and it is not) that the Medicare Claims Manual says that

23   CRNAs are permitted to work with physician supervision under the QZ modifier, Relator has

24   still plausibly alleged that Defendants engaged in a scheme of using the QZ modifier to

25   represent to CMS that CRNAs were being Medically Directed instead of Medically Supervised,

26   which resulted in overpayments by the Government to Defendants.

27        When Defendant physicians supervised more than four CRNAs, they were supposed to

28   bill with the Medical Supervision codes (AD/QX). SAC ¶¶ 34, 36; *see also* 42 C.F.R. §

414.46(f) ("If the physician medically supervises more than four concurrent anesthesia services, CMS bases the fee schedule amount on an anesthesia-specific [conversion factor] and three base units."). Because Defendants knew they would make less money billing to the Medical Supervision codes (AD/QX) than billing to the QK (Medical Direction) and QZ (CRNA Independent) codes, Defendants would instead manipulate the billing codes to obtain a more lucrative reimbursement from CMS. SAC ¶¶ 39-44, 51. Defendants engaged in the practice of billing the supervision of the first four CRNAs to the QK code for Medical Direction and then billing the remaining one or more CRNAs to the QZ code for CRNA Independent. *Id.* ¶¶ 49, 59, 65-67. This was a fraudulent representation because when Defendants billed with code QK, they made an express representation to the Government that the services in question were performed by an anesthesiologist supervising four or fewer CRNAs, when instead they were supervising more than four CRNAs. *Id.* ¶ 65.

Thus, whether the Government would allow Defendants to use the QZ modifier when a CRNA is being "medically supervised" by a physician has no bearing on Relator's materiality allegations. Defendants made express false certifications to CMS that they were "medically directing" when they were in fact supervising more than four CRNAs at a time. *Id.* ¶¶ 49, 59, 65-67. The use of the QK and QZ billing codes was directly tied to a higher reimbursement rate, which CMS would not have reimbursed had it known the nature of the actual services provided. *Id.* ¶ 68.

*Second*, even accepting PST's flawed and incorrect definition of the QZ modifier, Defendants' practice of appending the QZ modifier to services provided by Medically Supervised CRNAs still resulted in express misrepresentations.

The QZ modifier only reflects a CRNA's work. Appending the QZ modifier to a reimbursement claim does not reflect any physician involvement, much less physician supervision. Only the AD (Medically Supervised MDA) and QX (Medically Supervised CRNA) combination of billing codes accurately reflects situations in which there is Medical Supervision by a physician.[4] SAC ¶ 36. In short, providers must show the physician's

_____

[4] The "General Billing" section of the Medicare Claims Manual corroborates this, stating that,

1  involvement by billing the physician's and the CRNA's involvement as separate line items; it

2  would be inaccurate to bill a physician-supervised CRNA to the QZ modifier alone.

3      The SAC alleges this very scenario occurred: that Defendants made these express

4  misrepresentations to the Government by using the QZ modifier when a physician was in fact

5  supervising their procedure. SAC ¶ 67. When Defendant physicians performed five procedures

6  at the "medically directed" rate, the procedures should have been properly billed as "medical

7  supervision." Instead, as an alternative to billing the first four CRNAs as "medically directed"

8  and the remaining CRNAs to QZ, Defendants would bill all five to QZ (non-medically directed

9  CRNA practice), thus omitting the physician from the billing codes. *Id*. ¶¶ 49, 62. This

10  fraudulent billing practice is not hypothetical. On April 10, 2014, an employee of PST sent an

11  email to Defendants stating that she was running into issues with doctors "*medically directing* 5

12  rooms at once." *Id*. ¶ 109. The next day, a representative from McKesson Corporation (of which

13  PST is a subsidiary) directed employees to "disregard [the PST employee's] email below, we

14  are able to process the below mentioned cases as *non-medically directed CRNA* . . . ." *Id*. ¶ 110

15  (emphasis added).

16      *Third*, PST urges the Court to read the AD and QX modifiers out of the regulations

17  entirely. Taking PST's proposition to its logical conclusion, there would never be a situation

18  where providers would use the Medical Supervision billing code (AD/QX) because providers

19  would always be able to bill to the more lucrative QZ modifier for the same service.

20      PST cites to 42 C.F.R. § 414.60(a) for the proposition that CRNA services can either be

21  "medically directed or not medically directed." Dkt. 77-1 at 7. The regulation describes how

22  payment should be rendered for CRNA services, not which billing modifiers are appropriate.

