# EXHIBIT B

practice management

# Billing for Anesthesia Services and the QZ Modifier: A Lurking Problem

Jason R. Byrd, J.D.

Sharon K. Merrick, M.S., CCS-P

Stanley W. Stead, M.D., M.B.A., Chair
*Committee on Economics*

**High quality anesthesia care is provided in the United States by anesthesiologists or anesthesiologist-led anesthesia care teams.** Recognizing the fact that nonphysician providers often play a role in the administration of anesthesia services, the Centers for Medicare & Medicaid Services (CMS) has designed its anesthesia payment system essentially around four categories: personally performed, teaching, medically directed and medical supervision. Many of these terms are confused and used interchangeably by our members, so we thought it appropriate to set the record straight and illuminate a significant lurking problem with one billing modifier: the QZ.

## Categories of Anesthesia Services

*Personally performed* cases means as the name suggests – a physician performs the anesthesia service him/herself. The Medicare Claims Processing Manual, Chapter 12, defines the various categories and their regulatory requirements. In order to bill the federal government for a claim you determine was personally performed, you must personally perform the entire anesthesia service alone, or be continuously involved in a single case involving a student nurse anesthetist. There is a medically necessary exception that allows a physician and a certified registered nurse anesthetist (CRNA) or anesthesiologist assistant (AA) to receive full payment at the personally performed rate; however, this exception is relatively rare.

Anesthesia claims modifiers are used to document to CMS and some private payers the level/category of anesthesia services provided. For a personally performed case, the appropriate modifier is "AA." Medicare payment for such services is 100 percent of the Medicare allowed amount, which is calculated by adding the base unit for the anesthesia code to the total time units for the procedure (total anesthesia time/15, rounded to the nearest tenth) and multiplying by your geographically adjusted anesthesia conversion factor.

*Teaching* occurs when a physician is involved in the training of physician residents in up to two concurrent cases, or the training of physician residents in one case that is concurrent to another case paid under medical direction (see below). It is important to note that CMS considers a case to be concurrent if there is even one minute of overlap between two cases. The teaching physician must report the "GC" modifier with the teaching claim along with the appropriate payment modifier. The Medicare professional services payment to the teaching physician for a teaching case is 100 percent of the Medicare allowed amount.

*Medical direction* is often confused with supervision. Under CMS rules, medical direction is a billing distinction describing a higher level of physician involvement in a case than supervision. In order to bill for medical direction, the physician



*Jason R. Byrd, J.D., is Director of Practice Management, Quality and Regulatory Affairs for ASA in its Washington, D.C. office.*



*Sharon K. Merrick, M.S., CCS-P is Coding and Reimbursement Manager in the Washington, D.C. office.*



*Stanley, W. Stead, M.D., M.B.A. is CEO, Stead Health Group, Inc., Clinical Professor of Anesthesia and Pain Management, University of California Davis, Encino.*

must medically direct qualified providers in two, three or four concurrent cases and perform the following (informally known as the seven steps of medical direction):

- Performs a pre-anesthetic examination and evaluation;
- Prescribes the anesthesia plan;
- Personally participates in the most demanding procedures in the anesthesia plan, including induction and emergence;
- Ensures that any procedures in the anesthesia plan that he or she does not perform are performed by a qualified anesthetist;
- Monitors the course of anesthesia administration at frequent intervals;
- Remains physically present and available for immediate diagnosis and treatment of emergencies; and
- Provides indicated post-anesthesia care.

Qualified providers include CRNAs, AAs, interns, residents or combinations of each. Medical direction also applies to student nurse anesthetists if the physician directs two concurrent cases involving student nurse anesthetists or one case involving a student nurse anesthetist and another involving a qualified provider. The "QK" modifier is used to identify the physician's medical direction of two, three or four concurrent cases, while "QY" identifies the physician's medical direction of one CRNA. The "QX" modifier identifies the CRNA service under medical direction by a physician.

If any of the seven steps of medical direction are not performed, or if you perform a task that is not permitted while medically directing, the default is medical supervision. It is critical to note that documentation supporting the claim of medical direction is required. The old adage applies – *if it is not documented, it never happened*. While Recovery Audit Contractors (RACs) and other entities tasked with reviewing medical claims submitted to the federal government have not begun reviewing medical direction documentation, it is only a matter of time before they will.

