1   MICHAEL R. LINDSAY (SBN 110845)
    mlindsay@nixonpeabody.com
2   JASON GONZALEZ (SBN 178768)
    jgonzalez@nixonpeabody.com
3   ERIN J. HOLYOKE (SBN 288137)
    eholyoke@nixonpeabody.com
4   MAE HAU (SBN 293641)
    mhau@nixonpeabody.com
5   NIXON PEABODY LLP
    300 S. Grand Avenue, Suite 4100
6   Los Angeles, CA  90071-3151
    Tel:    213-629-6000
7   Fax:    213-629-6001

8   BRIAN K. FRENCH (Admitted *Pro Hac Vice*)
    bfrench@nixonpeabody.com
9   NIXON PEABODY LLP
    100 Summer Street
10  Boston, MA 02110-2131
    Tel:    617-345-1000
11  Fax:    617-345-1300

12  Attorneys for Defendants
    SOMNIA, INC., PRIMARY ANESTHESIA
13  SERVICES, BYRON MENDENHALL, M.D.,
    QUINN GEE, M.D., AND MARGARET VASSILEV, M.D.
14

15              **UNITED STATES DISTRICT COURT**

16             **EASTERN DISTRICT OF CALIFORNIA**

17

18  UNITED STATES and the STATE OF          Case No.:  1:15-CV-00433-DAD-EPG
    CALIFORNIA ex rel.  NICOLE O'NEILL.
19  NICOLE O'NEILL
                                            **DEFENDANT SOMNIA, INC., PRIMARY**
20                          Plaintiff,      **ANESTHESIA SERVICES, BYRON**
                                            **MENDENHALL, M.D., QUINN GEE, M.D.,**
21          vs.                             **AND MARGARET VASSILEV, M.D.'S**
                                            **REPLY MEMORANDUM IN SUPPORT**
22  SOMNIA, INC., PRIMARY ANESTHESIA        **OF MOTION TO DISMISS SECOND**
    SERVICES, MCKESSON CORPORATION,         **AMENDED COMPLAINT**
23  ROBERT GOLDSTEIN, M.D., ROY
    WINSTON, M.D., BRYON                    Date:  May 1, 2018
24  MENDENHALL, M.D., QUINN GEE, M.D.,      Time: 9:30 a.m.
    AND MARGARET VASSILEV, M.D, AND         Ctrm: 5
25  DOES 1 through 10 inclusive,
                                            Date Action Filed:  March 19, 2015
26                          Defendants.

27

28

# TABLE OF CONTENTS

Page

I.    INTRODUCTION .................................................................................................. 1

II.    ARGUMENT ........................................................................................................ 2

    A.    The "Law of the Case" Doctrine Does Not Apply to Defendants' Arguments Regarding the QZ Modifier .................................................. 2

    B.    Defendants Did Not Submit Claims Under the QZ Modifier that Contained False or Misleading Representations .......................................................... 5

        1.    Defendants Did Not Use the QZ Modifier to Represent to the Government that CRNAs Were Being Medically Directed or to Improperly Inflate Reimbursement Rates ........................................ 7

        2.    Billing with the QZ Modifier Does Not Misrepresent the Nature of the Physician's Involvement .................................................................. 8

        3.    The Regulations Support Defendants' Interpretation of the QZ Modifier ...................................................................................... 9

        4.    The Meaning of the QZ Modifier Is Not a Disputed Factual Issue ............. 11

    C.    The SAC Does Not Adequately Allege Materiality ............................................. 13

    D.    Relator's FCA Allegations Do Not Satisfy Rule 9(b) ......................................... 14

III.    CONCLUSION .................................................................................................... 15

1

# <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

**Federal Cases**

3

*Amaretto Ranch Breedables, LLC v. Ozimals, Inc.,*

4

    2011 WL 2690437 (N.D. Cal. Jul. 8, 2011) ........................................................................4–5

5

*Aponte Melendez v. Ortiz Otero,*

    964 F.2d 1225 (1st Cir. 1992) ...........................................................................................11–12

6

*CFM Communications, LLC v. Mitts Telecasting Co.,*

7

    424 F. Supp.2d 1229 (E.D. Cal. 2005) ...............................................................................11–12

8

*Creek v. Village of Westhaven,*

9

    144 F.3d 441 (7th Cir. 1998) ..................................................................................................3

10

*U.S. ex rel. Dresser v. Qualium Corp.,*

    2016 WL 3880763 (N.D. Cal. July 18, 2016) .......................................................................14

11

*U.S. ex rel. Englund v. Los Angeles Cty.,*

12

    2006 WL 3097941 (E.D. Cal. Oct. 31, 2006) .......................................................................12

13

*U.S. ex rel. Ferris v. Afognak Native Corp.,*

14

    2016 WL 9088706 (D. Alaska Sept. 28, 2016) ................................................................13–14

15

*U.S. ex rel. Garbe v. Kmart Corp.,*

    824 F.3d 632 (7th Cir. 2016) ............................................................................................11–12

16

*Hagood v. Sonoma Cty. Water Agency,*

17

    81 F.3d 1465 (9th Cir. 1996) .................................................................................................12

18

*U.S. ex rel. K&R Ltd. P'ship v. Mass. Hous. Fin. Agency,*

19

    530 F.3d 980, 984 (D.C. Cir. 2008) ................................................................................12–13

20

*U.S. ex rel. Ketroser v. Mayo,*

    729 F.3d 825, 832 (8th Cir. 2013) ...................................................................................12–13