23  PST presumes too much when it concludes, based on this regulation, that the regulations permit

24  services performed by a Medically Supervised CRNA to be billed with the QZ modifier.

25

---

26  "If an employer-physician furnishes concurrent medical direction for a procedure involving
   CRNAs and the medical direction service is unassigned, the physician should bill on an

27  assigned basis on a separate claim for the qualified nonphysician anesthetist service. *If the
   physician is participating or takes assignment, both services should be billed on one claim but*

28  *as separate line items*." Dkt. 49-3, RJN, Ex. C § 140.3.4 at 175.

---

1    Moreover, the regulation provides that non-medically directed CRNAs are to be
2    reimbursed at a higher rate than medically directed CRNAs. *See* 42 C.F.R. § 414.60(a)(1)
3    (medically directed CRNAs are to be reimbursed at *50% of the payment* allowance for services
4    personally performed by a physician alone) (citing 42 C.F.R. § 414.46(d)(3)); 42 C.F.R. §
5    414.60(a)(2) (non-medically directed CRNAs can be reimbursed *up to the full amount* for a
6    service personally performed by a physician alone). Remarkably, under PST's theory that a
7    "non-medically directed" CRNA encompasses Medically Supervised CRNAs, a Medically
8    Directed CRNA would be paid at a lower rate (50% of services personally performed by a
9    physician) than a Medically Supervised CRNA (up to the full amount for services personally
10   performed by a physician). *Id.* This is incongruous with the regulations and the Medicare
11   Claims Manual. Both are clear that the Government pays more for "medically directed" services
12   than it does for "medically supervised" services. *See* 42 C.F.R. § 414.46; Dkt. 49-3, RJN, Ex. C
13   § 50(C)-(D) at 120-122; *see also* SAC ¶ 51.  It is thus plain that Defendants' arguments are in
14   error and must be rejected.

15        *Finally*, the language of the Medicare Claims Manual that PST relies on does not prove
16   that Relator's allegation that the billing code QZ means that there was no physician supervising
17   fails to state a claim.  In fact, several sources interpreting the Manual have determined that the
18   QZ modifier is meant to signify truly independent, solo practice by a CRNA.  *See, e.g.*, Jason R.
19   Byrd, et al., *Billing for Anesthesia Services and the QZ Modifier: A Lurking Problem*, 75 AM.
20   SOC'Y OF ANESTHESIOLOGISTS MONITOR 36, 37 (2011) ("The QZ modifier was designed to
21   signify those instances in which a CRNA is administering anesthesia with no supervision");
22   Wisconsin Association of Nurse Anesthetists*, Fraud in Anesthesia Billing* (2017), *available at*
23   https://wiana.com/fraud-in-anesthesia-billing/ ("When the QZ modifier is used, no supervision
24   occurs"); Thomas R. Vetter, et al., *Physician Supervision of Nurse Anesthetists: To Opt  In or
25   To Opt Out?*, 122 ANESTHESIA & ANALGESIA 1766, 1767 (2016) ("The QZ modifier ostensibly
26   designates those cases in which a CRNA has administered anesthesia with no physician
27   supervision").  Therefore, at most, the language of the Manual suggests that there is a factual
28   dispute about the meaning of the QZ modifier that cannot be decided on a motion to dismiss.

Where, as here, Relator has alleged a specific, detailed, and fraudulent scheme, Relator should be permitted to test and present evidence on the meaning of a particular billing code alleged to have been used fraudulently. *See, e.g.*, *United States v. Planned Parenthood Gulf Coast, Inc.*, 21 F. Supp. 3d 825, 834 (S.D. Tex. 2014). In *Carroll*, the relator alleged that the defendant provider knowingly used billing codes that permitted it to wrongfully obtain reimbursement. The defendant asserted that based on CMS's definitions of relevant terms, its interpretation of the billing codes was reasonable. The Court denied the provider's motion to dismiss because, "in light of [Relator's] allegations to the contrary," "a determination of whether [Defendant] reasonably interpreted the term" in question "depends on credibility determinations that are improper in the context of a 12(b)(6) motion to dismiss." *Id.* at 834. So too here. Where Relator has alleged the meaning of the QZ modifier, that Defendants knew that meaning, and applied it incorrectly, PST's disputes about what the modifier actually encompasses are factual questions that are not appropriate for a motion to dismiss. Accordingly, the Motion should be denied.[5]

### 3. Relator Properly Alleges Implied False Certification

Under an implied false certification theory, the relator shows liability by demonstrating that the defendant failed to disclose noncompliance with material statutory, regulatory, or contractual requirements as part of a demand for payment. *Escobar*, 136 S. Ct. at 2001.