CMS has identified permissible exceptions to the medical direction rules, which operate as legitimate excuses to actions that would otherwise be deemed as incomplete medical direction. One of the most important exceptions is labor epidurals: a physician can medically direct a case and leave the area to efficiently administer an epidural for the purposes of easing labor pain. Exceptions also exist for receiving the next surgical patient, checking or discharging patients in the recovery room, handling scheduling matters, addressing an emergency of short duration in the immediate area, or periodically monitoring an obstetrical patient. Again, documentation of these exceptions is critical in order to receive and retain payment.

*Medical supervision* occurs when the physician is not able to meet all seven steps of medical direction, performs a task that is not permitted while medically directing, or is involved in more than four concurrent cases. The appropriate billing modifier is "AD."

### Why Does This Matter?

The distinctions between the various billing categories of anesthesia services are essential because they impact your payment. Table 1 illustrates the significant differences that can occur depending on how you perform and bill an anesthesia claim.

#### Table 1

| Billing Category | Physician Allowed Amount | CRNA/AA Allowed Amount |
|---|---|---|
| M.D. Personally Performed | 100% | N/A |
| Teaching | 100% | N/A |
| Medical Direction | 50% | 50% |
| Medical Supervision | 3 base units +1 time unit (if present at induction) | 50% |
| CRNA Performed w/o Supervision | N/A | 100% |

### The QZ Problem

Given this context and introduction, let's discuss a significant billing issue that could have detrimental implications for anesthesiologists: the QZ billing modifier. The QZ modifier was designed to signify those instances in which a CRNA is administering anesthesia with no supervision. Given the fact that the overwhelming majority of states require physician supervision of CRNAs in the administration of anesthesia – coupled with the fact that even in the 16 "opt-out" states, many of the hospitals still require some level of physician supervision – one would hypothesize that the QZ modifier would be used in relatively limited circumstances. In reality, it is used on thousands, perhaps millions of anesthesia claims. Why? One word – economics.

Over the years the QZ modifier has been twisted and contorted from its intended purpose to essentially a "catch-all" modifier for some practicing in the care team model. The documentation and regulatory requirements of medical direction are relatively onerous. If an anesthesia practice employs the anesthesiologists and CRNAs all payments flow to the practice, regardless of who is "credited" with providing the service. There is an appealing prospect of obtaining full payment with the least amount

*Continued on page 38*



American Society of Anesthesiologists

*Continued from page 37*

of administrative work. The QZ modifier affords this luxury with 100 percent of the allowed amount with limited administrative burdens. 2009 Medicare claims data shows 23.8 percent of cases are being reported QZ (Figure 1). By reporting QZ, the data greatly underreports the number of cases that anesthesiologists are actually involved in (58.6 percent), strengthening the CRNA assertion of independent practice (Figure 2).

**Figure 1: 2009 Medicare Anesthesia Claims Data by Modifier**



So why should this matter? The August 2010 Health Affairs article by Dulisse and Cromwell used claims data to justify its unfounded conclusions that anesthesia services administered by CRNAs are of the same quality (and lower cost) as anesthesiologists. The researchers organized Medicare claims into three categories using the payment modifiers: anesthesiologist working alone, CRNA working alone and anesthesia care team (supervision and direction). In fact, the authors were stuck by their analysis that found the rate of cases in which the CRNA worked alone rose in non-opt-out states at three times the rate of opt-out states.

The article certainly stirred the emotional and intellectual sides of our members and drew significant criticism from ASA and others, but was discussed in none other than the *New York Times*. As policymakers look to meet the three primary goals of health care reform – increase access, lower costs, and maintain or improve quality – pressures will exist to consider all options, including expanding all providers' scope of practice.

When we speak with anesthesiologists across the country, we often learn that practices bill QZ despite the fact that an anesthesiologist is supervising or directing the case. The summarized justification from nearly every practice: "it's easier." While we are sympathetic to this argument, we are concerned and frustrated by this response because the distorted reality of anesthesia care in the claims data could detrimentally impact the practice of anesthesiology. Members should be billing and documenting medical direction, when appropriate, and billing with the AD modifier to identify medical supervision when they have that level of involvement involved in the care of the patient. Failing to document your role in the patient's care may not have a significant impact on your pocketbook or workload, but it could have long-term negative consequences for the specialty. The Anesthesia Quality Institute (AQI) will eventually be able to help us with these complex issues, but until its database is robust enough, you can help the specialty by ensuring the Medicare data reflect the actual state of anesthesia practice in the country.

**Figure 2: 2009 Medicare Anesthesia Claims Data by Provider**