21

*U.S. ex rel. Lamers v. City of Green Bay,*

22

    168 F.3d 1013 (7th Cir. 1999) ...............................................................................................12

23

*U.S. ex rel. Lujan v. Hughes Aircraft Co.,*

    243 F.3d 1181 (9th Cir. 2001) ................................................................................................4

24

*Milgard Tempering, Inc. v. Selas Corp. of Am.,*

25

    902 F.2d 703 (9th Cir. 1990) ...........................................................................................2–3, 4

26

*Miller v. Yokohama Tire Corp.,*

27

    358 F.3d 616 (9th Cir. 2004) ...................................................................................................2

28

*Snow-Erlin v. U.S.,*

    470 F.3d 804 (9th Cir. 2006) ...........................................................................................2–3, 4

*Swartz v. KPMG LLP,*
    476 F.3d 756 (9th Cir. 2007) ...........................................................................15

*Taylor v. Higgins,*
    2009 WL 224953 (N.D. Cal. Jan. 29, 2009) ...............................................4–5

*Thomas v. Hickman,*
    2008 WL 2233566 (E.D. Cal. May 28, 2008) .................................................4

*Ebeid ex rel. U.S. v. Lungwitz,*
    616 F.3d 993 (9th Cir. 2010) ..........................................................................15

*U.S. v. Maybusher,*
    735 F.2d 366 (9th Cir. 1984) .......................................................................2–3

*U.S. v. Prabhu,*
    442 F. Supp.2d 1008, 1026 (D. Nev. 2006) ............................................12–13

*U.S. v. Scan Health Plan,*
    2017 WL 4564722 (C.D. Cal. Oct. 5, 2017) .................................................13

*Universal Health Servs., Inc. v. U.S. ex rel. Escobar,*
    136 S. Ct. 1989 (2016) ..................................................................................13

*Welenco, Inc. v. Corbell,*
    2014 WL 130526 (E.D. Cal. Jan. 14, 2014) ...................................................4

*U.S. ex rel. Wilson v. Kellogg Brown & Root, Inc.,*
    525 F.3d 370 (4th Cir. 2008) ..........................................................................12

*U.S. ex rel. Yannacopoulos v. General Dynamics,*
    652 F.3d 818 (7th Cir. 2011) ..........................................................................12

**Rules**

Fed. R. Civ. Proc. 9(b) .............................................................................................14, 15

**Regulations**

42 C.F.R. § 414.46 ........................................................................................7, 8, 9, 10

42 C.F.R. § 414.60 ........................................................................................1, 6, 8, 10

42 C.F.R. § 482.52(a)(4), (c) .....................................................................................10

51 Fed. Reg. 22010, 22028, 22049 (Jun. 17, 1986) ..................................................10

60 Fed. Reg. 63124, 63178 (Dec. 8, 1995) ...............................................................11

65 Fed. Reg. 65376, 65413 (Nov. 1, 2000) .................................................................7

DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION TO DISMISS SECOND AMENDED
COMPLAINT

# I.     INTRODUCTION

After three tries, Relator Nicole O'Neill still has not stated a viable False Claims Act action against defendants Somnia, Inc., Primary Anesthesia Services, Dr. Byron Mendenhall, Dr. Quinn Gee, and Dr. Margaret Vassilev regarding Defendants' alleged misuse of the QZ billing modifier.

The central question before the Court is whether Relator has plausibly alleged that submitting a claim for CRNA anesthesia services using the QZ modifier, when there has been some level of physician supervision of the services, but not enough to meet the requirements to bill them as "medically directed" by a physician, violates the FCA.  Defendants have demonstrated that CMS permits such services to be billed using the QZ modifier.  For example, the Medicare Claims Processing Manual ("CMS Manual") describes the QZ modifier as "CRNA service: Without medical direction by a physician." Ch. 12, § 140.3.3 (Defs' RJN, Ex. C).  Federal regulations, including 42 C.F.R. § 414.60(a), describe CRNA services as either "medically directed or not medically directed."  And guidance issued by Noridian Healthcare Solutions, the Medicare Administrative Contractor/Fiscal Intermediary responsible for administering Medicare Part B in California, has stated that the only instances in which CRNA services should not be billed with the QZ modifier are when a physician provides "medical direction" (or in cases of "monitored" anesthesiology services, a service that is not at issue in this case).[1]  Defs' RJN, Ex. D.

These authoritative sources establish that billing the services at issue using the QZ modifier does not violate the FCA.  First, the regulations and guidance demonstrate that it is in fact proper to bill the services this way.  While Relator's arguments to the contrary are essentially based upon Relator's own interpretation of the regulations and guidance, and are untethered to any authoritative sources, the plain language of the rules makes clear that there is no error in the Defendants' approach.  Second, even were the Court to conclude that Relator's fanciful gloss on the otherwise plain language of the rules raises a question about whether Relator or Defendants are correct about how to bill for these services (which it really does not), there can be no FCA

---

[1] This Court previously took judicial notice of the CMS Manual and Noridian guidance.  ECF No. 70 at 6-7.

violation because unclear regulations subject to multiple reasonable interpretations cannot support an FCA claim.  And third, Relator has failed to demonstrate that any discrepancy on this point is material.  Relator has not cited a single statement from any regulatory source suggesting that such billing is improper, and Relator has failed to allege that CMS has ever actually refused to pay a claim under these circumstances.