Here, Relator has alleged that when Defendants submitted demands for payment, those demands included an implied certification that Defendants had complied with TEFRA (the Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. 97-248), which mandates that procedures may only be billed as Medical Direction if seven specific requirements are met, and the physician documents in the patient's medical records that all the requirements were met. *Social Security Act*, § 1833(e); 42 C.F.R. § 415.110(b). SAC ¶ 69. Defendants are not permitted to alter or amend the medical charts retroactively. *Id.* ¶ 55. Because Defendants did not comply

---

[5] Defendants also continue to mischaracterize Relator's reliance on the Kaweah bylaws. Dkt. 77-1 at 4-5. Relator is not contending that breach of the bylaws is the basis for Defendants' FCA liability. Rather, the bylaws are direct evidence that CRNA Independent practice was not permitted at Kaweah and, as such, circumstantially show that there was no situation in which Defendants should have billed CMS under the QZ modifier.

with the seven requirements, did not document that the requirements were met in patient charts, and retroactively altered patient charts,[6] those certifications were false. *Id.* ¶¶ 59, 69. The claims for payment that impliedly certified compliance with TEFRA were in fact misleading half-truths about the services rendered; had the Government known the truth, the Government would not have reimbursed the services at the rates requested, or at all. *Id.* ¶¶ 69-70. *See also Escobar*, 136 S. Ct. at 2001 (holding that the plaintiff must show "the defendant's failure to disclose noncompliance with material statutory, regulatory, or contractual requirements makes those representations misleading half-truths").

First, PST is simply incorrect to argue that Relator fails to allege Defendants' noncompliance with the TEFRA regulations, when Relator has plainly alleged that Defendants routinely failed to meet the seven requirements for Medical Direction and kept incomplete or misleading patient records. *Id.* ¶¶ 59, 69-70. The SAC also describes the applicable requirements, which Defendants regularly failed to satisfy. *Id.* ¶¶ 33, 37, 40, 55, 56.

Second, Relator has sufficiently alleged an implied false certification theory based on Defendants' false representations of compliance with TEFRA. Relator alleges that the billing codes utilized by Defendants made "specific representations about the goods or services provided," namely that the TEFRA requirements were met, which were false. *United States ex rel. Campie v. Gilead Scis., Inc.*, 862 F.3d 890, 902–03 (9th Cir. 2017). In addition, the SAC alleges in great detail how the reimbursements would have differed had Defendants billed using the less lucrative coding that accurately described the procedures that were provided. *See United States ex rel. Poehling v. UnitedHealth Grp., Inc.*, No. CV1608697MWFSSX, 2018 WL 1363487, at *9 (C.D. Cal. Feb. 12, 2018). In *Poehling*, a reverse false claims act case, the defendants regularly submitted diagnostic data to CMS that "were not supported by the

---

[6] The April 2014 email shows that, at the very least, the documentation for the five services that were initially billed as "medically directed" were altered to show non-medically directed CRNA service. When Defendants simply changed the purported "medical direction" to "CRNA independent practice," they did so in express derogation of the regulations requiring documentation that the physician personally participated in, and closely oversaw, the CRNA's work throughout the anesthesia process. By this subterfuge, Defendants misled the Government and, as a result, tricked the Government into overpaying them thousands of times over.

beneficiaries' medical records." *Id.* at *3. CMS made "reconciliation payments to Defendants based on the diagnostic data submitted," and the diagnostic codes used were "central to the calculation of the amount of money CMS pays to Defendants." *Id.* at *9. Likewise here, the SAC describes in detail how the billing codes utilized were central to the calculation of the money paid to reimburse different procedures. Because Relator alleges that the codes, which impliedly certified compliance with the TEFRA requirements, influenced the payment of money to Defendants, she has stated a claim. The Motion should be denied.

## V.   CONCLUSION

For the foregoing reasons, Relator requests that the Court deny PST's Motion.

DATED:  April 17, 2018

SCHONBRUN SEPLOW
HARRIS & HOFFMAN LLP

*/s/ Stephanie T. Yu*

By: _____

Wilmer J. Harris
Michael D. Seplow
Stephanie T. Yu

TYCKO & ZAVAREEI LLP
Andrea R. Gold

Attorneys for Relator/Plaintiff, Nicolle O'Neill