For any one of these reasons, Relator's FCA claims based on the QZ modifier must be dismissed.  Relator simply has not plausibly alleged that her interpretation of the regulations is correct, much less sufficiently clearly correct to support a claim of fraudulent billing, or that even if Relator's interpretation were correct, failure to follow her interpretation would be material to the government's decision about whether or not to pay the claim.

Finally, the Court should grant Defendants' motion to dismiss **without** leave to amend.  Where a plaintiff "has previously filed an amended complaint . . . the district court's discretion to deny leave to amend is 'particularly broad.'"  *Miller v. Yokohama Tire Corp.*, 358 F.3d 616, 622 (9th Cir. 2004) (citation omitted).  Defendants' initial motion to dismiss highlighted the deficiencies of Relator's original Complaint (*see* ECF No. 32 at 8-10), yet Relator failed to cure those defects in her FAC.  Not surprisingly, the Court dismissed Relator's QZ-related claims as a result.  Although Relator was then given yet another opportunity to re-plead her FCA allegations, the SAC still does not provide a sufficient factual or legal basis for her FCA claims.  The court should therefore dismiss Relator's QZ-based causes of action with prejudice because allowing Relator a third opportunity to amend the Complaint would be futile.

## II.     ARGUMENT

### A.     The "Law of the Case" Doctrine Does Not Apply to Defendants' Arguments Regarding the QZ Modifier

Relator contends that the "law of the case" doctrine precludes the Court from considering Defendants' arguments regarding the QZ modifier that are unrelated to the issue of materiality.  Opp. at 6.  This argument is baseless.

The law of the case doctrine only applies to issues that were **actually decided** in a previous ruling.  *Snow-Erlin v. U.S.*, 470 F.3d 804, 807 (9th Cir. 2006) ("[F]or the law of the case

doctrine to apply, we must actually have decided the matter, either explicitly or by necessary implication, in our previous disposition"); *Milgard Tempering, Inc. v. Selas Corp. of Am.*, 902 F.2d 703, 715 (9th Cir. 1990) ("Under the [law of the case] doctrine, a court is generally precluded from reconsidering an issue previously decided by the same court"); *U.S. v. Maybusher*, 735 F.2d 366, 370 (9th Cir. 1984) ("The [law of the case] doctrine expresses only the practice of courts generally to refuse to reopen questions formerly decided, and is not a limitation of their power"). Even Relator recognizes this limitation.  Opp. at 6 ("Under the 'law of the case' doctrine, courts are ordinarily precluded from reexamining issues **previously decided** by the same court, or a higher court, in the same case") (emphasis added).

Therefore "it is essential to determine what issues were actually decided in order to define what is the 'law of the case.'"  *Creek v. Village of Westhaven*, 144 F.3d 441, 445 (7th Cir. 1998). Yet despite devoting a substantial portion of her opposition to her law of the case argument, Relator does not identify a single specific issue that was previously decided by the Court.  Instead, she constructs a fallacy.  Relator suggests that because the Court dismissed her QZ modifier claims solely on materiality grounds, it implicitly rejected all of Defendants' other arguments about why the QZ claims should be dismissed.  *Id.* at 6.  In fact, Relator ventures to say that the Court actually decided "that Relator **had stated a claim** [regarding the QZ modifier] but for the materiality element."  Opp. at 9 (emphasis added).  This is untrue.

In ruling on Defendants' motion to dismiss the FAC, the Court found that Relator's QZ modifier claims were based on the implied false certification theory of FCA liability.  ECF No. 70 at 15.  It noted with respect to those claims that Defendants had raised "multiple arguments as to why the FAC fail[ed] to state a claim on its implied false certification theory."[2]  *Id.*  The Court did not address each of Defendants' arguments regarding the QZ code, but focused exclusively on the issue of materiality.  *Id.* at 15-16.  In so doing, the Court found that the FAC did not adequately allege that Defendants' purported misuse of the QZ code was material and held that this deficiency

---

[2]  These arguments are set forth at pages 12-15 of Defendants' Memorandum of Points and Authorities in Support of Motion to Dismiss First Amended Complaint, ECF No. 48-1, and at pages 6-8 of Defendants Reply Memorandum in Support of Motion to Dismiss First Amended Complaint, ECF No. 57.

1   was "fatal" to Relator's claims.  *Id.* at 16.  The Court did not reach, much less decide upon, any of

2   Defendants' other arguments for dismissing Relator's QZ-based claims, presumably because there

3   were sufficient grounds to dismiss the claims on the materiality issue.  Relator's fanciful

4   suggestion otherwise is baseless.

5        Because the Court did not actually decide whether or not the QZ modifier claims should be

6   dismissed for any of the additional reasons Defendants identified, the Court is not precluded from

7   considering those arguments in connection with the present motion.  *See Snow-Erlin*, 470 F.3d at

8   807 (observing that the law of the case doctrine requires a court to respect what it previously

9   decided, "not . . . what it did not decide"); *U.S. ex rel. Lujan v. Hughes Aircraft Co.*, 243 F.3d

10  1181, 1187 (9th Cir. 2001) (finding that the law of the case doctrine did not preclude the court

11  from considering a jurisdictional issue that defendant had previously argued but which the court

12  had not explicitly or implicitly decided); *Milgard Tempering*, 902 F.2d at 715 (finding that the law

13  of the case doctrine did not apply to the issue of attorney's fees because the court did not

14  specifically address that issue previously).  The cases Relator relies upon in her opposition do not

15  alter this conclusion because the courts in those matters found that the issues in question had

16  actually been decided in earlier rulings.  *See Welenco, Inc. v. Corbell*, 2014 WL 130526, at *4

17  (E.D. Cal. Jan. 14, 2014) (finding that the law of the case precluded the court's consideration of

18  defendants' motion to transfer because a similar motion filed by a co-defendant and supported by

19  the same declaration and exhibits was previously denied by the court); *Thomas v. Hickman*, 2008

20  WL 2233566, at *3 (E.D. Cal. May 28, 2008) (finding that the law of the case applied to

21  defendant's second motion to dismiss because the court "**previously considered and decided**

22  **precisely the same issues**" in defendant's first motion to dismiss) (emphasis added).[3]

23  _____

24  [3] Relator claims that courts "routinely deny renewed motions to dismiss . . . that are simply
    revisiting an earlier order" and treat such motions as ones for reconsideration.  Opp. at 8.  This
    argument adds nothing to Relator's position.  First, the cases she cites do not establish that courts

25  "routinely" treat motions to dismiss amended complaints as motions for reconsideration or that
    such treatment is appropriate in this litigation.  Second, each of these cases turned on the fact that

26  the issue under consideration was **actually decided** previously.  *See Amaretto Ranch Breedables,
    LLC v. Ozimals, Inc.*, 2011 WL 2690437, at *2 (N.D. Cal. Jul. 8, 2011) (denying motion to

27  dismiss second amended complaint because the court previously found that the same claim in the
    first amended complaint had been plausibly pleaded); *Taylor v. Higgins*, 2009 WL 224953, at *4

28  (N.D. Cal. Jan. 29, 2009) (denying motion to dismiss an inmate's § 1983 claim because the court
    had previously decided, as part of its initial screening under 28 U.S.C. § 1915A, that the complaint

-4-

Finally, even if the Court had rejected Defendants' other QZ-related arguments, that decision would not preclude the Court from considering Defendants' arguments regarding the new false certification allegations Relator has included in the SAC, including (1) that when Defendants "used the billing code QZ, [they] made an express representation to the government that a CRNA, alone and without any supervision by an anesthesiologist, performed the services in question"; (2) that Defendants "knew that had they truthfully disclosed to the government that . . . CRNAs were not practicing independently when Defendants used the QZ modifier, the government would not have paid Defendants at the requested rates"; and (3) that Defendants "falsely described the services for which they sought reimbursement and actively concealed their failure to comply with the conditions of payment the government set forth in the regulations."  SAC at ¶¶ 66-68.  There is no law of the case in connection with these new allegations, which the Court has yet to consider or rule upon.  Since all of the arguments Defendants advance in support of their current motion to dismiss apply to Relator's new allegations, the Court is not precluded from considering them.

**B.      Defendants Did Not Submit Claims Under the QZ Modifier that Contained False or Misleading Representations**

In dismissing portions of Relator's FCA claims, the Court found that her allegations regarding the QZ modifier were based on an implied false certification theory of liability.  ECF No. 70 at 15.  As the Court noted, these claims were predicated on the notion that in submitting requests for payment with the QZ code, Defendants falsely certified compliance with the Bylaws of the Kaweah Delta Health Care District ("District"), which, according to Relator, prohibited CRNAs from working without the supervision of an anesthesiologist. *Id.* at 15-16.  The Court found that Relator failed to show that these alleged violations were material for purposes of the FCA. *Id.* at 16.  In her SAC, Relator now adds an entirely new false certification theory, alleging that when Defendants "used the billing code QZ, [they] made an express representation to the government that a CRNA, alone and without any supervision by an anesthesiologist, performed the services in question."  SAC at ¶ 66.  As discussed in detail in Defendants' Initial Memorandum

_____

stated a cognizable claim).  Defendants are not asking this Court to reconsider any prior decisions regarding their QZ-related arguments because, except for the materiality issue that was decided in Defendants' favor, the Court did not reach or decide those other issues.

(ECF No. 78-1 at 8-12), this theory is based on a mischaracterization of what the QZ modifier actually indicates and a flawed understanding of how that code may be used.

Relator erroneously defines the QZ code as "CRNA Independent" and "CRNA only." SAC at ¶ 36. She also maintains that the QZ modifier "indicates that there was no [physician] directing **or supervising**" the CRNA and that each time Defendants submitted claims with the QZ code, they "made an express representation to the government that a CRNA, **alone and without any supervision by an anesthesiologist**, performed the services in question." *Id.* at ¶¶ 66, 134 (emphasis added). But these characterizations of the QZ code are utterly without support in the regulations or guidance issued by CMS. Relator has simply plucked them from thin air. For example, 42 C.F.R. § 414.60(a) describes CRNA services as either "medically directed or not medically directed." The CMS Manual similarly describes the QZ modifier as "CRNA service: Without medical direction by a physician." Ch. 12, § 140.3.3. Incredibly, in response to Defendants pointing to the actual wording of the relevant regulations and guidance, Relator complains that Defendants' reliance on these sources is an effort to "muddy the waters." Opp. at 11. Clearly, Relator prefers to ascribe her own invented meaning to the QZ code.

Regardless of whether Relator's allegations are construed as advancing an express false certification theory or an implied false certification theory, Relator's claims must fail because Defendants' use of the QZ code did not include any representations that the CRNAs had worked alone and without any form of supervision. Further, Relator's contention that Defendants violated the FCA by submitting claims with the QZ modifier in cases in which the anesthesiologist failed to satisfy all of the requirements for "medical direction" is baseless. As noted, contrary to Relator's mischaracterization of the QZ code, CMS guidance expressly states that the QZ code reflects CRNA services delivered "[w]ithout medical direction by a physician." CMS Manual, Ch. 12, § 140.3.3. If Defendants used the QZ code when the requirements for medical direction were not met, that code was by definition an appropriate code.

This conclusion is bolstered by the guidance issued by Noridian Healthcare Solutions clarifying that the only instances in which CRNA services should not be billed with the QZ modifier is when the physician provides "medical direction" (or in cases of "monitored"

anesthesiology services, which is not at issue).  Defs' RJN, Ex. D.  Noridian had discretion to issue this guidance because CMS has specifically recognized that it does "not have a national policy that instructs [MACs] on the method of payment for a service when the anesthesiologist does not fulfill all of the medical direction requirements."  65 Fed. Reg. 65376, 65413 (Nov. 1, 2000).

Relator makes four additional arguments in opposing Defendants' motion, none of which have merit.

### 1.    Defendants Did Not Use the QZ Modifier to Represent to the Government that CRNAs Were Being Medically Directed or to Improperly Inflate Reimbursement Rates

Relator alleges (incorrectly) <u>in the SAC</u> that "when Defendants used the billing code QZ, Defendants made an express representation to the government that a CRNA, **alone and without any supervision by an anesthesiologist**, performed the services in question."  SAC at ¶ 66 (emphasis added).  <u>In her Opposition</u>, however, Relator makes the completely contradictory assertion that "Defendants engaged in a scheme of using the QZ modifier **to represent to CMS that CRNAs were being 'medically directed' instead of 'medically supervised**.'"  Opp. at 12 (emphasis added).  This is an incoherent argument that relies on yet another "express" representation that is not found in the QZ code and was never made by Defendants.

Although far from clear, the gist of Relator's argument appears to be that, in cases where an anesthesiologist may have directed more than four concurrent procedures, those procedures had to be billed as "medical supervision."  Assuming this is the point of Relator's argument, her position is wrong.  Under CMS regulations and guidance, "medical supervision" occurs "when the anesthesiologist is involved in furnishing more than four procedures concurrently or is performing other services while directing the concurrent procedures."  CMS Manual, Ch. 12, § 50.D.  *See also* 42 C.F.R. § 414.46(f).  In these scenarios, the medical supervision rate would apply only if the practice wished to bill for the anesthesiologist's services.  But the regulations do not require providers like Somnia/PAS, which retain salaried anesthesiologists and CRNAs as part of its group, SAC at ¶ 22, to bill for the anesthesiologist's services when medical direction requirements are not met.  Instead, the practice is permitted to bill for the CRNAs' services under the QZ code

because those services were "not medically directed."[4]  42 C.F.R. § 414.60(a); CMS Manual, Ch. 12, § 140.3.3.

### 2. Billing with the QZ Modifier Does Not Misrepresent the Nature of the Physician's Involvement

Relator argues that using the QZ modifier in cases in which the medical direction requirements were not met would result in a misrepresentation to the government because the QZ code would not reflect the physician's involvement in the procedures.  Opp. at 13.  This argument once again ignores the fact that Defendants do not bill for the anesthesiologist's services when they submit claims under the QZ code.  In such cases, the physician's involvement, which did not constitute "medical direction," is irrelevant for billing purposes because Defendants are not seeking reimbursement for the anesthesiologist.  For this same reason, Relator's reliance on the "General Billing Instructions" of the Medicare Claims Manual to support her argument is misplaced.  *See id.*  These instructions describe how an anesthesiologist's services should be billed when a provider submits a claim for concurrent medical direction.  *See* CMS Manual, Ch. 12, § 140.3.4.  When Defendants submit claims under the QZ code, they are not seeking reimbursement for the anesthesiologist's services nor do such claims seek payment for medical direction.[5]

---

[4] Relator argues later in her Opposition that under Defendants' interpretation of the QZ modifier, there would never be a situation in which providers would use the medical supervision code because doing so would result in less reimbursement.  Opp. at 15.  This argument fails to recognize that not all anesthesiologists and CRNAs work within the same practice.  When services are billed with the QZ code, no reimbursement is paid for the anesthesiologist's services.  Thus, if an anesthesiologist is involved in directing more than four concurrent cases and is not part of the same practice group as the CRNAs, the anesthesiologist would almost certainly bill for his or her services, even though doing so would result in an overall lower payment under the medical supervision rate.  42 C.F.R. § 414.46(f); CMS Manual, Ch. 12, § 50.D.

[5] Relator argues in this portion of her Opposition that an April 2014 email cited in the SAC shows that Defendants altered documentation for five procedures that were "initially billed as 'medically directed'" but were later changed "to show non-medically directed CRNA services."  Opp. at 15.  Although these allegations add nothing to Relator's argument, the paragraphs of the SAC to which she cites do not in any way reflect what Relator claims in her Opposition.  *See* SAC at ¶¶ 56, 109-10.

### 3. The Regulations Support Defendants' Interpretation of the QZ Modifier

Next, Relator argues that Defendants' interpretation of the QZ modifier cannot be correct because if it were (1) there would never be a situation where providers would use the medical supervision code, and (2) "a medically directed CRNA" would be paid at a lower rate than a "medically supervised CRNA."  Opp. at 16.  These arguments are unavailing.

First, as discussed in Footnote 3, *supra*, the "medical supervision" code would be used in cases in which an anesthesiologist is involved in directing more than four concurrent cases or performs other services while directing the concurrent procedures but still wishes to be reimbursed, albeit at the lower "medical supervision" rate.  *See* 42 C.F.R. § 414.46(f); CMS Manual, Ch. 12, § 50.D.  Although a practice that retains salaried anesthesiologists and CRNAs might elect instead to bill the services under the QZ modifier, this hardly means that the medical supervision code would never be used by other providers operating under different practice models or circumstances.

Second, Relator's argument that Defendants' interpretation of the QZ code would lead to the "incongruous" result of paying a "medically directed CRNA" less than a "medically supervised CRNA" is based on Relator's continued failure to recognize the distinction between "medical supervision" for purposes of Medicare billing and general operational supervision for quality of care purposes.

As noted, "medical supervision" occurs for purposes of Medicare billing when an anesthesiologist directs more than four concurrent cases or performs other services while directing the concurrent procedures.  42 C.F.R. § 414.46(f); CMS Manual, Ch. 12, § 50.D.  In these situations, if the providers wished to bill for the services of both the anesthesiologist and the CRNAs, they would submit claims under the "medical supervision" codes.  Under the "medical supervision" rate, the CRNAs would each receive 50% of the Medicare fee schedule amount, and the anesthesiologist would be paid three base units per procedure (plus one additional time unit if the physician was present at indication), which is typically less than 50% of the Medicare fee schedule amount.  *Id.*; SAC at ¶ 44.  If, instead, the anesthesiologist satisfied the "medical direction" requirements, the anesthesiologist would be entitled to 50% of the Medicare fee

1   schedule amount for each procedure and each of the CRNAs would receive the other 50%.  42

2   C.F.R. §§ 414.46(d)(3)(v), 414.60(a); CMS Manual, Ch. 12, §§ 50.C, 140.42.  Thus, for Medicare

3   billing purposes, a CRNA receives the same 50% reimbursement amount regardless of whether

4   the services are billed under "medical direction" or "medical supervision."

5         Relator seeks to confuse the issue by characterizing a CRNA whose services are billed

6   under the QZ modifier as a "medically supervised CRNA."  But "medical supervision" in the

7   Medicare billing context is not relevant when a CRNA's services are billed under the QZ code

8   because (1) the QZ code may be used in the absence of "medical direction," 42 C.F.R. §

9   414.60(a); CMS Manual, Ch. 12, § 140.3.3, and (2) the provider is not seeking reimbursement for

10  the anesthesiologist's services.  In that case, Medicare reimburses the full fee schedule amount to

11  the CRNA.  42 C.F.R. § 416.60(a), (b).  Relator's erroneous arguments notwithstanding, there is

12  nothing in the governing CMS regulations or guidance that requires a CRNA to operate entirely

13  alone and without any operational supervision in order to bill under the QZ modifier.  Had CMS

14  intended to limit use of the QZ modifier to such circumstances, it would have done so explicitly,

15  as it did with the requirements it imposed for an anesthesiologist to bill for "personally performed"

16  services.  *See* 42 C.F.R. § 414.46(c)(1)(i) (specifically providing that an anesthesiologist must

17  "perform[] the entire anesthesia service alone" in order to bill at the "personally performed" rate).

18        It makes sense that CMS would not expect or require CRNAs to operate entirely

19  independently in order to bill with the QZ modifier because CMS requires that CRNAs work

20  "under the supervision of the operating practitioner or of an anesthesiologist who is immediately

21  available if needed" as a condition of the hospital's participation in Medicare Part A.[6]  42 C.F.R. §

22  482.52(a)(4), (c).  CMS adopted this regulation in its current form in 1986.  51 Fed. Reg. 22010,

23  22028, 22049 (Jun. 17, 1986).  Nine years later, CMS adopted 42 C.F.R. § 414.60(a)(2), the

24  regulation that allows CRNA services that are not "medically directed" by an anesthesiologist to

25

26  [6] As discussed at length in Defendants Initial Memorandum, this general supervision requirement
    is among the quality of care standards that hospitals must meet to participate in Medicare Part A
27  and is distinct from, and should not be confused with, the separate billing concepts of "medical
    direction" and "medical supervision," which relate to reimbursement to anesthesiologist and
28  CRNAs under Medicare Part B.  ECF No. 78-1 at 4-5, 11-12.

be paid at the same rate an anesthesiologist would receive for "personally performed" services.  60 Fed. Reg. 63124, 63178 (Dec. 8, 1995).  In other words, CMS specifically allowed CRNAs to be reimbursed 100% of the Medicare fee schedule amount (which would be paid under the QZ modifier) for providing non-medically directed services notwithstanding the separate Part A requirement that CRNAs must work under the general supervision of the operating physician or an immediately available anesthesiologist.  This is fatal to Relator's contention that Defendants may bill under the QZ code only if the CRNA performed the services "alone and without any supervision by an anesthesiologist."

### 4. The Meaning of the QZ Modifier Is Not a Disputed Factual Issue

Finally, Relator cites to three articles from professional journals that she claims support her view that the QZ modifier "is meant to signify truly independent, solo practice by a CRNA."  Opp. at 16.  Relator contends that these articles establish that there is a factual dispute over the meaning of the QZ modifier that cannot be decided on a motion to dismiss.  *Id.*  This argument also fails.

First, as discussed throughout this memorandum, the relevant regulations and guidance from CMS, the agency charged with administering the Medicare program, do not provide any support for Relator's position that the QZ modifier may be used only when a CRNA works entirely alone and without any supervision.  To the contrary, as the preceding section of this memorandum makes clear, CMS specifically authorized CRNAs to receive 100% of the fee schedule amount (paid under the QZ code) despite also imposing conditions of participation on hospitals that required CRNAs to work under the supervision of the operating physician or an immediately available anesthesiologist.

Second, whether or not a CRNA must work entirely alone in order to bill under the QZ code requires an interpretation of the governing CMS regulations and guidance documents; this presents a legal – not a factual – question.  *See U.S. ex rel. Garbe v. Kmart Corp.*, 824 F.3d 632, 645 (7th Cir. 2016) ("[T]he interpretation of contractual and regulatory terms is generally a question of law"); *Aponte Melendez v. Ortiz Otero*, 964 F.2d 1225, 1227 n. 4 (1st Cir. 1992) ("[T]he interpretation of an administrative memorandum, like an administrative regulation, . . .

presents a question of law for the court"); *CFM Communications, LLC v. Mitts Telecasting Co.*, 424 F. Supp.2d 1229, 1234 (E.D. Cal. 2005) ("The meaning of federal regulations is a question of law, not a question of fact").  Moreover, even if the interpretation of the relevant regulations and guidance somehow presented a factual question for the Court, Relator cannot create a disputed factual issue simply by citing to articles written by third-parties that have nothing to do with the facts of this case.

Third, the articles that Relator cites do not support her position that the QZ modifier requires "truly independent, solo practice by a CRNA."  In addition, each article incorrectly uses the words "supervision" and "direction" interchangeably in the context of Medicare billing instead of keeping with the clear regulatory distinction between "medical supervision" and "medical direction."

Finally, and most important, to the extent a genuine dispute exists over the meaning of the CMS regulations and guidance, this is yet another reason why Relator cannot state a viable FCA claim.  Indeed, the FCA's "falsity" element requires proof of an "objective falsehood."  *See U.S. ex rel. Yannacopoulos v. General Dynamics*, 652 F.3d 818, 836 (7th Cir. 2011); *U.S. ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 376 (4th Cir. 2008).  Claims are not "false" for FCA purposes "when reasonable persons can disagree regarding whether the service was properly billed to the Government."  *U.S. ex rel. Englund v. Los Angeles Cty.*, 2006 WL 3097941, *7 (E.D. Cal. Oct. 31, 2006).  "[D]ifferences in interpretation growing out of a disputed legal question are similarly not false under the FCA."  *U.S. ex rel. Lamers v. City of Green Bay*, 168 F.3d 1013, 1018 (7th Cir. 1999).  *See also Hagood v. Sonoma Cty. Water Agency*, 81 F.3d 1465, 1477 (9th Cir. 1996) ("Even viewing [plaintiff's] evidence in the most favorable light, that evidence shows only a disputed legal issue; that is not enough to support a reasonable inference that the allocation was false within the meaning of the [FCA]").

Similarly, a defendant does not "knowingly" violate the FCA where his or her conduct is consistent with a reasonable interpretation of ambiguous or disputed regulatory guidance.  *See U.S. ex rel. Ketroser v. Mayo*, 729 F.3d 825, 832 (8th Cir. 2013) (dismissing FCA claim involving Medicare billing because defendant hospital's "reasonable interpretation of [an] ambiguity

DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION TO DISMISS SECOND AMENDED COMPLAINT

1   inherent in the regulations belie[d] the scienter necessary to establish a claim of fraud under the

2   FCA"); *U.S. ex rel. K&R Ltd. P'ship v. Mass. Hous. Fin. Agency*, 530 F.3d 980, 984 (D.C. Cir.

3   2008) (holding that defendant did not knowingly violate the FCA where the parties "simply

4   disagree[d] about how to interpret ambiguous contract language"); *U.S. v. Prabhu*, 442 F. Supp.2d

5   1008, 1026 (D. Nev. 2006) ("[A] Defendant does not 'knowingly' submit a 'false' claim when his

6   conduct is consistent with a reasonable interpretation of ambiguous regulatory guidance").

7       Relator cannot show that Defendants "knowingly" submitted "false" claims under the QZ

8   code where reasonable persons can disagree about the correct interpretation of the governing

9   regulations and guidelines.  The QZ-based FCA claims asserted in the SAC must therefore be

10  dismissed.

11      **C.      The SAC Does Not Adequately Allege Materiality**

12      The SAC falls far short of satisfying the FCA's "demanding" materiality standard.  *See*

13  *Universal Health Servs., Inc. v. U.S. ex rel. Escobar*, 136 S. Ct. 1989, 2003 (2016).  The SAC

14  includes just one conclusory allegation that the government would not have paid Defendants'

15  reimbursement requests with the QZ modifier had it known that CRNAs were not practicing

16  independently.  SAC at ¶ 67.  This allegation is insufficient because it too is based on the same

17  erroneous premise that a CRNA's services can be billed with the QZ code only if he or she

18  operates entirely alone and without any form of supervision.

19      Furthermore, as this Court previously recognized in dismissing Relator's QZ-based claims

20  on materiality grounds, it is not enough for a plaintiff to assert "only conclusory allegations that

21  the . . . Defendants' conduct was material."  ECF No. 70 at 16 (quoting *U.S. v. Scan Health Plan*,

22  2017 WL 4564722, at *6 (C.D. Cal. Oct. 5, 2017)).  Further, it is not enough to show that "the

23  Government designates compliance with a particular statutory, regulatory, or contractual

24  requirement as a condition of payment" or that "the Government would have the option to decline

25  to pay if it knew of the defendant's noncompliance."  *Escobar*, 136 S. Ct. at 2003.  Materiality

26  also "cannot be found where noncompliance is minor or insubstantial."  *Id.*  To establish

27  materiality requires a more significant showing that the violation in question will impact the

28  government's payment decision, such as "evidence that the defendant knows that the Government

-13-

1   consistently refuses to pay claims in the mine run of cases based on noncompliance with the

2   particular statutory, regulatory, or contractual requirement." *Id. See also U.S. ex rel. Ferris v.*

3   *Afognak Native Corp.*, 2016 WL 9088706, at *3 (D. Alaska Sept. 28, 2016) ("Post-*Escobar*, . . .

4   [a] relator must allege some facts that show that the government actually does not pay claims if

5   they involve the . . . violations in question").

6          Relator has not alleged any facts that would satisfy *Escobar*'s "demanding" and

7   "rigorous" materiality standard, such as examples of past refusals by Medicare to pay claims under

8   the QZ modifier because the CRNA worked under the general supervision of a physician.  The

9   QZ-based allegations in the SAC must therefore be dismissed.  *See U.S. ex rel. Dresser v.*

10  *Qualium Corp.*, 2016 WL 3880763, at *6 (N.D. Cal. July 18, 2016) (dismissing FCA claim for

11  failure to satisfy materiality requirement; complaint alleged that the government would not have

12  paid defendants' claims had it known of defendants' fraudulent conduct, but did not explain why).

13          **D.      Relator's FCA Allegations Do Not Satisfy Rule 9(b)**

14          To show that her SAC satisfies Rule 9(b), Relator cites to an April 2014 email exchange

15  between Somnia/PAS and its billing company involving a question about a doctor who had

16  "medically direct[ed] 5 rooms at once."  Opp. at 17; SAC at ¶ 109.  According to the SAC, the

17  parties decided that they were able to "process the below mentioned cases as non-medically

18  directed CRNA."[7]  SAC at ¶ 110.  This allegation does not identify any fraudulent activity; to the

19  contrary, it demonstrates that the parties were concerned with compliance and communicated with

20  one another to ensure proper billing practices.  Moreover, billing under the QZ modifier when the

21  requirements for "medical direction" are not met is perfectly appropriate.  Nevertheless, even if

22  this alleged email exchange raised potential FCA issues, these allegations hardly satisfy the

23  heightened pleading requirements of Rule 9(b).[8]

24  _____

25  [7] Inexplicably, Relator attempts to characterize this email discussion as improperly "modifying
    billing codes after the fact."  Opp. at 11.  In reality, billing codes are never determined until "after
26  the fact" of performance of the services.  Billers and coders do not sit in the operating room and
    make real time decisions about how to bill for the services.

27  [8] Relator also cites to an allegation in the SAC in which she claims to have contacted a billing
    company that previously worked with Somnia/PAS after her employment with Somnia/PAS
28  ended.  According to Relator, she called the billing company posing as an anesthesiologist who
    was exploring billing options and was allegedly told that the company used the QZ modifier when

DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION TO DISMISS SECOND AMENDED
COMPLAINT

To meet the Rule 9(b) standard, a plaintiff must state with particularity the "who, what, when, where, and how" of the alleged fraudulent conduct." *Ebeid ex rel. U.S. v. Lungwitz*, 616 F.3d 993, 998 (9th Cir. 2010).  Generally, allegations of fraud must contain "an account of the time, place, and specific content of the false representation as well as the identities of the parties to the misrepresentations." *Swartz v. KPMG LLP*, 476 F.3d 756, 765 (9th Cir. 2007) (citation and quotation omitted).  The allegations that Relator cites in her SAC – consisting of just a single email exchange in April 2014 – do not provide Defendants with any information that would enable them to defend against Relator's FCA claims, such as the dates of the procedures that were billed under the QZ code, the physicians and CRNAs involved in those procedures, or the circumstances indicating why the services should not have been billed using the QZ modifier.  In the absence of **any** such allegations, the Court should dismiss Relator's QZ-based FCA claims on Rule 9(b) grounds.

## III.     CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court dismiss the First, Second, and Third Causes of Action of the Second Amended Complaint with prejudice to the extent those claims are based on Defendants' alleged misuse of the QZ modifier.


Dated:  April 24, 2018                     NIXON PEABODY LLP


                                   By:____/s/ Michael Lindsay_____
                                         Michael R. Lindsay
                                         Attorneys for Defendants
                                         SOMNIA, INC., PRIMARY ANESTHESIA
                                         SERVICES, BYRON MENDENHALL QUINN
                                         GEE, M.D., and MARGARET VASSILEV, M.D.

---

the requirements for medical direction were not met (a practice that is, once again, perfectly permissible). Opp. at 17; SAC at ¶ 134.  This discussion did not mention or relate to Somnia/PAS in any way and therefore cannot assist Relator in satisfying Rule 9(b).